# Exhibit D

**EFiled:  Sep 14 2018 06:28PM EDT**
**Transaction ID 62455883**
**Case No. 2018-0606-SG**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CAMARILLO HOLDINGS, LLC, LEEWARD HOLDINGS, LLC, MEDALIST HOLDINGS, INC., CEREUS PROPERTIES, LLC, MICHAEL LACEY, JAMES LARKIN, SCOTT SPEAR, JOHN BRUNST, VERMILLION HOLDINGS, LLC, and SHEARWATER INVESTMENTS, LLC, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| AMSTEL RIVER HOLDINGS, LLC, KICKAPOO RIVER INVESTMENTS LLC, LUPINE HOLDINGS LLC, ATLANTISCHE BEDRIJVEN, C.V., CF HOLDINGS GP LLC, CF ACQUISITIONS LLC, UGC TECH GROUP, C.V., AD TECH HOLDINGS GP BV, AD TECH COOPERATIEF U.A., AD TECH BV, CARL FERRER, DARTMOOR HOLDINGS, LLC, IC HOLDINGS, LLC, BACKPAGE.COM, LLC, WEBSITE TECHNOLOGIES, LLC, POSTING SOLUTIONS, LLC, POSTFASTER, LLC, CLASSIFIED STRATEGIES COOPERATIEF U.A., PAYMENT SOLUTIONS, B.V., CLASSIFIED SOLUTIONS LTD., and LES BACKPAGE ENTERPRISES INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

C.A. No. 2018-0606-SG

## NOTICE OF ENTRY OF APPEARANCE

PLEASE TAKE NOTICE that Paul D. Brown and Joseph B. Cicero of Chipman Brown Cicero & Cole, LLP hereby enter their appearance in the above-captioned action as counsel to represent Defendants Carl Ferrer and Backpage.com, LLC.

Dated:  September 14, 2018

CHIPMAN BROWN CICERO & COLE, LLP

 /s/ Paul D. Brown
Paul D. Brown (No. 3903)
Joseph B. Cicero (No. 4388)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801

*Attorneys for Defendants Carl Ferrer
and Backpage.com, LLC*

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of September, 2018, copies of the foregoing *Notice of Entry of Appearance* were caused to be served by File & Serve*Xpress* on the counsel of record indicated below:

Kathleen M. Miller
Robert K. Beste III
**SMITH, KATZENSTEIN & JENKINS LLP**
1000 West Street, Suite 1501
Wilmington, DE 19801


*/s/ Paul D. Brown*
Paul D. Brown (No. 3903)

**EFiled:  Sep 14 2018 06:28PM EDT**
**Transaction ID 62455883**
**Case No. 2018-0606-SG**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CAMARILLO HOLDINGS, LLC, LEEWARD HOLDINGS, LLC, MEDALIST HOLDINGS, INC., CEREUS PROPERTIES, LLC, MICHAEL LACEY, JAMES LARKIN, SCOTT SPEAR, JOHN BRUNST, VERMILLION HOLDINGS, LLC, and SHEARWATER INVESTMENTS, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2018-0606-SG |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| AMSTEL RIVER HOLDINGS, LLC, KICKAPOO RIVER INVESTMENTS LLC, LUPINE HOLDINGS LLC, ATLANTISCHE BEDRIJVEN, C.V., CF HOLDINGS GP LLC, CF ACQUISITIONS LLC, UGC TECH GROUP, C.V., AD TECH HOLDINGS GP BV, AD TECH COOPERATIEF U.A., AD TECH BV, CARL FERRER, DARTMOOR HOLDINGS, LLC, IC HOLDINGS, LLC, BACKPAGE.COM, LLC, WEBSITE TECHNOLOGIES, LLC, POSTING SOLUTIONS, LLC, POSTFASTER, LLC, CLASSIFIED STRATEGIES COOPERATIEF U.A., PAYMENT SOLUTIONS, B.V., CLASSIFIED SOLUTIONS LTD., and LES BACKPAGE ENTERPRISES INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

# DEFENDANTS CARL FERRER'S AND BACKPAGE.COM, LLC'S OPPOSITION TO PLAINTIFFS' MOTION <u>FOR EXPEDITED PROCEEDINGS</u>

Dated:  September 14, 2018

OF COUNSEL

Mark A. Castillo
Curtis | Castillo PC
901 Main St., Ste. 6515
Dallas, TX 75202
Telephone: 214.752.2222
Fax: 214.752.0709
Email: mcastillo@curtislaw.net

Paul D. Brown (No. 3903)
Joseph B. Cicero (No. 4388)
**CHIPMAN BROWN CICERO & COLE, LLP**
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801

*Attorneys for Defendants Carl Ferrer and Backpage.com, LLC*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT .............................................................1

BACKGROUND ...................................................................................6

    A.    Ferrer and Affiliated Entities Purportedly Purchase Backpage in a Leveraged Buyout Transaction ...........................................................6

    B.    The Retainer Funds Plaintiffs Seek Control Over Already Have Been Forfeited to the United States .............................10

    C.    Plaintiffs Have Sought and/or Obtained Litigation Stays in Other Pending Litigation.................................................................11

    D.    Plaintiffs Do Not Lack Funds to Pay for Their Defense....................12

ARGUMENT .......................................................................................14

    I.    THE UNIQUE FACTS OF THIS CASE DICTATE THAT THE ACTION SHOULD BE STAYED OR HEARD ON A SCHEDULE THAT DOES NOT RISK CONFLICT WITH OUSTSTANDING ORDERS OF OTHER FEDERAL AND STATE COURTS AND OTHERWISE IMPAIR FERRER'S DUE PROCESS RIGHTS ...............................................14

        A.    Plaintiffs' Requested Expedited Procedures Before this Court Should be Denied as an Improper Attempt to Circumvent Federal Statutes and Orders Issued by Other Federal and State Courts and Authorities...............................................................................14

        B.    Plaintiffs' Requested Expedited Procedures Before this Court Would Unduly Prejudice Defendant Ferrer's Fifth Amendment Rights Against Self-Incrimination..............................................................................16

II.    OTHER PRACTICAL REASONS WARRANT DENIAL
       OF EXPEDITION ................................................................................18

       A.    Plaintiffs' Requested Expedited Procedures are
             Unnecessary Because Plaintiffs Already Have
             Sought and/or Obtained Litigation Stays in Other
             Pending Litigation..................................................................18

       B.    Plaintiffs' Requested Expedited Procedures are
             Unnecessary Because Plaintiffs Have Access to
             Millions of Dollars and Admit the Defendants Do
             Not............................................................................................19

       C.    Plaintiffs' Requested Expedited Procedures Also
             Should be Denied Because Plaintiffs Have Had
             Nearly Half a Year to Take Action in Other Courts,
             But Failed to Timely Do So.....................................................19

III.   RESERVATION OF RIGHTS............................................................20

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                    **<u>Page</u>**

*CNL-AB LLC v. Eastern Prop. Fund I SPE (MS REF) LLC*,
    2011 Del. Ch. LEXIS 25 (Del. Ch. Jan. 28, 2011).......................................20

*Marzouca v. GFG Realty Fund, LLC*,
    2012 WL 910010 (D.S.C. Mar. 16, 2012)....................................................15

*Miller v. United States*,
    2004 WL 1335946 (N.D. Tx. 2004) .............................................................16

*U.S. v. MacInnes*,
    223 F. App'x 549 (9th Cir. 2007) ................................................................15

*U.S. v. Phillips*,
    185 F.3d 183 (4th Cir. 1999) ................................................................14, 15

# PRELIMINARARY STATEMENT

Although bearing the patina of a routine summary proceeding for advancement, the tangled web of parties and allegedly illicit scheme underpinning this action make it anything but routine.  And, Plaintiffs' 251-paragraph complaint betrays the obvious:  This case is anything but summary.  While advancement cases typically are heard more quickly than plenary cases, this case is unique and well outside the fold of cases warranting such treatment.  The most unique feature of this case is that Plaintiffs' claims equate to a collateral attack on extant federal and state court orders seizing the client trust accounts and other property that Plaintiffs ask this Court to declare available to satisfy alleged advancement rights.  For this and other reasons that seriously risk conflict with other courts' orders and jeopardize at least one defendant's constitutional due process rights, expedition should be denied and this anomalous case should be scheduled, if at all, to account for these unique circumstances.

At the heart of the action is a series of transactions by which defendants Carl Ferrer ("Ferrer") and affiliated entities purportedly purchased the operations of Backpage.com, LLC ("Backpage") in a leveraged buyout transaction.  Much of what followed garnered national attention.  The former and current owners and operators of Backpage became the targets of various civil and criminal actions alleging that Backpage essentially was a front for prostitution, human trafficking and money

laundering.  As one might imagine, this has yielded a flurry of court orders, pleas and entanglements with federal and state prosecutors in other jurisdictions.  It is this unique situation that warrants different treatment of this case from other truly routine advancement cases.

Here, expedited proceedings should be denied because Plaintiffs' request to this Court is an improper attempt to circumvent federal law and federal and state orders already issued by courts in other jurisdictions that already have ruled contrary to Plaintiffs' allegations to this Court.  First, the United States District Court for the District of Arizona has issued forfeiture orders stating that Defendants' assets and retainers are forfeited *to the United States* (not to Plaintiffs) to compensate *victims* (not Plaintiffs) throughout the country.  Second, statements and pleadings by Plaintiffs on other cases make clear that federal authorities have issued and executed seizure warrants upon Plaintiffs' law firms to seize the funds held in their trust accounts that Plaintiffs want this Court to overrule.  Third, the District Court of Dallas County, Texas, 44th Judicial District, already has ruled that the funds within Plaintiffs' law firm's trust account constitute retainer funds that should be returned to Defendants, and Plaintiffs did not appeal that ruling.  Expedited proceedings in a new forum would violate federal law and jeopardize all of these prior rulings from various jurisdictions and authorities, impair federal and state authorities' abilities to seize the funds at issue, and prejudice hundreds of victims from restitution on a

national scale.

The United States has alleged that the entire set of contracts that the Plaintiffs ask this Court to enforce are themselves part of an unlawful conspiracy designed by Plaintiffs in this action James Larkin ("Larkin"), Michael Lacey ("Lacey"), Scott Spear ("Spear"), and Jed Brunst ("Brunst") to promote prostitution and money laundering. *See United States v. Lacey et al.*, Case No. 2:18-cr-00422-SPL, D. Ariz. In the superseding indictment in the federal prosecution of Larkin, Lacey, Spear, and Brunst, the United States alleges that, in April 2015, Larkin, Lacey, Brunst and Spear "purported to sell their ownership interest in Backpage and several related entities," but that "[t]hrough these mechanisms, LARKIN and others exerted post-April 2015 control over Backpage's banking relationships, the migration of some of Backpage's operations to the Philippines, the management of Backpage's counsel, Backpage's acceptance of gift cards, Backpage's response to a Senate investigation, and Backpage's licensing agreements." *See* Exhibit A, *United States of America v. Michael Lacey and James Larkin, et al*., Case No. 2:18-CR-422-SPL (D. Ariz), Doc. 230, ¶¶ 29, 32 (Superseding Indictment, Redacted for Public Disclosure, hereafter, "Superseding Indictment").

The U.S. Senate reached the same conclusion in January 2017, characterizing the April 2015 sale of Backpage as a sham that positioned Carl Ferrer as the "nominal owner of Backpage," while "Lacey and Larkin retain near-total debt equity

in the company, continue to reap Backpage profits in the form of loan repayments, and can exert control over Backpage's operations and financial affairs pursuant to loan agreements that financed the sale and other agreements." United States Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, *Backpage.com's Knowing Facilitation of Online Sex Trafficking*, at 45 ("Senate Report"). The Senate Report further found that "the company's elaborate corporate structure, under which Ferrer purchased Backpage through a series of foreign entities—appears to provide no tax benefit and serves only to obscure Ferrer's U.S.-based ownership." *Id.* This is the precise set of agreements that Plaintiffs are asking this Court to enforce as standard contracts in an expedited proceeding.

Further, expedited proceedings should be denied because a stay is required to protect Defendant Ferrer's Fifth Amendment rights against self-incrimination.[1] The United States and the States of California and Texas have plead that criminal schemes permeated through the website backpage.com, and authorities continue their investigation into Backpage and Ferrer. The criminal and civil litigation

---

[1] In order to safeguard Ferrer's Fifth Amendment privilege, the argument of counsel in this brief is limited to summarizing and reflecting the assertions of other third-parties about Plaintiffs' and Ferrer's conduct, including the U.S. Attorney's Office in the District of Arizona, the United States Senate's Permanent Subcommittee on Investigations, and lawyers for dozens of victims of sex trafficking across the United States.

throughout the United States alleges that Plaintiffs' criminal schemes were implemented via the website backpage.com and related holding companies, which are at the heart of Plaintiffs' purported purchase and loan agreements in this case. Defendants' ability to defend this case by arguing Plaintiffs' purported agreements are void due to Plaintiffs' commission and continuation of crimes and criminal conspiracies and are void against public policy, would severely and irreparably impair and prejudice Defendant Ferrer's Fifth Amendment rights against self-incrimination. Expedited proceedings in this case without careful consideration of a litigation stay would impair Defendant Ferrer's ability to protect his Fifth Amendment rights.

Expedited proceedings also should be denied because Plaintiffs themselves already have sought and/or obtained stays in several of the cases for which they allege to need legal fees. Since Plaintiffs continue to seek and obtain stays for their benefit in other jurisdictions, there is no need to expedite proceedings in this case.

Lastly, expedited proceedings should be denied because Plaintiffs have failed to take timely action in prior federal and state court proceedings on these retainer issues for nearly half a year. Moreover, whereas the Superseding Indictment reflects, and Plaintiffs admit, Plaintiffs have received substantial amounts from Defendants, Plaintiffs also admit in their Complaint that "the [Defendant] Ferrer Parties and the Backpage Entities have no assets from which to advance defense

costs and expenses for the [Plaintiff] Medalist Parties." (Compl. ¶ 26.) Plaintiffs'

failure to act for nearly half a year and recognition that Defendants now lack material

assets left belie Plaintiffs' alleged urgency now.

## **BACKGROUND**

### A.  **Ferrer and Affiliated Entities Purportedly Purchase Backpage in a Leveraged Buyout Transaction**

The crux of Plaintiffs' case is that, in April 2015, Defendant Ferrer and

various affiliates acquired the Plaintiffs' Backpage.com website and online-ad

business in a leveraged buyout. (Compl. ¶ 7.) Federal authorities pursuing these

Plaintiffs have described the Plaintiffs' Backpage.com business as an unlawful

venture rife with criminal activities and money laundering. *See* Exhibit A,

Superseding Indictment, ¶ 15 ("Virtually every dollar flowing into Backpage's

coffers represented the proceeds of illegal activity.").

As part of the purported buyout, Plaintiffs next assert the Defendants made

"sizeable advanced fee deposits with a number of law firms" to represent both the

Plaintiffs and Defendants in numerous investigations and federal and state lawsuits

detailed in and attached to Plaintiffs' Complaint. (Compl. ¶¶ 11-12.) Plaintiffs

conclude by praying that this Court (a) adjudicate that the underlying "Purchase

and Loan Agreements" are legal, valid, binding, and enforceable, and (b) declare

that the retainers held at various law firms such as Davis Wright Tremaine, LLP,

Perkins Coie LLP, and others are subject to the sole ownership of the Plaintiffs.

6

However, Plaintiffs have not given the full picture of litigation already pending on these very same matters.

Plaintiffs Lacey and Larkin are the lead defendants in pending federal criminal indictments on 100 federal charges of conspiracy, facilitating prostitution, conspiracy to commit money laundering, concealing money laundering, international promotional money laundering, transactional money laundering, and international concealment money laundering.  *See* <u>Exhibit A</u>, Superseding Indictment.  The Superseding Indictment alleges, "Virtually every dollar flowing into Backpage's coffers represented the proceeds of illegal activity."  *Id.* at ¶ 15.

The federal charges against Plaintiffs Lacey and Larkin include the same allegations by those Plaintiffs in this case concerning a purported sale from Plaintiffs to Defendants:

> In or around April 2015, LACEY, LARKIN [and others] purported to sell their ownership interests in Backpage and several related entities for around $600 million to various Dutch entities…. controlled by C.F., who simply "borrowed" most of the $600 million from entities controlled by the sellers to finance the purchase. Due to this financial arrangement, LACEY, LARKIN, SPEAR, and BRUNST retained a significant financial interest in Backpage after the transactions were completed.

*Id.* at ¶¶ 29-30.   The Superseding Indictment already has alleged these Plaintiffs' purported sale documents were part of a criminal sham:

> LACEY, LARKIN, SPEAR, and BRUNST also retained significant operational control over Backpage following these transactions. For example, the April 2015 loan agreement

required C.F. to sign a six-year employment agreement, required C.F. to provide the lenders with full access to Backpage's books and records, required C.F. to provide the lenders with an annual listing of all of C.F.'s personal assets, and prohibited C.F. from opening new bank accounts on Backpage's behalf without the lenders' consent.

LARKIN and others also met regularly with C.F. following the April 2015 transaction to discuss and direct the operation of Backpage's business, often taking steps (such as avoiding the use of email and holding the meetings in the presence of attorneys) intended to conceal their continued involvement in, and control over, the company. Through these mechanisms, LARKIN and others exerted post-April 2015 control over Backpage's banking relationships, the migration of some of Backpage's operations to the Philippines, the management of Backpage's counsel, Backpage's acceptance of gift cards, Backpage's response to a Senate investigation, and Backpage's licensing agreements. Additionally, LARKIN and others took steps in 2018 to attempt to sell the company to a new buyer.

*Id.* at ¶¶ 31-2.

Importantly, the Superseding Indictment further illustrates numerous facts dating back to 2007 – nearly a decade before the Plaintiffs purportedly sold their business to the Defendants in April 2015 – concerning Plaintiffs' criminal knowledge. *Id.* at ¶¶ 33 – 152 ("Knowledge And Facilitation Of Prostitution"). The criminal charges against Plaintiffs Lacey and Larkin are at the heart of the purported purchase and loan documents Plaintiffs belatedly ask this Court to deem valid, legal, binding and enforceable.

The legal retainers Plaintiffs seek to put at issue in this case already are subject to other pending litigation. *See, e.g.,* <u>Exhibit A</u>, Superseding Indictment, Forfeiture

8

Allegation One, ¶¶ 24 – 5, 40 ("Such property also includes, but is not limited to, all funds, securities, and/or other assets held in the following bank accounts: "Perkins Coie Brokerage Account number xxxxxx7012"; "Perkins Coie Liquid Assets xxxxxxx0012"; "Paul Hastings LLP Account number xxxxx0457"); *see also*, Exhibit B, Aug. 1, 2018 Email from Daniel J. Quigley, counsel for Plaintiffs Camarillo Holdings, LLC, Leeward Holdings, LLC, and Medalist Holdings, Inc., (advising, "the US Attorney's office sent an email advising that it believes funds held in DWT's [Davis Wright Tremaine LLP's] trust account may be subject to recovery as 'criminal proceeds.'").[2]

As for the Plaintiffs' question to this Court of whether the retainer funds in their various firms' trust accounts are retainer funds, at least one court already has ruled against the Plaintiffs – and they did not appeal.  On July 26, 2018, in connection with Davis Wright Tremaine LLP's motion to withdraw from representing these Defendants in a victim's case in Dallas, Texas, the District Court of Dallas County, Texas, 44th Judicial District, issued an order that the funds within Plaintiffs' law firm's trust account constitute retainer funds held in trust (not loan payments) that should be partially returned to Defendants.  *See* Exhibit C ("It is further Ordered that … counsel of record for the Defendants shall meet and confer on division of retainer

---

[2]     Counsel for the Plaintiffs recently have confirmed to Defendants' counsel and courts in Washington State and Texas that federal authorities are executing seizure warrants on Plaintiffs' counsels' retainer accounts.

funds held in trust so as not to prejudice Backpage Defendants in this Court."). These

Plaintiffs did not appeal that ruling.

## B.   The Retainer Funds Plaintiffs Seek Control Over Already Have Been Forfeited to the United States

On April 5, 2018, both Ferrer and Backpage entered into Plea Agreements

with the United States of America.  *See* Exhibits D1 and D2, respectively.  Other

Defendants in this case, including Amstel River Holdings, LLC, UGC Tech Group,

BV, Ad Tech BV, Website Technologies, LLC, and Posting Solutions, LLC

similarly have entered into plea agreements to cooperate with the United States.  *See*

Exhibits D3 – D7, respectively.  These Plea Agreements have been unsealed by

subsequent orders of the Arizona District Court.  *See* Exhibit E.[3]  Pursuant to those

Plea Agreements, the Backpage Defendants have shut down website operations and

agreed to forfeit *to the United States* "all corporate assets and other property owned

---

[3]      The Orders unsealing the Plea Agreements of Ferrer and Backpage are attached at Exhibit E.  The Orders unsealing the remaining referenced Plea Agreements are as follows:  Order Granting Mot. to Unseal Case, Dkt. No. 12, *U.S.A. v. Backpage.com, LLC, et al.*, U.S.D.C., D. Ariz., Case No. 2:18-cr-00465-SPL-4 (Apr. 12, 2018) (Amstel River Holdings, LLC); Order Granting Mot. to Unseal Case, Dkt. No. 12, *U.S.A. v. Backpage.com, LLC, et al.*, U.S.D.C., D. Ariz., Case No. 2:18-cr-00465-SPL-6 (Apr. 12, 2018) (UGC Tech Group, BV); Order Granting Mot. to Unseal Case, Dkt. No. 12, *U.S.A. v. Backpage.com, LLC, et al.*, U.S.D.C., D. Ariz., Case No. 2:18-cr-00465-SPL-5 (Apr. 12, 2018) (Ad Tech BV); Order Granting Mot. to Unseal Case, Dkt. No. 12, *U.S.A. v. Backpage.com, LLC, et al.*, U.S.D.C., D. Ariz., Case No. 2:18-cr-00465-SPL-2 (Apr. 12, 2018) (Website Technologies, LLC); Order Granting Mot. to Unseal Case, Dkt. No. 12, *U.S.A. v. Backpage.com, LLC, et al.*, U.S.D.C., D. Ariz., Case No. 2:18-cr-00465-SPL-3 (Apr. 12, 2018) (Posting Solutions, LLC).

or controlled" by the Backpage Defendants.  *See, e.g.,* <u>Exhibit D1</u>, ¶ 3.b.  These forfeited assets include:  "domain names, servers, intellectual property, trademarks, trade secrets, bank accounts, cryptocurrency, and other financial instruments owned or controlled by such entities."  *See, e.g.,* <u>Exhibit D1</u>, ¶¶ 3.b, 8; <u>Exhibit D2</u>, ¶ 8.

As part of their agreement to cooperate in the federal and state criminal cases, since at least April 24, 2018, the Backpage Defendants (both directly and through counsel) have requested that Plaintiffs and their counsel immediately account for and return all retainer funds advanced to them.  *See* <u>Exhibit F</u>.

On May 16, 2018, the United States District Court for the District of Arizona entered Preliminary Orders of Forfeiture against both Ferrer and Backpage.  *See* <u>Exhibits G and H</u>, respectively. The Forfeiture Orders forfeited all "rights, title, and interest" in and to the property defined as the "Forfeited Property," which includes bank accounts, both foreign and domestic, real property, domain names, security deposits and retainers/deposits for future services, reserves and accounts receivable, both foreign and domestic, and trademarks and other intellectual property.  <u>Exhibit G</u>, ¶ A – D; <u>Exhibit H</u>, ¶ A – G.

## C. Plaintiffs Have Sought and/or Obtained Litigation Stays in Other Pending Litigation

In several of the pending cases cited in Plaintiffs' Complaint, Plaintiffs already have sought and/or obtained litigation stays in other jurisdictions based upon the parties' substantial Fifth Amendment rights.  This litigation conduct in these

other jurisdictions undercuts Plaintiffs' claimed need for expedited resolution in this case.

For example, in the litigation pending in Massachusetts (*see* Compl. ¶ 159(f)), Plaintiffs already have obtained a litigation stay in their favor.  *See* Order Granting Mot. to Stay Proceedings, Dkt. No. 44, *Jane Doe #1, et al. v. Backpage.com, LLC, et al*, U.S.D.C., D. Mass., Case No. 1:17-cv-11069-LTS (Jan. 16, 2018). Exhibit I. As further example, in the litigation pending in Washington (*see* Compl. ¶ 159(s)), Plaintiffs also have obtained a litigation stay in their favor.  *See* Ruling Granting Stay, *R.O. v. Medalist Holdings Inc.*, *et al.*, Wash. Ct. App. Div. II, No. 522641-II (Sep. 5, 2018).  *Id.*  Plaintiffs have requested numerous litigation stays in other pending litigations.

## D.     Plaintiffs Do Not Lack Funds to Pay for Their Defense.

The Superseding Indictment asserts, as part of the purported sale from Plaintiffs to Defendants, Plaintiffs directed Defendants to transfer millions of dollars to Plaintiffs, which also according to the Superseding Indictment, Plaintiffs have hidden away for their defense in various cases.  By way of example, the Superseding Indictment charges:

> The BACKPAGE DEFENDANTS also engaged in other financial transactions designed to conceal their misconduct and evade seizure by law enforcement. For example, in July 2016, LACEY wrote an email seeking assistance in "put[ting] some assets in place[s] where . . . government parties . . . can not access my accounts." A few months later, LACEY asked employees of

an Arizona-based bank for advice on how to move his assets 'offshore' to protect them from seizure by the government. Soon afterward, $16.5 million in Backpage derived cash was wired from LACEY's bank accounts in the United States to an overseas bank accounts in Hungary. At the time of the Hungarian transfer, LACEY was facing criminal charges in California state court and was aware of the federal grand jury investigation in this matter.

[B]etween January 2015 and December 2016, Website Technologies accounts received over $45.5 million in wire transfers from Backpage-associated bank accounts in Lichtenstein, over $30.1 million in wire transfers from Backpage-associated accounts in Iceland and over $3.9 million in wire transfers from Backpage-associated bank accounts in the Netherlands.

Between around December 2015 and October 2016, Website Technologies accounts sent wire transfers totaling over $47 million to accounts held by Cereus Properties.

[B]etween around August 2016 and November 2016, Cereus Properties accounts received over $11.3 million in deposits and wire transfers from Backpage-associated accounts in the Netherlands.

[B]etween January 2016 and January 2017, LACEY (and LACEY's family members) received distributions totaling over $30.3 million and LARKIN separately received distributions totaling over $21 million.

Exhibit A, Superseding Indictment, ¶¶ 16, 189 - 92. Accordingly, the Superseding

Indictment makes clear that Plaintiffs have access to millions of dollars in addition

to the legal retainers at issue in other pending litigation.  Defendants, however, do

not.  (Compl. ¶ 26) ("the Ferrer Parties and the Backpage Entities have no assets

from which to advance defense costs and expenses for the Medalist Parties").

## ARGUMENT

I. **THE UNIQUE FACTS OF THIS CASE SUPPORT THAT THE ACTION SHOULD BE STAYED OR HEARD ON A SCHEDULE THAT DOES NOT RISK CONFLICT WITH OUSTSTANDING ORDERS OF OTHER FEDERAL AND STATE COURTS AND OTHERWISE IMPAIR FERRER'S DUE PROCESS RIGHTS**

   A. **Plaintiffs' Requested Expedited Procedures Before this Court Should be Denied as an Improper Attempt to Circumvent Federal Statutes and Orders  Issued by Other Federal and State Courts and Authorities**

Expedited proceedings are not warranted to condone Plaintiffs' improper and untimely collateral attack upon other proceedings pending in other federal and state jurisdictions.  Plaintiffs' relief requested in this case conflicts with rulings already issued by the federal court in Arizona and a state court in Texas.  Moreover, Plaintiffs' relief requested in this case conflicts with federal authorities' ongoing efforts to seize the funds within Plaintiffs' law firms' trust accounts.

As set forth above, the U.S. District Court for the District of Arizona already has ordered the forfeiture of the retainer funds Plaintiffs seek to make an issue in this case.  Accordingly, the legal retainers already have vested in the United States.  *See U.S. v. Phillips*, 185 F.3d 183, 188 (4th Cir. 1999) ("Pursuant to 21 U.S.C.A. § 853(c) and the Supplemental Order, all right, title, and interest in the forfeited property vest[s] in the United States upon the commission of the act giving rise to the forfeiture."). Section 853(k) further provides that once an indictment is issued, "commencing an[y] action at law or equity against the United States concerning the

validity of [its] alleged interest in the property ... subject to forfeiture" is barred by § 853(k). *Id*. The district court retains "exclusive jurisdiction over the [seized] property . . . at least until the property is sold or otherwise disposed of." *U.S. v. MacInnes*, 223 F. App'x 549, 553 (9th Cir. 2007).

Even actions "technically" brought against a criminal defendant and not the United States constitute "an action at law or equity against the United States" and are statutorily barred under § 853(k) if the Government holds title to the seized property. *Phillips*, 185 F.3d at 188 (citing *U.S. v. Sec. Marine Credit Corp.*, 767 F. Supp. 260, 262–63 (S.D. Fla. 1991) for its holding that § 853(k) bars all alternative methods under which a third party might assert its claim over forfeited property once the forfeiture proceedings have commenced).

Section 853(g) gives courts broad powers and § 853(o) directs them to construe § 853 "liberally ... to effectuate its remedial purposes." *MacInnes*, 223 F. App'x at 552-53. Even though a recognized right may be valid, "the extent of its validity can only be litigated in front of the district court pursuant to § 853(n). *Id* at 553. Section 853(k) extinguishes the right of "interested parties to enforce their rights against the Government through separate civil litigation." *Id; see also Marzouca v. GFG Realty Fund, LLC*, 2012 WL 910010, *3 (D.S.C. Mar. 16, 2012) (barring post-indictment foreclosure as an "action against the United States" even though the Government was not named as a party because the U.S. had a vested

interest in the subject property); *Miller v. United States*, 2004 WL 1335946 (N.D.
Tx. 2004). Defendants' Pleas and Forfeiture Orders forfeited Defendants' assets to
the United States. Plaintiffs cannot have a different court subsequently order
otherwise. Accordingly, expedited proceedings should be denied.

**B. Plaintiffs' Requested Expedited Procedures Before this Court Would Unduly Prejudice Defendant Ferrer's Fifth Amendment Rights Against Self-Incrimination.**

Expedited proceedings also are not warranted where substantial Fifth
Amendment rights are in jeopardy. While Ferrer and Backpage have pled guilty in
April 2018 to several state and federal criminal charges,[4] none of these plea
agreements have been accepted by the respective courts, nor have any sentences been
imposed. *See, e.g.*, *United States v. Ferrer,* Case No. 2:18-cr-464-SPL, Dkt. No. 20
("THE COURT FURTHER ORDERS that the plea agreement will not be accepted
or rejected at this time but will be deferred to the time of sentencing.") Indeed,

---

[4]     Ferrer pled guilty in federal court in Arizona to one count of Conspiracy, 18
U.S.C. § 371. Case No. 2:18-cr-464-SPL (D. Ariz). He also pled guilty in California
to four counts of Conspiracy to Commit Money Laundering, Cal. Penal Code §
186.10, Case No. 16FE024013, and in Texas to one count of Money Laundering,
Texas Penal Code § 3402, *State of Texas v. Ferrer*, Case No. 18FC1652C, pending
before the 94th District Court of Nueces County, Texas. Backpage.com pled guilty
in federal court to a violation of Money Laundering Conspiracy, 18 U.S.C. §
1956(h), Case No. 2:18-cr-465-SPL (D. Ariz), and in Texas to one count of
Trafficking in Persons, Texas Penal Code § 20A.02 and one count of Engaging in
Organized Criminal Activity, Texas Penal Code § 71.02. 18FC-1653C, in the 94th
District Court of Nueces County, Texas. All of these plea agreements were entered
in April 2018, and none of them have been accepted by the respective courts.

Ferrer's federal plea agreement specifically acknowledges the possibility that a judge may reject his plea and includes provisions that permit him to withdraw his guilty plea and/or that allow the government to vacate his federal plea agreement should state court judges in Texas or California reject his plea in those independent matters. <u>Exhibit D1</u>, ¶ 3(c).   In the event Ferrer's federal plea agreement is withdrawn, the agreement states that "the United States shall be free to prosecute the defendant for all crimes of which it then has knowledge and any charges that have been dismissed because of this plea agreement shall automatically be reinstated." *Id.*, ¶ 5(b).

The United States recently acknowledged, in a letter to Ferrer dated August 28, 2018, that Ferrer's Plea Agreement is not final and the investigation is ongoing. <u>Exhibit J</u>, Letter from United States Attorney's Office to Carl Ferrer (U.S. Attorney writes: "As you know, our investigation into Backpage is ongoing and the terms of your plea agreement have yet to be accepted by the court.").

Ferrer's status as a cooperator makes him particularly vulnerable to the risks that parallel civil proceedings may violate his rights under the Fifth Amendment. Unlike Plaintiffs Lacey and Larkin, Ferrer has waived his right to file motions or assert defenses to the federal and state charges related to his operation of Backpage.com.  <u>Exhibit D1</u>, ¶ 6.

The crux of Plaintiffs' claims in this case is that Defendants purportedly are

bound by operating and purchase agreements that federal and state authorities and numerous victims around the U.S. have alleged were an attempt to facilitate, perpetrate, and conceal numerous federal and state crimes against thousands of victims around the country and internationally.  A fulsome defense against Plaintiffs' claims necessarily would require pleadings and discovery into the purported legality of Plaintiffs' agreements and efforts, and could implicate Defendants as part of Plaintiffs' criminal schemes as well.  Accordingly, expediting proceedings in this case should be denied to allow appropriate time for Defendants to prepare and file a motion for stay to protect Defendant Ferrer's Fifth Amendment rights during the pendency of ongoing investigations and federal criminal proceedings in *United States v. Carl Allen Ferrer*, Case No. 2:18-cr-464-SPL (D. Ariz.) and *United States v. Backpage.com, LLC*, Case No. 2:18-cr-465-SPL (D. Ariz.) as well as criminal proceedings in California, Case No. 16FE024013, and in Texas, *State of Texas v. Ferrer*, Case No. 18FC-1652C and *State of Texas v. Backpage.com*, LLC, 18FC-1653C, in the 94th District Court of Nueces County, Texas.

## II. OTHER PRACTICAL REASONS WARRANT DENIAL OF EXPEDITION

### A. Plaintiffs' Requested Expedited Procedures are Unnecessary Because Plaintiffs Already Have Sought and/or Obtained Litigation Stays in Other Pending Litigation

Expedited proceedings are not warranted where Plaintiffs already have sought and/or obtained litigation stays in other jurisdictions based upon the parties'

18

substantial Fifth Amendment rights.

Plaintiffs already have obtained a litigation stay in their favor in Massachusetts and Washington.  *See* Background, § C, *supra*.  Plaintiffs have requested litigation stays in numerous other pending litigations that, if granted, would further negate the need for urgency in light of the substantial forgoing issues and concerns.

**B.     Plaintiffs' Requested Expedited Procedures are Unnecessary Because Plaintiffs Have Access to Millions of Dollars and Admit the Defendants Do Not**

As described in the Superseding Indictment in the federal criminal matters in Arizona, Plaintiffs have access to millions of dollars, yet, in their own Complaint, Plaintiffs admit Defendants do not.  A key admission in Plaintiffs' Complaint is that "Upon information and belief ... the Ferrer Parties and the Backpage Entities have no assets from which to advance defense costs and expenses for the Medalist Parties."  (Compl. ¶ 26.)

Because Plaintiffs themselves admit the Defendants cannot pay them, there is no risk of dissipation of assets by affording Defendants full and due process, and there is no valid reason to expedite these proceedings.

**C.     Plaintiffs' Requested Expedited Procedures Also Should be Denied Because Plaintiffs Have Had Nearly Half a Year to Take Action in other Courts, But Failed to Timely Do So**

Court filings in Texas, Washington and other states show that Defendants

requested return of their retainers beginning in April 2018. Various courts have issued rulings and held hearings in which the requested legal retainers were forfeited or deemed retainers due back to Defendants.

The doctrine of laches, if not waiver, res judicata, and estoppel, preclude Plaintiffs from supporting a case of urgency nearly half a year later. Under Delaware law, "the defense of laches bars an action in equity if the movant waited an unreasonable length of time before asserting its claims and the delay unfairly prejudices the nonmovant." *CNL-AB LLC v. Eastern Prop. Fund I SPE (MS REF) LLC*, 2011 Del. Ch. LEXIS 25, *21-22 (Del. Ch. Jan. 28, 2011) (citations omitted). "[A] motion for expedited proceedings, like a TRO or a hearing, may be denied where the movant has not proceeded as promptly as it might and, by virtue of its torpor, has contributed to the emergency nature of its application for preliminary relief." *Id*. at * 22 (citation omitted). Plaintiffs commenced this action on August 16, 2018—nearly one month ago—and did not until September 9 approach out-of-state counsel about attempting to schedule a hearing on the Motion to Expedite. This belies any claim that expedition is necessary. To the contrary, this is not a typical advancement case; it is not really an advancement case at all. It is a thinly-veiled collateral attack on federal forfeiture orders.

## III. RESERVATION OF RIGHTS

By filing this opposition to expedited proceedings, Defendants Ferrer and

Backpage hereby expressly reserve, and in no way intend to waive or impair, all rights, claims, and defenses, including without limitation with respect to jurisdiction and venue.

WHEREFORE, Defendants Carl Ferrer and Backpage.com, LLC respectfully request that the Court deny expedited proceedings in this case.

Dated:  September 14, 2018

OF COUNSEL

Mark A. Castillo
Curtis | Castillo PC
901 Main St., Ste. 6515
Dallas, TX 75202
Telephone: 214.752.2222
Fax: 214.752.0709
Email: mcastillo@curtislaw.net

CHIPMAN BROWN CICERO & COLE, LLP

 _/s/ Paul D. Brown_____
Paul D. Brown (No. 3903)
Joseph B. Cicero (No. 4388)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801

*Attorneys for Defendants Carl Ferrer and Backpage.com, LLC*

WORDS: 4,947

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of September, 2018, copies of the foregoing *Defendants Carl Ferrer's and Backpage.com, LLC's Opposition To Plaintiffs' Motion To Expedite Proceedings* were caused to be served by File & Serve*Xpress* on the counsel of record indicated below:

Kathleen M. Miller
Robert K. Beste III
**SMITH, KATZENSTEIN & JENKINS LLP**
1000 West Street, Suite 1501
Wilmington, DE 19801


*/s/ Paul D. Brown*
Paul D. Brown (No. 3903)

**EFiled:  Sep 14 2018 06:28PM EDT**
**Transaction ID 62455883**
**Case No. 2018-0606-SG**

# Exhibit A

FILED _____ LODGED
_____ RECEIVED _____ COPY

JUL 2 5 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

REDACTED FOR
PUBLIC DISCLOSURE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR 18-422-PHX-SPL (BSB) |
|---|---|
| Plaintiff, | |
| v. | **SUPERSEDING INDICTMENT** |

| | |
|---|---|
| 1. Michael Lacey<br>    (Counts 1-70, 81, 83-84, 86, 88-92,<br>    and 94-100) | VIO: 18 U.S.C. § 371<br>(Conspiracy)<br>Count 1 |
| 2. James Larkin<br>    (Counts 1-68, 80, and 87) | 18 U.S.C. § 1952(a)(3)(A)<br>(Travel Act—Facilitate Prostitution)<br>Counts 2-51 |
| 3. Scott Spear<br>    (Counts 1-68, 71-78, 85, and 93) | 18 U.S.C. § 1956(h)<br>(Conspiracy to Commit Money<br>Laundering)<br>Count 52 |
| 4. John "Jed" Brunst<br>    (Counts 1-70, 78-84, and 86-93) | 18 U.S.C. § 1956(a)(1)(B)(i)<br>(Concealment Money Laundering)<br>Counts 53-62 |
| 5. Dan Hyer<br>    (Counts 1-68) | 18 U.S.C. § 1956(a)(2)(A)<br>(International Promotional Money<br>Laundering)<br>Counts 63-68 |
| 6. Andrew Padilla<br>    (Counts 1-51) | 18 U.S.C. § 1957(a)<br>(Transactional Money Laundering)<br>Counts 69-99 |
| 7. Joye Vaught<br>    (Counts 1-51) | 18 U.S.C. § 1956(a)(2)(B)(i)<br>(International Concealment Money<br>Laundering)<br>Count 100 |
| Defendants. | |

18 U.S.C. §§ 981(a)(1)(C),
982(a)(1) and (b); 21 U.S.C.
§ 853(p); 28 U.S.C. § 2461(c)
(Forfeiture Allegations)

THE GRAND JURY CHARGES:

## A.    Introduction

1.    The website www.backpage.com ("Backpage") was, until being shut down by federal law enforcement authorities in April 2018, notorious for being the internet's leading source of prostitution advertisements. Backpage derived the overwhelming majority of its revenue from such ads. These practices enabled Backpage to earn over $500 million in prostitution-related revenue during its fourteen years of existence.

2.    Backpage was created in 2004 by defendant MICHAEL LACEY ("LACEY"), defendant JAMES LARKIN ("LARKIN"), and a third individual, C.F. From 2004-15, LACEY and LARKIN oversaw the website's policies and strategic direction. Additionally, LACEY and LARKIN retained significant control over the website (and continued receiving tens of millions of dollars of Backpage-related distributions) after purportedly selling their interests in Backpage in 2015.

3.    Defendant SCOTT SPEAR served as the Executive Vice President of one of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 4%.

4.    Defendant JOHN "JED" BRUNST ("BRUNST") served as the Chief Financial Officer of Backpage and several of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 6%.

5.    Defendant DAN HYER ("HYER") joined Backpage's marketing department in or around 2006 and served as Backpage's Sales and Marketing Director.

6.    Defendant ANDREW PADILLA ("PADILLA") served as Backpage's Operations Manager.

- 2 -

7.     Defendant JOYE VAUGHT ("VAUGHT") served as Backpage's assistant Operations Manager.

8.     The defendants identified above are referred to at times in this Superseding Indictment as the "BACKPAGE DEFENDANTS."

9.     As explained in detail below, the BACKPAGE DEFENDANTS were aware that the vast majority of the "adult" and "escort" ads appearing on Backpage were actually ads for prostitution and took steps to intentionally facilitate that illegal activity.  For example, during Backpage's early years of operation, the company's employees were actually trained to—and paid bonuses for—identifying prostitutes who were posting ads on rival websites, creating free ads on Backpage for them, and using the resulting Backpage ads (which would only remain free for a trial period) in an attempt to secure the prostitutes' future business.   These affirmative content-creation efforts, which were described internally as "content aggregation" or the "Dallas Plan," were vital to Backpage's early growth and success.

10.    Backpage also employed other business strategies that were specifically intended to promote and facilitate prostitution.  For example, for several years, Backpage had a reciprocal link agreement with The Erotic Review ("TER"), a website that permitted customers to post explicit "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts.  Backpage paid tens of thousands of dollars to TER in return for assistance in getting TER's customer base to start using Backpage.

11.    In addition to affirmatively creating prostitution-related content and intentionally soliciting prostitution-related business, Backpage also utilized a variety of strategies to conceal the true nature of the ads being posted on its website.  Most notably, Backpage periodically used computerized filters and human "moderators" to edit the wording of (or block) ads that explicitly offered sexual services in return for money.  The BACKPAGE DEFENDANTS admitted—in internal company documents and during private meetings—that, despite these editing practices, they knew the overwhelming

1    majority of the website's ads still involved prostitution. In one internal document, LACEY

2    actually bragged about the company's contributions to the prostitution industry:

3    "Backpage is part of the solution. Eliminating adult advertising will in no way eliminate

4    or even reduce the incidence of prostitution in this country. . . . For the very first time, the

5    oldest profession in the world has transparency, record keeping and safeguards."

6          12.    Notwithstanding these private admissions, the BACKPAGE

7    DEFENDANTS took pains to mislead the public, regulators, and law enforcement officials

8    concerning the supposed sincerity of Backpage's efforts to prevent the publication of

9    prostitution-related ads. For example, after reviewing LACEY's written description of

10    Backpage's contributions to the prostitution industry and editing practices, LARKIN

11    instructed C.F. to prevent "any of the information in this being made public." PADILLA,

12    who helped supervise Backpage's moderators, threatened to fire any employee who

13    acknowledged in writing that the "escorts" depicted in the website's ads were actually

14    prostitutes: "Leaving notes . . . implying that we're aware of prostitution . . . is enough to

15    lose your job over." And in one internal document, Backpage's media strategy was

16    described simply as "Do not acknowledge the prostitution."

17          13.    Many of the ads published on Backpage depicted children who were victims

18    of sex trafficking. Once again, although Backpage sought to create the perception that it

19    was diligently attempting to prevent the publication of such ads, the reality is that Backpage

20    allowed such ads to be published while declining—for financial reasons—to take necessary

21    steps to address the problem. For example, for several years, Backpage's official policy,

22    when presented with an ad featuring the prostitution of a child, was to delete the particular

23    words in the ad denoting the child's age and then publish a revised version of the ad. Such

24    editing, of course, did nothing to change the fact the ad featured the prostitution of a child—

25    it only created a veneer of deniability and helped Backpage's customers (*i.e.,* pimps

26    trafficking children) evade detection. Similarly, in April 2011, several BACKPAGE

27    DEFENDANTS were warned that the term "New In Town" was a coded phrase used by

28    "pimps who shuttle children to locations where they do not know anyone and cannot get

1  help." Nevertheless, Backpage continued for the next seven years to permit ads using the
2  phrase "New In Town" to be published on its website.

3      14.  Backpage also contributed to the proliferation of ads featuring the
4  prostitution of children in other ways. For example, an anti-sex trafficking organization
5  once suggested that Backpage provide an automatic warning message whenever a customer
6  searched for particular terms indicative of the prostitution of a child. In response, C.F.
7  acknowledged the proposal was a good one but declined to adopt it because Backpage
8  would not derive any public-relations benefit from doing so: "This is a good idea but it is
9  not visible to AGs [state attorneys general] so it has little PR value. It is a low priority."
10  Backpage also claimed it did everything in its power to alert the National Center for
11  Missing and Exploited Children ("NCMEC") whenever it became aware that a child was
12  being advertised on its website. However, the BACKPAGE DEFENDANTS implemented
13  policies to artificially limit such referrals. In one training document, moderators were
14  instructed not to send emergency alerts to NCMEC in response to complaints filed by the
15  grandparents and other extended family members of children being advertised on the
16  website: "Neice [sic], nephew, grandchild, cousin, etc. doesn't count."

17      15.  Virtually every dollar flowing into Backpage's coffers represented the
18  proceeds of illegal activity. In fact, by 2015, the major credit card companies stopped
19  processing payments for Backpage and some banks closed Backpage's accounts out of
20  concern they were being used for illegal purposes. In response, the BACKPAGE
21  DEFENDANTS pursued an array of money laundering strategies. These strategies
22  included (a) instructing customers to send checks and money orders to a particular Post
23  Office box, depositing those payments in bank accounts held in the name of entities with
24  no apparent connection to Backpage, and then giving customers a corresponding "credit"
25  on Backpage to purchase new ads, (b) wiring the proceeds of Backpage's business to bank
26  accounts held in foreign countries and then redistributing the funds to certain BACKPAGE
27  DEFENDANTS (as compensation) or redepositing the funds in bank accounts held in the
28  United States (to conceal the nature of those funds and promote Backpage's ongoing

operations), and (c) converting customer payments, and the proceeds of Backpage's business, into cryptocurrency.

16.     The BACKPAGE DEFENDANTS also engaged in other financial transactions designed to conceal their misconduct and evade seizure by law enforcement. For example, in July 2016, LACEY wrote an email seeking assistance in "put[ting] some assets in place[s] where . . . government parties . . . can not access my accounts." A few months later, LACEY asked employees of an Arizona-based bank for advice on how to move his assets "offshore" to protect them from seizure by the government. Soon afterward, $16.5 million in Backpage-derived cash was wired from LACEY's bank accounts in the United States to an overseas bank account in Hungary. At the time of the Hungarian transfer, LACEY was facing criminal charges in California state court and was aware of the federal grand jury investigation in this matter.

17.     For all of these reasons, the BACKPAGE DEFENDANTS are charged in this superseding indictment with the crimes of facilitating prostitution (18 U.S.C. § 1952), concealment, transactional, international promotional, and international concealment money laundering (18 U.S.C. §§ 1956 and 1957), and/or conspiracy to commit these offenses (18 U.S.C § 371 and 1956).

**B.     Backpage's Origins, Ownership, and Control**

18.     LACEY and LARKIN are the founders of the *Phoenix New Times*, an alternative newspaper based in Arizona. Over time, LACEY and LARKIN acquired several other alternative newspapers, which they came to operate through entities called New Times Media and Village Voice Media Holdings (referred to collectively for ease of reference as "VVMH"). Additionally, SPEAR served as VVMH's Executive Vice President and BRUNST served as VVMH's Chief Financial Officer.

19.     The publications within the VVMH newspaper chain routinely featured illegal prostitution ads. In fact, more than 30 years ago, a federal court affirmed the conviction of the operator of a prostitution business (which masqueraded as a massage parlor) for publishing ads in the classified section of the *Village Voice. See United States*

*v. Sigalow*, 812 F.2d 783 (2d Cir. 1987). The conviction was for violating 18 U.S.C. § 1952, one of the same crimes charged in this Superseding Indictment.

20.     By 2000, the rise of the internet—and, in particular, the website www.craigslist.com ("Craigslist"), which offered free classified ads—began to significantly disrupt VVMH's business model, which depended on classified advertising revenue for survival.

21.     LACEY and LARKIN, with assistance from C.F., sought to address this threat by creating Backpage. Their decision to create Backpage was later described in an internal company document as follows: "In 2004, in response to the Craigslist threat that was decimating daily newspapers, VVM launched its own online classified site, Backpage.com, named after the back page of VVM's print publication."

22.     During its first few years of operation, Backpage accounted for only a fraction of VVMH's overall revenue. In January 2006, for example, VVMH estimated that Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage had "tremendous upside potential."

23.     This prediction proved prophetic. By 2008, Backpage was generating over $5 million in annual profit. This annual profit figure increased to over $10 million in 2009.

24.     In 2010, Craiglist chose to shut down its "adult" section due to the prevalence of ads for prostitution and other illegal services. The BACKPAGE DEFENDANTS, sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share of this market. In one internal document, LARKIN commented: "Craigslist has folded . . . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . . We have with the Village Voice probably the longest run of adult content advertising in the US and it is, like it or not, in our DNA."

25.     This push was successful. In internal documents, Backpage stated that it experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume." Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and over $78 million in 2012.

26.     These figures dwarfed the profits that VVMH's print publications were generating.  In fact, Backpage became so profitable that the BACKPAGE DEFENDANTS decided to get rid of VVMH's publishing business so they could focus on Backpage's further development and expansion.   Accordingly, in or around November 2012, the BACKPAGE DEFENDANTS spun off VVMH's print publications and began utilizing several new corporate entities, including Medalist Holdings, Inc. ("Medalist"), Dartmoor Holdings LLC ("Dartmoor"), and Camarillo Holdings, LLC ("Camarillo"), to serve as Backpage's parent companies.

27.     Following these transactions, LACEY held an ownership interest in Medalist (and, therefore, in Backpage) of approximately 45%, LARKIN held an ownership interest of approximately 43%, BRUNST held an ownership interest of approximately 6%, and SPEAR held an ownership interest of approximately 4%.

28.     Backpage's annual profits continued to skyrocket during and after these changes.  They grew to over $112 million in 2013 and over $134 million in 2014.

29.     In or around April 2015, LACEY, LARKIN, SPEAR, and BRUNST purported to sell their ownership interests in Backpage and several related entities for around $600 million to various Dutch entities.  These Dutch entities included Atlantische Bedrijven, C.V., which agreed to purchase Backpage's U.S. operations for around $526 million, and UGC Tech Group C.V., which agreed to purchase Backpage's overseas operations for around $77 million.

30.     In fact, these Dutch entities were controlled by C.F., who simply "borrowed" most of the $600 million from entities controlled by the sellers to finance the purchase. Due to this financial arrangement, LACEY, LARKIN, SPEAR, and BRUNST retained a significant financial interest in Backpage after the transactions were completed.

31.     LACEY, LARKIN, SPEAR, and BRUNST also retained significant operational control over Backpage following these transactions.  For example, the April 2015 loan agreement required C.F. to sign a six-year employment agreement, required C.F. to provide the lenders with full access to Backpage's books and records, required C.F. to

provide the lenders with an annual listing of all of C.F.'s personal assets, and prohibited C.F. from opening new bank accounts on Backpage's behalf without the lenders' consent.

32.     LARKIN and others also met regularly with C.F. following the April 2015 transaction to discuss and direct the operation of Backpage's business, often taking steps (such as avoiding the use of email and holding the meetings in the presence of attorneys) intended to conceal their continued involvement in, and control over, the company. Through these mechanisms, LARKIN and others exerted post-April 2015 control over Backpage's banking relationships, the migration of some of Backpage's operations to the Philippines, the management of Backpage's counsel, Backpage's acceptance of gift cards, Backpage's response to a Senate investigation, and Backpage's licensing agreements. Additionally, LARKIN and others took steps in 2018 to attempt to sell the company to a new buyer.

**C.     Knowledge And Facilitation Of Prostitution**

33.     Prostitution is illegal in 49 states and in most of Nevada. Advertisements for prostitution services in those locations are, therefore, not protected by the First Amendment.

34.     As explained below, the BACKPAGE DEFENDANTS were aware that the overwhelming majority of the website's "adult" and "escort" ads were actually ads for prostitution and took a variety of steps to intentionally facilitate that illegal activity. These steps evolved over time and included, but were not limited to, creating free ads for prostitutes in an attempt to secure future advertising revenues from them (*i.e.*, "content aggregation"), entering into formal business arrangements with known prostitution services and websites in an attempt to increase the volume of prostitution advertisements being posted on Backpage (*i.e.*, reciprocal link and affiliate programs), and sanitizing ads by editing them—specifically, removing terms and pictures that were particularly indicative of prostitution and then publishing a revised version of the ad (*i.e.*, "moderation").

i.   **Aggregation**

35.   On or about April 10, 2007, SPEAR sent an email to HYER and C.F. concerning HYER's aggregation efforts in Dallas. SPEAR encouraged HYER and C.F. to create a "blueprint" for "moving that process to other cities."

36.   Included as an attachment to this email was a document entitled "Dallas success in other markets." This document described Backpage's aggregation process in extensive detail. Among other things, it explained how Backpage employees would "secure content" by running Google searches to identify prostitutes advertising on other websites, then "Call clients. Ask them if they have tried backpage.com. If not, post a free ad with an auto repost for free for six weeks." The document further stated: "Dan Hyer to direct and manage this process for all the cities. [C.F.] to consult and supervise."

37.   Also included, as another attachment to this email, was a document entitled "Class Director Steps to grow Backpage.com visits and revenue." Under the heading "Aggregating Content," it explained: "For the past 6 months we have uploaded 25 adult . . . leads each week. Leads come from Adult websites, the Gay publication here in Dallas, and the daily paper."

38.   On or about June 15, 2007, several Backpage principals, including SPEAR, HYER, and C.F., met in Oregon to discuss various Backpage-related developments. The agenda for this meeting stated that HYER would be presenting on the topic "How Dallas grew to $40K+ per month" and that this revenue growth was driven in part by creating "adult content online for free" by posting "20 free adult ads per week for prospects on other sites with a 6 week auto repost for free."

39.   On July 18, 2007, HYER sent an email that, among other things, summarized Backpage's "Aggregation" efforts. It stated that Backpage's employees were responsible for "Aggregat[ing] new adult content from other sites."

40.   On or about July 20, 2007, several Backpage principals, including LARKIN, SPEAR, and C.F., met to discuss various Backpage-related developments. The agenda for this meeting included a "Dallas aggregation update."

41.   On or about August 20, 2007, SPEAR sent an email to LARKIN, C.F., and another Backpage principal. Enclosed with that email was an agenda for a meeting to be held later that day. The agenda provided for another "Dallas aggregation update" and stated that Backpage employees were "Wrapping up [aggregation] in SF, Nashville, KC and OC."

42.   On or about December 18, 2007, C.F. provided a document entitled "Backpage strategic plan" to LARKIN, SPEAR, and BRUNST. Among other things, it stated that Backpage intended to expand the Dallas aggregation efforts to other cities: "Create additional Dallas adult revenue models in LA and NY." This document also contained a detailed summary of how the aggregation process worked ("Here's the detail on what the backpage staff does to create Dallas like results"), which included "Set up free user posting (250 to 500 postings per market)."

43.   In November 2008, an internal company email was sent to LARKIN, C.F., and others stating that Backpage had just experienced its "best month ever" in terms of revenue. In response, C.F. sent a series of emails explaining that nearly all of the revenue growth was due to HYER's aggregation efforts in Dallas: "btw: the revenue wasn;t [sic] that great except for dallas. . . . Dallas sure gave us a nice bump. Hyer's done an awesome job with his marketing crew."

44.   On or about October 25, 2013, C.F. sent an email to SPEAR summarizing his "to do list" for Backpage. It included a plan to hire "Content creators" in the Netherlands to create free ads on Backpage for potential customers who were posting on "competing sites."

**ii.   Reciprocal Link And Affiliate Programs**

45.   On July 2, 2007, C.F. sent an email to SPEAR entitled "The erotic review." In this email, C.F. explained that Backpage received "2 million page views, 150,000 visits from the erotic review per month. They bring in more referrals than the Village Voice." C.F. also sought permission from SPEAR to initiate a business arrangement with TER under which the two companies would post reciprocal ads on each other's website.

46.    On July 16, 2007, HYER sent an email to SPEAR and C.F. summarizing various criticisms of a particular Backpage employee. Among other thing, the email chain stated that the employee was deleting adult ads too quickly, which "kills the sites seo [search engine optimization] as in no traffic from TheEroticReview.com. . . . Why care? Without TheEroticReview traffic you might as well kiss any growth in [that city] good bye." On August 31, 2007, C.F. sent a follow-up email to HYER concerning this employee that explained: "We have a deal with the TER. It's a reciprocal link program where we get an additional million page views from TER. . . . The TER deal is very big for us. The internet makes strange bed fellows."

47.    On or about July 20, 2007, several Backpage principals, including LARKIN, SPEAR, and C.F., met to discuss various Backpage-related developments. The agenda for this meeting stated that Backpage intended to "Trade with TER" in order to "increase traffic in adult."

48.    On or about August 20, 2007, several Backpage principals, including LARKIN, SPEAR, and C.F., met to discuss various Backpage-related developments. The agenda for this meeting provided an update on the previous efforts to create a business partnership with The Erotic Review, stating: "Trade with TER – complete."

49.    On or about December 18, 2007, C.F. provided a document entitled "Backpage strategic plan" to LARKIN, SPEAR, and BRUNST. Among other things, it stated that Backpage intended to "look for more relationships like TER to drive traffic" and to "Expand relationship with TER." The document also stated that, when seeking to expand Backpage's business in particular cities, Backpage employees would "Set up 100 fresh TER reciprocal links to the specific city" and that a key to Backpage's growth was "Drive traffic via reciprocal links . . . . Example of PR [public relations] is the posting in the forums in TER talking about us."

50.    On or about December 20, 2007, C.F. provided a document entitled "2008 Budget and Business Plan for Backpage.com" to LARKIN, SPEAR, and potentially others. Among other things, it explained: "In terms of marketing, we struck a deal with

TheEroticReview (TER) with reciprocal links. It created huge brand awareness in this niche industry and increased page views from TER by 120,000 per day."

51. On or about December 14, 2008, C.F. provided SPEAR with a document discussing Backpage's budget. Among other things, it noted that Backpage was paying $4,000 per month (*i.e.,* nearly $50,000 per year) to place advertisements on The Erotic Review ("4k- banner ad on ter"). The document further noted that "We have made a special buy with TER in terms of high quality referrals."

52. On or about December 17, 2008, C.F. distributed, to other Backpage principals, a document entitled "How We Are Going To Get There In 2009." Among other things, this document identified Backpage's top marketing strategy as "TER- high page view per referral" and stated "We have made a special buy with TER in terms of high qualify referrals."

53. On May 7, 2009, HYER and C.F. exchanged emails concerning how to improve Backpage's business relationship with TER, with C.F. commenting: "I think we need to move some staff on this project and make one more play to get to 40,000 referrals per day."

54. On May 11, 2009, LARKIN forwarded a news article to SPEAR and C.F. that described a recent "prostitution bust" in Phoenix in which 43 people were "indicted on charges of having roles in a prostitution syndicate." The article further noted that some of the defendants had provided reviews on TER, which was described in the article as a "prostitution website." In the subject line of the email, LARKIN summarized the article's contents as follows: "johns accused of favorably rating escorts on Erotic Review in exchange for discounts."

55. Between around June 10, 2009, and June 19, 2009, HYER and C.F. exchanged additional emails concerning how to improve Backpage's business relationship with TER. In one email, C.F. stated: "I need help creating a wish list to discuss with the TER people. . . . We can get to 40k in referrals by 2010."

56. On or about November 1, 2011, C.F. met with LARKIN and SPEAR to

discuss Backpage-related developments. The agenda for this meeting noted that Backpage was still obtaining "very strong referral traffic" based on its "Reciprocal link relationships" and stated that Backpage was considering a "move offshore" because such a move would "Minimize restrictions" and "Allow more skin."

57. The BACKPAGE DEFENDANTS were routinely forwarded and/or briefed about "Google Analytics" reports, which provided a monthly snapshot of which other websites were referring users to Backpage. For example, on July 27, 2012, LARKIN sent an email to SPEAR, BRUNST, and C.F. stating: "[C.F], Jed, and Scott: These are the topics I would like to cover in our discussion 10:00 am Wednesday in Phoenix. . . . [A]nalytics . . . ." On December 19, 2012, C.F. sent an email to LARKIN, SPEAR, and BRUNST that included, as attachments, various Google Analytics reports. And on March 4, 2014, LARKIN, SPEAR, BRUNST, HYER, and C.F. received an email from another executive stating: "I have attached 2 items. An agenda for tomorrow and an excerpt from Google Analytics to show a comparison of January and February."

58. These Google Analytics reports confirmed that TER was playing a crucial role in driving traffic to the Backpage website. For example, the monthly report for January 2009 stated that TER was the #1 outside source of referrals and was responsible for over half a million visits that month. The daily report for March 22, 2010 showed that TER was responsible for referring more than 40,000 daily visits to Backpage—more than six times as many as the next-biggest referral source. The daily report for February 1, 2012, again showed that TER was responsible for referring more than 40,000 daily visits to Backpage—more than three times as many as the next-biggest referral source. The monthly report for August 2013 showed that TER was responsible for nearly 1 million visits each month. And the monthly report for November 2014 showed that, once again, TER was the #1 source of non-search engine referrals.

59. In addition to pursuing a formal partnership with TER, Backpage also formed "affiliate" partnerships with other organizations and individuals who were known to be involved in the prostitution industry. One such individual, known as "Dollar Bill," earned

1  fees in return for arranging for prostitutes and pimps to post ads on Backpage.

2        60.    On March 5, 2010, PADILLA received an email from a co-worker that

3  described Dollar Bill as a "super affiliate" and sought PADILLA's assistance in restoring

4  two of Dollar Bill's ads that had been deleted from Backpage.  In response, PADILLA

5  stated "i'm working . . . on it now" and forwarded the email chain to C.F.

6        61.    On or around March 18, 2010, Backpage deleted over 4,000 ads that had been

7  presented by Dollar Bill.  After Dollar Bill called to complain, PADILLA sent an email to

8  Backpage's computer programmers stating that "4200 ads need to be restored" and

9  explaining that "[t]his is one of our largest adult accounts and the restoration of these ads

10  is a high priority for us."

11        62.    On April 15, 2010, Dollar Bill sent an email to C.F. proposing the creation

12  of a new website called "Dollar Bills Escort Roundup" that would "discuss[] issues in the

13  escort business and give[] insider info from an Editor who knows the biz from both sides

14  via my unique relationship with the girls."  The email further stated that the proposed new

15  website "could sell ads in local areas just like best gfe does."

16        63.    On October 24, 2010, Dollar Bill sent an email to C.F. requesting a reduction

17  in the rates that Backpage was him charging for ads.  Dollar Bill argued he was entitled to

18  such a reduction because "I've championed Backpage in print and with the girls in the past"

19  and because "I don't feel there should be a statute of limitations on residual benefits

20  Backpage gives me for my previous contributions which by your own admission were

21  consideration. . . .  [W]hy would you want to raise my rate when I was so instrumental in

22  building New York, where you're making a bloody fortune?"

23        64.    On October 25, 2010, Dollar Bill sent an email to C.F. complaining about

24  Backpage's decision to refuse one of his ads even though "IT NEVER SAID GFE" and

25  noting that other, even more obvious prostitution ads had been published despite "saying

26  GFE."

27        65.    On December 29, 2010, HYER sent an email to SPEAR and C.F. entitled

28  "Sales & Marketing 2011 Working Agenda."  One of the agenda items was "[Dollar] Bill

1  . . . rate increase."

2      66.     On February 26, 2011, Dollar Bill wrote an email to C.F. complaining that

3  the nude pictures had been stripped out of one of his ads (which was entitled "real-crazy-

4  party-asian-girl-23"). In response, C.F. advised Dollar Bill that "[t]his user sneaking in

5  nudes may need to be set for forced moderation" and then forwarded the email chain to

6  HYER, who adjusted Backpage's filter accordingly.

7      67.     On December 21, 2011, Dollar Bill wrote an email to C.F. discussing

8  whether Backpage would publish 15 ads depicting a particular "girl" who "makes about 10

9  grand a week . . . owns 4 apartments . . . and a store! . . . [A] millionaire several times over

10  at age 28. And all from being an escort!" In response, C.F. stated that the enclosed picture

11  was "a little too nude for us" and provided advice to Dollar Bill on how to wordsmith ads

12  so they wouldn't be rejected by Backpage's moderators.

13      **iii.     Moderation And Notice**

14      68.     In April 2008, C.F. wrote an email explaining that, although he was "under

15  pressure to clean up phoenix's adult content," he was unwilling to delete prostitution ads

16  because doing so "would put us in a very uncompetitive position with craig[slist]" and

17  result in "lost pageviews and revenue." Thus, he instructed Backpage's technical staff to

18  edit the wording of such ads, by removing particular terms that were indicative of

19  prostitution, and then allow the remainder of the ad to be featured on Backpage's website.

20      69.     On February 26, 2009, C.F. received an email asking why Backpage's terms

21  of service purported to prevent customers from "suggest[ing] an exchange of sexual favors

22  for money" in light of the fact that "[c]learly everyone on the entire backpage network

23  breaks the rules." In response, C.F. didn't dispute the author's characterization and

24  explained that Backpage had simply added the terms of service at the behest of "our

25  attorney in SF" in an attempt to avoid liability in civil lawsuits.

26      70.     On May 25, 2009, SPEAR received an email summarizing a plan to begin

27  "remov[ing] sex act pics and coded terms" from Backpage ads. Later that day, C.F.

28  forwarded this email to HYER with the explanatory note that "We do not intend to be a

craig[slist] here, just get out the most egregious stuff."

71.    On March 8, 2010, C.F. testified in federal court (the United States District Court for the Southern District of Florida) in the criminal trial of a pimp who had used Backpage to post prostitution ads. During his testimony, C.F. acknowledged the defendant had used the email address "Youngpimpin86" when posting the ads. C.F. also acknowledged that the ads described one so-called escort as "five-foot-three, with a small waist and amazing ass you'll have to see to believe. XL, XL, XL, Lollipop" and described a different so-called escort as "discrete, sincere and extremely naughty. I am the type of girl who absolutely adores a man who understands the many desires of a young beautiful woman and how to accommodate a variety of fantasies." This episode provided notice to Backpage that it was implausible to pretend such ads were merely offering lawful escort services.

72.    On September 1, 2010, PADILLA sent an email to HYER and C.F. stating that customers who engaged in "extreme and repeat" violations of Backpage's posting rules would have their ads deleted and be banned from the website. However, PADILLA also stated the bans would only be temporary and that "we'll do everything we can to affect only the worst apples."

73.    On September 1, 2010, SPEAR received an email acknowledging that Backpage's moderators were being instructed to "Remove any sex act pics in escorts [ads]" and "Remove any illegal text in escorts [ads] to include any code words for sex act for money."

74.    On September 21, 2010, a group of state attorneys general wrote a letter to Backpage. This letter observed that "ads for prostitution—including ads trafficking children—are rampant on the site" and argued that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them altogether." The letter acknowledged that this step would cause Backpage to "lose the considerable revenue generated by the adult services ads" but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue

to be victimized, in the marketplace provided by backpage."

75.    On September 25, 2010, C.F. wrote an email explaining that Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund those customers' fees. Thus, C.F. announced that Backpage would "go back to having our moderators remove bad content in a post . . . ."

76.    On September 30, 2010, C.F. testified in federal court (the United States District Court for the District of Minnesota) in the criminal trial of a pimp who had used Backpage to post prostitution ads.  During his testimony, C.F. acknowledged that Backpage's servers are located in Arizona and that the ads posted by the Minnesota-based defendant had therefore "traveled across state lines."

77.    On October 8, 2010, PADILLA sent an email (on which VAUGHT was cc'd) threatening to fire any Backpage employee who acknowledged, in writing, that a customer was a prostitute:  "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . .  This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

78.    On October 16, 2010, PADILLA sent an email to a large group of Backpage employees (including HYER and VAUGHT).  The email had two attachments that provided guidance on how to "moderate" ads. The first was a Powerpoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts.  Next to each picture was an instruction as to whether it should be approved or disapproved by a Backpage moderator. These instructions included "Approve. Nude rear shots are okay as long as the model is not exposing her anus or genitalia." and "Approve.  Rear shot okay.  Transparent wet panties okay."  The second was an Excel spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should be "stripped" from ads before publication.  PADILLA concluded the email by stating: "[I]t's the language in ads that's really killing us with the Attorneys General.  Images are

almost an afterthought to them."

79. On October 16, 2010, PADILLA sent a separate internal email (which also included HYER and VAUGHT as recipients). In this email, PADILLA explained that "I'd like to still avoid Deleting ads when possible," that "we're still allowing phrases with nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

80. On October 21, 2010, C.F. sent an email to PADILLA stating: "Maybe lighten up on the images moderation. Spear tells me it's the text that is the problem." In response, PADILLA wrote: "[T]hat's the training i've given the staff."

81. On October 25, 2010, C.F. sent an email to SPEAR, HYER, and PADILLA acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act." This email also explained that, after the "sex act pics are removed," the "ad text may stay."

82. On October 26, 2010, HYER and PADILLA received an email explaining: "We will not remove ads with vaginas or penis showing, just the images unless they are a frequent offender. We will not remove ads with rates under an hour, just the text with the minimum rates. Users need time to react to this change."

83. On October 27, 2010, PADILLA sent an email to the head of a group of contractors from India who had been hired to moderate Backpage's adult ads. In this email, PADILLA criticized the contractors for deleting too many ads, stated that this approach was bad for business, and instructed the contractors to simply edit the ads to remove the more-obvious language: "As long as your crew is editing and not removing the ad entirely, we shouldn't upset too many users. Your crew has permission to edit out text violations and images and then approve the ad."

84. On November 4, 2010, C.F. sent an email to Backpage's India-based moderators (on which PADILLA was cc'd) explaining that "[m]any of the ads need to have 15 minute and 30 minute pricing removed" and that "I'm being evaluated by lawyers [*i.e.,* state attorneys general] later this week so cleaning up old stuff is important."

85. On November 17, 2010, HYER and PADILLA received an email

1    acknowledging that the term Lolita is "code for under aged girl" but explaining that this
2    term could simply be stripped out from ads (as opposed to refusing to publish the ad).  The
3    email also explained that customers should be allowed to include their identification
4    numbers from The Erotic Review: "[A]llow users to put in TER IDs (just no live links)."

5         86.    On November 30, 2010, LARKIN, SPEAR, and other Backpage
6    representatives participated in a conference call with representatives from NCMEC.
7    During this call, the Backpage representatives were advised that a large portion of the ads
8    on Backpage were blatant prostitution ads, that many of those ads featured children, and
9    that the posting of such ads was illegal in every state.

10        87.    In December 2010, HYER, PADILLA, and others exchanged a series of
11   emails entitled "Deep cleaning strip out."  These emails identified a lengthy list of terms
12   that were indicative of prostitution and discussed plans for removing the terms from the
13   old ads in Backpage's archives.  During this exchange, C.F. stated that Backpage wasn't
14   willing to delete the old prostitution ads because "our users love" having access them,
15   "[s]o, best to do deep cleaning and not kill a valuable feature."  C.F. later encouraged
16   Backpage's staff to complete the project quickly to avoid scrutiny:  "This task is urgent
17   since CNN is runing [sic] a report soon."

18        88.    On January 13, 2011, HYER and PADILLA received an email summarizing
19   instructions that had been provided to members of Backpage's technical staff.  It explained
20   that the technical staff had been instructed "not to display the moderation log" in a
21   particular section of Backpage's database "since we pdf this page for subpoenas.  I would
22   rather not testify in court as to why my staff 'approved' . . . postings."

23        89.    In January 2011, LARKIN and LACEY met with a representative from
24   NCMEC.  During this meeting, LACEY asked which types of sex ads would be acceptable
25   from NCMEC's perspective.  When the NCMEC representative declined to say that any
26   such ads would be acceptable, LACEY made a statement to the effect of "adult prostitution
27   is none of your business."

28        90.    On January 31, 2011, and February 1, 2011, C.F. engaged in an email

- 20 -

1     exchange concerning whether to remove links to other prostitution websites (such as TER)

2     from expired Backpage ads. C.F. stated that, although SPEAR and his "internet safety

3     guy" were recommending that such ads be removed, he thought this would "be a stupid

4     move" because it would hurt Backpage financially (by reducing the number of referrals

5     from other sites). C.F. added that "this overly zealous focus on moderation at the expense

6     of other development is a lot of bullshit . . . ."

7          91.    On February 3, 2011, a Backpage customer who went by the name "Licks

8     Alot" wrote an email to Backpage complaining that all of the pictures in one of her ads

9     (entitled "Athletic SWF Guaranteed Low Mileage Boys!!!") had been deleted. C.F.

10    responded to "Licks Alot" by explaining that one of her photos had been removed because

11    "[o]ur crazy internet safety experts do not want any genitalia showing up around the

12    thong." However, C.F. proceeded to apologize to "Licks Alot" over the removal of her

13    remaining photos, allowed her ad (which was obviously for prostitution) to remain on the

14    website, and offered her a free upgrade.

15         92.    On February 8, 2011, C.F. testified in federal court (the United States District

16    Court for the Middle District of Florida) in the criminal trial of a pimp who had used

17    Backpage to post prostitution ads. During his testimony, C.F. authenticated one of the ads

18    the defendant had placed on Backpage, whose title was "Extra horny sexy newbie,"

19    confirmed that Backpage had allowed this ad to be posted multiple times in various East

20    Coast cities, and acknowledged that Backpage published "a lot" of similar ads. This

21    episode provided further notice to Backpage that it was implausible to pretend such ads

22    were merely offering lawful escort services.

23         93.    On February 16, 2011, PADILLA sent an email to Backpage's India-based

24    moderators (on which VAUGHT was cc'd) explaining that Backpage was adopting a

25    "more lenient policy" and that he was instructing his Phoenix-based employees to "go easy

26    on some types of violations." PADILLA acknowledged this approach would "likely" result

27    in more "violations" but emphasized that "moderators should err on the side of the user."

28         94.    On February 16, 2011, PADILLA sent a separate email discussing whether

several terms should remain on Backpage's "filtered terms" list. During this discussion, PADILLA acknowledged—by placing quote marks around the term "companionship"—that he didn't actually believe the women being advertised on Backpage were providing lawful escort services: "[The term] implies some exchange of bodily fluids which kills our 'companionship' argument, but i don't think we've ever really gotten in trouble for it."

95. On February 22, 2011, PADILLA received an email requesting Backpage's "list of banned, stripped out adult terms." In response, PADILLA sent an Excel spreadsheet entitled "Phrase List 02211," which PADILLA described as "the latest greatest version of the list." The enclosed spreadsheet identified over 660 words or phrases that are indicative of prostitution, including an array of terms that are suggestive of child prostitution (*e.g.,* "lolita," "fresh," "high school," "tight," "young"). The spreadsheet explained that most such terms were simply to be "filtered" from the ads in which they appeared.

96. On February 23, 2011, PADILLA received an email concerning a particular ad that had been edited by Backpage's India-based moderators. The ad was obviously for prostitution—its title was "new-new-new-put me in your favorite position" and the poster had attempted to include two photographs that violated Backpage's posting rules. In response, the India-based moderators had deleted both of those photos, as well as a third photo that depicted the prostitute's face, and then allowed the ad to be published. The email received by PADILLA did not criticize the moderators for allowing an obvious prostitution ad to be published after editing. To the contrary, it emphasized that the ad should remain on Backpage and criticized the moderators for removing the third photo, threatening to fire them if they did it again: "2 out of 3 pics should have been removed. But [the] moderator deleted all three pics. This is plain wrong . . . . I would fire a moderator in Phoenix if they did this."

97. In March 2011, LARKIN, LACEY, SPEAR, and other Backpage representatives met with representatives from NCMEC. During this meeting, the Backpage representatives were again advised that a large portion of the ads on Backpage were blatant

1    prostitution ads. The Backpage representatives also were advised they could be criminally

2    prosecuted under federal law for their conduct.

3        98.     On or about March 9, 2011, C.F. distributed, to other Backpage principals, a

4    document entitled "Backpage Growth Agenda." Among other things, this document stated

5    that the company intended to renew its focus on "growth and efficiency" by "adjust[ing]

6    content rules to be more flexible" and to permit more coded terms: "Allow 30 minutes,

7    naughty, etc. Nipples." This document also discussed plans to expand to certain countries

8    in Europe, where Backpage would explicitly "Allow nudity and sex for money text."

9        99.     On April 5, 2011, PADILLA sent an email whose recipients included

10    VAUGHT and the supervisor of Backpage's Indian moderation team. The email was

11    entitled "relaxed image standards" and included, as an attachment, a document that

12    displayed a series of 30 nude and partially-nude photographs. Next to each picture was an

13    instruction as to whether it should be approved or disapproved by a moderator. One picture

14    showed a woman sitting on a bed, wearing only a bra and panties, with her legs spread

15    open and her hand partially covering her crotch. The caption provided in part: "okay –

16    but barely."

17       100.     On April 27, 2011, LARKIN, SPEAR, C.F., and others received an email

18    from a firm that Backpage had hired to assist with "internet safety" issues. Enclosed with

19    the email was a list of recommended "action items" for the company to pursue. One such

20    item, listed in the category of "Finding Illegal Ads," warned that "'New In Town'

21    terminology is often used by pimps who shuttle children to different locations where they

22    do not know anyone and cannot get help." Another item, also listed in the category of

23    "Finding Illegal Ads," recommended that Backpage should "[d]etermine if there is a way

24    to figure out if a [credit] card being used is prepaid; this could be one indicator (of many)

25    . . . as a potential trafficking ad." And yet another recommendation, under the category of

26    "Finding Illegal Ads," was to "[c]reate a way to figure out if one phone number is being

27    used on numerous different ads . . . [because] this could indicate a prostitution situation or

28    a human trafficking situation."

101. Backpage disregarded all of these recommendations. After April 2011, the company continued publishing ads using the phrase "New In Town," continued accepting prepaid credit cards (in fact, such cards supplied a large portion of the company's revenues), and continued allowing a person with a single phone number to post advertisements for multiple "escorts."

102. Between April 2011 and March 2012, PADILLA, C.F., and others participated in an email exchange acknowledging that Backpage was deleting thousands of pictures from customer ads each week and seeking assistance in collecting all of the deleted pictures so they could be used for "entertainment" or to generate user "traffic for other projects." The email explained that the deleted pictures could be made available to the public on a new website called "nakedpics.backpage.com" or "badpics.backpage.com."

103. On April 19, 2011, LARKIN and SPEAR received an email seeking permission to terminate the contract of a third-party vendor that had been receiving $17,000 per month to "remov[e] any nude pics" from the expired ads in Backpage's database. LARKIN responded: "do it!"

104. On June 7, 2011, C.F. received an inquiry from a law enforcement official about a particular ad that included the term "amber alert." In response, C.F. acknowledged this might be "some kind of bizarre new code word for an under aged person." C.F. then forwarded this exchange to PADILLA and stated that he had instructed HYER to add "amber alert" to Backpage's "strip out" list. In other words, HYER, PADILLA, and C.F. did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage—they merely required such ads to be edited before publication.

105. On June 30, 2011, several Backpage representatives met with representatives from the office of the Washington State Attorney General. During this meeting, the Backpage representatives initially attempted to claim that no prostitution ads appeared on their website. In response, a representative from the Attorney General's office stated: "You mean to tell me that if someone responded to an advertisement, the woman they

called for services would be offering to go out for coffee?" A Backpage representative responded to this question by looking at C.F., laughing, and acknowledging that Backpage couldn't "deny the undeniable."

106. On July 27, 2011, C.F. sent an email to HYER and PADILLA, and a nearly-identical email to LARKIN and LACEY, concerning the possibility of using age-verification software. In this email, C.F. acknowledged the software might be beneficial ("This might be our solution") but recommended against its wholesale adoption because it would cost "79 to 99 cents per query" and would thus cut into Backpage's profits.

107. On July 28, 2011, LACEY sent LARKIN a draft editorial entitled "BackPage understood." In this document, LACEY bragged about Backpage's contributions to the prostitution industry: "Backpage is part of the solution. Eliminating our adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. . . . For the very first time, the oldest profession in the world has transparency, record keeping and safeguards." LACEY also acknowledged that Backpage used an automatic filter to remove particular phrases from ads that were indicative of prostitution but still published the ads after editing them.

108. Soon afterward, LARKIN forwarded the editorial to C.F., with a cover note cautioning against some of LACEY's statements "being made public" because "we need to stay away from the very idea of 'editing' the posts, as you know." C.F., in turn, revised the editorial to take out the paragraph lauding Backpage's contributions to the prostitution industry.

109. On August 5, 2011, Backpage received a letter from the mayor of Seattle. This letter warned that "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010" and explained that Backpage was dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution." The letter also recommended that Backpage require in-person age verification for all of the "escorts"

1     depicted in its ads. Afterward, Backpage declined to adopt these recommendations.

2     110.    On August 15, 2011, PADILLA received an email containing an updated

3 version of Backpage's moderation guidelines. This six-page document provided the

4 following instructions concerning photographs: "Nude rear shots are okay as long the

5 model is not exposing her anus or genitalia," "Transparent wet panties okay should not be

6 able to see personal private part," and "cherry, Ice-cream keeping in mouth [is okay]." The

7 document also explained that "Bikini, lingerie, g-string, thong, and hands covering nipples

8 are all allowed," "Hourly rates are OK," and "Sessions are okay. E.g $50 session."

9     111.    On August 31, 2011, Backpage received a letter from the National

10 Association of Attorneys General. This letter characterized Backpage as "a hub" for

11 human trafficking, identified "more than 50 instances, in 22 states over three years, of

12 charges filed against those trafficking or attempting to traffic minors on Backpage.com,"

13 and noted that "[n]early naked persons in provocative positions are pictured in nearly every

14 adult services advertisement on Backpage.com and the site requires advertisements for

15 escorts, and other similar 'services,' to include hourly rates. It does not require forensic

16 training to understand that these advertisements are for prostitution."

17     112.    In or around September 2011, certain BACKPAGE DEFENDANTS assisted

18 in the creation of a Powerpoint presentation, entitled "Management Presentation," that was

19 intended to describe Backpage's business model to potential buyers. This presentation

20 acknowledged that the non-adult sections of the Backpage website were simply intended

21 to "allow[] 'plausible deniability,'" to make the website more palatable to "regulatory and

22 law enforcement" officials, and to otherwise make Backpage's adult section more

23 "defensible."

24     113.    On October 6, 2011, C.F. sent an email discussing various proposals for

25 addressing "the under aged issue." With respect to one particular proposal, C.F.

26 acknowledged it was a good one but recommended against adopting it because Backpage

27 would not derive any public-relations benefit from doing so: "This is a good idea but it is

28 not visible to AG's [state attorneys general] so it has little PR value. It is a low priority."

114.    In the fall of 2011, Backpage sought the assistance of a public relations firm based in Washington, D.C.  On October 12, 2011, C.F. received a written copy of the firm's presentation.  Later, some of the BACKPAGE DEFENDANTS attended a meeting at which the presentation was discussed in more detail.  The presentation warned that Backpage's business practices would inevitably result in legal trouble ("One day the proverbial is going to hit the fan") and characterized Backpage's "media strategy" as "Do not acknowledge the prostitution."  The presentation also noted that the "ads on the backpage.com site" generally fall into three categories, one of which is "Pimps and Men Looking for Kids."

115.    On October 21, 2011, LARKIN received an email discussing whether the Backpage website should include a warning message concerning the prostitution of children.  This email contained the following joke:  "Andrew [PADILLA] thinks it to[o] heavy handed and thinks our web site name will be entrapment.com (Hilarious)."

116.    On November 16, 2011, HYER and PADILLA received an email asking for "urgent" assistance in eliminating the word "teen" from the ads appearing on Backpage's website:  "Remove ads with teens or remove the text teen from . . . ads."  The following day, PADILLA wrote back with an update that he had found "76 pages of results" and that he had simply "edited" all of the ads posted within the last two months (*i.e.,* allowed those ads to remain on the website after sanitizing them).

117.    Between around January and March 2012, many of Backpage's moderators (who were supervised in part by PADILLA and VAUGHT) underwent performance appraisals.  These appraisals revealed that many of the moderators did "not report young looking escorts."  Nevertheless, these moderators were allowed to keep their jobs, and sometimes were given strong overall performance ratings.

118.    On February 23, 2012, C.F. was forwarded a legal notice claiming that several of Backpage's ads included copyrighted content from two competing websites called RubMaps.com and EroticMP.com.  C.F. also received copies of the underlying ads from the competing websites, which clearly involved prostitution.  In one of the ads, a

customer stated that, in return for $45 and a $5 tip, he had received a "Blow Job . . . w/ condom" from a woman who "had nice breasts." In a different ad, a customer stated that, in return for $60, he had oral and vaginal sex with a prostitute. And in a different ad, a customer stated: "Her bj was slow and erotic, and she was happy to go with whatever position I wanted." When C.F. forwarded these materials to Backpage's staff, he was asked whether the corresponding ads appearing on Backpage's website should be removed immediately. C.F. replied that they should be allowed to remain on Backpage for another few weeks without any modification.

119. On March 15, 2012, HYER received an email concerning the ads with the copyrighted material. This email stated that the ads shouldn't be deleted and that Backpage's technical staff should merely "strip out" the names of the competing prostitution websites: "Copyright infringement issue. We need to strip out every appearance of rubmaps.com and eroticmp.com." When a staff member sought more guidance, HYER interjected: "We don't need to delete ads or users."

120. On April 7, 2012, PADILLA was informed that a woman had contacted Backpage to report that one of the "escorts" depicted on the site was only 17 years old. The woman provided the juvenile's full name and birth year and further stated that the juvenile had been attempting to recruit the complaining party's daughter (who was 15). In response, PADILLA instructed his staff to refuse to remove the ad because "she's isn't claiming her own daughter is in the ad."

121. On April 8, 2012, LACEY sent an email emphasizing that "jim [LARKIN] and I believe in legalized prostitution" and stating that Backpage's efforts to prevent the prostitution of children on the site were "not perfect, by any means."

122. On April 25, 2012, a Backpage representative spoke at a meeting of the New York City Council's Women's Issues Committee. During this meeting, the representative stated it was better to have ads for sex work appear on Backpage than have them move to other places on the internet. The representative further stated: "I don't deny that Backpage is part of the problem, but the problem is the internet."

123.   On April 27, 2012, a woman wrote an email to Backpage's support department stating that her underage daughter had been kidnapped, drugged, and was being advertised as a prostitute against her will.  The email identified the specific phone number associated with the ads (754-229-xxxx), stated that the ads appeared on a website called BackpagePics.com, and asked that the ads be removed immediately:  "This is a drugged and held against her will child who had photos taken under threat and duress . . . .  Please remove."  This email was forwarded to PADILLA by a subordinate, who asked "should we respond?"   PADILLA replied by explaining that, because the website BackpagePics.com wasn't owned by Backpage, there was no need to respond to the mother.

124.   On April 30, 2012 (three days later), the same woman wrote another email to Backpage's support department.  In this email, the woman stated that "I have contacted backpage on several occassions [sic] to remove these pictures which were posted against her will and while she was drugged and held captive.  I have yet to receive a reply."  This time, the woman provided a link to her daughter's ad on Backpage (not BackpagePics.com), which included the same phone number (754-229-xxxx) that had been included in the other ad.

125.   On May 1, 2012 (the next day), the same woman wrote a third email to Backpage's support department.  In this email, the woman included a link to another ad on Backpage depicting her underage daughter and stated:  "I also found a pix of my daughter within this url both girls are in protective custody."  Later that day, the woman received an email from Backpage's support department stating:  "The post is confirmed removed."

126.   Some of these emails were forwarded to LACEY and LARKIN.  In response, LARKIN applauded Backpage's "good solid response" to the woman and remarked:  "this whole rigamarole seems a little odd to me."

127.   On May 10, 2012, the television news station CNN ran an expose on Backpage that emphasized "how young some of these girls look" and deemed the website "a hub for the sex trade."

128. On May 11, 2012, PADILLA sent an email to VAUGHT and other Backpage employees entitled "forbidden planet." Enclosed with the email was an Excel spreadsheet that identified over 600 words and phrases that are indicative of prostitution. The spreadsheet also specified, for each word and phrase, whether an ad containing the offending language should be banned or whether Backpage should simply "strip term from ad" and then publish it after the revision.

129. On July 12, 2012, PADILLA sent an email (which was also shared with VAUGHT) to the head of Backpage's Indian moderation team. In this email, PADILLA criticized the moderators for deleting too many ads and provided the following instruction: "I agree that 'over cautiousness' is as big of a problem as moderators that miss a lot of violations."

130. Between June 2012 and August 2012, a Backpage representative, E.M., engaged in correspondence with a vendor about potentially acquiring software "that could help Backpage screen for minors." In one email, sent on August 16, 2012, the vendor stated that he understood, from his discussions with E.M., that "Backpage has a problem with pimps phoning in false accusations that another advertiser's women are underage. Do we know if there is any public DB [database] that they might affordably access to solve this?" and further stated that the vendor could not assist with this "problem." In response, E.M. thanked the vendor for the information, sought additional information about the cost of the software, and forwarded the email chain to C.F.

131. In or around November 2012, a researcher at Arizona State University published a study concluding that most of the ads on Backpage's Phoenix page involved prostitution and that many of the ads depicted juvenile trafficking victims. On December 19, 2012, LACEY was forwarded a copy of the study's results. The researcher responsible for the study also met with a Backpage representative to propose various mechanisms for reducing or eliminating the prostitution of children on the website. Backpage declined to adopt these proposals.

132. Between around September 2010 and October 2012, C.F. became aware that

a particular Backpage customer, P.R., was posting prostitution ads. Rather than bar this customer from posting future ads, C.F. repeatedly restored her posting privileges and gave her advice on how to conform to Backpage's publication standards. The communications involving this woman's ads included the following:

• On September 26, 2010, C.F. received an email from a woman who was obviously posting prostitution ads on Backpage. The woman, whose email address included the phrase "provider4u," wrote to complain that her escort ad ("50 Red Roses special – Dont Miss out !!!") had been removed even though "[o]ther women have more explicit ads than me and they are up!" The woman continued: "I can not afford to have this ad removed. This is the only way I can get by and if its not on all the time I will not be able to pay my bills . . . . My fiancé is in jail and he is not able to help me at this point." In response, C.F. arranged for the woman to be allowed to continue posting ads.

• On October 6, 2010, C.F. received another email from the same woman. In this email, she complained that her most recent ad had been removed because it included an explicit picture of her body. She provided a copy of the picture to C.F. and stated: "If the person [who removed the ad] is such a prude well maybe they should check out the other women's ads in that [escorts] section." On November 15, 2010, C.F. wrote back to the woman to encourage her to edit the ad so it could be re-posted: "Ok, please try editing the ad now." After this exchange, the woman was permitted to resume posting ads on Backpage.

• On June 6, 2011, C.F. received another email from the same woman. It stated: "I would really appreciate it if you would please take the block off my ad for editing . . . . I wont post any more objectionable pics, ok?" In response, C.F. arranged for the woman's editing and posting privileged to be restored: "You should be able to edit now. Please let us know if you are still having any trouble." After this exchange, the woman resumed posting ads on Backpage.

• On July 14, 2012, C.F. received another email from the same woman. It stated: "would you please take the edit block off my ad. I need to change some info on it

and update it. I promise i wont put no more nude pics in it, you have my word. . . . [M]y ad says: 50 red roses special – dont miss out." After this exchange, the woman was allowed to continue posting ads on Backpage.

- On September 17, 2012, C.F. received another email from the same woman. This time, she complained that Backpage was editing her ads (whose title continued to feature the obvious prostitution term "50 Red roses special") to remove the most explicit pictures. She stated: "I would like to know why my ad in the escort section of backpage keeps getting messed with. . . . [S]omeone keeps erasing the link to my pics on the ad. that is so wrong. I am being deprived of income that I sorely need . . . . There are other woman posting pics on their ads that show more nudity . . . ." After this exchange, the woman was permitted to continue posting ads on Backpage.

- On October 16, 2012, the woman wrote another email to Backpage. In this email, she again complained about how Backpage was editing her ads to remove the most explicit pictures. She stated: "It is very hard for me to make any income from this ad as they continually go into my ad and remove the link from the ad that goes to my pictures. They wont allow me to post my pics on the ad yet other women with other ads show more nudity than my pictures ever did."

- This email was forwarded to VAUGHT and to PADILLA, who asked another Backpage employee to "dig into this one a little." On October 17, 2012, PADILLA received a follow-up email from his co-worker stating that the woman's ad had been posted on September 27, was still on the Backpage website, and that the pictures the woman had originally attempted to include in the ad (which had been stripped by Backpage) were "topless shots."

- Following these exchanges, between October 2012 and November 2015, the same customer was allowed to post over a dozen new ads on Backpage, many of which utilized the same identifying information, coded prostitution terms, and contact phone number as before.

133. On January 7, 2013, VAUGHT was informed by a moderator that Backpage

wasn't diligently pursuing reports of child exploitation: "We've supposedly been checking them, but some seem to be ignored. They get 'marked as read', but nothing gets done with them. It's aggravating and irresponsible."

134. On June 6, 2013, Backpage received a letter from NCMEC recommending the adoption of several specific security measures to prevent the trafficking of children. The recommended security measures included (a) verifying the age and identity of users who submitted adult ads, (b) verifying the age and identity of individuals depicted in photographs within adult ads, (c) prohibiting the use of anonymous payment sources such as prepaid credit cards, and (d) requiring users to utilize verified email addresses and telephone numbers. Backpage declined to follow any of these recommendations.

135. On August 30, 2013, LARKIN, SPEAR, BRUNST, HYER, and C.F. received an email notifying them that "Chase [Bank] was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking." In response, C.F. informed the group that he intended to begin "giv[ing] users free ads if they complain while we wait on directly transactions to another processor."

136. On September 11, 2013, a Backpage representative made a presentation to the Arizona Governor's Task Force on Human Trafficking. Following this presentation (which took place in Phoenix), the representative was asked whether there would be any "cons" to requiring verifiable identification of all escorts being advertised on Backpage's website. In response, the representative did not identify any financial or logistical hurdles to the adoption of such a requirement. Instead, the representative stated that such a requirement would simply cause Backpage to lose business to other prostitution websites like myRedBook.com or to overseas prostitution websites. During this meeting, members of the task force also provided the representative with evidence showing that Backpage's moderation efforts were ineffective at preventing the publication of prostitution ads.

137. On April 3, 2014, PADILLA and VAUGHT were forwarded an email that had been sent to Backpage by a credit card processing company in Canada. The email stated that "[w]e have multiple user accounts that are paying for your services for what I

1   understand to be prostitution advertisements" and sought information about "how you are

2   processing these transactions."

3       138.    On April 14, 2014, LARKIN and BRUNST received an email from C.F.

4   discussing why Backpage had experienced "past high growth" and identifying various

5   ideas for achieving "future growth."  This email stated that Backpage had been the

6   beneficiary of "[m]igration of content from other . . . marketplaces to the internet" and

7   identified one particular marketplace as a key source of Backpage's customers: "[N]et loss

8   for brick and mortar marketplaces: Strip clubs, hotels, and gathering spots displaced by the

9   internet."  In other words, the email acknowledged that the supposed "escorts" advertising

10  on Backpage were actually prostitutes (lawful escorts did not congregate at strip clubs,

11  hotels, and other brick-and-mortar "gathering spots" during the pre-internet age).  This

12  email also attributed Backpage's success in part to its adoption of policies that allowed

13  customers to post ads without leaving any meaningful identifying information—in a list of

14  Backpage's advantageous policies, it identified "Anonymous," "Prepaid card friendly,"

15  "User can post paid ads without a valid email address," and "bitcoin."

16      139.    On April 24, 2014, VAUGHT sent an email to Backpage's moderators (while

17  cc'ing PADILLA).  In this email, VAUGHT explained that if a moderator came across an

18  ad containing a link to a "sex for money" website, the moderator should add the link to a

19  list of banned terms but "don't bother removing it from the current ad."

20      140.    On September 4, 2014, Backpage was served with a brief that had been filed

21  by NCMEC in a lawsuit in Washington state court.  In this brief, NCMEC criticized the

22  sincerity of Backpage's efforts to prevent child sex trafficking: "Backpage has repeatedly

23  claimed in public statements and court filings that it is working to reduce child sex

24  trafficking on its website.  The unpleasant reality is that Backpage publicizes carefully

25  selected operational processes as a subterfuge to avoid increased scrutiny, while providing

26  traffickers with easy access to an online venue to sell children for sex.  In practice,

27  Backpage's stated interest in doing something meaningful to stop child sex trafficking ads

28  on its site is apparently overridden by the enormous revenue it generates from its escort

ads, including ads selling children for sex."

141.   On March 17, 2015, a law enforcement officer with the California Department of Justice spoke with a Backpage representative concerning the prevalence of blatant prostitution ads on Backpage.  In response, the representative did not dispute the officer's characterization and said the internet and prostitution were not going away.

142.   On or about July 19, 2015, LACEY and LARKIN received a "Thank You Letter" from the Sex Worker's Outreach Project ("SWOP").  This letter lauded Backpage's contributions to the prostitution industry ("Backpage has made quite a difference for many of us . . . ."), thanked Backpage for continuing to permit sex workers "to advertise in the 'Adult' area," expressed gratitude for Backpage's willingness to accept alternative payment methods "as a way to pay for ads when MasterCard and Visa abruptly halted processing our credit card payments," and stated that Backpage had provided "our community an opportunity to learn how to use alternative payment methods, like Bitcoin."

143.   On July 30, 2015, a document entitled "trainingJuly2015" was distributed to Backpage's moderators.  This training manual specifically told moderators that, if they saw a photograph depicting "a person [who] looks young/minor," they should "approve dont delete the ad unless it has a banned term."  The training manual also identified, under the heading "THESE ARE ALL OKAY," a long list of terms that are indicative of prostitution, such as "99% CUM BACK FOR MORE," "car service," and "lollipop special."

144.   In or around August 2015, as part of a lawsuit in Illinois, Backpage was served with an affidavit from a detective employed by the Seattle Police Department.  In this affidavit, the detective avowed that "[t]o date, no Detective within the Seattle Police Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort' (person who charges simply for companionship with no offer of sex) or 'masseuse' (person offering legitimate and licensed massage therapy rather than sex) while responding to ads placed in these categories on Backpage.com" and that "every time the Seattle Police Department's Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity."  During the same lawsuit in

Illinois, Backpage was served with a different affidavit from a detective employed by the Boston Police Department. In this affidavit, the detective avowed that "Backpage.com is the number one site in Boston for prostitution and sex trafficking," that his unit had "[s]ince 2010 . . . arrested over 100 buyers of sex of both adults and minors through Backpage.com ads," and that "nearly all the cases we find associated with it [Backpage] involve pimp controlled prostitution."

145. On October 7, 2015, PADILLA received an email from another Backpage employee (which was later forwarded to VAUGHT) disclosing that there were "massive numbers of live ads with banned terms and pictures out on the site."

146. On December 9, 2015, Backpage received an email from a reporter stating that "[o]f the 359 sex trafficking incidents Toronto Police have been involved in since 2013, every single girl that was rescued was advertised on Backpage." The email also asked: "Why hasn't Backpage closed down the adult escort ads portion of its site like Craigslist when it's known that underage girls are being exploited via Backpage?"

147. In or around January 2016, Company A was retained to serve as a payment processor for some of Backpage's websites. On April 29, 2016, Company A informed C.F. that it had conducted "a review of your website, and unfortunately we had to suspend your account . . . [because] advertising of illegal activities is strictly forbidden."

148. Beginning in or around January 2016, Backpage's moderators were instructed to stop removing ads that contained the phrase "GFE." For example, on January 28, 2016, VAUGHT was sent an email from a Backpage moderator explaining that "As far as I am aware we are no longer removing ads for GFE." Similarly, on March 9, 2016, a Backpage moderator sent an email to his coworkers explaining that "Andrew [PADILLA] and I talked about the GFE thing, going forward we will not be removing ads for GFE" and clarifying "this includes even gfe with price." And again, on March 25, 2016, an email was sent to Backpage's moderation staff stating that "We are no longer removing ads for 'GFE' or 'PSE.'"

149. In fact, the BACKPAGE DEFENDANTS repeatedly acknowledged that the

term "GFE" (girlfriend experience) is a coded term for prostitution.  For example:

- On October 26, 2010, SPEAR, HYER, and PADILLA received an email from C.F. that explained: "No coded sex act for money: GFE, PSE, BBBJ, DATY, etc."

- On May 4, 2011, HYER sent an email to PADILLA and others identifying GFE as a "code word" that should be forbidden.

- On August 31, 2011, PADILLA and C.F. exchanged emails in which they discussed a list of 100 "solid sex for money terms."  The list included "GFE = girlfriend experience."

- On November 2, 2011, PADILLA and VAUGHT received an email from a co-worker identifying GFE in a list of "sex phrases and coded terms" that are "not allowed."

150.  HYER, PADILLA, and other BACKPAGE DEFENDANTS periodically received a "Google alert" when articles discussing Backpage appeared in the news.  Many of the news articles identified in these alerts discussed instances in which prostitutes who had been advertised on Backpage were kidnapped, raped, or murdered.

151.  In January 2017, after conducting a lengthy investigation, the Senate Subcommittee on Permanent Investigations ("Subcommittee") issued a 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking."  This report concluded, among other things, that virtually all of Backpage's "adult" ads were actually solicitations for illegal prostitution services and that "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . .  Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created."

152.  In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website.  However, the prostitution ads simply migrated to other sections of the website, where they remained until the website was shut down by federal law enforcement authorities in April 2018.

**D.**     **International Operations**

153.     In addition to facilitating prostitution through its U.S. website, Backpage also facilitated prostitution through its websites in foreign countries. In this context, Backpage (as it did through its domestic "aggregation" efforts and the Dallas Plan) often affirmatively created the content of the prostitution ads being published.

154.     Around 2013 or 2014, Backpage hired a Philippines-based company (Company B) in an attempt to increase the profitability of Backpage's international operations. Company B's employees were instructed to (1) visit rival prostitution websites in other countries, (2) obtain the email addresses of prostitutes who were posting ads on those websites (often by falsely posing as prospective customers), (3) use the information from the other website to create a competing prostitution ad on Backpage (a process referred to internally as "preboarding"), and then (4) transmit the new ad to the prostitute, often using the previously-harvested email account information, in an attempt to persuade the prostitute to become a Backpage customer. Company B's employees were paid bonuses based on the amount of ad revenue they generated for Backpage using these techniques.

155.     Backpage's executives were fully aware of the plan to use Company B to create prostitution ads outside the United States. For example, on or around November 6, 2013, C.F. made a presentation to LARKIN, SPEAR, and BRUNST. Among other things, this presentation summarized Backpage's plans for "International Planning and Expansion." One of the plans was to use the Philippines as a "test" market and hire Filipino contractors to "contact by email leads, secure email address, add ad and email address in [computer system] and assign to American staff. American staff makes contact."

156.     On August 7, 2014, HYER sent an email stating that Company B was "an efficient and cost effective way for us to bring new users to backpage." This email also contained the following summary of how Company B would operate: "Process after hiring company offering BPO services: 1. Backpage provides BPO with sites, categories & countries to target. Backpage also provides sample 'scripts' and examples of phone

calls. 2. BPO contacts users via phone from sites backpage provided, obtains user email address & permission to preboard ad. 3. BPO preboards ad as public user. 4. After ad is preboarded, users receive verification link to verify the ad." This email also stated that Backpage would offer a "bonus per verified authenticated ad."

157. On April 10, 2015, a "five-year business plan" was emailed to LARKIN, BRUNST, SPEAR, and C.F. One of the goals for 2015 was "Off shore marketing staff in the Philippines to grow to 166 and main task is international market content acquisition." This email also included a separate attachment stating that HYER should be considered for promotion because "his strengths are strong marketing and revenue growth skills" and he had been "heavily involved in the user experience development" and that VAUGHT should be considered for a promotion because "[h]er strengths include six years of experience managing moderators."

158. On May 15, 2015, a Company B employee posing as a Backpage employee sent an email to an apparent prostitute. The subject line was "Offering Free Advertisement from Backpage.com" and the text of the email sought to persuade the prostitute to "upgrade your ad with sponsor placement or automatic repost." In response, the prostitute wrote back that she had "managed to activate my ad and could buy credits as well. thanks for your help. I'm traveling today to [London] how can I change my location." This email exchange was later forwarded by HYER to C.F. with a cover note stating: "[I]deal scenario for [Company B] agent – user activates ad, user purchases credit."

159. On December 14, 2015, C.F. was part of an email exchange concerning an ad that had an IP address associated with Company B. This email contained the following description of Company B's process for creating and selling prostitution ads on Backpage: (1) "Staff found lead in assigned area." (2) "Staff entered all relevant into [database] (phone/email/etc.)" (3) "Staff called lead to discuss creation of free ad" (4) "Staff created free ad for lead (verification email sent)." (5) "Staff followed under with an email reminding lead of phone conversation and detailing verification of ad."

**E.**    **Select Victim Summaries**

160.    Between in or around 2009 and 2013, Victim 1 was sold for sex, through the use of Backpage ads, in Ohio, Indiana, and Georgia. Victim 1's Backpage ads often included words and phrases that were indicative of prostitution, such as "roses" (money). On at least one occasion, Victim 1 contacted Backpage after a proposed ad had been rejected because it contained banned words and phrases. In response, a Backpage representative coached Victim 1 on how to re-write the ad using different words. Victim 1's trafficker took all of the money that was earned through her acts of prostitution.

161.    Between in or around 2009 and 2011, Victim 2 was sold for sex, through the use of Backpage ads, in Arizona, Georgia, North Carolina, Texas, New York, New Jersey, and Louisiana. Victim 2's trafficker drafted her Backpage ads and Victim 2 initially did not know she was being offered on Backpage. The ads contained words and phrases to make customers believe Victim 2 was "barely legal" and also contained words and phrases indicative of prostitution, such as "roses" (money).

162.    Between in or around 2009 and 2012, Victim 3 was sold for sex, through the use of Backpage ads, in Colorado and North Dakota. Victim 3's pimp instructed her to review existing prostitution ads on Backpage to learn how to draft her own ads. During a portion of this period, Victim 3 was required by her pimp to make week-long trips to North Dakota to work as a prostitute. During these trips, which would generate as much as $2,000 in prostitution-derived revenue each day, Victim 3 was forced to leave her children at home in the care of her pimp.

163.    In or around 2010, Victim 4 was sold for sex, through the use of Backpage ads, in Washington. During this period, Victim 4 was a juvenile (15 years old). Victim 4's pimp drafted the ads that were placed on Backpage. The wording of these ads was edited by Backpage before publication. The ads contained words and phrases such as "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL" and included pictures of Victim 4 in provocative positions showing her breasts and buttocks.

164. Between in or around 2011 and 2016, Victim 5 was sold for sex, through the use of Backpage ads, in Massachusetts and Rhode Island. During much of this period, Victim 5 was a juvenile (14-19 years old). Victim 5's female pimp instructed Victim 5 that Backpage was the safest place to advertise because it did not require age verification. On one occasion, Backpage declined to accept a proposed ad that indicated Victim 5 was only 17 years old. In response, the ad was simply resubmitted with a new (false) age of 19. On other occasions, Backpage removed provocative pictures of Victim 5 from ads and then allowed edited versions of the ads to be published. Victim 5's Backpage ads included words and phrases that were indicative of prostitution, such as "roses" (money) and "back door" (anal sex). Some of the customers who responded Victim 5's Backpage ads forced Victim 5 to perform sexual acts at gun point, choked her to the point of having seizures, and gang-raped her.

165. In or around June 2012, Victim 6 was sold for sex, through the use of Backpage ads, in Arizona. Her traffickers utilized Backpage ads that did not offer a specific person but instead generally offered a woman with a particular type of hair color and build. On June 22, 2012, Victim 6 was dispatched to a customer who had responded to a Backpage ad featuring "Nadia," who was described as a slender brunette woman. Upon her arrival at the location, Victim 6 was stabbed to death.

166. Between in or around 2012 and 2015, Victim 7 was sold for sex, through the use of Backpage ads, in Washington and Oregon. Victim 7's pimp drafted the ads that were placed on Backpage. The wording of these ads was edited by Backpage before publication. The ads contained provocative nude pictures of Victim 7.

167. Between in or around 2013 and 2014, Victim 8 was sold for sex, through the use of Backpage ads, in Maine, Connecticut, and Massachusetts. During this period, Victim 8 was a juvenile (15 years old). Victim 8's uncle, as well as his friends, placed the ads on Backpage, which included words and phrases that were indicative of prostitution, such as "roses" (money), "fetish friendly," and 150 for 1/2 hour, 200 for full hour. Through these ads, Victim 8 was forced to do "in-calls" (where she was raped in hotels) as

well as "out-calls" (where she was raped at other locations chosen by the men paying for her).

168.    In or around 2013, Victim 9 was sold for sex, through the use of Backpage ads, in Florida. Victim 9's pimp taught her how to use code words in her Backpage ads to indicate how much she was charging for certain sex acts. Victim 9 was brutally attacked by her trafficker, causing bruises and a fractured cheek bone.

169.    Between in or around 2014 and 2015, Victim 10 was sold for sex, through the use of Backpage ads, in California and Arizona. During some of this period, Victim 10 was a juvenile (17 years old). An associate of Victim 10's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire" and included pictures of Victim 10 in provocative positions showing her legs, stomach, shoulder, and buttocks.

170.    Between in or around 2014 and 2015, Victim 11 was sold for sex, through the use of Backpage ads, in Arizona, Colorado, Minnesota, Oregon, California, Montana, Nevada, New Mexico, and Utah. The Backpage ads contained words and phrases indicative of prostitution and included pictures of Victim 11 in provocative positions. On some occasions, Backpage would remove certain explicit photos from the ads but publish the remaining text and other photos. Victim 11's trafficker gave her drugs, took her identification documents, sexually assaulted her with a firearm, and forced her to work full-time as a prostitute.

171.    In or around 2015, Victim 12 was sold for sex, through the use of Backpage ads, in California and Arizona. Victim 12 was first advertised on Backpage in San Bernardino, California, but moved to the Phoenix metro area because the Super Bowl was being held there. Victim 12's advertisements on Backpage contained words and phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}" and included pictures showing Victim 12's legs, stomach, shoulders and buttocks.

172.    In or around 2015, Victim 13 was sold for sex, through the use of Backpage

ads, in California. During this period, Victim 13 was a juvenile (15 years old). Victim 13 and her trafficker both posted the Backpage ads, which falsely represented that Victim 13 was 19 years old and showed pictures of her face and body. On at least one occasion, a Backpage representative contacted Victim 13 with instructions on how to fix an ad so it could be published.

173. In or around June 2015, Victim 14 was sold for sex, through the use of a Backpage ad, in Texas. This ad contained words and phrases such as "fun, young, exotic," "Ready to be your fantasy girl," "OUT CALLS ONLY," and "NO BLACK MEN" and included pictures of Victim 14's stomach, breasts, shoulders, and buttocks. On or around June 20, 2015, Victim 14 was murdered by a customer. Afterward, the customer attempted to destroy Victim 14's corpse by lighting it on fire. Victim 14's father later contacted Backpage to request that the ads showing his deceased daughter be removed. Backpage did not immediately comply with this request.

174. In or around June 2015, Victim 15 was sold for sex, through the use of Backpage ads, in Texas and Louisiana. These ads contained words and phrases such as "Thick Glass of Chocolate Milk Looking for a GoodTime!!!" and "sexy certified freak" and contained pictures showing Victim 15's legs, shoulders and buttocks. On June 10, 2015, Victim 15 was forced into a vehicle with her trafficker, who was attempting to take her to Texas against her will. In an attempt to escape, Victim 15 jumped out of the vehicle onto Interstate 10 and was killed after being hit by several vehicles at high speeds.

175. In or around July and August 2015, Victim 16 was sold for sex, through the use of Backpage ads, in Michigan. These ads contained words and phrases such as "OUTCALLS ONLY," "Juicy Caramel Lady On Duty," "Sexy, Erotic Caramel Dream," and "No Thugs, Pimps Or Weirdos" and contained pictures showing Victim 16's breasts, legs, lips, buttocks, and face. On August 15, 2015, Victim 16 was murdered by a customer. Afterward, the customer dumped her corpse in a park.

176. Between in or around 2015 and 2016, Victim 17 was sold for sex, through the use of Backpage ads, in Arizona and California. Victim 17 averaged ten customers a

day during this time and turned over all of her prostitution earnings (approximately $1,500 per day) to her pimp. An associate of Victim 17's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true!" and "Sorry, but NO BLACK MEN" and included pictures of Victim 17's buttocks and face.

## F. Money Laundering Activities

177. Backpage's customers overwhelmingly used the proceeds of criminal activity (*i.e.*, money earned from pimping and prostitution) when purchasing ads on Backpage. In addition, because Backpage's publication of such ads was an independent crime (*e.g.*, violation of 18 U.S.C. § 1952), the fees it collected from customers posting prostitution ads—estimated at more than $500 million—constituted the proceeds of unlawful activity.

178. For these and other reasons, banks and financial institutions repeatedly refused to do business with Backpage. In response, the BACKPAGE DEFENDANTS pursued a variety of money laundering strategies. For example, on August 27, 2013, C.F. was forwarded an array of emails from Backpage customers who were complaining that their credit card companies had refused to process Backpage-related transactions. One customer wrote: "Have you resolved the issue of Chase Bank not honoring payment for you for ethical reasons?" C.F. forwarded these complaint emails to LARKIN, SPEAR, and BRUNST and proposed, as a "solution" to the problem, that Backpage reconfigure its website to fool credit card companies into believing the charges were being incurred on a different website.

179. During a November 2013 presentation by C.F. to LARKIN, SPEAR, and BRUNST, C.F. again discussed strategies for fooling credit card companies into believing that Backpage-associated charges were being incurred on different websites, including a proposal to set up shell companies without any apparent connection to Backpage ("create new companies with new principals") and use their bank accounts to accept payment. Another "solution" was to "allow users to fund an account thru several other sites" that

1 "have no adult or images."

2      180.   On November 6, 2013, LARKIN, SPEAR, and BRUNST received an email

3 entitled "Options for the future of Backpage." This email discussed various strategies for

4 creating new entities to process Backpage-related payments "without ever disclosing ties

5 to Backpage."

6      181.   On April 1, 2015, BRUNST and C.F. were informed that Mastercard was

7 "snooping around" Backpage and might stop processing payments for Backpage. In

8 response, C.F. offered several suggestions for setting up new payment channels that would

9 conceal Backpage's involvement. One such proposal was to begin routing Backpage-

10 related transactions through banks located in the country of Mauritius. In response,

11 BRUNST stated: "Didnt we go down the Mauritius path once and the banks had the same

12 issue with our content?"

13      182.   Notwithstanding these strategies, the three major credit card companies

14 stopped doing business with Backpage. On or about April 30, 2015, Backpage learned that

15 American Express would no longer allow its cards to be used for any purchases in

16 Backpage's adult section. In or around July 2015, Backpage learned that Mastercard would

17 no longer allow its cards to be used for Backpage-related transactions. When discussing

18 this decision, MasterCard stated that it "has rules that prohibit our cards from being used

19 for illegal activities." Around the same time, Backpage learned that Visa would no longer

20 allow its cards to be used for Backpage-related transactions. When discussing this

21 decision, Visa stated that its "rules prohibit our network from being used for illegal

22 activity."

23      183.   Similarly, some banks closed accounts that were held by Backpage (or

24 Backpage-related entities) out of concern the accounts were being used for illegal purposes.

25 For example, on April 2, 2014, BRUNST received a letter from U.S. Bank that was

26 addressed to "Backpage.com." The letter explained: "Dear Jed . . . please be advised that

27 we have elected to close your Account with us."

28      184.   Backpage responded to these developments in several ways. One was to

encourage customers to send checks and money orders to a Post Office box held in the name of a seemingly-unrelated entity called Posting Solutions LLC ("Posting Solutions") and give such customers a corresponding credit on Backpage. For example, on July 31, 2015, C.F. exchanged email correspondence with a representative from a payment processing company. In this email, C.F. identified himself as the CEO of Posting Solutions, described Backpage as a "brand" operated by Posting Solutions, and explained he was seeking to "find a way to position payments under another company."

185. The following episode provides an example of how the Posting Solutions payment process worked. On October 16, 2015, Backpage received an email from a customer complaining about her inability to pay for ads using a credit card. In response, a Backpage representative explained—in an email exchange later forwarded to VAUGHT— that "[i]f you would like to pay for upgrades or buy credits, we suggest posting with alternative payment methods such as Bitcoin. If you are in the United States, you can also pay by check or money order. Please make payable to 'Posting Solutions.' WE CAN ONLY ACCEPT CHECKS OR MONEY ORDERS MADE OUT TO 'POSTING SOLUTIONS.' Posting Solutions. Attn: Accounts. P.O. Box 192307. Dallas, TX 75219. Please send through the United States Postal Service. FedEx, UPS, or other mail delivery alternatives cannot deliver to a P.O. Box. When sending your payment please be sure to include your email address. Please do not make your payments out to backpage.com as we will no longer be able to accept them."

186. Between around September 2015 and June 2016, over $7.1 million of checks and money orders sent by Backpage customers were deposited in bank accounts held by Posting Solutions.

187. Backpage also utilized a different entity, called Website Technologies, LLC ("Website Technologies"), to process Backpage-related funds and took steps to make it appear that Backpage and Website Technologies were independent entities. For example, on March 10, 2014, BRUNST, SPEAR, and others participated in an email exchange with the subject line "Website Technologies vs Backpage (Vendors, audits, risk assessments,

email).” During this exchange, one person stated “[C.F.] and I were just discussing company names and the possibility of updating our email addresses to websitetechnologies.com.” In response, BRUNST cautioned: “We need to think this thru or all the work to separate it from BP will be lost.” Similarly, on April 3, 2014, BRUNST sent an email to SPEAR and others explaining that “[b]y May 1 we will have to be out of US Bank. We will move all banking under Website Technologies at [a different bank, BMO Harris].”

188. In many instances, Backpage-related money that was initially deposited into accounts held by Posting Solutions was later transmitted to accounts held by Website Technologies. For example:

• On October 27, 2015, C.F. received an email entitled “Two packages coming your way! (Money Orders).” The email stated that two UPS packages filled with money orders were being sent—one containing $47,647.25 of money orders made out to Backpage and the other containing $52,251.48 of money orders made out to Posting Solutions.

• Similarly, on November 16, 2015, C.F. received an email entitled “Three packages sent today $441,408.69.” The email stated that three packages filled with money orders were being sent—one containing $129,193.61 of money orders made out to Backpage, another containing $244,353.63 of money orders made out to Posting Solutions, and the last containing an additional $67,861.75 of money orders made out to Posting Solutions.

• And again, on January 29, 2016, a Posting Solutions account wired $2.4 million to a Website Technologies account. PADILLA and C.F. were both authorized signers on the recipient account.

189. In addition to receiving millions of dollars from Posting Solutions, the Website Technologies accounts also served as the repository for millions of dollars of wires from international bank accounts controlled by Backpage-associated entities. For example, between January 2015 and December 2016, Website Technologies accounts received over $45.4 million in wire transfers from Backpage-associated bank accounts in Liechtenstein,

over $30.1 million in wire transfers from Backpage-associated bank accounts in Iceland, and over $3.9 million in wire transfers from Backpage-associated bank accounts in the Netherlands.

190.    In many instances, the next stage of the money-laundering process was for money to be wired from Website Technologies accounts to bank accounts held by a different entity called Cereus Properties LLC ("Cereus Properties"). The authorized signers on the Cereus Properties accounts included SPEAR and BRUNST. Between around December 2015 and October 2016, Website Technologies accounts sent wire transfers totaling over $47 million to accounts held by Cereus Properties.

191.    Accounts held by Cereus Properties also received money directly from international bank accounts controlled by Backpage-associated entities. For example, between around August 2016 and November 2016, Cereus Properties accounts received over $11.3 million in deposits and wire transfers from Backpage-associated accounts in the Netherlands.

192.    After money reached Cereus Properties, large portions of it were funneled back to Backpage or to certain BACKPAGE DEFENDANTS. For example, between January 2016 and January 2017, LACEY (and LACEY's family members) received distributions totaling over $30.3 million and LARKIN separately received distributions totaling over $21 million.

193.    Backpage also furthered its money laundering efforts through the use of bitcoin processing companies. Over time, Backpage utilized companies such as CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital to receive payments from customers and/or route money through the accounts of related companies.

194.    Backpage also furthered its money laundering efforts by developing ways for customers to purchase ads using gift cards issued by third-party vendors. This process was described in a July 23, 2015, email exchange between various Backpage employees on which HYER and others were copied. This exchange included the following: "[W]hat if we used a customers [sic] payment method, say visa prepaid card, to buy [bitcoin] from

our seller account . . . giving said bitcoin to our catch-all wallet elsewhere (instead of to user), simultaneously adding credits/purchasing paid ad or upsells? From the user's perspective they just input their prepaid card and get their credits or purchase."

## COUNT 1

### (Conspiracy)

195. The factual allegations in Paragraphs 1-194 are incorporated by reference and re-alleged as though fully set forth herein.

196. Beginning in or around 2004, and continuing through April 2018, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

        a.    18 U.S.C. § 1952(a)(3)(A) (Travel Act—Facilitate Prostitution).

### OBJECT OF THE CONSPIRACY

197. The object of the conspiracy was to obtain money.

### MANNER AND MEANS OF THE CONSPIRACY

198. The manner and means of the conspiracy are described in paragraphs 1-194 above, incorporated by reference and re-alleged as though fully set forth herein.

### OVERT ACTS

199. Overt acts were committed in furtherance of the conspiracy, including but not limited to those described in paragraphs 1-194 above, incorporated by reference and re-alleged as though fully set forth herein.

In violation of 18 U.S.C. § 371.

## COUNTS 2-51

### (Travel Act—Facilitate Prostitution)

200. The factual allegations in Paragraphs 1-199 are incorporated by reference and re-alleged as though fully set forth herein.

201.   On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to Title 13, Arizona Revised Statutes, Section 13-3214, and thereafter performed and attempted to perform an act that did promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as follows:

| Count | Date | Description |
| --- | --- | --- |
| 2. | Sept. 10, 2013 | Publish ad depicting Victim 5 entitled "Get freaky Tuesday . . Come spend ur day with us – 19," with accompanying text "Doin incalls and outcalls" |
| 3. | Jan. 27, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 4. | Jan. 29, 2014 | Publish ad depicting Victim 8 entitled "Puerto Rican mami in walpole area INCALLS –19" after deleting one picture from the originally-submitted ad |
| 5. | Jan. 31, 2014 | Publish ad depicting Victim 8 entitled "Exotic latina, south portland area, ready to play, INCALLS, 30 min specials!!! – 19" after deleting one picture from originally-submitted ad |
| 6. | Feb. 6, 2014 | Publish ad involving P.R. entitled "75 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 7. | Apr. 20, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |

| 8. | May 7, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
|---|---|---|
| 9. | May 31, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 10. | July 1, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 11. | Aug. 19, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 12. | Nov. 23, 2014 | Publish ad depicting Victim 10 entitled "New in Town Super Hot Skinny Mixed Cuban Girl With Long Black Hair – 18" after deleting picture from originally-submitted ad |
| 13. | Jan. 29, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asain Bombshell with a Nice & Tight {Booty} – 23" after deleting one picture from the originally-submitted ad |
| 14. | Jan. 31, 2015 | Publish ad depicting Victim 10 entitled "NEW IN TOWN sexy sweet European mixed Cuban California girl – 21" |
| 15. | Jan. 31, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asian mixed Bombshell – 23" after deleting one picture from the originally-submitted ad |
| 16. | Feb. 4, 2015 | Publish ad depicting Victim 11 entitled "Upscale Independent BRUNETTE BOMBSHELL 5-Star Fantasy – 26," after deleting pictures from originally-submitted ad |
| 17. | Feb. 18, 2015 | Publish ad depicting Victim 11 entitled "Alexis Foxx the HOTTEST in town!!!!! – 26," after deleting six pictures from the originally-submitted ad |
| 18. | Feb. 26, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |

| 19. | May 18, 2015 | Publish ad depicting Victim 15 entitled "GORGEOUS ebony PLAYMATE Perfect Curves…Skills to make ur TOES CURL – 19," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "Incalls & Outcall!!!" |
|---|---|---|
| 20. | May 19, 2015 | Publish ad depicting Victim 15 entitled "Hot & Driping Submissive Ebony Playmates – 20," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "We're ready to please and accommodate all of your needs and wants!!  With a mouth that'll ROCK your [] and a [picture of cat] that'll leave you purring for more" |
| 21. | July 1, 2015 | Publish ad depicting Victim 17 entitled "AbSoLuTeLy AmAziNg CoMe PLaY WiTh Me #1 MoST WaNtEd SwEeT SEXii PlAymate – 20," with accompanying text "By contacting me you agree that you are not affiliated with any form of law enforcement," PERFECT & Will satisfy your every need," and "IN/CALLS – ONLY" |
| 22. | July 2, 2015 | Publish ad depicting Victim 17 entitled "SeXy!! Exotic playmate Call me! the girl you NEED to See! – 20," with accompanying text "I DO NOT OFFER 40$, 50$, 60$ SPECIALS" and "IN/CALLS – ONLY" |
| 23. | Aug. 13, 2015 | Publish ad depicting Victim 13 entitled "Young SEXY PUERTO RICAN – 19," which accompanying text "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" |

| 24. | Aug. 15, 2015 | Publish ad depicting Victim 16 entitled "Outcalls Now Freaky Curvy Caramel Lady OUTCALLS NOW – 23" |
| 25. | Sept. 13, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 26. | Nov. 28, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 27. | Apr. 21, 2016 | Publish ad entitled "Finally!!  PSE & GFE – Kimber Rae and MIA Marie Together BOOK NOW" |
| 28. | Nov. 3, 2016 | Publish ad entitled "GFEE New – 18" |
| 29. | Nov. 11, 2016 | Publish ad entitled "Mind blowing Tiffany. Incall in Taunton – 37," with accompanying text "Soft GFE . . . Im real and reviewed" |
| 30. | Nov. 14, 2016 | Publish ad entitled "Top Model  2016 Special  'Best Looking Young Asian' . . . – 22," with accompanying text "Sexy Asian Girl Incall Service" and "GFE" |
| 31. | Nov. 14, 2016 | Publish ad entitled "Sometimes It's All About The Journey, And The Destination.....Erectile Dysfunctional G F E Provider – 44," with accompanying test "You can find a few current reviews at T3R xxxxxx#" and "I have been EROS authenticated" |
| 32. | Nov. 19, 2016 | Publish ad entitled "The True (G)irl (F)riend (E)xperience… Visiting November 27th Sunday ~ PRE-BOOKING SPECIAL ~ - 100," with accompanying text "Let's blur restrictions between financial transaction & Romantic Connection" |

| 33. | Nov. 24, 2016 | Publish ad entitled "Top Asian Grand Opening 100% Young 100% Sexy . . . – 23," with accompanying text "BEST INCALL IN TOWN!" and "GFE" |
| 34. | Nov. 26, 2016 | Publish ad entitled "I LOVE MEN!! I'm a GFE. OutCall and Incall with exception on the Incall!! – 42" |
| 35. | Dec. 20, 2016 | Publish ad entitled "OMG Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24," with accompanying text "I do ALL the things YOU Wish Your Wife Did!!" and "(G).(F).(E) 30 min/$180" |
| 36. | Jan. 15, 2017 | Publish ad entitled "Real & Reviewed Girlfriend Theonesweet.weebly.com – 30," with accompanying text "250 G F E" |
| 37. | Apr. 4, 2017 | Publish ad entitled "KISSING & GFE KOREAN GIRLS – 20" |
| 38. | Apr. 11, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 39," with accompanying text "complete GFE experience" |
| 39. | July 3, 2017 | Publish ad entitled "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit – 20," with accompanying "100% GFE with 100% no Pimps" |
| 40. | July 15, 2017 | Publish ad entitled "Ready for some fun daddy? This is your chance too have a amazing time - 21," with accompanying text "Slim body, nice tits, freaky, GFE" |
| 41. | July 15, 2017 | Publish ad entitled "New in town BiGBubble Booty SWEETLiPS HOT BODY – 24," with "GFE" in accompanying text |
| 42. | July 21, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 30," with accompanying text "complete GFE experience" |

| 43. | July 23, 2017 | Publish ad entitled "ASIAN GODDESS young – 20," with accompanying text "100% Discreet service" and "#GFE" |
| 44. | Jan. 26, 2018 | Publish ad entitled "GFE Service Available!  Private Encounters w/ Pampering Beauty" |
| 45. | Jan. 30, 2018 | Publish ad entitled "241 & white plans area  Carfun  Perfect Treat   Available No Rush," with "Sweet Sexy GFE" in accompanying text |
| 46. | Jan. 30, 2018 | Publish ad entitled "GFE REAL HOT Sweet DREAM AMAZING BEST RELAX" |
| 47. | Jan. 30, 2018 | Publish ad entitled "Tall, Slim & Sexy Luxe Goddess * NARCISA * Sensual Body Rub + Fetish Sessions," with accompanying text "gfe Hh: $160  H: $220" |
| 48. | Jan. 31, 2018 | Publish ad entitled "Exotic Asian Beauty," with accompanying text "I am an independent GFE with excellent massage skills" |
| 49. | Feb. 1, 2018 | Publish ad entitled "Nuru (Best GFE ever) incall only" |
| 50. | Feb. 6, 2018 | Publish ad entitled "Tuesday with Ashleigh. Available now," with "GFE" in accompanying text |
| 51. | Feb. 6, 2018 | Publish ad entitled "GFE  Kisskisspop 100% Real Photo Choice 9Asian girl Nurunude" |

In violation of 18 U.S.C. § 1952(a)(3)(A).

## COUNT 52

### (Conspiracy To Commit Money Laundering)

202.   The factual allegations in Paragraphs 1-201 are incorporated by reference and re-alleged as though fully set forth herein.

203.   Beginning in or around 2004, and continuing through April 2018, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and

HYER, and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

        a.   18 U.S.C. § 1956(a)(1)(A)(i) (Promotional Money Laundering)

        b.   18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering)

        c.   18 U.S.C. § 1956(a)(2)(A) (Int'l Promotional Money Laundering)

        d.   18 U.S.C. § 1956(a)(2)(B)(i) (Int'l Concealment Money Laundering)

        e.   18 U.S.C. § 1957(a) (Transactional Money Laundering)

In violation of 18 U.S.C. § 1956(h).

## COUNTS 53-62

### (Concealment Money Laundering)

204. The factual allegations in Paragraphs 1-203 are incorporated by reference and re-alleged as though fully set forth herein.

205. On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, as follows:

| Count | Date | Amount | Description |
|-------|------|--------|-------------|
| 53. | May 18, 2016 | $1,476,505.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 54. | May 18, 2016 | $264,438.00 | Website Technologies (x2008) to Cereus Properties (x6211) |

| 55. | May 31, 2016 | $3,171,675.80 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 56. | May 31, 2016 | $432,961.87 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 57. | June 20, 2016 | $842,878.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 58. | June 30, 2016 | $3,076,147.75 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 59. | July 27, 2016 | $3,252,681.62 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 60. | July 27, 2016 | $438,818.86 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 61. | Aug. 16, 2016 | $804,250.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 62. | Aug. 31, 2016 | $3,171,264.42 | Website Technologies (x2008) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(1)(B)(i).

## COUNTS 63-68

### (International Promotional Money Laundering)

206. The factual allegations in Paragraphs 1-205 are incorporated by reference and re-alleged as though fully set forth herein.

207. On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and

through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, as follows:

| Count | Date | Amount | Description |
|-------|------|--------|-------------|
| 63. | Mar. 4, 2014 | $6,450.00 | U.S. Bank (x1165) to S.B. (web developer in India) |
| 64. | Aug. 5, 2016 | $5,005,732.86 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 65. | Sept, 22, 2016 | $2,916,955.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 66. | Oct. 3, 2016 | $354,050.84 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 67. | Nov. 2, 2016 | $2,726,170.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 68. | Nov. 15, 2016 | $351,403.54 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(2)(A).

## COUNTS 69-99

### (Transactional Money Laundering)

208. The factual allegations in Paragraphs 1-207 are incorporated by reference and re-alleged as though fully set forth herein.

209. On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, as follows:

| Count | Defendant | Date | Amount | Description |
|---|---|---|---|---|
| 69. | LACEY, BRUNST | Aug. 21, 2013 | $30,000.00 | Bank of America (x1793) to Stewart Title (partial payment for Sedona property) |
| 70. | LACEY, BRUNST | Sept. 13, 2013 | $62,491.47 | BMO Harris to Stewart Title (partial payment for Sedona property) |
| 71. | SPEAR | June 11, 2014 | $300,000.00 | National Bank of Arizona (x0178) to Spear Family Trust |
| 72. | SPEAR | June 20, 2014 | $200,000.00 | National Bank of Arizona (x0178) to TD Ameritrade |
| 73. | SPEAR | Nov. 4, 2014 | $1,000,000.00 | National Bank of Arizona (x0178) to UBS Financial |
| 74. | SPEAR | May 14, 2015 | $250,000.00 | National Bank of Arizona (x0178) to Lincoln National Life |
| 75. | SPEAR | May 26, 2015 | $50,000.00 | National Bank of Arizona (x0178) to Industrial Property Trust |
| 76. | SPEAR | Nov. 3, 2015 | $300,000.00 | National Bank of Arizona (x0178) to Ally Bank |
| 77. | SPEAR | Dec. 1, 2015 | $200,000.00 | National Bank of Arizona (x0178) to Wells Fargo |
| 78. | SPEAR, BRUNST | Jan. 11, 2016 | $133,045.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |

| 79. | BRUNST | Jan. 26, 2016 | $101,974.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 80. | LARKIN, BRUNST | Feb. 3, 2016 | $1,507.944.00 | Cereus Properties (x6211) to Charles Schwab |
| 81. | LACEY, BRUNST | Mar. 1, 2016 | $1,692,020.00 | Cereus Properties (x6211) to Bank of America (x5554) |
| 82. | BRUNST | Apr. 1, 2016 | $220,944.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 83. | LACEY, BRUNST | June 27, 2016 | $397,9500.00 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 84. | LACEY, BRUNST | July 20, 2016 | $12,859,152.57 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 85. | SPEAR | July 22, 2016 | $50,000.00 | National Bank of Arizona (x0178) to Strategic Storage Trust II |
| 86. | LACEY, BRUNST | Aug. 2, 2016 | $16,243.00 | Cereus Properties (x6211) to Wells Fargo (x0495) |
| 87. | LARKIN, BRUNST | Oct. 6, 2016 | $1,206,356.00 | Cereus Properties (x6211) to Charles Schwab (x4693) |
| 88. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1967) |
| 89. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1972) |
| 90. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1986) |

| 91. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1991) |
|---|---|---|---|---|
| 92. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x2014) |
| 93. | SPEAR, BRUNST | Oct. 6, 2016 | $141,444.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |
| 94. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 95. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 96. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 97. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 98. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 99. | LACEY | Jan. 3, 2017 | $16,500,000.00 | Johnson Bank (x9992) to Primus Trust Co./K&H Bank (Hungary) |

In violation of 18 U.S.C. § 1957(a).

**COUNT 100**

**(International Concealment Money Laundering)**

210.    The factual allegations in Paragraphs 1-209 are incorporated by reference and re-alleged as though fully set forth herein.

211.    On or about the date set forth below, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, as follows:

| Count | Defendant | Date | Amount | Description |
|---|---|---|---|---|
| 100. | LACEY | Jan. 3, 2017 | $16,500,000.00 | Johnson Bank (x9992) to Primus Trust Co./K&H Bank (Hungary) |

In violation of 18 U.S.C. § 1956(a)(2)(B)(i).

## FORFEITURE ALLEGATION ONE

### [18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.  The factual allegations in Paragraphs 1-211 are incorporated by reference and re-alleged as though fully set forth herein.

2.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Counts 1 through 51 of this Superseding Indictment. Each defendant so convicted shall forfeit to the United States the following:

a.  All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense. Such property includes, but is not limited to, the real property located at the following addresses:

1.  10647 N. State Route 89A, Sedona, AZ 86336
2.  1100 Union St. #700, San Francisco, CA 94109
3.  1308 E. 56th Street, 2, Chicago, IL 60637
4.  14, rue Saint Guillaume, Paris, France 75007
5.  2043 Pleasant Hill Rd, Sebastopol, CA 95472
6.  2416 N. Foote Dr., Phoenix, AZ 85008
7.  2531 Tumbleweed Way, Frisco, TX 75034
8.  2755 Fillmore St, San Francisco, CA 94123
9.  3300 E. Stella Lane, Paradise Valley, AZ 85253
10. 3304 E. Stella Lane, Paradise Valley, AZ 85253
11. 3308 E. Stella Lane, Paradise Valley, AZ 85253
12. 3311 E. Stella Lane, Paradise Valley, AZ 85253
13. 3353 Red Robin Road, Pinetop, AZ 85935
14. 343 Presidio Ave, San Francisco, CA 94115

15.  3516 Estacado Lane, Plano, TX 75025-4432 (Rental)

16.  493 Zinfandel Lane, Saint Helena, CA 94574

17.  4931 E. White Gates Drive, Phoenix, AZ 85018

18.  5245 Evening Sun Dr., Frisco, TX 75034

19.  5555 North Casa Blanca Drive, Paradise Valley, AZ 85253

20.  5751 N. 77th Place, Scottsdale, AZ 85250

21.  5830 E. Calle Del Media (Medio), Phoenix, AZ 85018

22.  6300 N. 33rd Street, Paradise Valley, AZ 85253

23.  6314 N. 33rd Street, Paradise Valley, AZ 85253

24.  7409 Kingsbarns, The Colony, TX 75056

25.  8604 E. San Ardo Dr., Scottsdale, AZ 85258

26.  948 Carlsbad Dr., Plano, TX 75023

Such property also includes, but is not limited to, all funds, securities, and/or other assets held in the following bank accounts:

1.  Prosperity Bank account number XXXXX7188

2.  Compass Bank Account number XXXXXX3873

3.  Compass Bank Account number XXXXXX3825

4.  National Bank of Arizona Account number XXXX0178

5.  National Bank of Arizona Account number XXXX0151

6.  National Bank of Arizona Account number XXXX3645

7.  Live Oak Bank Account Number x6910

8.  Ascensus Broker Dealer Services Account Number XXXXX6943-01

9.  Ascensus Broker Dealer Services account Number XXXXX5280-01

10.  First Federal Savings & Loan of San Rafael account number XXXX3620

11.  Republic Bank of Arizona account number XXXX1889

12.  Republic Bank of Arizona account number XXXX2592

13.  Republic Bank of Arizona account number XXXX2500

14.  Republic Bank of Arizona account number XXXX1938

| | | |
|---|---|---|
| 1 | 15. | Bank of America Account number XXXXXXXXXXXX8225 |
| 2 | 16. | Bank of America Account number XXXXXXXXXXXX7054 |
| 3 | 17. | Bank of America Account number XXXXXXXXXXXX9342 |
| 4 | 18. | Bank of America Account number XXXXXXXXXXXX0071 |
| 5 | 19. | San Francisco Fire Credit Union Account Number XXXXXXXXXX2523 |
| 6 | 20. | Ally Bank Account Number XXXXXX6292 |
| 7 | 21. | Branch Banking and Trust Bank account number XXXXXXXXX0218 |
| 8 | 22. | Green Bank Account number XXX4832 |
| 9 | 23. | Green Bank Account number XXXXXX4293 |
| 10 | 24. | Perkins Coie Brokerage Account number xxxxxx7012 |
| 11 | 25. | Perkins Coie Liquid Assets xxxxxxx0012 |
| 12 | 26. | Alliance Bernstein Brokerage Account number xxxx6878 |
| 13 | 27. | Alliance Bernstein Brokerage Account number xxxx4954 |
| 14 | 28. | Alliance Bernstein Brokerage Account number xxxx7892 |
| 15 | 29. | Alliance Bernstein Brokerage Account number xxxx7888 |
| 16 | 30. | Alliance Bernstein Brokerage Account number xxxx6485 |
| 17 | 31. | Republic Bank of Arizona Brokerage Account number xxxx2485 |
| 18 | 32. | Republic Bank of Arizona Brokerage Account number xxxx1897 |
| 19 | 33. | Republic Bank of Arizona Brokerage Account number xxxx3126 |
| 20 | 34. | Republic Bank of Arizona Certificate of Deposit xxxxxx8316 |
| 21 | 35. | Republic Bank of Arizona Certificate of Deposit xxxxxx8324 |
| 22 | 36. | Republic Bank of Arizona Certificate of Deposit xxxxxx8332 |
| 23 | 37. | Republic Bank of Arizona Certificate of Deposit xxxxxx8103 |
| 24 | 38. | Republic Bank of Arizona Certificate of Deposit xxxxxx8162 |
| 25 | 39. | Republic Bank of Arizona Certificate of Deposit xxxxxx8189 |
| 26 | 40. | Paul Hastings LLP Account number xxxxx0457 |
| 27 | 41. | Global Trading Solutions xxx7177 |
| 28 | 42. | K&H Bank Account number xxxxxxxxxxxxxxxxxxxxxxxx1210 |

| | | |
|---|---|---|
| 1 | 43. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx5803 |
| 2 | 44. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx5801 |
| 3 | 45. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx5805 |
| 4 | 46. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx2226 |
| 5 | 47. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx2231 |
| 6 | 48. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx2230 |
| 7 | 49. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx4194 |
| 8 | 50. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx4196 |
| 9 | 51. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx4198 |
| 10 | 52. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx8083 |
| 11 | 53. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx8086 |
| 12 | 54. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx8080 |
| 13 | 55. | Bank Frick Account number xxxxxxxxxxxxxxx LI090x |
| 14 | 56. | Bank Frick Account number xxxxxxxxxxxxxxx LI300x |
| 15 | 57. | Bank Frick Account number xxxxxxxxxxxxxxx LI740x |
| 16 | 58. | Bank Frick Account number xxxxxxxxxxxxxxx LI900x |
| 17 | 59. | Knab Bank Account number xxxxxxxxxxxxxx7664 |
| 18 | 60. | Rabo Bank Account number xxxxxxxxxxxxx2452 |
| 19 | 61. | Rabo Bank Account number xxxxxxxxxxxxx4721 |
| 20 | 62. | Acacia Conservation Fund Brokerage Account number x2020 |
| 21 | 63. | Saxo Payments Account number x1262 |
| 22 | 64. | AS LHV Pank Account number xxxxxxxxxxxxxxxx4431 |
| 23 | 65. | Bitcoin Wallet -6Lix5 in the amount of 6 BTC |
| 24 | 66. | Bitcoin Wallet -6Lix5 in the amount of 199.99995716 BTC |
| 25 | 67. | Bitcoin Wallet -6Lix5 in the amount of 404.9984122 BTC |
| 26 | 68. | JP Morgan Chase Bank account number xxxxx4455 in the amount of $699,940 |
| 27 | 69. | JP Morgan Chase Bank account number xxxxx4455 in the amount of $106,988.41 |
| 28 | 70. | JP Morgan Chase Bank account number xxxxx4455 in the amount of $499,910 |

71. JP Morgan Chase Bank account number xxxxx4455 in the amount of $50,000

72. Bitcoin Cash Wallet –t8v7e in the amount of 3,673.59306905 BCH

73. Litecoin Wallet -goaeV in the amount of 16,310.79413202 LTC

74. Bitcoin Wallet -6Lix5 in the amount of 173.97319 BTC

75. Bitcoin Cash Wallet –t8v7e in the amount of 55.5 BCH

76. Bitcoin Wallet -6Lix5 in the amount of 411.00019 BTC

77. Bitcoin Wallet -6Lix5 in the amount of 2.00069333 BTC

78. Bitcoin Wallet -6Lix5 in the amount of 136.6544695 BTC

79. Bitcoin Cash Wallet –t8v7e in the amount of 73.62522241 BCH

80. Litecoin Wallet –goaeV in the amount of 783.9735116 LTC

81. Bitcoin Gold Wallet -KK1mJ in the amount of 509.81904619 BTG

82. Crypto Capital account number x1124

83. Crypto Capital account number x1933

84. Any and all bank funds, securities, cryptocurrency, or other assets on deposit or seized from an account held at Kraken in the name of Ad Tech BV.

85. JP Morgan Chase Bank account number xxxxx4155 in the amount of $42,500

86. Alliance Bernstein Brokerage account x7889

87. Alliance Bernstein Brokerage account x0582

88. Midfirst Bank account x4139

89. Crypto Capital account number x6886

Such property further includes, but is not limited to, the following domain names:

1. admoderation.com (Versio)

2. admoderators.com (Versio)

3. adnet.ws (NetNames)

4. adplace24.com (Versio)

5. adplaces24.com (Versio)

6. adpost24.com (Versio)

7. adpost24.cz (GoDaddy)

| | | |
|---|---|---|
| 1 | 8. | adquick365.com (Versio) |
| 2 | 9. | adreputation.com (NetNames) |
| 3 | 10. | ads-posted-mp.com (Versio) |
| 4 | 11. | adsplace24.com (Versio) |
| 5 | 12. | adspot24.com (Versio) |
| 6 | 13. | adspots24.com (Versio) |
| 7 | 14. | adsspot24.com (Versio) |
| 8 | 15. | adtechbv.co.nl (NetNames) |
| 9 | 16. | adtechbv.com (NetNames) |
| 10 | 17. | adtechbv.nl (NetNames) |
| 11 | 18. | advert-ep.com (Versio) |
| 12 | 19. | adverts-mp.com (Versio) |
| 13 | 20. | axme.com (GoDaddy) |
| 14 | 21. | back0age.com (NetNames) |
| 15 | 22. | backpa.ge (NetNames) |
| 16 | 23. | backpaee.com (NetNames) |
| 17 | 24. | backpage-insider.com (NetNames) |
| 18 | 25. | backpage.adult (NetNames) |
| 19 | 26. | backpage.ae (NetNames) |
| 20 | 27. | backpage.at (NetNames) |
| 21 | 28. | backpage.ax (NetNames) |
| 22 | 29. | backpage.be (NetNames) |
| 23 | 30. | backpage.bg (European domains) |
| 24 | 31. | backpage.bg (NetNames) |
| 25 | 32. | backpage.ca (NetNames) |
| 26 | 33. | backpage.cl (NetNames) |
| 27 | 34. | backpage.cn (European domains) |
| 28 | 35. | backpage.cn (NetNames) |

| | | |
|---|---|---|
| 1 | 36. | backpage.co.id (NetNames) |
| 2 | 37. | backpage.co.nl (European domains) |
| 3 | 38. | backpage.co.nl (NetNames) |
| 4 | 39. | backpage.co.nz (NetNames) |
| 5 | 40. | backpage.co.uk (NetNames) |
| 6 | 41. | backpage.co.ve (NetNames) |
| 7 | 42. | backpage.co.za (NetNames) |
| 8 | 43. | backpage.com (NetNames) |
| 9 | 44. | backpage.com.ar (NetNames) |
| 10 | 45. | backpage.com.au (NetNames) |
| 11 | 46. | backpage.com.ph (NetNames) |
| 12 | 47. | backpage.cz (NetNames) |
| 13 | 48. | backpage.dk (NetNames) |
| 14 | 49. | backpage.ec (NetNames) |
| 15 | 50. | backpage.ee (European domains) |
| 16 | 51. | backpage.ee (NetNames) |
| 17 | 52. | backpage.es (NetNames) |
| 18 | 53. | backpage.fi (European domains) |
| 19 | 54. | backpage.fi (NetNames) |
| 20 | 55. | backpage.fr (European domains) |
| 21 | 56. | backpage.fr (NetNames) |
| 22 | 57. | backpage.gr (European domains) |
| 23 | 58. | backpage.gr (NetNames) |
| 24 | 59. | backpage.hk (European domains) |
| 25 | 60. | backpage.hk (NetNames) |
| 26 | 61. | backpage.hu (European domains) |
| 27 | 62. | backpage.hu (NetNames) |
| 28 | 63. | backpage.ie (NetNames) |

| | | |
|---|---|---|
| 1 | 64. | backpage.in (NetNames) |
| 2 | 65. | backpage.it (NetNames) |
| 3 | 66. | backpage.jp (NetNames) |
| 4 | 67. | backpage.kr (NetNames) |
| 5 | 68. | backpage.lt (NetNames) |
| 6 | 69. | backpage.lv (European domains) |
| 7 | 70. | backpage.lv (NetNames) |
| 8 | 71. | backpage.me (NetNames) |
| 9 | 72. | backpage.mx (NetNames) |
| 10 | 73. | backpage.my (NetNames) |
| 11 | 74. | backpage.net (NetNames) |
| 12 | 75. | backpage.nl (NetNames) |
| 13 | 76. | backpage.no (European domains) |
| 14 | 77. | backpage.no (NetNames) |
| 15 | 78. | backpage.nz (NetNames) |
| 16 | 79. | backpage.pe (NetNames) |
| 17 | 80. | backpage.ph (NetNames) |
| 18 | 81. | backpage.pk (NetNames) |
| 19 | 82. | backpage.pl (NetNames) |
| 20 | 83. | backpage.porn (NetNames) |
| 21 | 84. | backpage.pt (NetNames) |
| 22 | 85. | backpage.ro (European domains) |
| 23 | 86. | backpage.ro (NetNames) |
| 24 | 87. | backpage.se (NetNames) |
| 25 | 88. | backpage.sex (NetNames) |
| 26 | 89. | backpage.sg (NetNames) |
| 27 | 90. | backpage.si (European domains) |
| 28 | 91. | backpage.si (NetNames) |

| | | |
|---|---|---|
| 1 | 92. | backpage.sk (European domains) |
| 2 | 93. | backpage.sk (NetNames) |
| 3 | 94. | backpage.sucks (NetNames) |
| 4 | 95. | backpage.tw (NetNames) |
| 5 | 96. | backpage.uk (NetNames) |
| 6 | 97. | backpage.uk.com (NetNames) |
| 7 | 98. | backpage.us (NetNames) |
| 8 | 99. | backpage.vn (NetNames) |
| 9 | 100. | backpage.xxx (NetNames) |
| 10 | 101. | backpage.xyz (NetNames) |
| 11 | 102. | backpagecompimp.com (NetNames) |
| 12 | 103. | backpagecompimps.com (NetNames) |
| 13 | 104. | backpagepimp.com (NetNames) |
| 14 | 105. | backpagepimps.com (NetNames) |
| 15 | 106. | backpagg.com (NetNames) |
| 16 | 107. | backpagm.com (NetNames) |
| 17 | 108. | backpagu.com (NetNames) |
| 18 | 109. | backpaoe.com (NetNames) |
| 19 | 110. | backpawe.com (NetNames) |
| 20 | 111. | backqage.com (NetNames) |
| 21 | 112. | backrage.com (NetNames) |
| 22 | 113. | backxage.com (NetNames) |
| 23 | 114. | bakkpage.com (NetNames) |
| 24 | 115. | bcklistings.com (NetNames) |
| 25 | 116. | bestofbackpage.com (NetNames) |
| 26 | 117. | bestofbigcity.com (NetNames) |
| 27 | 118. | bickpage.com (NetNames) |
| 28 | 119. | bigcity.com (NetNames) |

| | | |
|---|---|---|
| 1 | 120. | bpclassified.com (NetNames) |
| 2 | 121. | bpclassifieds.com (NetNames) |
| 3 | 122. | carlferrer.com (NetNames) |
| 4 | 123. | clasificadosymas.com (NetNames) |
| 5 | 124. | clasificadosymas.net (NetNames) |
| 6 | 125. | clasificadosymas.org (NetNames) |
| 7 | 126. | classifiedsolutions.co.uk (NetNames) |
| 8 | 127. | classifiedsolutions.net (NetNames) |
| 9 | 128. | classyadultads.com (Versio) |
| 10 | 129. | columbusbackpage.com (NetNames) |
| 11 | 130. | connecticutbackpage.com (NetNames) |
| 12 | 131. | cracker.co.id (NetNames) |
| 13 | 132. | cracker.com (NetNames) |
| 14 | 133. | cracker.com.au (NetNames) |
| 15 | 134. | cracker.id (NetNames) |
| 16 | 135. | cracker.net.au (NetNames) |
| 17 | 136. | crackers.com.au (NetNames) |
| 18 | 137. | crackers.net.au (NetNames) |
| 19 | 138. | ctbackpage.com (NetNames) |
| 20 | 139. | dallasbackpage.com (NetNames) |
| 21 | 140. | denverbackpage.com (NetNames) |
| 22 | 141. | easypost123.com (Versio) |
| 23 | 142. | easyposts123.com (Versio) |
| 24 | 143. | emais.com.pt (NetNames) |
| 25 | 144. | evilempire.com (NetNames) |
| 26 | 145. | ezpost123.com (Versio) |
| 27 | 146. | fackpage.com (NetNames) |
| 28 | 147. | fastadboard.com (Versio) |

| | | |
|---|---|---|
| 1 | 148. | guliettagroup.nl (Versio) |
| 2 | 149. | htpp.org (NetNames) |
| 3 | 150. | ichold.com (NetNames) |
| 4 | 151. | internetspeechfoundation.com (nameisp) |
| 5 | 152. | internetspeechfoundation.org (nameisp) |
| 6 | 153. | loads2drive.com (NetNames) |
| 7 | 154. | loadstodrive.com (NetNames) |
| 8 | 155. | loadtodrive.com (NetNames) |
| 9 | 156. | losangelesbackpage.com (NetNames) |
| 10 | 157. | mediafilecloud.com (NetNames) |
| 11 | 158. | miamibackpage.com (NetNames) |
| 12 | 159. | minneapolisbackpage.com (NetNames) |
| 13 | 160. | mobileposting.com (Versio) |
| 14 | 161. | mobilepostings.com (Versio) |
| 15 | 162. | mobilepostlist.com (Versio) |
| 16 | 163. | mobilposting.com (Versio) |
| 17 | 164. | naked.city (NetNames) |
| 18 | 165. | nakedcity.com (NetNames) |
| 19 | 166. | newyorkbackpage.com (NetNames) |
| 20 | 167. | paidbyhour.com (NetNames) |
| 21 | 168. | petseekr.com (NetNames) |
| 22 | 169. | petsfindr.com (NetNames) |
| 23 | 170. | phoenixbackpage.com (NetNames) |
| 24 | 171. | posteasy123.com (Versio) |
| 25 | 172. | postfaster.com (NetNames) |
| 26 | 173. | postfastly.com (NetNames) |
| 27 | 174. | postfastr.com (NetNames) |
| 28 | 175. | postonlinewith.com (Versio) |

| 1 | 176. | postonlinewith.me (Versio) |
| 2 | 177. | postseasy123.com (Versio) |
| 3 | 178. | postsol.com (GoDaddy) |
| 4 | 179. | postszone24.com (Versio) |
| 5 | 180. | postzone24.com (Versio) |
| 6 | 181. | postzones24.com (Versio) |
| 7 | 182. | rentseekr.com (NetNames) |
| 8 | 183. | results911.com (NetNames) |
| 9 | 184. | sandiegobackpage.com (NetNames) |
| 10 | 185. | sanfranciscobackpage.com (NetNames) |
| 11 | 186. | seattlebackpage.com (NetNames) |
| 12 | 187. | sellyostuffonline.com (Versio) |
| 13 | 188. | sfbackpage.com (NetNames) |
| 14 | 189. | simplepost24.com (Versio) |
| 15 | 190. | simpleposts24.com (Versio) |
| 16 | 191. | svc.ws (NetNames) |
| 17 | 192. | truckrjobs.com (NetNames) |
| 18 | 193. | ugctechgroup.com (NetNames) |
| 19 | 194. | universads.nl (Versio) |
| 20 | 195. | villagevoicepimps.com (GoDaddy) |
| 21 | 196. | websitetechnologies.co.uk (NetNames) |
| 22 | 197. | websitetechnologies.com (NetNames) |
| 23 | 198. | websitetechnologies.net (NetNames) |
| 24 | 199. | websitetechnologies.nl (NetNames) |
| 25 | 200. | websitetechnologies.org (NetNames) |
| 26 | 201. | weprocessmoney.com (GoDaddy) |
| 27 | 202. | wst.ws (NetNames) |
| 28 | 203. | xn--yms-fla.com (NetNames) |

| | | |
|---|---|---|
| 1 | 204. | ymas.ar.com (European domains) |
| 2 | 205. | ymas.br.com (European domains) |
| 3 | 206. | ymas.br.com (NetNames) |
| 4 | 207. | ymas.bz (European domains) |
| 5 | 208. | ymas.bz (NetNames) |
| 6 | 209. | ymas.cl (European domains) |
| 7 | 210. | ymas.cl (NetNames) |
| 8 | 211. | ymas.co.bz (European domains) |
| 9 | 212. | ymas.co.bz (NetNames) |
| 10 | 213. | ymas.co.cr (European domains) |
| 11 | 214. | ymas.co.cr (NetNames) |
| 12 | 215. | ymas.co.ni (European domains) |
| 13 | 216. | ymas.co.ni (NetNames) |
| 14 | 217. | ymas.co.ve (European domains) |
| 15 | 218. | ymas.co.ve (NetNames) |
| 16 | 219. | ymas.com (NetNames) |
| 17 | 220. | ymas.com.br (European domains) |
| 18 | 221. | ymas.com.br (NetNames) |
| 19 | 222. | ymas.com.bz (European domains) |
| 20 | 223. | ymas.com.bz (NetNames) |
| 21 | 224. | ymas.com.co (European domains) |
| 22 | 225. | ymas.com.co (NetNames) |
| 23 | 226. | ymas.com.do (European domains) |
| 24 | 227. | ymas.com.do (NetNames) |
| 25 | 228. | ymas.com.ec (European domains) |
| 26 | 229. | ymas.com.ec (NetNames) |
| 27 | 230. | ymas.com.es (European domains) |
| 28 | 231. | ymas.com.es (NetNames) |

| | | |
|---|---|---|
| 1 | 232. | ymas.com.gt (European domains) |
| 2 | 233. | ymas.com.gt (NetNames) |
| 3 | 234. | ymas.com.hn (European domains) |
| 4 | 235. | ymas.com.hn (NetNames) |
| 5 | 236. | ymas.com.mx (NetNames) |
| 6 | 237. | ymas.com.ni (European domains) |
| 7 | 238. | ymas.com.ni (NetNames) |
| 8 | 239. | ymas.com.pe (European domains) |
| 9 | 240. | ymas.com.pe (NetNames) |
| 10 | 241. | ymas.com.pr (European domains) |
| 11 | 242. | ymas.com.pr (NetNames) |
| 12 | 243. | ymas.com.pt (NetNames) |
| 13 | 244. | ymas.com.uy (European domains) |
| 14 | 245. | ymas.com.uy (NetNames) |
| 15 | 246. | ymas.com.ve (European domains) |
| 16 | 247. | ymas.com.ve (NetNames) |
| 17 | 248. | ymas.cr (European domains) |
| 18 | 249. | ymas.cr (NetNames) |
| 19 | 250. | ymas.do (European domains) |
| 20 | 251. | ymas.do (NetNames) |
| 21 | 252. | ymas.ec (European domains) |
| 22 | 253. | ymas.ec (NetNames) |
| 23 | 254. | ymas.es (European domains) |
| 24 | 255. | ymas.es (NetNames) |
| 25 | 256. | ymas.org (NetNames) |
| 26 | 257. | ymas.pe (European domains) |
| 27 | 258. | ymas.pe (NetNames) |
| 28 | 259. | ymas.pt (NetNames) |

260. ymas.us (European domains)

261. ymas.us (NetNames)

262. ymas.uy (European domains)

263. ymas.uy (NetNames)

264. ymas.uy.com (European domains)

265. atlantabackpage.com (NetNames)

266. backpage.com.br (NetNames)

267. chicagobackpage.com (NetNames)

268. tampabackpage.com (NetNames)

       b.     To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

       3.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

## FORFEITURE ALLEGATION TWO

### [18 U.S.C. § 982(a)(1)]

       1.     The factual allegations in Paragraphs 1-211 are incorporated by reference and re-alleged as though fully set forth herein.

       2.     Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction under Counts 52 through 100 of this Superseding Indictment. Each defendant so convicted shall forfeit to the United States the following:

a.     All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Counts 52 through 100 of this Superseding Indictment. Such property includes, but is not limited to, the real property located at the following addresses:

1.     10647 N. State Route 89A, Sedona, AZ 86336

2.     1100 Union St. #700, San Francisco, CA 94109

3.     1308 E. 56th Street, 2, Chicago, IL 60637

4.     14, rue Saint Guillaume, Paris, France 75007

5.     2043 Pleasant Hill Rd, Sebastopol, CA 95472

6.     2416 N. Foote Dr., Phoenix, AZ 85008

7.     2531 Tumbleweed Way, Frisco, TX 75034

8.     2755 Fillmore St, San Francisco, CA 94123

9.     3300 E. Stella Lane, Paradise Valley, AZ 85253

10.     3304 E. Stella Lane, Paradise Valley, AZ 85253

11.     3308 E. Stella Lane, Paradise Valley, AZ 85253

12.     3311 E. Stella Lane, Paradise Valley, AZ 85253

13.     3353 Red Robin Road, Pinetop, AZ 85935

14.     343 Presidio Ave, San Francisco, CA 94115

15.     3516 Estacado Lane, Plano, TX 75025-4432 (Rental)

16.     493 Zinfandel Lane, Saint Helena, CA 94574

17.     4931 E. White Gates Drive, Phoenix, AZ 85018

18.     5245 Evening Sun Dr., Frisco, TX 75034

19.     5555 North Casa Blanca Drive, Paradise Valley, AZ 85253

20.     5751 N. 77th Place, Scottsdale, AZ 85250

21.     5830 E. Calle Del Media (Medio), Phoenix, AZ 85018

22.     6300 N. 33rd Street, Paradise Valley, AZ 85253

23.     6314 N. 33rd Street, Paradise Valley, AZ 85253

24.     7409 Kingsbarns, The Colony, TX 75056

25. 8604 E. San Ardo Dr., Scottsdale, AZ 85258

26. 948 Carlsbad Dr., Plano, TX 75023

Such property also includes, but is not limited to, all funds, securities, and/or other assets held in the following bank accounts:

1. Prosperity Bank account number XXXXX7188

2. Compass Bank Account number XXXXXX3873

3. Compass Bank Account number XXXXXX3825

4. National Bank of Arizona Account number XXXX0178

5. National Bank of Arizona Account number XXXX0151

6. National Bank of Arizona Account number XXXX3645

7. Live Oak Bank Account Number x6910

8. Ascensus Broker Dealer Services Account Number XXXXX6943-01

9. Ascensus Broker Dealer Services account Number XXXXX5280-01

10. First Federal Savings & Loan of San Rafael account number XXXX3620

11. Republic Bank of Arizona account number XXXX1889

12. Republic Bank of Arizona account number XXXX2592

13. Republic Bank of Arizona account number XXXX2500

14. Republic Bank of Arizona account number XXXX1938

15. Bank of America Account number XXXXXXXXXXXX8225

16. Bank of America Account number XXXXXXXXXXXX7054

17. Bank of America Account number XXXXXXXXXXXX9342

18. Bank of America Account number XXXXXXXXXXXX0071

19. San Francisco Fire Credit Union Account Number XXXXXXXXXX2523

20. Ally Bank Account Number XXXXXX6292

21. Branch Banking and Trust Bank account number XXXXXXXXX0218

22. Green Bank Account number XXX4832

23. Green Bank Account number XXXXXX4293

24. Perkins Coie Brokerage Account number xxxxxx7012

| | | |
|---|---|---|
| 1 | 25. | Perkins Coie Liquid Assets xxxxxxx0012 |
| 2 | 26. | Alliance Bernstein Brokerage Account number xxxx6878 |
| 3 | 27. | Alliance Bernstein Brokerage Account number xxxx4954 |
| 4 | 28. | Alliance Bernstein Brokerage Account number xxxx7892 |
| 5 | 29. | Alliance Bernstein Brokerage Account number xxxx7888 |
| 6 | 30. | Alliance Bernstein Brokerage Account number xxxx6485 |
| 7 | 31. | Republic Bank of Arizona Brokerage Account number xxxx2485 |
| 8 | 32. | Republic Bank of Arizona Brokerage Account number xxxx1897 |
| 9 | 33. | Republic Bank of Arizona Brokerage Account number xxxx3126 |
| 10 | 34. | Republic Bank of Arizona Certificate of Deposit xxxxxx8316 |
| 11 | 35. | Republic Bank of Arizona Certificate of Deposit xxxxxx8324 |
| 12 | 36. | Republic Bank of Arizona Certificate of Deposit xxxxxx8332 |
| 13 | 37. | Republic Bank of Arizona Certificate of Deposit xxxxxx8103 |
| 14 | 38. | Republic Bank of Arizona Certificate of Deposit xxxxxx8162 |
| 15 | 39. | Republic Bank of Arizona Certificate of Deposit xxxxxx8189 |
| 16 | 40. | Paul Hastings LLP Account number xxxxx0457 |
| 17 | 41. | Global Trading Solutions xxx7177 |
| 18 | 42. | K&H Bank Account number xxxxxxxxxxxxxxxxxxxxxxx1210 |
| 19 | 43. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx5803 |
| 20 | 44. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx5801 |
| 21 | 45. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx5805 |
| 22 | 46. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx2226 |
| 23 | 47. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx2231 |
| 24 | 48. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx2230 |
| 25 | 49. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx4194 |
| 26 | 50. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx4196 |
| 27 | 51. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx4198 |
| 28 | 52. | Fio Bank Account number xxxxxxxxxxxxxxxxxxx8083 |

| | | |
|---|---|---|
| 1 | 53. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8086 |
| 2 | 54. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8080 |
| 3 | 55. | Bank Frick Account number xxxxxxxxxxxxxxxx LI090x |
| 4 | 56. | Bank Frick Account number xxxxxxxxxxxxxxxx LI300x |
| 5 | 57. | Bank Frick Account number xxxxxxxxxxxxxxxx LI740x |
| 6 | 58. | Bank Frick Account number xxxxxxxxxxxxxxxx LI900x |
| 7 | 59. | Knab Bank Account number xxxxxxxxxxxxxxx7664 |
| 8 | 60. | Rabo Bank Account number xxxxxxxxxxxxxxx2452 |
| 9 | 61. | Rabo Bank Account number xxxxxxxxxxxxxxx4721 |
| 10 | 62. | Acacia Conservation Fund Brokerage Account number x2020 |
| 11 | 63. | Saxo Payments Account number x1262 |
| 12 | 64. | AS LHV Pank Account number xxxxxxxxxxxxxxxx4431 |
| 13 | 65. | Bitcoin Wallet -6Lix5 in the amount of 6 BTC |
| 14 | 66. | Bitcoin Wallet -6Lix5 in the amount of 199.99995716 BTC |
| 15 | 67. | Bitcoin Wallet -6Lix5 in the amount of 404.9984122 BTC |
| 16 | 68. | JP Morgan Chase Bank account number xxxxx4455 in the amount of $699,940 |
| 17 | 69. | JP Morgan Chase Bank account number xxxxx4455 in the amount of $106,988.41 |
| 18 | 70. | JP Morgan Chase Bank account number xxxxx4455 in the amount of $499,910 |
| 19 | 71. | JP Morgan Chase Bank account number xxxxx4455 in the amount of $50,000 |
| 20 | 72. | Bitcoin Cash Wallet –t8v7e in the amount of 3,673.59306905 BCH |
| 21 | 73. | Litecoin Wallet -goaeV in the amount of 16,310.79413202 LTC |
| 22 | 74. | Bitcoin Wallet -6Lix5 in the amount of 173.97319 BTC |
| 23 | 75. | Bitcoin Cash Wallet –t8v7e in the amount of 55.5 BCH |
| 24 | 76. | Bitcoin Wallet -6Lix5 in the amount of 411.00019 BTC |
| 25 | 77. | Bitcoin Wallet -6Lix5 in the amount of 2.00069333 BTC |
| 26 | 78. | Bitcoin Wallet -6Lix5 in the amount of 136.6544695 BTC |
| 27 | 79. | Bitcoin Cash Wallet –t8v7e in the amount of 73.62522241 BCH |
| 28 | 80. | Litecoin Wallet –goaeV in the amount of 783.9735116 LTC |

81. Bitcoin Gold Wallet -KK1mJ in the amount of 509.81904619 BTG

82. Crypto Capital account number x1124

83. Crypto Capital account number x1933

84. Any and all bank funds, securities, cryptocurrency, or other assets on deposit or seized from an account held at Kraken in the name of Ad Tech BV.

85. JP Morgan Chase Bank account number xxxxx4155 in the amount of $42,500

86. Alliance Bernstein Brokerage account x7889

87. Alliance Bernstein Brokerage account x0582

88. Midfirst Bank account x4139

89. Crypto Capital account number x6886

Such property further includes, but is not limited to, the following domain names:

1. admoderation.com (Versio)

2. admoderators.com (Versio)

3. adnet.ws (NetNames)

4. adplace24.com (Versio)

5. adplaces24.com (Versio)

6. adpost24.com (Versio)

7. adpost24.cz (GoDaddy)

8. adquick365.com (Versio)

9. adreputation.com (NetNames)

10. ads-posted-mp.com (Versio)

11. adsplace24.com (Versio)

12. adspot24.com (Versio)

13. adspots24.com (Versio)

14. adsspot24.com (Versio)

15. adtechbv.co.nl (NetNames)

16. adtechbv.com (NetNames)

17. adtechbv.nl (NetNames)

| | | |
|---|---|---|
| 1 | 18. | advert-ep.com (Versio) |
| 2 | 19. | adverts-mp.com (Versio) |
| 3 | 20. | axme.com (GoDaddy) |
| 4 | 21. | back0age.com (NetNames) |
| 5 | 22. | backpa.ge (NetNames) |
| 6 | 23. | backpaee.com (NetNames) |
| 7 | 24. | backpage-insider.com (NetNames) |
| 8 | 25. | backpage.adult (NetNames) |
| 9 | 26. | backpage.ae (NetNames) |
| 10 | 27. | backpage.at (NetNames) |
| 11 | 28. | backpage.ax (NetNames) |
| 12 | 29. | backpage.be (NetNames) |
| 13 | 30. | backpage.bg (European domains) |
| 14 | 31. | backpage.bg (NetNames) |
| 15 | 32. | backpage.ca (NetNames) |
| 16 | 33. | backpage.cl (NetNames) |
| 17 | 34. | backpage.cn (European domains) |
| 18 | 35. | backpage.cn (NetNames) |
| 19 | 36. | backpage.co.id (NetNames) |
| 20 | 37. | backpage.co.nl (European domains) |
| 21 | 38. | backpage.co.nl (NetNames) |
| 22 | 39. | backpage.co.nz (NetNames) |
| 23 | 40. | backpage.co.uk (NetNames) |
| 24 | 41. | backpage.co.ve (NetNames) |
| 25 | 42. | backpage.co.za (NetNames) |
| 26 | 43. | backpage.com (NetNames) |
| 27 | 44. | backpage.com.ar (NetNames) |
| 28 | 45. | backpage.com.au (NetNames) |

| | | |
|---|---|---|
| 1 | 46. | backpage.com.ph (NetNames) |
| 2 | 47. | backpage.cz (NetNames) |
| 3 | 48. | backpage.dk (NetNames) |
| 4 | 49. | backpage.ec (NetNames) |
| 5 | 50. | backpage.ee (European domains) |
| 6 | 51. | backpage.ee (NetNames) |
| 7 | 52. | backpage.es (NetNames) |
| 8 | 53. | backpage.fi (European domains) |
| 9 | 54. | backpage.fi (NetNames) |
| 10 | 55. | backpage.fr (European domains) |
| 11 | 56. | backpage.fr (NetNames) |
| 12 | 57. | backpage.gr (European domains) |
| 13 | 58. | backpage.gr (NetNames) |
| 14 | 59. | backpage.hk (European domains) |
| 15 | 60. | backpage.hk (NetNames) |
| 16 | 61. | backpage.hu (European domains) |
| 17 | 62. | backpage.hu (NetNames) |
| 18 | 63. | backpage.ie (NetNames) |
| 19 | 64. | backpage.in (NetNames) |
| 20 | 65. | backpage.it (NetNames) |
| 21 | 66. | backpage.jp (NetNames) |
| 22 | 67. | backpage.kr (NetNames) |
| 23 | 68. | backpage.lt (NetNames) |
| 24 | 69. | backpage.lv (European domains) |
| 25 | 70. | backpage.lv (NetNames) |
| 26 | 71. | backpage.me (NetNames) |
| 27 | 72. | backpage.mx (NetNames) |
| 28 | 73. | backpage.my (NetNames) |

| | | |
|---|---|---|
| 1 | 74. | backpage.net (NetNames) |
| 2 | 75. | backpage.nl (NetNames) |
| 3 | 76. | backpage.no (European domains) |
| 4 | 77. | backpage.no (NetNames) |
| 5 | 78. | backpage.nz (NetNames) |
| 6 | 79. | backpage.pe (NetNames) |
| 7 | 80. | backpage.ph (NetNames) |
| 8 | 81. | backpage.pk (NetNames) |
| 9 | 82. | backpage.pl (NetNames) |
| 10 | 83. | backpage.porn (NetNames) |
| 11 | 84. | backpage.pt (NetNames) |
| 12 | 85. | backpage.ro (European domains) |
| 13 | 86. | backpage.ro (NetNames) |
| 14 | 87. | backpage.se (NetNames) |
| 15 | 88. | backpage.sex (NetNames) |
| 16 | 89. | backpage.sg (NetNames) |
| 17 | 90. | backpage.si (European domains) |
| 18 | 91. | backpage.si (NetNames) |
| 19 | 92. | backpage.sk (European domains) |
| 20 | 93. | backpage.sk (NetNames) |
| 21 | 94. | backpage.sucks (NetNames) |
| 22 | 95. | backpage.tw (NetNames) |
| 23 | 96. | backpage.uk (NetNames) |
| 24 | 97. | backpage.uk.com (NetNames) |
| 25 | 98. | backpage.us (NetNames) |
| 26 | 99. | backpage.vn (NetNames) |
| 27 | 100. | backpage.xxx (NetNames) |
| 28 | 101. | backpage.xyz (NetNames) |

| | | |
|---|---|---|
| 1 | 102. | backpagecompimp.com (NetNames) |
| 2 | 103. | backpagecompimps.com (NetNames) |
| 3 | 104. | backpagepimp.com (NetNames) |
| 4 | 105. | backpagepimps.com (NetNames) |
| 5 | 106. | backpagg.com (NetNames) |
| 6 | 107. | backpagm.com (NetNames) |
| 7 | 108. | backpagu.com (NetNames) |
| 8 | 109. | backpaoe.com (NetNames) |
| 9 | 110. | backpawe.com (NetNames) |
| 10 | 111. | backqage.com (NetNames) |
| 11 | 112. | backrage.com (NetNames) |
| 12 | 113. | backxage.com (NetNames) |
| 13 | 114. | bakkpage.com (NetNames) |
| 14 | 115. | bcklistings.com (NetNames) |
| 15 | 116. | bestofbackpage.com (NetNames) |
| 16 | 117. | bestofbigcity.com (NetNames) |
| 17 | 118. | bickpage.com (NetNames) |
| 18 | 119. | bigcity.com (NetNames) |
| 19 | 120. | bpclassified.com (NetNames) |
| 20 | 121. | bpclassifieds.com (NetNames) |
| 21 | 122. | carlferrer.com (NetNames) |
| 22 | 123. | clasificadosymas.com (NetNames) |
| 23 | 124. | clasificadosymas.net (NetNames) |
| 24 | 125. | clasificadosymas.org (NetNames) |
| 25 | 126. | classifiedsolutions.co.uk (NetNames) |
| 26 | 127. | classifiedsolutions.net (NetNames) |
| 27 | 128. | classyadultads.com (Versio) |
| 28 | 129. | columbusbackpage.com (NetNames) |

| | | |
|---|---|---|
| 1 | 130. | connecticutbackpage.com (NetNames) |
| 2 | 131. | cracker.co.id (NetNames) |
| 3 | 132. | cracker.com (NetNames) |
| 4 | 133. | cracker.com.au (NetNames) |
| 5 | 134. | cracker.id (NetNames) |
| 6 | 135. | cracker.net.au (NetNames) |
| 7 | 136. | crackers.com.au (NetNames) |
| 8 | 137. | crackers.net.au (NetNames) |
| 9 | 138. | ctbackpage.com (NetNames) |
| 10 | 139. | dallasbackpage.com (NetNames) |
| 11 | 140. | denverbackpage.com (NetNames) |
| 12 | 141. | easypost123.com (Versio) |
| 13 | 142. | easyposts123.com (Versio) |
| 14 | 143. | emais.com.pt (NetNames) |
| 15 | 144. | evilempire.com (NetNames) |
| 16 | 145. | ezpost123.com (Versio) |
| 17 | 146. | fackpage.com (NetNames) |
| 18 | 147. | fastadboard.com (Versio) |
| 19 | 148. | guliettagroup.nl (Versio) |
| 20 | 149. | htpp.org (NetNames) |
| 21 | 150. | ichold.com (NetNames) |
| 22 | 151. | internetspeechfoundation.com (nameisp) |
| 23 | 152. | internetspeechfoundation.org (nameisp) |
| 24 | 153. | loads2drive.com (NetNames) |
| 25 | 154. | loadstodrive.com (NetNames) |
| 26 | 155. | loadtodrive.com (NetNames) |
| 27 | 156. | losangelesbackpage.com (NetNames) |
| 28 | 157. | mediafilecloud.com (NetNames) |

- 87 –

| | | |
|---|---|---|
| 1 | 158. | miamibackpage.com (NetNames) |
| 2 | 159. | minneapolisbackpage.com (NetNames) |
| 3 | 160. | mobileposting.com (Versio) |
| 4 | 161. | mobilepostings.com (Versio) |
| 5 | 162. | mobilepostlist.com (Versio) |
| 6 | 163. | mobilposting.com (Versio) |
| 7 | 164. | naked.city (NetNames) |
| 8 | 165. | nakedcity.com (NetNames) |
| 9 | 166. | newyorkbackpage.com (NetNames) |
| 10 | 167. | paidbyhour.com (NetNames) |
| 11 | 168. | petseekr.com (NetNames) |
| 12 | 169. | petsfindr.com (NetNames) |
| 13 | 170. | phoenixbackpage.com (NetNames) |
| 14 | 171. | posteasy123.com (Versio) |
| 15 | 172. | postfaster.com (NetNames) |
| 16 | 173. | postfastly.com (NetNames) |
| 17 | 174. | postfastr.com (NetNames) |
| 18 | 175. | postonlinewith.com (Versio) |
| 19 | 176. | postonlinewith.me (Versio) |
| 20 | 177. | postseasy123.com (Versio) |
| 21 | 178. | postsol.com (GoDaddy) |
| 22 | 179. | postszone24.com (Versio) |
| 23 | 180. | postzone24.com (Versio) |
| 24 | 181. | postzones24.com (Versio) |
| 25 | 182. | rentseekr.com (NetNames) |
| 26 | 183. | results911.com (NetNames) |
| 27 | 184. | sandiegobackpage.com (NetNames) |
| 28 | 185. | sanfranciscobackpage.com (NetNames) |

| | | |
|---|---|---|
| 1 | 186. | seattlebackpage.com (NetNames) |
| 2 | 187. | sellyostuffonline.com (Versio) |
| 3 | 188. | sfbackpage.com (NetNames) |
| 4 | 189. | simplepost24.com (Versio) |
| 5 | 190. | simpleposts24.com (Versio) |
| 6 | 191. | svc.ws (NetNames) |
| 7 | 192. | truckrjobs.com (NetNames) |
| 8 | 193. | ugctechgroup.com (NetNames) |
| 9 | 194. | universads.nl (Versio) |
| 10 | 195. | villagevoicepimps.com (GoDaddy) |
| 11 | 196. | websitetechnologies.co.uk (NetNames) |
| 12 | 197. | websitetechnologies.com (NetNames) |
| 13 | 198. | websitetechnologies.net (NetNames) |
| 14 | 199. | websitetechnologies.nl (NetNames) |
| 15 | 200. | websitetechnologies.org (NetNames) |
| 16 | 201. | weprocessmoney.com (GoDaddy) |
| 17 | 202. | wst.ws (NetNames) |
| 18 | 203. | xn--yms-fla.com (NetNames) |
| 19 | 204. | ymas.ar.com (European domains) |
| 20 | 205. | ymas.br.com (European domains) |
| 21 | 206. | ymas.br.com (NetNames) |
| 22 | 207. | ymas.bz (European domains) |
| 23 | 208. | ymas.bz (NetNames) |
| 24 | 209. | ymas.cl (European domains) |
| 25 | 210. | ymas.cl (NetNames) |
| 26 | 211. | ymas.co.bz (European domains) |
| 27 | 212. | ymas.co.bz (NetNames) |
| 28 | 213. | ymas.co.cr (European domains) |

| | | |
|---|---|---|
| 1 | 214. | ymas.co.cr (NetNames) |
| 2 | 215. | ymas.co.ni (European domains) |
| 3 | 216. | ymas.co.ni (NetNames) |
| 4 | 217. | ymas.co.ve (European domains) |
| 5 | 218. | ymas.co.ve (NetNames) |
| 6 | 219. | ymas.com (NetNames) |
| 7 | 220. | ymas.com.br (European domains) |
| 8 | 221. | ymas.com.br (NetNames) |
| 9 | 222. | ymas.com.bz (European domains) |
| 10 | 223. | ymas.com.bz (NetNames) |
| 11 | 224. | ymas.com.co (European domains) |
| 12 | 225. | ymas.com.co (NetNames) |
| 13 | 226. | ymas.com.do (European domains) |
| 14 | 227. | ymas.com.do (NetNames) |
| 15 | 228. | ymas.com.ec (European domains) |
| 16 | 229. | ymas.com.ec (NetNames) |
| 17 | 230. | ymas.com.es (European domains) |
| 18 | 231. | ymas.com.es (NetNames) |
| 19 | 232. | ymas.com.gt (European domains) |
| 20 | 233. | ymas.com.gt (NetNames) |
| 21 | 234. | ymas.com.hn (European domains) |
| 22 | 235. | ymas.com.hn (NetNames) |
| 23 | 236. | ymas.com.mx  (NetNames) |
| 24 | 237. | ymas.com.ni (European domains) |
| 25 | 238. | ymas.com.ni (NetNames) |
| 26 | 239. | ymas.com.pe (European domains) |
| 27 | 240. | ymas.com.pe (NetNames) |
| 28 | 241. | ymas.com.pr (European domains) |

| | | |
|---|---|---|
| 1 | 242. | ymas.com.pr (NetNames) |
| 2 | 243. | ymas.com.pt  (NetNames) |
| 3 | 244. | ymas.com.uy (European domains) |
| 4 | 245. | ymas.com.uy (NetNames) |
| 5 | 246. | ymas.com.ve (European domains) |
| 6 | 247. | ymas.com.ve (NetNames) |
| 7 | 248. | ymas.cr (European domains) |
| 8 | 249. | ymas.cr (NetNames) |
| 9 | 250. | ymas.do (European domains) |
| 10 | 251. | ymas.do (NetNames) |
| 11 | 252. | ymas.ec (European domains) |
| 12 | 253. | ymas.ec (NetNames) |
| 13 | 254. | ymas.es (European domains) |
| 14 | 255. | ymas.es (NetNames) |
| 15 | 256. | ymas.org (NetNames) |
| 16 | 257. | ymas.pe (European domains) |
| 17 | 258. | ymas.pe (NetNames) |
| 18 | 259. | ymas.pt (NetNames) |
| 19 | 260. | ymas.us (European domains) |
| 20 | 261. | ymas.us (NetNames) |
| 21 | 262. | ymas.uy (European domains) |
| 22 | 263. | ymas.uy (NetNames) |
| 23 | 264. | ymas.uy.com (European domains) |
| 24 | 265. | atlantabackpage.com (NetNames) |
| 25 | 266. | backpage.com.br (NetNames) |
| 26 | 267. | chicagobackpage.com (NetNames) |
| 27 | 268. | tampabackpage.com (NetNames) |
| 28 | b. | To the extent such property is not available for forfeiture, a sum of money |

1  equal to the total value of such property.

2       3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

3  Title 18, United States Code, Section 982(b), each defendant convicted under Counts 52

4  through 100 of this Superseding Indictment shall forfeit substitute property, if, by any act

5  or omission of that defendant, the property described in the preceding paragraph, or any

6  portion thereof, cannot be located upon the exercise of due diligence; has been transferred,

7  sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court;

8  has been substantially diminished in value; or has been commingled with other property

9  that cannot be divided without difficulty.

10

11                                A TRUE BILL

12

13                            *S/*_____
                          FOREPERSON OF THE GRAND JURY

14                            Date:  July 25, 2018

15  ELIZABETH A. STRANGE
    First Assistant United States Attorney

16  District of Arizona

17  BRIAN BENCZKOWSKI Assistant Attorney General
    Criminal Division, U.S. Department of Justice

18

19  *S/*_____

20  KEVIN M. RAPP
    MARGARET PERLMETER

21  PETER KOZINETS
    ANDREW STONE

22  Assistant U.S. Attorneys

23  JOHN J. KUCERA
    Special Assistant U.S. Attorney

24  REGINALD E. JONES
    Senior Trial Attorney

25  U.S. Department of Justice, Criminal Division
    Child Exploitation and Obscenity Section

26

27

28

EFiled:  Sep 14 2018 06:28PM EDT
Transaction ID 62455883
Case No. 2018-0606-SG

Exhibit B

## Mark Castillo

**From:** Daniel J. Quigley <quigley@djqplc.com>
**Sent:** Wednesday, August 01, 2018 4:49 PM
**To:** Mark Castillo
**Subject:** RO v. Backpage

Mark:

I am writing in relation to our previous correspondence, following which the "Backpage Parties" agreed to the payment of the sanctions assessed in the R.O. matter from funds held by Davis Wright Tremaine in its trust account.

In the meantime, the US Attorney's office sent an email advising that it believes funds held in DWT's trust account may be subject to recovery as "criminal proceeds."  As a result, we intend to contact the attorney who sent the email early tomorrow and inform him that (i) prior to receiving his email, the parties had intended to pay the R.O. sanction from funds held in the DWT trust account; (ii) we do not understand his email to preclude such payment; and (iii) we have asked the court in R.O. for leave to pay the sanction into the court's registry, pending the outcome of the appeal.  If the court approves, DWT would intend to pay the sanction to the court's registry on Friday, August 3, in accordance with the deadline set by the R.O. court.

If you have had previous communications with the US Attorney's office regarding the payment of the sanction from the funds held by DWT,  please let me know.  Also please let me know you have any concerns regarding the course of action outlined above.  As the court in R.O. will hold a hearing Friday morning on the motion to deposit funds into the registry, and any reply regarding that motion is due tomorrow at noon, I'd appreciate your contacting me today so that DWT has time to contact the US Attorneys' office in the morning before the noon deadline.

Dan
--
Daniel J. Quigley (quigley@djqplc.com)
Daniel J. Quigley, PLC
5425 E. Broadway, Suite 352
Tucson, Arizona 85711
(520) 867-4450
(520) 867-4433 (f)
www.djqplc.com

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**EFiled:  Sep 14 2018 06:28PM EDT**
**Transaction ID 62455883**
**Case No. 2018-0606-SG**

Exhibit C

NO. DC-17-00951

| | | |
|---|---|---|
| PLAINTIFF XXXXXXXX, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| MEDALIST HOLDINGS, LLC; | § | |
| LEEWARD HOLDINGS, LLC; | § | |
| CAMARILLO HOLDINGS, LLC; | § | |
| DARTMOOR HOLDINGS, LLC; | § | DALLAS COUNTY, TEXAS |
| IC HOLDINGS, LLC; | § | |
| BACKPAGE.COM, LLC; | § | |
| UGC TECH GROUP CV; | § | |
| WEBSITE TECHNOLOGIES, LLC; | § | |
| ATLANTISCHE BEDRIJVEN C.V.; | § | |
| AMSTEL RIVER HOLDINGS, LLC; | § | |
| LUPINE HOLDINGS LLC; | § | |
| KICKAPOO RIVER INVESTMENTS, LLC; | § | |
| CF HOLDINGS GP, LLC; | § | |
| CF ACQUISITIONS, LLC; | § | |
| CARL FERRER; | § | |
| JAMES LARKIN; | § | |
| MICHAEL LACEY; | § | |
| MICHAEL PHILLIP PATRAKIS; | § | |
| AND JOHN DOE 1-5, | § | |
| | § | |
| Defendants. | § | 44TH JUDICIAL DISTRICT |

## ~~[PROPOSED]~~ ORDER ON MOTION TO WITHDRAW AS ATTORNEYS OF RECORD

Before the Court is the law firms Davis Wright Tremaine LLP and Akin Gump Strauss

Hauer & Feld LLP's (collectively, the "Movants") Motion to Withdraw as Attorneys of Record

(the "Motion"). Having considered the Motion and the record, and having determined that good *the responses, objections and reply thereto*

cause exists for Movants to withdraw as counsel for Defendants Backpage.com, LLC d/b/a

Backpage, Dartmoor Holdings, LLC, IC Holdings, LLC, Website Technologies, LLC,

Atlantische Bedrijven C.V., UGC Tech Group C.V., Amstel River Holdings, LLC, Lupine

Holdings, LLC, Kickapoo River Investments, LLC, CF Holdings GP, LLC, CF Acquisitions,

LLC, and Carl Ferrer (collectively, the "Backpage Defendants"), the Court has determined that

the Motion should be, and hereby is, GRANTED in its entirety, *over objection*

It is therefore ORDERED that the law firms Davis Wright Tremaine LLP and Akin Gump

Strauss Hauer & Feld LLP are withdrawn as counsel for the Backpage Defendants in this matter.

It is further ORDERED that Movants will provide a copy of this Order to the Backpage

Defendants within five (5) business days via email or first class mail.

*It is further ordered that the case is abated for Thirty days for corporate defendants to retain legal counsel. In the interim, counsel of record for the defendant shall meet and confer on division of retainer funds held in trust so as not to prejudice Backpage Defendant in this Court.*

**IT IS SO ORDERED.**

SIGNED this 26ᵗʰ day of ~~July~~, 2018.

_____
**JUDGE PRESIDING**

*~~Request motion to expedite the trial setting, any trial setting to be held within that date~~*

*The Court hereby sets the trial to September 16, 2019, which date ~~they~~ may be modified by agreement of the parties upon submission of an agreed scheduling order after the abatement period.*

*✱ Mr. Castillo appears of record for purposes of objections, and to avoid prejudice*

**EFiled:  Sep 14 2018 06:28PM EDT**
**Transaction ID 62455883**
**Case No. 2018-0606-SG**

# Exhibit D1

___ FILED        ___ LODGED
___ RECEIVED     ___ COPY

APR 0 5 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY____Smk____ DEPUTY

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-464-PHX-DJH |
| Plaintiff, | **PLEA AGREEMENT** |
| vs. | |
| TN: Carl Allen Ferrer<br>Carl Ferrer, | **SEALED** |
| Defendant. | |

Plaintiff, United States of America, and the defendant, Carl Ferrer, hereby agree to dispose of this matter on the following terms and conditions:

1. **PLEA**

The defendant will plead guilty to an Information charging the defendant with a violation of 18 United States Code (U.S.C.) § 371, Conspiracy, a Class D felony offense.

cc: AUSA, Defense Counsel, USPO

**2.**     **MAXIMUM PENALTIES**

       a.     A violation of 18 U.S.C. § 371 is punishable by a maximum fine of $250,000 (or, if any person derived pecuniary gain from the offense, or if the offense resulted in pecuniary loss to a person other than the defendant, not more than the greater of twice the gross gain or twice the gross loss), a maximum term of imprisonment of 5 years, or both, and a term of supervised release of 3 years. A maximum term of probation is five years.

       b.     According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

            (1)     make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

            (2)     pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

            (3)     serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

            (4)     pay upon conviction a $100 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

       c.     The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

**3.**     **AGREEMENTS REGARDING SENTENCING**

       a.     <u>Immediate Shutdown of Backpage Website</u>: The defendant stipulates and agrees that, upon entry of his guilty plea, he will take all steps within his power to immediately shut down the website www.backpage.com ("Backpage") in the United

1  States and all other countries in which the website operates. Such steps shall include, but
2  not be limited to, surrendering to the United States the registration account, including
3  login and password information, for the www.backpage.com domain name necessary to
4  operate the various Backpage websites and providing technical assistance to the United
5  States to effectuate the shutdown. If the defendant fails to take all steps within his power
6  to immediately shut down the website, this plea agreement shall be null and void and the
7  United States shall be free to prosecute the defendant for all crimes of which it then has
8  knowledge. In such event, the defendant waives any and all objections, motions, and
9  defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional
10 restrictions in bringing later charges or proceedings.

11      b.    Forfeiture Assistance: The defendant stipulates and agrees that, upon entry
12 of his guilty plea, he will take all steps within his power to forfeit to the United States all
13 corporate assets and other property owned or controlled by Website Technologies, LLC
14 ("Website Technologies"), which owns and operates the Backpage website, as well as all
15 corporate assets and other property owned or controlled by Backpage.com, LLC, Posting
16 Solutions LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC Tech Group CV.
17 Such steps shall include, but not be limited to, agreeing to the forfeiture of the domain
18 names, servers, intellectual property, trademarks, trade secrets, bank accounts,
19 cryptocurrency, and other financial instruments owned or controlled by such entities. If
20 the defendant fails to comply with this agreement, this plea agreement shall be null and
21 void and the United States shall be free to prosecute the defendant for all crimes of which
22 it then has knowledge. In such event, the defendant waives any and all objections,
23 motions, and defenses based upon the Statute of Limitations, the Speedy Trial Act, or
24 constitutional restrictions in bringing later charges or proceedings.

25      c.    California And Texas Proceedings: It is the parties' expectation that,
26 concurrently, or as close in time as is practicable to the time the defendant enters his
27 guilty plea in this case, the defendant also will enter guilty pleas to Backpage-related
28 charges in California and Texas state court. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the

- 3 -

United States and the defendant stipulate that the defendant's guilty plea in this case is contingent upon the state courts' acceptance of his plea agreements in the California and Nueces County, Texas matters. If either of those plea agreements is rejected, the defendant will be afforded an opportunity to withdraw his guilty plea in this case.

d. <u>Concurrency With State Sentences</u>: Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that the anticipated terms of imprisonment in the aforementioned California and Texas proceedings will arise from "relevant conduct to the instant offense of conviction." Accordingly, under U.S.S.G. § 5G1.3(c), the United States and the defendant stipulate that any term of imprisonment imposed in this case shall run concurrently with any terms of imprisonment subsequently imposed in the aforementioned California and Texas proceedings.

e. <u>Federal Custody</u>. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that, to the extent the defendant is sentenced to concurrent terms of federal and state imprisonment, the defendant will serve all concurrent time in federal custody.

f. <u>Ability To Request Downward Departure/Variance</u>: The defendant reserves the right to request a downward departure or a downward variance based on the factors set forth in 18 U.S.C. § 3553(a). The defendant understands that the government is free to oppose any such request.

g. <u>Restitution</u>. Pursuant to 18 U.S.C. § 3663 and/or 3663A, the defendant specifically agrees to pay full restitution, regardless of the resulting loss amount but in no event more than $500 million, to all victims directly or proximately harmed by the defendant's "relevant conduct," including conduct pertaining to any dismissed counts or uncharged conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. The defendant understands that such restitution will be included in the Court's Order of Judgment and that an unanticipated restitution amount will not serve as grounds to withdraw the defendant's guilty plea or to withdraw from this plea agreement.

h.  <u>Assets and Financial Responsibility</u>.  The defendant shall make a full accounting of all assets in which the defendant has any legal or equitable interest.  The defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer more than $500 of any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures).  The defendant also expressly authorizes the United States Attorney's Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.  The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose.  Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

i.  <u>Acceptance of Responsibility</u>.  If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a).  If the defendant has an offense level of 16 or more, the United States will move the Court for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

**4.  AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

a.  This office shall not prosecute the defendant for any offenses committed by the defendant, and known by the United States, in connection with the subject matter described in the factual basis of this agreement.

b.  This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office.

- 5 -

**5.     COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

a.     If the Court, after reviewing this plea agreement, concludes that any provision contained herein is inappropriate, it may reject the plea agreement and give the defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P. 11(c)(5).

b.     If the defendant's guilty plea or plea agreement is rejected, withdrawn, vacated, or reversed at any time, or if the state courts considering related claims in California and Texas reject the defendant's plea agreements in those states, this agreement shall be null and void, the United States shall be free to prosecute the defendant for all crimes of which it then has knowledge and any charges that have been dismissed because of this plea agreement shall automatically be reinstated. In such event, the defendant waives any and all objections, motions, and defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional restrictions in bringing later charges or proceedings, and any statements made by the defendant at the time of his change of plea or sentencing in this case may not be used against him in any subsequent hearing, trial, or proceeding.

**6.     WAIVER OF DEFENSES AND APPEAL RIGHTS**

The defendant waives (1) any and all motions, defenses, probable cause determinations, and objections that the defendant could assert to the indictment or information; and (2) any right to file an appeal, any collateral attack, and any other writ or motion that challenges the conviction, an order of restitution or forfeiture, the entry of judgment against the defendant, or any aspect of the defendant's sentence, including the manner in which the sentence is determined, including but not limited to any appeals under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255 (habeas petitions), and any right to file a motion for modification of sentence, including under 18 U.S.C. § 3582(c). This waiver shall result in the dismissal of any appeal, collateral attack, or other motion the defendant might file challenging the conviction, order of restitution or forfeiture, or sentence in this case. This waiver shall

not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics Op. 15-01 (2015)).

**7.   DISCLOSURE OF INFORMATION**

a.     The United States retains the unrestricted right to provide information and make any and all statements it deems appropriate to the U.S. Probation Office and to the Court in connection with the case.

b.     Any information, statements, documents, and evidence that the defendant provides to the United States pursuant to this agreement may be used against the defendant at any time.

c.     The defendant shall cooperate fully with the U.S. Probation Office.  Such cooperation shall include providing complete and truthful responses to questions posed by the U.S. Probation Office including, but not limited to, questions relating to:

(1)     criminal convictions, history of drug abuse, and mental illness; and

(2)     financial information, including present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

**8.   FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

a.     Pursuant to 18 U.S.C. § 981(a)(1)(C), the defendant agrees to forfeit, and hereby forfeits, all interest in any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.  Such property includes, but is not limited to, all right, title, and interest in funds held in the following bank accounts:

(1)     Republic Bank of Arizona account number x2912

(2)     Republic Bank of Arizona account number x2500

(3)     Green Bank account number x4832

(4)     Plains Capital Bank account number x1098

Such property further includes, but is not limited to, all right, title, and interest in the following domain names:

(1)     atlantabackpage.com

- 7 -

| | | |
|---|---|---|
| 1 | (2) | backpage.be |
| 2 | (3) | backpage.com |
| 3 | (4) | backpage.com.br |
| 4 | (5) | backpage.cz |
| 5 | (6) | backpage.dk |
| 6 | (7) | backpage.ee |
| 7 | (8) | backpage.es |
| 8 | (9) | backpage.fi |
| 9 | (10) | backpage.fr |
| 10 | (11) | backpage.gr |
| 11 | (12) | backpage.hu |
| 12 | (13) | backpage.ie |
| 13 | (14) | backpage.it |
| 14 | (15) | backpage.lt |
| 15 | (16) | backpage.mx |
| 16 | (17) | backpage.net |
| 17 | (18) | backpage.no |
| 18 | (19) | backpage.pl |
| 19 | (20) | backpage.pt |
| 20 | (21) | backpage.ro |
| 21 | (22) | backpage.si |
| 22 | (23) | backpage.sk |
| 23 | (24) | backpage.us |
| 24 | (25) | backpage-insider.com |
| 25 | (26) | bestofbackpage.com |
| 26 | (27) | bestofbigcity.com |
| 27 | (28) | bigcity.com |
| 28 | (29) | chicagobackpage.com |

            (30)   denverbackpage.com

            (31)   newyorkbackpage.com

            (32)   phoenixbackpage.com

            (33)   sandiegobackpage.com

            (34)   seattlebackpage.com

            (35)   tampabackpage.com

Such property further includes, but is not limited to, all right, title, and interest in any funds remaining in the following IOLTA bank accounts at the conclusion of litigation (with the understanding that the funds currently deposited in those IOLTA bank accounts may only be withdrawn by counsel based on the provision of legal services):

            (1)   First Republic Bank IOLTA Account x6180

            (2)   First Republic Bank IOLTA Account x6255

            (3)   First Republic Bank IOLTA Account x5978

            (4)   All funds previously deposited in Wells Fargo IOLTA Account x7091 to fund the criminal defense of Backpage.com, LLC, Website Technologies, LLC, Posting Solutions LLC, Amstel River Holdings LLC, Ad Tech BV, and/or UGC Tech Group BV

Such property further includes, but is not limited to, all right, title, and interest in any funds previously advanced to a bail bond service (with the understanding that, should the defendant not be required to post a bond in this matter, he will take immediate steps to recover any funds previously advanced to a bail bond service and surrender those funds to the United States for forfeiture).

     b.    The United States and the defendant further agree that the following assets are not subject to forfeiture, either in this criminal proceeding or in a future administrative or civil forfeiture proceeding, because the assets were obtained solely with non-Backpage related funds (and, therefore, cannot lawfully be forfeited under the relevant statutes):

            (1)   The real property located at 2531 Tumbleweed Way, Frisco, Texas.

(2)     The defendant's pre-2004 contributions to Millennium Trust IRA account number x2890.

c.     The defendant further agrees that, other than paragraph 8(b) above, nothing in this agreement shall be construed to protect him from administrative or civil forfeiture proceedings or to prohibit the United States from proceeding with and/or initiating an action for civil forfeiture (either with respect to the property identified above or with respect to additional property that is not subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) but may be subject to forfeiture under other provisions).

d.     The defendant further agrees to waive all interest in all property subject to forfeiture under this agreement in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant further understands and agrees that forfeiture of the property is appropriate and in accordance with the applicable forfeiture statutes, which may include Title 8 U.S.C. § 1324(b), Title 18 U.S.C. §§ 924(d), 981, 982 and 2253, Title 21 U.S.C. §§ 853 and 881, and Title 28 U.S.C. § 2461(c).

e.     Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule). If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

f.     Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose

upon the defendant in addition to forfeiture. This agreement does not preclude the United States from instituting any civil or administrative forfeiture proceedings as may be appropriate now or in the future.

g.     The defendant agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, double jeopardy or any other means) to any forfeiture imposed as a result of this guilty plea or any pending or completed administrative or civil forfeiture actions, including that the forfeiture constitutes an excessive fine or punishment. The defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding (including any proceeding to adjudicate the claim of any third party to the forfeited assets). The defendant acknowledges that all property covered by this agreement is subject to forfeiture and that no other person or entity has a legitimate claim to these items listed, other than any community property interest that his wife may have in the forfeited assets under state law.

h.     The defendant agrees not to file a claim to any of the listed property subject to forfeiture under paragraph 8(a) of this agreement in any civil proceeding, administrative or judicial, which may be initiated. The defendant further agrees that he/she will not contest civil, administrative, or judicial forfeiture of that property. The defendant agrees to waive his/her right to notice of any forfeiture proceeding involving this property, and agrees not to file a claim or assist others in filing a claim in that forfeiture proceeding.

i.     The government reserves its right to proceed against any remaining assets not identified either in this agreement, other than the assets identified in paragraph 8(b) above, or in any civil actions which are being resolved along with this plea of guilty, including any property in which the defendant has any interest or control, if said assets, real or personal, tangible or intangible were involved in the offense(s).

j.     The defendant hereby waives, and agrees to hold the government and its agents and employees harmless from any and all claims whatsoever in connection with

the seizure, forfeiture, and disposal of the property described above. Without limitation, the defendant understands and agrees that by virtue of this plea of guilty, the defendant will waive any rights or cause of action that the defendant might otherwise have had to claim that he/she is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related civil forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

9.  **ELEMENTS**

**Conspiracy**

Beginning no later than 2004, and continuing through in or around March 2018, in the District of Arizona and elsewhere:

1.  There was an agreement between two or more persons to commit one or more of the crimes of Travel Act—Facilitate Prostitution (18 U.S.C. § 1952(a)(3)(A)), Concealment Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i)), International Promotional Money Laundering (18 U.S.C. § 1956(a)(2)(A)),Transactional Money Laundering (18 U.S.C. § 1957(a)), and International Concealment Money Laundering (18 U.S.C. § 1956(a)(2)(B)(i)).

2.  The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

3.  One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

10.  **FACTUAL BASIS**

a.  The defendant admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

In 2004, I co-founded the website www.Backpage.com ("Backpage"), along with M.L. and J.L.  Backpage eventually became the second-largest classified advertising website in the world and, during its 14 years of existence, has derived

the great majority of its revenue from fees charged in return for publishing advertisements for "adult" and "escort" services.

I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., D.H., A.P, and J.V.) to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers. For example, I worked with my co-conspirators to create "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage. These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.

In addition to conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers, I also conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., J.B., and D.H.) to engage in various money laundering offenses. Since 2004, Backpage has earned hundreds of millions of dollars in revenue from publishing "escort" and "adult" ads. Over time, many banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business. In response, I worked with my co-conspirators to find ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different

websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies (including but not limited to CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

     b.    The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any intentional material inconsistencies in the defendant's testimony may subject the defendant to additional penalties for perjury or false swearing, which may be enforced by the United States under this agreement.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it.

I have discussed the case and my constitutional and other rights with my attorney. I understand that by entering my plea of guilty I shall waive my rights to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to present evidence in my defense, to remain silent and refuse to be a witness against myself by asserting my privilege against self-incrimination, all with the assistance of counsel, and to be presumed innocent until proven guilty beyond a reasonable doubt.

I agree to enter my guilty plea as indicated above on the terms and conditions set forth in this agreement.

I have been advised by my attorney of the nature of the charges to which I am entering my guilty plea. I have further been advised by my attorney of the nature and range of the possible sentence and that my ultimate sentence shall be determined by the Court after consideration of the advisory Sentencing Guidelines.

1    My guilty plea is not the result of force, threats, assurances, or promises, other

2    than the promises contained in this agreement.  I voluntarily agree to the provisions of

3    this agreement and I agree to be bound according to its provisions.

4    I understand that if I am granted probation or placed on supervised release by the

5    Court, the terms and conditions of such probation/supervised release are subject to

6    modification at any time.  I further understand that if I violate any of the conditions of my

7    probation/supervised release, my probation/supervised release may be revoked and upon

8    such revocation, notwithstanding any other provision of this agreement, I may be

9    required to serve a term of imprisonment or my sentence otherwise may be altered.

10    This written plea agreement, and any written addenda filed as attachments to this

11    plea agreement, contain all the terms and conditions of the plea.  Any additional

12    agreements, if any such agreements exist, shall be recorded in a separate document and

13    may be filed with the Court under seal; accordingly, additional agreements, if any, may

14    not be in the public record.

15    I further agree that promises, including any predictions as to the Sentencing

16    Guideline range or to any Sentencing Guideline factors that will apply, made by anyone

17    (including my attorney) that are not contained within this written plea agreement, are null

18    and void and have no force and effect.

19    I am satisfied that my defense attorney has represented me in a competent manner.

20    I fully understand the terms and conditions of this plea agreement.  I am not now

21    using or under the influence of any drug, medication, liquor, or other intoxicant or

22    depressant that would impair my ability to fully understand the terms and conditions of

23    this plea agreement.

24    _4-5-18_____                    _O C A_____

25    Date                                      CARL FERRER
                                               Defendant
26

27

28

**APPROVAL OF DEFENSE COUNSEL**

I have discussed this case and the plea agreement with my client in detail and have advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the constitutional and other rights of an accused, the factual basis for and the nature of the offense to which the guilty plea will be entered, possible defenses, and the consequences of the guilty plea including the maximum statutory sentence possible. I have further discussed the concept of the advisory Sentencing Guidelines with the defendant. No assurances, promises, or representations have been given to me or to the defendant by the United States or any of its representatives that are not contained in this written agreement. I concur in the entry of the plea as indicated above and that the terms and conditions set forth in this agreement are in the best interests of my client. I agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all the requirements of Fed. R. Crim. P. 11.

4-5-18
Date

NANCI CLARENCE
JONATHAN BAUM
Attorneys for Defendant

- 16 -

1

## APPROVAL OF THE UNITED STATES

2       I have reviewed this matter and the plea agreement. I agree on behalf of the

3 United States that the terms and conditions set forth herein are appropriate and are in the

4 best interests of justice.

5                             ELIZABETH A. STRANGE
                            First Assistant United States Attorney
6                             District of Arizona

7                             JOHN P. CRONAN
                            Acting Assistant Attorney General
8                             Criminal Division, U.S. Department of Justice

9

10 _____
  4 - 5 - 18

Date                            KEVIN RAPP

11                             DOMINIC LANZA
                            MARGARET PERLMETER
12                             JOHN J. KUCERA
                            Assistant U.S. Attorneys

13                             REGINALD JONES
                            Senior Trial Attorney
14

15

## ACCEPTANCE BY THE COURT

16

17 _____

Date                            United States District Judge

18

19

20

21

22

23

24

25

26

27

28

Exhibit D2

RECEIVED ☐ COPY

APR 0 5 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _Smv_ DEPUTY

1   ELIZABETH A. STRANGE
    First Assistant United States Attorney
2   District of Arizona

3   KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
    DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
4   MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
    JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
5   Assistant U.S. Attorneys
    40 N. Central Avenue, Suite 1800
6   Phoenix, Arizona 85004-4408
    Telephone (602) 514-7500
7
    JOHN P. CRONAN
8   Acting Assistant Attorney General
    Criminal Division, U.S. Department of Justice
9
    REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
10  Senior Trial Attorney, U.S. Department of Justice
    Child Exploitation and Obscenity Section
11  950 Pennsylvania Ave N.W., Room 2116
    Washington, D.C. 20530
12  Telephone (202) 616-2807
    Attorneys for Plaintiff

13
14              IN THE UNITED STATES DISTRICT COURT

15              FOR THE DISTRICT OF ARIZONA

                                            SEALED
16  United States of America,              CR-18-465-PHX-DJH

17                  Plaintiff,             **PLEA AGREEMENT**

18          vs.

19  Backpage.com, LLC,
20
                    Defendant.
21

22          Plaintiff, United States of America, and the defendant, Backpage.com, LLC,

23  hereby agree to dispose of this matter on the following terms and conditions:

24  **1.    PLEA**

25          The defendant will plead guilty to an Information charging the defendant with a

26  violation of 18 United States Code (U.S.C.) § 1956(h), Money Laundering Conspiracy, a

27  Class C felony offense.

28


cc: AUSA, Defense Counsel, USPO

## 2. **MAXIMUM PENALTIES**

a. A violation of 18 U.S.C. § 1956(h) is punishable by a maximum fine of $500,000 (or, if any person derived pecuniary gain from the offense, or if the offense resulted in pecuniary loss to a person other than the defendant, not more than the greater of twice the gross gain or twice the gross loss), a maximum term of imprisonment of 20 years, or both, and a term of supervised release of 3 years. A maximum term of probation is five years.

b. According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

(1) make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

(2) pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

(3) serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

(4) pay upon conviction a $400 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

c. The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

## 3. **AGREEMENTS REGARDING SENTENCING**

a. <u>California And Texas Proceedings</u>: It is the parties' expectation that, around the time the defendant enters a guilty plea in this case, co-defendant Carl Ferrer will enter guilty pleas to Backpage-related charges in California and Texas state court.

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that the defendant's guilty plea in this case is contingent upon the acceptance of Ferrer's plea agreements in the California and Texas matters. If either of those plea agreements is rejected, the defendant will be afforded an opportunity to withdraw the guilty plea in this case.

b.  Timing Of Sentencing:  The defendant agrees that sentencing in this case may be delayed until the federal sentencing of co-defendant Carl Ferrer.

c.  Offset for Fine Payments By Organizational Co-Defendants.  The parties stipulate and agree that, to the extent the Court imposes a criminal fine against any of the other organizational co-defendants in this matter, the defendant will receive credit toward its criminal fine obligation (under 18 U.S.C. § 3612(i)) for any fine-related payments made by such organizational co-defendants.

d.  Length Of Probationary Term:  It is the parties' intention that the defendant will cease to exist or operate following its entry of a guilty plea in this matter. Nevertheless, pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend that, if it appears the defendant will remain in existence and operation following sentencing in this case, the defendant be sentenced to a 60-month term of probation.

e.  Restitution.  Pursuant to 18 U.S.C. § 3663 and/or 3663A, the defendant specifically agrees to pay full restitution, regardless of the resulting loss amount but in no event more than $500 million, to all victims directly or proximately harmed by the defendant's "relevant conduct," including conduct pertaining to any dismissed counts or uncharged conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A.  The defendant understands that such restitution will be included in the Court's Order of Judgment and that an unanticipated restitution amount will not serve as grounds to withdraw the defendant's guilty plea or to withdraw from this plea agreement.

f.  Assets and Financial Responsibility.  The defendant shall make a full accounting of all assets in which the defendant has any legal or equitable interest.  The

- 3 -

defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Attorney's Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

g. <u>Acceptance of Responsibility</u>. If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a). If the defendant has an offense level of 16 or more, the United States will move the Court for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

**4.    AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

a. This office shall not prosecute the defendant for any offenses committed by the defendant, and known by the United States, in connection with the subject matter described in the factual basis of this agreement.

b. This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office.

**5.    COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

- 4 -

a.    If the Court, after reviewing this plea agreement, concludes that any provision contained herein is inappropriate, it may reject the plea agreement and give the defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P. 11(c)(5).

b.    If the defendant's guilty plea or plea agreement is rejected, withdrawn, vacated, or reversed at any time, this agreement shall be null and void, the United States shall be free to prosecute the defendant for all crimes of which it then has knowledge and any charges that have been dismissed because of this plea agreement shall automatically be reinstated. In such event, the defendant waives any and all objections, motions, and defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional restrictions in bringing later charges or proceedings. The defendant understands that any statements made at the time of the defendant's change of plea or sentencing may be used against the defendant in any subsequent hearing, trial, or proceeding subject to the limitations of Fed. R. Evid. 410.

## 6.    WAIVER OF DEFENSES AND APPEAL RIGHTS

The defendant waives (1) any and all motions, defenses, probable cause determinations, and objections that the defendant could assert to the indictment or information; and (2) any right to file an appeal, any collateral attack, and any other writ or motion that challenges the conviction, an order of restitution or forfeiture, the entry of judgment against the defendant, or any aspect of the defendant's sentence, including the manner in which the sentence is determined, including but not limited to any appeals under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255 (habeas petitions), and any right to file a motion for modification of sentence, including under 18 U.S.C. § 3582(c). This waiver shall result in the dismissal of any appeal, collateral attack, or other motion the defendant might file challenging the conviction, order of restitution or forfeiture, or sentence in this case. This waiver shall not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics

Op. 15-01 (2015)).

**7.    DISCLOSURE OF INFORMATION**

a.    The United States retains the unrestricted right to provide information and make any and all statements it deems appropriate to the U.S. Probation Office and to the Court in connection with the case.

b.    Any information, statements, documents, and evidence that the defendant provides to the United States pursuant to this agreement may be used against the defendant at any time.

c.    The defendant shall cooperate fully with the U.S. Probation Office.  Such cooperation shall include providing complete and truthful responses to questions posed by the U.S. Probation Office including, but not limited to, questions relating to:

(1)    criminal convictions, history of drug abuse, and mental illness; and

(2)    financial information, including present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

**8.    FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

a.    Nothing in this agreement shall be construed to protect the defendant from administrative or civil forfeiture proceedings or prohibit the United States from proceeding with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule).  If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

b.    The defendant agrees to forfeit, and hereby forfeits, all interest in any asset that the defendant owns or over which the defendant exercises control, directly or

indirectly, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of the offense(s), or which was used to facilitate the commission of the offense(s). Such property includes, but is not limited to, all right, title, and interest in funds held in the following bank accounts:

     (1)    Prosperity Bank account number x7188

     (2)    Compass Bank account number x3873

Such property further includes, but is not limited to, all right, title, and interest in the following domain names:

     (1)    atlantabackpage.com

     (2)    backpage.be

     (3)    backpage.com

     (4)    backpage.com.br

     (5)    backpage.cz

     (6)    backpage.dk

     (7)    backpage.ee

     (8)    backpage.es

     (9)    backpage.fi

     (10)    backpage.fr

     (11)    backpage.gr

     (12)    backpage.hu

     (13)    backpage.ie

     (14)    backpage.it

     (15)    backpage.lt

     (16)    backpage.mx

     (17)    backpage.net

     (18)    backpage.no

     (19)    backpage.pl

     (20)    backpage.pt

| | | |
|---|---|---|
| (21) | backpage.ro | |
| (22) | backpage.si | |
| (23) | backpage.sk | |
| (24) | backpage.us | |
| (25) | backpage-insider.com | |
| (26) | bestofbackpage.com | |
| (27) | bestofbigcity.com | |
| (28) | bigcity.com | |
| (29) | chicagobackpage.com | |
| (30) | denverbackpage.com | |
| (31) | newyorkbackpage.com | |
| (32) | phoenixbackpage.com | |
| (33) | sandiegobackpage.com | |
| (34) | seattlebackpage.com | |
| (35) | tampabackpage.com | |

Such property further includes, but is not limited to, all right, title, and interest in any funds remaining in the following IOLTA bank accounts at the conclusion of litigation (with the understanding that the funds currently deposited in those IOLTA bank accounts may only be withdrawn by counsel based on the provision of legal services):

    (1)   First Republic Bank IOLTA Account x6180

    (2)   First Republic Bank IOLTA Account x6255

    (3)   First Republic Bank IOLTA Account x5978

    (4)   All funds previously deposited in Wells Fargo IOLTA account number x7091 to fund the criminal defense of Backpage.com, LLC, Website Technologies, LLC, Posting Solutions LLC, Amstel River Holdings LLC, Ad Tech BV, and/or UGC Tech Group BV

Such property further includes, but is not limited to, all right, title, and interest in any funds previously advanced to a bail bond service (with the understanding that, should co-

1    defendant Carl Ferrer not be required to post a bond in this matter, the defendant will take

2    immediate steps to recover any funds previously advanced to a bail bond service and

3    surrender those funds to the United States for forfeiture).

4          c.     The defendant further agrees to waive all interest in any such asset in any

5    administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal.

6    The defendant agrees to consent to the entry of orders of forfeiture for such property and

7    waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding

8    notice of the forfeiture in the charging instrument, announcement of the forfeiture at

9    sentencing, and incorporation of the forfeiture in the judgment.  The defendant further

10   understands and agrees that forfeiture of the assets is appropriate and in accordance with

11   the applicable forfeiture statutes, which may include Title 8 U.S.C. § 1324(b), Title 18

12   U.S.C. §§ 924(d), 981, 982 and 2253, Title 21 U.S.C. §§ 853 and 881, and Title 28

13   U.S.C. § 2461(c).

14         d.     Forfeiture of the defendant's assets shall not be treated as satisfaction of

15   any fine, restitution, cost of imprisonment, or any other penalty this court may impose

16   upon the defendant in addition to forfeiture.  This agreement does not preclude the United

17   States from instituting any civil or administrative forfeiture proceedings as may be

18   appropriate now or in the future.

19         e.     The defendant agrees to waive all constitutional and statutory challenges in

20   any manner (including direct appeal, habeas corpus, double jeopardy or any other means)

21   to any forfeiture imposed as a result of this guilty plea or any pending or completed

22   administrative or civil forfeiture actions, including that the forfeiture constitutes an

23   excessive fine or punishment.  The defendant agrees to take all steps as requested by the

24   United States to pass clear title to forfeitable assets to the United States, and to testify

25   truthfully in any judicial forfeiture proceeding.   The defendant acknowledges that all

26   property covered by this agreement is subject to forfeiture as proceeds of illegal conduct,

27   property facilitating illegal conduct, and substitute assets for property otherwise subject

28   to forfeiture, and that no other person or entity has a legitimate claim to these items listed.

f. The defendant agrees not to file a claim to any of the listed property in any civil proceeding, administrative or judicial, which may be initiated. The defendant further agrees that he/she will not contest civil, administrative or judicial forfeiture of the listed property. The defendant agrees to waive his/her right to notice of any forfeiture proceeding involving this property, and agrees not to file a claim or assist others in filing a claim in that forfeiture proceeding.

g. The government reserves its right to proceed against any remaining assets not identified either in this agreement or in any civil actions which are being resolved along with this plea of guilty, including any property in which the defendant has any interest or control, if said assets, real or personal, tangible or intangible were involved in the offense(s).

h. The defendant hereby waives, and agrees to hold the government and its agents and employees harmless from any and all claims whatsoever in connection with the seizure, forfeiture, and disposal of the property described above. Without limitation, the defendant understands and agrees that by virtue of this plea of guilty, the defendant will waive any rights or cause of action that the defendant might otherwise have had to claim that he/she is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related civil forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

9. **ELEMENTS**

**Money Laundering Conspiracy**

Beginning no later than 2004, and continuing through in or around March 2018, in the District of Arizona and elsewhere:

1. There was an agreement between two or more persons to commit one or more of the crimes of Concealment Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i)), International Promotional Money Laundering (18 U.S.C. § 1956(a)(2)(A)),Transactional Money Laundering (18 U.S.C. § 1957(a)), and/or International Concealment Money Laundering (18 U.S.C. § 1956(a)(2)(B)(i)); and

2.     The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

**10.     FACTUAL BASIS**

a.     The defendant admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

The website www.Backpage.com ("Backpage") was created in 2004. It eventually became the second-largest classified advertising website in the world and, during its 14 years of existence, has derived the great majority of its revenue from fees charged in return for publishing advertisements for "adult" and "escort" services.

The great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, certain employees and representatives of Backpage.com, LLC (who were authorized to bind the company with their actions) conspired to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers. For example, the company utilized "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage. These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.

- 11 -

In addition to conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers, certain employees and representatives of Backpage.com, LLC (who were authorized to bind the company with their actions) also conspired to engage in various money laundering offenses. Since 2004, Backpage has earned hundreds of millions of dollars in revenue from publishing "escort" and "adult" ads. Over time, many banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business. In response, the aforementioned employees and representatives found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies (including but not limited to CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

b. The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any intentional material inconsistencies in the defendant's testimony may subject the defendant to additional penalties for perjury or false swearing, which may be enforced by the United States under this agreement.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT'S AUTHORIZED REPRESENTATIVE

I am authorized to enter into a written plea bargain agreement and enter a plea of guilty on behalf of the defendant.

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it on behalf of the defendant.

1    I understand that by entering my plea of guilty, the defendant shall waive its rights

2    to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance

3    of witnesses, to present evidence in its defense, to remain silent and refuse to be a witness

4    against itself by asserting its privilege against self-incrimination (if applicable), all with

5    the assistance of counsel, and to be presumed innocent until proven guilty beyond a

6    reasonable doubt.

7    I agree to enter this guilty plea as indicated above on the terms and conditions set

8    forth in this agreement.

9    I understand the nature of the charges to which the defendant is entering its guilty

10   plea. I further understand the nature and range of the possible sentence and that the

11   defendant's ultimate sentence shall be determined by the Court after consideration of the

12   advisory Sentencing Guidelines.

13   The defendant's guilty plea is not the result of force, threats, assurances, or

14   promises, other than the promises contained in this agreement. The defendant voluntarily

15   agrees to the provisions of this agreement and agrees to be bound according to its

16   provisions.

17   I understand that if the defendant is granted probation or placed on supervised

18   release by the Court, the terms and conditions of such probation/supervised release are

19   subject to modification at any time. I further understand that if the defendant violates any

20   of the conditions of its probation/supervised release, its probation/supervised release may

21   be revoked and upon such revocation, notwithstanding any other provision of this

22   agreement, its sentence otherwise may be altered.

23   This written plea agreement, and any written addenda filed as attachments to this

24   plea agreement, contain all the terms and conditions of the plea. Any additional

25   agreements, if any such agreements exist, shall be recorded in a separate document and

26   may be filed with the Court under seal; accordingly, additional agreements, if any, may

27   not be in the public record.

28

1    I further agree on behalf of the defendant that promises, including any predictions

2    as to the Sentencing Guideline range or to any Sentencing Guideline factors that will

3    apply, made by anyone (including the defendant's attorney) that are not contained within

4    this written plea agreement, are null and void and have no force and effect.

5    I fully understand the terms and conditions of this plea agreement. I am not now

6    using or under the influence of any drug, medication, liquor, or other intoxicant or

7    depressant that would impair my ability to fully understand the terms and conditions of

8    this plea agreement.

9

10   Date _4-5-18_

     CARL FERRER
     Defendant's Authorized Representative

11

12   **APPROVAL OF DEFENSE COUNSEL**

13   I have discussed this case and the plea agreement with my client in detail and have

14   advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the

15   constitutional and other rights of an accused, the factual basis for and the nature of the

16   offense to which the guilty plea will be entered, possible defenses, and the consequences

17   of the guilty plea including the maximum statutory sentence possible. I have further

18   discussed the concept of the advisory Sentencing Guidelines with the defendant. No

19   assurances, promises, or representations have been given to me or to the defendant by the

20   United States or any of its representatives that are not contained in this written

21   agreement. I concur in the entry of the plea as indicated above and that the terms and

22   conditions set forth in this agreement are in the best interests of my client. I agree to

23   make a bona fide effort to ensure that the guilty plea is entered in accordance with all the

24   requirements of Fed. R. Crim. P. 11.

25

26   Date _4/5/2018_

     David Botsford
     Attorney for Defendant

27

28

- 14 -

1  **APPROVAL OF THE UNITED STATES**

2      I have reviewed this matter and the plea agreement.  I agree on behalf of the

3  United States that the terms and conditions set forth herein are appropriate and are in the

4  best interests of justice.

5

6                                           ELIZABETH A. STRANGE
                                         First Assistant United States Attorney

7                                           District of Arizona

8                                         JOHN P. CRONAN
                                         Acting Assistant Attorney General

9                                         Criminal Division, U.S. Department of Justice

10  4 - 5 - 18

11  ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Date                                  KEVIN RAPP

12                                         DOMINIC LANZA
                                       MARGARET PERLMETER

13                                         JOHN J. KUCERA
                                       Assistant U.S. Attorneys

14                                         REGINALD JONES

15                                         Senior Trial Attorney

16  **ACCEPTANCE BY THE COURT**

17

18  ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾         ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

19  Date                                United States District Judge

20

21

22

23

24

25

26

27

28

- 15 -

Exhibit D3

_____ RECEIVED _____ COPY

APR 0 5 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY S:A+ _____ DEPUTY

1  ELIZABETH A. STRANGE
   First Assistant United States Attorney
2  District of Arizona

3  KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
   DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
4  MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
   JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
5  Assistant U.S. Attorneys
   40 N. Central Avenue, Suite 1800
6  Phoenix, Arizona 85004-4408
   Telephone (602) 514-7500
7
8  JOHN P. CRONAN
   Acting Assistant Attorney General
   Criminal Division, U.S. Department of Justice
9
   REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
10 Senior Trial Attorney, U.S. Department of Justice
   Child Exploitation and Obscenity Section
11 950 Pennsylvania Ave N.W., Room 2116
   Washington, D.C. 20530
12 Telephone (202) 616-2807
   Attorneys for Plaintiff
13
14              IN THE UNITED STATES DISTRICT COURT

15              FOR THE DISTRICT OF ARIZONA

16 United States of America,                    SEALED

17              Plaintiff,              CR-18-465-PHX-DJH
                                        **PLEA AGREEMENT**
18      vs.

19
   Amstel River Holdings, LLC,
20
               Defendant.
21

22      Plaintiff, United States of America, and the defendant, Amstel River Holdings,

23 LLC, hereby agree to dispose of this matter on the following terms and conditions:

24 1.      **PLEA**

25      The defendant will plead guilty to an Information charging the defendant with a

26 violation of 18 United States Code (U.S.C.) § 1956(h), Money Laundering Conspiracy, a

27 Class C felony offense.

28

cc: AUSA, Defense Counsel, USPO

**2.**     **MAXIMUM PENALTIES**

a.     A violation of 18 U.S.C. § 1956(h) is punishable by a maximum fine of $500,000 (or, if any person derived pecuniary gain from the offense, or if the offense resulted in pecuniary loss to a person other than the defendant, not more than the greater of twice the gross gain or twice the gross loss), a maximum term of imprisonment of 20 years, or both, and a term of supervised release of 3 years. A maximum term of probation is five years.

b.     According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

(1)     make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

(2)     pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

(3)     serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

(4)     pay upon conviction a $400 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

c.     The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

**3.**     **AGREEMENTS REGARDING SENTENCING**

a.     <u>California And Texas Proceedings</u>: It is the parties' expectation that, around the time the defendant enters a guilty plea in this case, co-defendant Carl Ferrer will enter guilty pleas to Backpage-related charges in California and Texas state court.

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that the defendant's guilty plea in this case is contingent upon the acceptance of Ferrer's plea agreements in the California and Texas matters. If either of those plea agreements is rejected, the defendant will be afforded an opportunity to withdraw the guilty plea in this case.

      b.    <u>Timing Of Sentencing</u>: The defendant agrees that sentencing in this case may be delayed until the federal sentencing of co-defendant Carl Ferrer.

      c.    <u>Offset for Fine Payments By Organizational Co-Defendants</u>. The parties stipulate and agree that, to the extent the Court imposes a criminal fine against any of the other organizational co-defendants in this matter, the defendant will receive credit toward its criminal fine obligation (under 18 U.S.C. § 3612(i)) for any fine-related payments made by such organizational co-defendants.

      d.    <u>Length Of Probationary Term</u>: It is the parties' intention that the defendant will cease to exist or operate following its entry of a guilty plea in this matter. Nevertheless, pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend that, if it appears the defendant will remain in existence and operation following sentencing in this case, the defendant be sentenced to a 60-month term of probation.

      e.    <u>Restitution</u>. Pursuant to 18 U.S.C. § 3663 and/or 3663A, the defendant specifically agrees to pay full restitution, regardless of the resulting loss amount but in no event more than $500 million, to all victims directly or proximately harmed by the defendant's "relevant conduct," including conduct pertaining to any dismissed counts or uncharged conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. The defendant understands that such restitution will be included in the Court's Order of Judgment and that an unanticipated restitution amount will not serve as grounds to withdraw the defendant's guilty plea or to withdraw from this plea agreement.

      f.    <u>Assets and Financial Responsibility</u>. The defendant shall make a full accounting of all assets in which the defendant has any legal or equitable interest. The

- 3 -

defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Attorney's Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

g. <u>Acceptance of Responsibility</u>. If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a). If the defendant has an offense level of 16 or more, the United States will move the Court for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

**4.    AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

a. This office shall not prosecute the defendant for any offenses committed by the defendant, and known by the United States, in connection with the subject matter described in the factual basis of this agreement.

b. This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office.

**5.    COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

1       a.     If the Court, after reviewing this plea agreement, concludes that any

2 provision contained herein is inappropriate, it may reject the plea agreement and give the

3 defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P.

4 11(c)(5).

5       b.     If the defendant's guilty plea or plea agreement is rejected, withdrawn,

6 vacated, or reversed at any time, this agreement shall be null and void, the United States

7 shall be free to prosecute the defendant for all crimes of which it then has knowledge and

8 any charges that have been dismissed because of this plea agreement shall automatically

9 be reinstated. In such event, the defendant waives any and all objections, motions, and

10 defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional

11 restrictions in bringing later charges or proceedings. The defendant understands that any

12 statements made at the time of the defendant's change of plea or sentencing may be used

13 against the defendant in any subsequent hearing, trial, or proceeding subject to the

14 limitations of Fed. R. Evid. 410.

15 **6.**    **WAIVER OF DEFENSES AND APPEAL RIGHTS**

16 The defendant waives (1) any and all motions, defenses, probable cause

17 determinations, and objections that the defendant could assert to the indictment or

18 information; and (2) any right to file an appeal, any collateral attack, and any other writ

19 or motion that challenges the conviction, an order of restitution or forfeiture, the entry of

20 judgment against the defendant, or any aspect of the defendant's sentence, including the

21 manner in which the sentence is determined, including but not limited to any appeals

22 under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and

23 2255 (habeas petitions), and any right to file a motion for modification of sentence,

24 including under 18 U.S.C. § 3582(c). This waiver shall result in the dismissal of any

25 appeal, collateral attack, or other motion the defendant might file challenging the

26 conviction, order of restitution or forfeiture, or sentence in this case. This waiver shall

27 not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel

28 or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics

1    Op. 15-01 (2015)).

2    **7.      DISCLOSURE OF INFORMATION**

3            a.      The United States retains the unrestricted right to provide information and

4    make any and all statements it deems appropriate to the U.S. Probation Office and to the

5    Court in connection with the case.

6            b.      Any information, statements, documents, and evidence that the defendant

7    provides to the United States pursuant to this agreement may be used against the

8    defendant at any time.

9            c.      The defendant shall cooperate fully with the U.S. Probation Office.  Such

10   cooperation shall include providing complete and truthful responses to questions posed

11   by the U.S. Probation Office including, but not limited to, questions relating to:

12                  (1)      criminal convictions, history of drug abuse, and mental illness; and

13                  (2)      financial information, including present financial assets or liabilities

14   that relate to the ability of the defendant to pay a fine or restitution.

15   **8.      FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

16           a.      Nothing in this agreement shall be construed to protect the defendant from

17   administrative or civil forfeiture proceedings or prohibit the United States from

18   proceeding with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. §

19   3613, all monetary penalties, including restitution imposed by the Court, shall be due

20   immediately upon judgment, shall be subject to immediate enforcement by the United

21   States, and shall be submitted to the Treasury Offset Program so that any federal payment

22   or transfer of returned property the defendant receives may be offset and applied to

23   federal debts (which offset will not affect the periodic payment schedule).  If the Court

24   imposes a schedule of payments, the schedule of payments shall be merely a schedule of

25   minimum payments and shall not be a limitation on the methods available to the United

26   States to enforce the judgment.

27           a.      The defendant agrees to forfeit, and hereby forfeits, all interest in any asset

28   that the defendant owns or over which the defendant exercises control, directly or

indirectly, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of the offense(s), or which was used to facilitate the commission of the offense(s). Such property includes, but is not limited to, all right, title, and interest in funds held in the following bank accounts:

  (1)  Prosperity Bank account number x7188

  (2)  Compass Bank account number x3873

Such property further includes, but is not limited to, all right, title, and interest in the following domain names:

  (1)  atlantabackpage.com

  (2)  backpage.be

  (3)  backpage.com

  (4)  backpage.com.br

  (5)  backpage.cz

  (6)  backpage.dk

  (7)  backpage.ee

  (8)  backpage.es

  (9)  backpage.fi

  (10)  backpage.fr

  (11)  backpage.gr

  (12)  backpage.hu

  (13)  backpage.ie

  (14)  backpage.it

  (15)  backpage.lt

  (16)  backpage.mx

  (17)  backpage.net

  (18)  backpage.no

  (19)  backpage.pl

  (20)  backpage.pt

1    (21) backpage.ro

2    (22) backpage.si

3    (23) backpage.sk

4    (24) backpage.us

5    (25) backpage-insider.com

6    (26) bestofbackpage.com

7    (27) bestofbigcity.com

8    (28) bigcity.com

9    (29) chicagobackpage.com

10    (30) denverbackpage.com

11    (31) newyorkbackpage.com

12    (32) phoenixbackpage.com

13    (33) sandiegobackpage.com

14    (34) seattlebackpage.com

15    (35) tampabackpage.com

16 Such property further includes, but is not limited to, all right, title, and interest in any

17 funds remaining in the following IOLTA bank accounts at the conclusion of litigation

18 (with the understanding that the funds currently deposited in those IOLTA bank accounts

19 may only be withdrawn by counsel based on the provision of legal services):

20   (1) First Republic Bank IOLTA Account x6180

21   (2) First Republic Bank IOLTA Account x6255

22   (3) First Republic Bank IOLTA Account x5978

23   (4) All funds previously deposited in Wells Fargo IOLTA account

24     number x7091 to fund the criminal defense of Backpage.com, LLC,

25     Website Technologies, LLC, Posting Solutions LLC, Amstel River

26     Holdings LLC, Ad Tech BV, and/or UGC Tech Group BV

27 Such property further includes, but is not limited to, all right, title, and interest in any

28 funds previously advanced to a bail bond service (with the understanding that, should co-

1    defendant Carl Ferrer not be required to post a bond in this matter, the defendant will take

2    immediate steps to recover any funds previously advanced to a bail bond service and

3    surrender those funds to the United States for forfeiture).

4      b.  The defendant further agrees to waive all interest in any such asset in any

5    administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal.

6    The defendant agrees to consent to the entry of orders of forfeiture for such property and

7    waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding

8    notice of the forfeiture in the charging instrument, announcement of the forfeiture at

9    sentencing, and incorporation of the forfeiture in the judgment. The defendant further

10   understands and agrees that forfeiture of the assets is appropriate and in accordance with

11   the applicable forfeiture statutes, which may include Title 8 U.S.C. § 1324(b), Title 18

12   U.S.C. §§ 924(d), 981, 982 and 2253, Title 21 U.S.C. §§ 853 and 881, and Title 28

13   U.S.C. § 2461(c).

14     c.  Forfeiture of the defendant's assets shall not be treated as satisfaction of

15   any fine, restitution, cost of imprisonment, or any other penalty this court may impose

16   upon the defendant in addition to forfeiture. This agreement does not preclude the United

17   States from instituting any civil or administrative forfeiture proceedings as may be

18   appropriate now or in the future.

19     d.  The defendant agrees to waive all constitutional and statutory challenges in

20   any manner (including direct appeal, habeas corpus, double jeopardy or any other means)

21   to any forfeiture imposed as a result of this guilty plea or any pending or completed

22   administrative or civil forfeiture actions, including that the forfeiture constitutes an

23   excessive fine or punishment. The defendant agrees to take all steps as requested by the

24   United States to pass clear title to forfeitable assets to the United States, and to testify

25   truthfully in any judicial forfeiture proceeding. The defendant acknowledges that all

26   property covered by this agreement is subject to forfeiture as proceeds of illegal conduct,

27   property facilitating illegal conduct, and substitute assets for property otherwise subject

28   to forfeiture, and that no other person or entity has a legitimate claim to these items listed.

e.     The defendant agrees not to file a claim to any of the listed property in any civil proceeding, administrative or judicial, which may be initiated. The defendant further agrees that he/she will not contest civil, administrative or judicial forfeiture of the listed property. The defendant agrees to waive his/her right to notice of any forfeiture proceeding involving this property, and agrees not to file a claim or assist others in filing a claim in that forfeiture proceeding.

f.     The government reserves its right to proceed against any remaining assets not identified either in this agreement or in any civil actions which are being resolved along with this plea of guilty, including any property in which the defendant has any interest or control, if said assets, real or personal, tangible or intangible were involved in the offense(s).

g.     The defendant hereby waives, and agrees to hold the government and its agents and employees harmless from any and all claims whatsoever in connection with the seizure, forfeiture, and disposal of the property described above. Without limitation, the defendant understands and agrees that by virtue of this plea of guilty, the defendant will waive any rights or cause of action that the defendant might otherwise have had to claim that he/she is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related civil forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

## 9.    <u>ELEMENTS</u>

### Money Laundering Conspiracy

Beginning no later than 2004, and continuing through in or around March 2018, in the District of Arizona and elsewhere:

1.     There was an agreement between two or more persons to commit one or more of the crimes of Concealment Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i)), International Promotional Money Laundering (18 U.S.C. § 1956(a)(2)(A)),Transactional Money Laundering (18 U.S.C. § 1957(a)), and/or International Concealment Money Laundering (18 U.S.C. § 1956(a)(2)(B)(i)); and

2.      The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

**10.      FACTUAL BASIS**

a.      The defendant admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

The website www.Backpage.com ("Backpage") was created in 2004. It eventually became the second-largest classified advertising website in the world and, during its 14 years of existence, has derived the great majority of its revenue from fees charged in return for publishing advertisements for "adult" and "escort" services.

The great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, certain employees and representatives of Amstel River Holdings, LLC (who were authorized to bind the company with their actions) conspired to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers. For example, the company utilized "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage. These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.

1    In addition to conspiring to knowingly facilitate the state-law prostitution offenses
2    being committed by Backpage's customers, certain employees and representatives
3    of Amstel River Holdings, LLC (who were authorized to bind the company with
4    their actions) also conspired to engage in various money laundering offenses.
5    Since 2004, Backpage has earned hundreds of millions of dollars in revenue from
6    publishing "escort" and "adult" ads.   Over time, many banks, credit card
7    companies, and other financial institutions refused to do business with Backpage
8    due to the illegal nature of its business.   In response, the aforementioned
9    employees and representatives found ways to fool credit card companies into
10   believing that Backpage-associated charges were being incurred on different
11   websites, to route Backpage-related payments and proceeds through bank accounts
12   held in the name of seemingly unconnected entities (including but not limited to
13   Posting Solutions, Website Technologies, and Cereus Properties), and to use
14   cryptocurrency-processing companies (including but not limited to CoinBase,
15   GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

16

17        b.      The defendant shall swear under oath to the accuracy of this statement and,
18   if the defendant should be called upon to testify about this matter in the future, any
19   intentional material inconsistencies in the defendant's testimony may subject the
20   defendant to additional penalties for perjury or false swearing, which may be enforced by
21   the United States under this agreement.

22   ## APPROVAL AND ACCEPTANCE OF THE DEFENDANT'S AUTHORIZED
23   ## REPRESENTATIVE

24        I am authorized to enter into a written plea bargain agreement and enter a plea of
25   guilty on behalf of the defendant.

26        I have read the entire plea agreement with the assistance of my attorney.   I
27   understand each of its provisions and I voluntarily agree to it on behalf of the defendant.

28

1    I understand that by entering my plea of guilty, the defendant shall waive its rights

2    to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance

3    of witnesses, to present evidence in its defense, to remain silent and refuse to be a witness

4    against itself by asserting its privilege against self-incrimination (if applicable), all with

5    the assistance of counsel, and to be presumed innocent until proven guilty beyond a

6    reasonable doubt.

7    I agree to enter this guilty plea as indicated above on the terms and conditions set

8    forth in this agreement.

9    I understand the nature of the charges to which the defendant is entering its guilty

10   plea. I further understand the nature and range of the possible sentence and that the

11   defendant's ultimate sentence shall be determined by the Court after consideration of the

12   advisory Sentencing Guidelines.

13   The defendant's guilty plea is not the result of force, threats, assurances, or

14   promises, other than the promises contained in this agreement. The defendant voluntarily

15   agrees to the provisions of this agreement and agrees to be bound according to its

16   provisions.

17   I understand that if the defendant is granted probation or placed on supervised

18   release by the Court, the terms and conditions of such probation/supervised release are

19   subject to modification at any time. I further understand that if the defendant violates any

20   of the conditions of its probation/supervised release, its probation/supervised release may

21   be revoked and upon such revocation, notwithstanding any other provision of this

22   agreement, its sentence otherwise may be altered.

23   This written plea agreement, and any written addenda filed as attachments to this

24   plea agreement, contain all the terms and conditions of the plea. Any additional

25   agreements, if any such agreements exist, shall be recorded in a separate document and

26   may be filed with the Court under seal; accordingly, additional agreements, if any, may

27   not be in the public record.

28

1      I further agree on behalf of the defendant that promises, including any predictions

2    as to the Sentencing Guideline range or to any Sentencing Guideline factors that will

3    apply, made by anyone (including the defendant's attorney) that are not contained within

4    this written plea agreement, are null and void and have no force and effect.

5      I fully understand the terms and conditions of this plea agreement. I am not now

6    using or under the influence of any drug, medication, liquor, or other intoxicant or

7    depressant that would impair my ability to fully understand the terms and conditions of

8    this plea agreement.

9

10    Date    **4-5-18**

                        CARL FERRER

11                      Defendant's Authorized Representative

12                **APPROVAL OF DEFENSE COUNSEL**

13      I have discussed this case and the plea agreement with my client in detail and have

14    advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the

15    constitutional and other rights of an accused, the factual basis for and the nature of the

16    offense to which the guilty plea will be entered, possible defenses, and the consequences

17    of the guilty plea including the maximum statutory sentence possible. I have further

18    discussed the concept of the advisory Sentencing Guidelines with the defendant. No

19    assurances, promises, or representations have been given to me or to the defendant by the

20    United States or any of its representatives that are not contained in this written

21    agreement. I concur in the entry of the plea as indicated above and that the terms and

22    conditions set forth in this agreement are in the best interests of my client. I agree to

23    make a bona fide effort to ensure that the guilty plea is entered in accordance with all the

24    requirements of Fed. R. Crim. P. 11.

25

26    Date  **4/5/2018**

                     David Botsford

27                     Attorney for Defendant

28

1
## APPROVAL OF THE UNITED STATES

2       I have reviewed this matter and the plea agreement.  I agree on behalf of the

3   United States that the terms and conditions set forth herein are appropriate and are in the

4   best interests of justice.

5

6                                      ELIZABETH A. STRANGE
                                   First Assistant United States Attorney

7                                      District of Arizona

8                                      JOHN P. CRONAN
                                   Acting Assistant Attorney General

9                                      Criminal Division, U.S. Department of Justice

10

        6-5-19

11  ——————————————————   ——————————————————
   Date                                    KEVIN RAPP

12                                     DOMINIC LANZA
                                   MARGARET PERLMETER

13                                     JOHN J. KUCERA
                                   Assistant U.S. Attorneys

14                                     REGINALD JONES
                                   Senior Trial Attorney

15

16  ## ACCEPTANCE BY THE COURT

17

18  ——————————————————   ——————————————————
   Date                                    United States District Judge

19

20

21

22

23

24

25

26

27

28

Exhibit D4

_____ RECEIVED _____ COPY

APR 0 5 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _Smi)_ DEPUTY

1  ELIZABETH A. STRANGE
   First Assistant United States Attorney
2  District of Arizona

3  KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
   DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
4  MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
   JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
5  Assistant U.S. Attorneys
   40 N. Central Avenue, Suite 1800
6  Phoenix, Arizona 85004-4408
   Telephone (602) 514-7500
7
   JOHN P. CRONAN
8  Acting Assistant Attorney General
   Criminal Division, U.S. Department of Justice
9
   REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
10 Senior Trial Attorney, U.S. Department of Justice
   Child Exploitation and Obscenity Section
11 950 Pennsylvania Ave N.W., Room 2116
   Washington, D.C. 20530
12 Telephone (202) 616-2807
   Attorneys for Plaintiff

13

14                     IN THE UNITED STATES DISTRICT COURT

15                        FOR THE DISTRICT OF ARIZONA

                                                    SEALED
16  United States of America,               CR-18-465-PHX-DJH

17                 Plaintiff,                **PLEA AGREEMENT**

18          vs.

19
    UGC Tech Group BV,
20
                   Defendant.
21

22          Plaintiff, United States of America, and the defendant, UGC Tech Group BV,

23  hereby agree to dispose of this matter on the following terms and conditions:

24  1.    **PLEA**

25          The defendant will plead guilty to an Information charging the defendant with a

26  violation of 18 United States Code (U.S.C.) § 1956(h), Money Laundering Conspiracy, a

27  Class C felony offense.

28

    cc: AUSA, Defense Counsel, USPO

**2.**    **MAXIMUM PENALTIES**

     a.    A violation of 18 U.S.C. § 1956(h) is punishable by a maximum fine of $500,000 (or, if any person derived pecuniary gain from the offense, or if the offense resulted in pecuniary loss to a person other than the defendant, not more than the greater of twice the gross gain or twice the gross loss), a maximum term of imprisonment of 20 years, or both, and a term of supervised release of 3 years. A maximum term of probation is five years.

     b.    According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

        (1)    make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

        (2)    pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

        (3)    serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

        (4)    pay upon conviction a $400 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

     c.    The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

**3.**    **AGREEMENTS REGARDING SENTENCING**

     a.    <u>California And Texas Proceedings</u>: It is the parties' expectation that, around the time the defendant enters a guilty plea in this case, co-defendant Carl Ferrer will enter guilty pleas to Backpage-related charges in California and Texas state court.

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that the defendant's guilty plea in this case is contingent upon the acceptance of Ferrer's plea agreements in the California and Texas matters. If either of those plea agreements is rejected, the defendant will be afforded an opportunity to withdraw the guilty plea in this case.

b.  Timing Of Sentencing: The defendant agrees that sentencing in this case may be delayed until the federal sentencing of co-defendant Carl Ferrer.

c.  Offset for Fine Payments By Organizational Co-Defendants. The parties stipulate and agree that, to the extent the Court imposes a criminal fine against any of the other organizational co-defendants in this matter, the defendant will receive credit toward its criminal fine obligation (under 18 U.S.C. § 3612(i)) for any fine-related payments made by such organizational co-defendants.

d.  Length Of Probationary Term: It is the parties' intention that the defendant will cease to exist or operate following its entry of a guilty plea in this matter. Nevertheless, pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend that, if it appears the defendant will remain in existence and operation following sentencing in this case, the defendant be sentenced to a 60-month term of probation.

e.  Restitution. Pursuant to 18 U.S.C. § 3663 and/or 3663A, the defendant specifically agrees to pay full restitution, regardless of the resulting loss amount but in no event more than $500 million, to all victims directly or proximately harmed by the defendant's "relevant conduct," including conduct pertaining to any dismissed counts or uncharged conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. The defendant understands that such restitution will be included in the Court's Order of Judgment and that an unanticipated restitution amount will not serve as grounds to withdraw the defendant's guilty plea or to withdraw from this plea agreement.

f.  Assets and Financial Responsibility. The defendant shall make a full accounting of all assets in which the defendant has any legal or equitable interest. The

- 3 -

defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Attorney's Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

g. <u>Acceptance of Responsibility</u>. If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a). If the defendant has an offense level of 16 or more, the United States will move the Court for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

**4. <u>AGREEMENT TO DISMISS OR NOT TO PROSECUTE</u>**

a. This office shall not prosecute the defendant for any offenses committed by the defendant, and known by the United States, in connection with the subject matter described in the factual basis of this agreement.

b. This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office.

**5. <u>COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION</u>**

1       a.     If the Court, after reviewing this plea agreement, concludes that any

2   provision contained herein is inappropriate, it may reject the plea agreement and give the

3   defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P.

4   11(c)(5).

5       b.     If the defendant's guilty plea or plea agreement is rejected, withdrawn,

6   vacated, or reversed at any time, this agreement shall be null and void, the United States

7   shall be free to prosecute the defendant for all crimes of which it then has knowledge and

8   any charges that have been dismissed because of this plea agreement shall automatically

9   be reinstated.  In such event, the defendant waives any and all objections, motions, and

10   defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional

11   restrictions in bringing later charges or proceedings.  The defendant understands that any

12   statements made at the time of the defendant's change of plea or sentencing may be used

13   against the defendant in any subsequent hearing, trial, or proceeding subject to the

14   limitations of Fed. R. Evid. 410.

15   **6.**     **WAIVER OF DEFENSES AND APPEAL RIGHTS**

16       The defendant waives (1) any and all motions, defenses, probable cause

17   determinations, and objections that the defendant could assert to the indictment or

18   information; and (2) any right to file an appeal, any collateral attack, and any other writ

19   or motion that challenges the conviction, an order of restitution or forfeiture, the entry of

20   judgment against the defendant, or any aspect of the defendant's sentence, including the

21   manner in which the sentence is determined, including but not limited to any appeals

22   under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and

23   2255 (habeas petitions), and any right to file a motion for modification of sentence,

24   including under 18 U.S.C. § 3582(c).  This waiver shall result in the dismissal of any

25   appeal, collateral attack, or other motion the defendant might file challenging the

26   conviction, order of restitution or forfeiture, or sentence in this case.  This waiver shall

27   not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel

28   or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics

Op. 15-01 (2015)).

**7.     DISCLOSURE OF INFORMATION**

a.     The United States retains the unrestricted right to provide information and make any and all statements it deems appropriate to the U.S. Probation Office and to the Court in connection with the case.

b.     Any information, statements, documents, and evidence that the defendant provides to the United States pursuant to this agreement may be used against the defendant at any time.

c.     The defendant shall cooperate fully with the U.S. Probation Office.  Such cooperation shall include providing complete and truthful responses to questions posed by the U.S. Probation Office including, but not limited to, questions relating to:

(1)     criminal convictions, history of drug abuse, and mental illness; and

(2)     financial information, including present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

**8.     FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

a.     Nothing in this agreement shall be construed to protect the defendant from administrative or civil forfeiture proceedings or prohibit the United States from proceeding with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule).  If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

b.     The defendant agrees to forfeit, and hereby forfeits, all interest in any asset that the defendant owns or over which the defendant exercises control, directly or

- 6 -

indirectly, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of the offense(s), or which was used to facilitate the commission of the offense(s). Such property includes, but is not limited to, all right, title, and interest in funds held in the following bank accounts:

    (1)  Prosperity Bank account number x7188

    (2)  Compass Bank account number x3873

Such property further includes, but is not limited to, all right, title, and interest in the following domain names:

    (1)  atlantabackpage.com

    (2)  backpage.be

    (3)  backpage.com

    (4)  backpage.com.br

    (5)  backpage.cz

    (6)  backpage.dk

    (7)  backpage.ee

    (8)  backpage.es

    (9)  backpage.fi

    (10)  backpage.fr

    (11)  backpage.gr

    (12)  backpage.hu

    (13)  backpage.ie

    (14)  backpage.it

    (15)  backpage.lt

    (16)  backpage.mx

    (17)  backpage.net

    (18)  backpage.no

    (19)  backpage.pl

    (20)  backpage.pt

(21)    backpage.ro

(22)    backpage.si

(23)    backpage.sk

(24)    backpage.us

(25)    backpage-insider.com

(26)    bestofbackpage.com

(27)    bestofbigcity.com

(28)    bigcity.com

(29)    chicagobackpage.com

(30)    denverbackpage.com

(31)    newyorkbackpage.com

(32)    phoenixbackpage.com

(33)    sandiegobackpage.com

(34)    seattlebackpage.com

(35)    tampabackpage.com

Such property further includes, but is not limited to, all right, title, and interest in any funds remaining in the following IOLTA bank accounts at the conclusion of litigation (with the understanding that the funds currently deposited in those IOLTA bank accounts may only be withdrawn by counsel based on the provision of legal services):

(1)    First Republic Bank IOLTA Account x6180

(2)    First Republic Bank IOLTA Account x6255

(3)    First Republic Bank IOLTA Account x5978

(4)    All funds previously deposited in Wells Fargo IOLTA account number x7091 to fund the criminal defense of Backpage.com, LLC, Website Technologies, LLC, Posting Solutions LLC, Amstel River Holdings LLC, Ad Tech BV, and/or UGC Tech Group BV

Such property further includes, but is not limited to, all right, title, and interest in any funds previously advanced to a bail bond service (with the understanding that, should co-

defendant Carl Ferrer not be required to post a bond in this matter, the defendant will take immediate steps to recover any funds previously advanced to a bail bond service and surrender those funds to the United States for forfeiture).

c.     The defendant further agrees to waive all interest in any such asset in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant further understands and agrees that forfeiture of the assets is appropriate and in accordance with the applicable forfeiture statutes, which may include Title 8 U.S.C. § 1324(b), Title 18 U.S.C. §§ 924(d), 981, 982 and 2253, Title 21 U.S.C. §§ 853 and 881, and Title 28 U.S.C. § 2461(c).

d.     Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose upon the defendant in addition to forfeiture. This agreement does not preclude the United States from instituting any civil or administrative forfeiture proceedings as may be appropriate now or in the future.

e.     The defendant agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, double jeopardy or any other means) to any forfeiture imposed as a result of this guilty plea or any pending or completed administrative or civil forfeiture actions, including that the forfeiture constitutes an excessive fine or punishment. The defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding. The defendant acknowledges that all property covered by this agreement is subject to forfeiture as proceeds of illegal conduct, property facilitating illegal conduct, and substitute assets for property otherwise subject to forfeiture, and that no other person or entity has a legitimate claim to these items listed.

f. The defendant agrees not to file a claim to any of the listed property in any civil proceeding, administrative or judicial, which may be initiated. The defendant further agrees that he/she will not contest civil, administrative or judicial forfeiture of the listed property. The defendant agrees to waive his/her right to notice of any forfeiture proceeding involving this property, and agrees not to file a claim or assist others in filing a claim in that forfeiture proceeding.

g. The government reserves its right to proceed against any remaining assets not identified either in this agreement or in any civil actions which are being resolved along with this plea of guilty, including any property in which the defendant has any interest or control, if said assets, real or personal, tangible or intangible were involved in the offense(s).

h. The defendant hereby waives, and agrees to hold the government and its agents and employees harmless from any and all claims whatsoever in connection with the seizure, forfeiture, and disposal of the property described above. Without limitation, the defendant understands and agrees that by virtue of this plea of guilty, the defendant will waive any rights or cause of action that the defendant might otherwise have had to claim that he/she is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related civil forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

9. **ELEMENTS**

**Money Laundering Conspiracy**

Beginning no later than 2004, and continuing through in or around March 2018, in the District of Arizona and elsewhere:

1. There was an agreement between two or more persons to commit one or more of the crimes of Concealment Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i)), International Promotional Money Laundering (18 U.S.C. § 1956(a)(2)(A)),Transactional Money Laundering (18 U.S.C. § 1957(a)), and/or International Concealment Money Laundering (18 U.S.C. § 1956(a)(2)(B)(i)); and

1        2.      The defendant became a member of the conspiracy knowing of at least one

2        of its objects and intending to help accomplish it.

3   **10.    FACTUAL BASIS**

4        a.      The defendant admits that the following facts are true and that if this matter

5   were to proceed to trial the United States could prove the following facts beyond a

6   reasonable doubt:

7

8        The website www.Backpage.com ("Backpage") was created in 2004. It eventually

9        became the second-largest classified advertising website in the world and, during

10       its 14 years of existence, has derived the great majority of its revenue from fees

11       charged in return for publishing advertisements for "adult" and "escort" services.

12

13       The great majority of these advertisements are, in fact, advertisements for

14       prostitution services (which are not protected by the First Amendment and which

15       are illegal in 49 states and in much of Nevada). Acting with this knowledge,

16       certain employees and representatives of UGC Tech Group BV (who were

17       authorized to bind the company with their actions) conspired to find ways to

18       knowingly facilitate the state-law prostitution crimes being committed by

19       Backpage's customers. For example, the company utilized "moderation"

20       processes through which Backpage would remove terms and pictures that were

21       particularly indicative of prostitution and then publish a revised version of the ad.

22       Such editing did not, of course, change the essential nature of the illegal service

23       being offered in the ad—it was merely intended to create a veneer of deniability

24       for Backpage. These editing practices were only one component of an overall,

25       company-wide culture and policy of concealing and refusing to officially

26       acknowledge the true nature of the services being offered in Backpage's "escort"

27       and "adult" ads.

28

- 11 -

In addition to conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers, certain employees and representatives of UGC Tech Group BV (who were authorized to bind the company with their actions) also conspired to engage in various money laundering offenses. Since 2004, Backpage has earned hundreds of millions of dollars in revenue from publishing "escort" and "adult" ads. Over time, many banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business. In response, the aforementioned employees and representatives found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies (including but not limited to CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

b. The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any intentional material inconsistencies in the defendant's testimony may subject the defendant to additional penalties for perjury or false swearing, which may be enforced by the United States under this agreement.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT'S AUTHORIZED REPRESENTATIVE

I am authorized to enter into a written plea bargain agreement and enter a plea of guilty on behalf of the defendant.

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it on behalf of the defendant.

- 12 -

I understand that by entering my plea of guilty, the defendant shall waive its rights to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to present evidence in its defense, to remain silent and refuse to be a witness against itself by asserting its privilege against self-incrimination (if applicable), all with the assistance of counsel, and to be presumed innocent until proven guilty beyond a reasonable doubt.

I agree to enter this guilty plea as indicated above on the terms and conditions set forth in this agreement.

I understand the nature of the charges to which the defendant is entering its guilty plea. I further understand the nature and range of the possible sentence and that the defendant's ultimate sentence shall be determined by the Court after consideration of the advisory Sentencing Guidelines.

The defendant's guilty plea is not the result of force, threats, assurances, or promises, other than the promises contained in this agreement. The defendant voluntarily agrees to the provisions of this agreement and agrees to be bound according to its provisions.

I understand that if the defendant is granted probation or placed on supervised release by the Court, the terms and conditions of such probation/supervised release are subject to modification at any time. I further understand that if the defendant violates any of the conditions of its probation/supervised release, its probation/supervised release may be revoked and upon such revocation, notwithstanding any other provision of this agreement, its sentence otherwise may be altered.

This written plea agreement, and any written addenda filed as attachments to this plea agreement, contain all the terms and conditions of the plea. Any additional agreements, if any such agreements exist, shall be recorded in a separate document and may be filed with the Court under seal; accordingly, additional agreements, if any, may not be in the public record.

I further agree on behalf of the defendant that promises, including any predictions as to the Sentencing Guideline range or to any Sentencing Guideline factors that will apply, made by anyone (including the defendant's attorney) that are not contained within this written plea agreement, are null and void and have no force and effect.

I fully understand the terms and conditions of this plea agreement. I am not now using or under the influence of any drug, medication, liquor, or other intoxicant or depressant that would impair my ability to fully understand the terms and conditions of this plea agreement.

4-5-18
_____
Date

_____
CARL FERRER
Defendant's Authorized Representative

## APPROVAL OF DEFENSE COUNSEL

I have discussed this case and the plea agreement with my client in detail and have advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the constitutional and other rights of an accused, the factual basis for and the nature of the offense to which the guilty plea will be entered, possible defenses, and the consequences of the guilty plea including the maximum statutory sentence possible. I have further discussed the concept of the advisory Sentencing Guidelines with the defendant. No assurances, promises, or representations have been given to me or to the defendant by the United States or any of its representatives that are not contained in this written agreement. I concur in the entry of the plea as indicated above and that the terms and conditions set forth in this agreement are in the best interests of my client. I agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all the requirements of Fed. R. Crim. P. 11.

4/5/2018
_____
Date

_____
David Botsford
Attorney for Defendant

- 14 -

1   **APPROVAL OF THE UNITED STATES**

2      I have reviewed this matter and the plea agreement.  I agree on behalf of the

3   United States that the terms and conditions set forth herein are appropriate and are in the

4   best interests of justice.

5

6                                    ELIZABETH A. STRANGE
                                     First Assistant United States Attorney
7                                    District of Arizona

8                                    JOHN P. CRONAN
                                     Acting Assistant Attorney General
9                                    Criminal Division, U.S. Department of Justice

10   ___4-5-18_____     _____

11   Date                            KEVIN RAPP
                                     DOMINIC LANZA
12                                   MARGARET PERLMETER
                                     JOHN J. KUCERA
13                                   Assistant U.S. Attorneys

14                                   REGINALD JONES
                                     Senior Trial Attorney
15

16                   **ACCEPTANCE BY THE COURT**

17

18   _____         _____

19   Date                            United States District Judge

20

21

22

23

24

25

26

27

28

- 15 -

Exhibit D5



RECEIVED ___ COPY

APR 0 5 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY S.ua ___ DEPUTY

1  ELIZABETH A. STRANGE
   First Assistant United States Attorney
2  District of Arizona

3  KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
   DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
4  MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
   JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
5  Assistant U.S. Attorneys
   40 N. Central Avenue, Suite 1800
6  Phoenix, Arizona 85004-4408
   Telephone (602) 514-7500
7
8  JOHN P. CRONAN
   Acting Assistant Attorney General
   Criminal Division, U.S. Department of Justice
9
   REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
10 Senior Trial Attorney, U.S. Department of Justice
   Child Exploitation and Obscenity Section
11 950 Pennsylvania Ave N.W., Room 2116
   Washington, D.C. 20530
12 Telephone (202) 616-2807
   Attorneys for Plaintiff
13
14             IN THE UNITED STATES DISTRICT COURT
15               FOR THE DISTRICT OF ARIZONA
16 United States of America,                    **SEALED**
17            Plaintiff,          CR-18-465-PHX-DJH
18     vs.                        **PLEA AGREEMENT**
19
5  Ad Tech BV,
20
             Defendant.
21
22         Plaintiff, United States of America, and the defendant, Ad Tech BV, hereby agree

23 to dispose of this matter on the following terms and conditions:

24 **1.    PLEA**

25         The defendant will plead guilty to an Information charging the defendant with a

26 violation of 18 United States Code (U.S.C.) § 1956(h), Money Laundering Conspiracy, a

27 Class C felony offense.

28

cc: AUSA, Defense Counsel, USPO

**2.**     **MAXIMUM PENALTIES**

         a.     A violation of 18 U.S.C. § 1956(h) is punishable by a maximum fine of $500,000 (or, if any person derived pecuniary gain from the offense, or if the offense resulted in pecuniary loss to a person other than the defendant, not more than the greater of twice the gross gain or twice the gross loss), a maximum term of imprisonment of 20 years, or both, and a term of supervised release of 3 years. A maximum term of probation is five years.

         b.     According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

         (1)     make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

         (2)     pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

         (3)     serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

         (4)     pay upon conviction a $400 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

         c.     The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

**3.**     **AGREEMENTS REGARDING SENTENCING**

         a.     <u>California And Texas Proceedings</u>: It is the parties' expectation that, around the time the defendant enters a guilty plea in this case, co-defendant Carl Ferrer will enter guilty pleas to Backpage-related charges in California and Texas state court.

1    Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate

2    that the defendant's guilty plea in this case is contingent upon the acceptance of Ferrer's

3    plea agreements in the California and Texas matters.  If either of those plea agreements is

4    rejected, the defendant will be afforded an opportunity to withdraw the guilty plea in this

5    case.

6            b.      Timing Of Sentencing:  The defendant agrees that sentencing in this case

7    may be delayed until the federal sentencing of co-defendant Carl Ferrer.

8            c.      Offset for Fine Payments By Organizational Co-Defendants.  The parties

9    stipulate and agree that, to the extent the Court imposes a criminal fine against any of the

10   other organizational co-defendants in this matter, the defendant will receive credit toward

11   its criminal fine obligation (under 18 U.S.C. § 3612(i)) for any fine-related payments

12   made by such organizational co-defendants.

13           d.      Length Of Probationary Term:  It is the parties' intention that the defendant

14   will cease to exist or operate following its entry of a guilty plea in this matter.

15   Nevertheless, pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend

16   that, if it appears the defendant will remain in existence and operation following

17   sentencing in this case, the defendant be sentenced to a 60-month term of probation.

18           e.      Restitution.  Pursuant to 18 U.S.C. § 3663 and/or 3663A, the defendant

19   specifically agrees to pay full restitution, regardless of the resulting loss amount but in no

20   event more than $500 million, to all victims directly or proximately harmed by the

21   defendant's "relevant conduct," including conduct pertaining to any dismissed counts or

22   uncharged conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct

23   constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A.  The defendant

24   understands that such restitution will be included in the Court's Order of Judgment and

25   that an unanticipated restitution amount will not serve as grounds to withdraw the

26   defendant's guilty plea or to withdraw from this plea agreement.

27           f.      Assets and Financial Responsibility.  The defendant shall make a full

28   accounting of all assets in which the defendant has any legal or equitable interest.  The

- 3 -

defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Attorney's Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

g. <u>Acceptance of Responsibility</u>. If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a). If the defendant has an offense level of 16 or more, the United States will move the Court for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

**4.      AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

a.      This office shall not prosecute the defendant for any offenses committed by the defendant, and known by the United States, in connection with the subject matter described in the factual basis of this agreement.

b.      This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office.

**5.      COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

- 4 -

a.     If the Court, after reviewing this plea agreement, concludes that any provision contained herein is inappropriate, it may reject the plea agreement and give the defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P. 11(c)(5).

b.     If the defendant's guilty plea or plea agreement is rejected, withdrawn, vacated, or reversed at any time, this agreement shall be null and void, the United States shall be free to prosecute the defendant for all crimes of which it then has knowledge and any charges that have been dismissed because of this plea agreement shall automatically be reinstated. In such event, the defendant waives any and all objections, motions, and defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional restrictions in bringing later charges or proceedings. The defendant understands that any statements made at the time of the defendant's change of plea or sentencing may be used against the defendant in any subsequent hearing, trial, or proceeding subject to the limitations of Fed. R. Evid. 410.

**6.    <u>WAIVER OF DEFENSES AND APPEAL RIGHTS</u>**

The defendant waives (1) any and all motions, defenses, probable cause determinations, and objections that the defendant could assert to the indictment or information; and (2) any right to file an appeal, any collateral attack, and any other writ or motion that challenges the conviction, an order of restitution or forfeiture, the entry of judgment against the defendant, or any aspect of the defendant's sentence, including the manner in which the sentence is determined, including but not limited to any appeals under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255 (habeas petitions), and any right to file a motion for modification of sentence, including under 18 U.S.C. § 3582(c). This waiver shall result in the dismissal of any appeal, collateral attack, or other motion the defendant might file challenging the conviction, order of restitution or forfeiture, or sentence in this case. This waiver shall not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics

Op. 15-01 (2015)).

**7.     DISCLOSURE OF INFORMATION**

a.     The United States retains the unrestricted right to provide information and make any and all statements it deems appropriate to the U.S. Probation Office and to the Court in connection with the case.

b.     Any information, statements, documents, and evidence that the defendant provides to the United States pursuant to this agreement may be used against the defendant at any time.

c.     The defendant shall cooperate fully with the U.S. Probation Office. Such cooperation shall include providing complete and truthful responses to questions posed by the U.S. Probation Office including, but not limited to, questions relating to:

(1)     criminal convictions, history of drug abuse, and mental illness; and

(2)     financial information, including present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

**8.     FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

a.     Nothing in this agreement shall be construed to protect the defendant from administrative or civil forfeiture proceedings or prohibit the United States from proceeding with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule). If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

b.     The defendant agrees to forfeit, and hereby forfeits, all interest in any asset that the defendant owns or over which the defendant exercises control, directly or

indirectly, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of the offense(s), or which was used to facilitate the commission of the offense(s).  Such property includes, but is not limited to, all right, title, and interest in funds held in the following bank accounts:

    (1)      Prosperity Bank account number x7188

    (2)      Compass Bank account number x3873

Such property further includes, but is not limited to, all right, title, and interest in the following domain names:

    (1)      atlantabackpage.com

    (2)      backpage.be

    (3)      backpage.com

    (4)      backpage.com.br

    (5)      backpage.cz

    (6)      backpage.dk

    (7)      backpage.ee

    (8)      backpage.es

    (9)      backpage.fi

    (10)    backpage.fr

    (11)    backpage.gr

    (12)    backpage.hu

    (13)    backpage.ie

    (14)    backpage.it

    (15)    backpage.lt

    (16)    backpage.mx

    (17)    backpage.net

    (18)    backpage.no

    (19)    backpage.pl

    (20)    backpage.pt

1        (21)   backpage.ro

2        (22)   backpage.si

3        (23)   backpage.sk

4        (24)   backpage.us

5        (25)   backpage-insider.com

6        (26)   bestofbackpage.com

7        (27)   bestofbigcity.com

8        (28)   bigcity.com

9        (29)   chicagobackpage.com

10      (30)   denverbackpage.com

11      (31)   newyorkbackpage.com

12      (32)   phoenixbackpage.com

13      (33)   sandiegobackpage.com

14      (34)   seattlebackpage.com

15      (35)   tampabackpage.com

16 Such property further includes, but is not limited to, all right, title, and interest in any

17 funds remaining in the following IOLTA bank accounts at the conclusion of litigation

18 (with the understanding that the funds currently deposited in those IOLTA bank accounts

19 may only be withdrawn by counsel based on the provision of legal services):

20      (1)   First Republic Bank IOLTA Account x6180

21      (2)   First Republic Bank IOLTA Account x6255

22      (3)   First Republic Bank IOLTA Account x5978

23      (4)   All funds previously deposited in Wells Fargo IOLTA account

24              number x7091 to fund the criminal defense of Backpage.com, LLC,

25              Website Technologies, LLC, Posting Solutions LLC, Amstel River

26              Holdings LLC, Ad Tech BV, and/or UGC Tech Group BV

27 Such property further includes, but is not limited to, all right, title, and interest in any

28 funds previously advanced to a bail bond service (with the understanding that, should co-

defendant Carl Ferrer not be required to post a bond in this matter, the defendant will take immediate steps to recover any funds previously advanced to a bail bond service and surrender those funds to the United States for forfeiture).

c.     The defendant further agrees to waive all interest in any such asset in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant further understands and agrees that forfeiture of the assets is appropriate and in accordance with the applicable forfeiture statutes, which may include Title 8 U.S.C. § 1324(b), Title 18 U.S.C. §§ 924(d), 981, 982 and 2253, Title 21 U.S.C. §§ 853 and 881, and Title 28 U.S.C. § 2461(c).

d.     Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose upon the defendant in addition to forfeiture. This agreement does not preclude the United States from instituting any civil or administrative forfeiture proceedings as may be appropriate now or in the future.

e.     The defendant agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, double jeopardy or any other means) to any forfeiture imposed as a result of this guilty plea or any pending or completed administrative or civil forfeiture actions, including that the forfeiture constitutes an excessive fine or punishment. The defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding. The defendant acknowledges that all property covered by this agreement is subject to forfeiture as proceeds of illegal conduct, property facilitating illegal conduct, and substitute assets for property otherwise subject to forfeiture, and that no other person or entity has a legitimate claim to these items listed.

f.     The defendant agrees not to file a claim to any of the listed property in any civil proceeding, administrative or judicial, which may be initiated. The defendant further agrees that he/she will not contest civil, administrative or judicial forfeiture of the listed property. The defendant agrees to waive his/her right to notice of any forfeiture proceeding involving this property, and agrees not to file a claim or assist others in filing a claim in that forfeiture proceeding.

g.     The government reserves its right to proceed against any remaining assets not identified either in this agreement or in any civil actions which are being resolved along with this plea of guilty, including any property in which the defendant has any interest or control, if said assets, real or personal, tangible or intangible were involved in the offense(s).

h.     The defendant hereby waives, and agrees to hold the government and its agents and employees harmless from any and all claims whatsoever in connection with the seizure, forfeiture, and disposal of the property described above. Without limitation, the defendant understands and agrees that by virtue of this plea of guilty, the defendant will waive any rights or cause of action that the defendant might otherwise have had to claim that he/she is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related civil forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

**9.     ELEMENTS**

**Money Laundering Conspiracy**

Beginning no later than 2004, and continuing through in or around March 2018, in the District of Arizona and elsewhere:

1.     There was an agreement between two or more persons to commit one or more of the crimes of Concealment Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i)), International Promotional Money Laundering (18 U.S.C. § 1956(a)(2)(A)),Transactional Money Laundering (18 U.S.C. § 1957(a)), and/or International Concealment Money Laundering (18 U.S.C. § 1956(a)(2)(B)(i)); and

- 10 -

2.     The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

## 10.   **FACTUAL BASIS**

a.     The defendant admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

The website www.Backpage.com ("Backpage") was created in 2004. It eventually became the second-largest classified advertising website in the world and, during its 14 years of existence, has derived the great majority of its revenue from fees charged in return for publishing advertisements for "adult" and "escort" services.

The great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, certain employees and representatives of Ad Tech BV (who were authorized to bind the company with their actions) conspired to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers. For example, the company utilized "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage. These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.

In addition to conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers, certain employees and representatives of Ad Tech BV (who were authorized to bind the company with their actions) also conspired to engage in various money laundering offenses. Since 2004, Backpage has earned hundreds of millions of dollars in revenue from publishing "escort" and "adult" ads. Over time, many banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business. In response, the aforementioned employees and representatives found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies (including but not limited to CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

b.       The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any intentional material inconsistencies in the defendant's testimony may subject the defendant to additional penalties for perjury or false swearing, which may be enforced by the United States under this agreement.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT'S AUTHORIZED REPRESENTATIVE

I am authorized to enter into a written plea bargain agreement and enter a plea of guilty on behalf of the defendant.

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it on behalf of the defendant.

I understand that by entering my plea of guilty, the defendant shall waive its rights to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to present evidence in its defense, to remain silent and refuse to be a witness against itself by asserting its privilege against self-incrimination (if applicable), all with the assistance of counsel, and to be presumed innocent until proven guilty beyond a reasonable doubt.

I agree to enter this guilty plea as indicated above on the terms and conditions set forth in this agreement.

I understand the nature of the charges to which the defendant is entering its guilty plea. I further understand the nature and range of the possible sentence and that the defendant's ultimate sentence shall be determined by the Court after consideration of the advisory Sentencing Guidelines.

The defendant's guilty plea is not the result of force, threats, assurances, or promises, other than the promises contained in this agreement. The defendant voluntarily agrees to the provisions of this agreement and agrees to be bound according to its provisions.

I understand that if the defendant is granted probation or placed on supervised release by the Court, the terms and conditions of such probation/supervised release are subject to modification at any time. I further understand that if the defendant violates any of the conditions of its probation/supervised release, its probation/supervised release may be revoked and upon such revocation, notwithstanding any other provision of this agreement, its sentence otherwise may be altered.

This written plea agreement, and any written addenda filed as attachments to this plea agreement, contain all the terms and conditions of the plea. Any additional agreements, if any such agreements exist, shall be recorded in a separate document and may be filed with the Court under seal; accordingly, additional agreements, if any, may not be in the public record.

1       I further agree on behalf of the defendant that promises, including any predictions

2  as to the Sentencing Guideline range or to any Sentencing Guideline factors that will

3  apply, made by anyone (including the defendant's attorney) that are not contained within

4  this written plea agreement, are null and void and have no force and effect.

5       I fully understand the terms and conditions of this plea agreement. I am not now

6  using or under the influence of any drug, medication, liquor, or other intoxicant or

7  depressant that would impair my ability to fully understand the terms and conditions of

8  this plea agreement.

9

10 <u>4-5-18</u>
    Date                                  CARL FERRER

11                                      Defendant's Authorized Representative

12                    **APPROVAL OF DEFENSE COUNSEL**

13       I have discussed this case and the plea agreement with my client in detail and have

14  advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the

15  constitutional and other rights of an accused, the factual basis for and the nature of the

16  offense to which the guilty plea will be entered, possible defenses, and the consequences

17  of the guilty plea including the maximum statutory sentence possible. I have further

18  discussed the concept of the advisory Sentencing Guidelines with the defendant. No

19  assurances, promises, or representations have been given to me or to the defendant by the

20  United States or any of its representatives that are not contained in this written

21  agreement. I concur in the entry of the plea as indicated above and that the terms and

22  conditions set forth in this agreement are in the best interests of my client. I agree to

23  make a bona fide effort to ensure that the guilty plea is entered in accordance with all the

24  requirements of Fed. R. Crim. P. 11.

25

26 <u>4|5|18</u>
    Date                                    David Botsford

27                                      Attorney for Defendant

28

1   ## APPROVAL OF THE UNITED STATES

2       I have reviewed this matter and the plea agreement.  I agree on behalf of the

3   United States that the terms and conditions set forth herein are appropriate and are in the

4   best interests of justice.

5

6                                 ELIZABETH A. STRANGE

                              First Assistant United States Attorney

7                                 District of Arizona

8                                 JOHN P. CRONAN

                              Acting Assistant Attorney General

9                                 Criminal Division, U.S. Department of Justice

10          4 - 5 -18

11  Date                          KEVIN RAPP

12                                DOMINIC LANZA

                              MARGARET PERLMETER

13                                JOHN J. KUCERA

                              Assistant U.S. Attorneys

14                                REGINALD JONES

15                                Senior Trial Attorney

16                ## ACCEPTANCE BY THE COURT

17

18

    Date                               United States District Judge

19

20

21

22

23

24

25

26

27

28

Exhibit D6

FILED ___ LODGED X
___ RECEIVED ___ COPY

APR 0 5 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _Shir_ DEPUTY

1   ELIZABETH A. STRANGE
    First Assistant United States Attorney
2   District of Arizona

3   KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
    DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
4   MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
    JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
5   Assistant U.S. Attorneys
    40 N. Central Avenue, Suite 1800
6   Phoenix, Arizona 85004-4408
    Telephone (602) 514-7500
7

8   JOHN P. CRONAN
    Acting Assistant Attorney General
9   Criminal Division, U.S. Department of Justice

10  REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
    Senior Trial Attorney, U.S. Department of Justice
11  Child Exploitation and Obscenity Section
    950 Pennsylvania Ave N.W., Room 2116
12  Washington, D.C. 20530
    Telephone (202) 616-2807
    Attorneys for Plaintiff

13

14                    IN THE UNITED STATES DISTRICT COURT

15                       FOR THE DISTRICT OF ARIZONA

16  United States of America,                    **SEALED**

17                  Plaintiff,           CR-18-465-PHX-DJH

18          vs.                          **PLEA AGREEMENT**

19
20  Website Technologies, LLC,

21                  Defendant.

22          Plaintiff, United States of America, and the defendant, Website Technologies,

23  LLC, hereby agree to dispose of this matter on the following terms and conditions:

24  **1.    PLEA**

25          The defendant will plead guilty to an Information charging the defendant with a

26  violation of 18 United States Code (U.S.C.) § 1956(h), Money Laundering Conspiracy, a

27  Class C felony offense.

28

2. **MAXIMUM PENALTIES**

a.      A violation of 18 U.S.C. § 1956(h) is punishable by a maximum fine of $500,000 (or, if any person derived pecuniary gain from the offense, or if the offense resulted in pecuniary loss to a person other than the defendant, not more than the greater of twice the gross gain or twice the gross loss), a maximum term of imprisonment of 20 years, or both, and a term of supervised release of 3 years.   A maximum term of probation is five years.

b.      According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

(1)      make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

(2)      pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

(3)      serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

(4)      pay upon conviction a $400 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

c.      The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence.   However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

3. **AGREEMENTS REGARDING SENTENCING**

a.      California And Texas Proceedings:   It is the parties' expectation that, around the time the defendant enters a guilty plea in this case, co-defendant Carl Ferrer will enter guilty pleas to Backpage-related charges in California and Texas state court.

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that the defendant's guilty plea in this case is contingent upon the acceptance of Ferrer's plea agreements in the California and Texas matters. If either of those plea agreements is rejected, the defendant will be afforded an opportunity to withdraw the guilty plea in this case.

b.  Timing Of Sentencing:  The defendant agrees that sentencing in this case may be delayed until the federal sentencing of co-defendant Carl Ferrer.

c.  Offset for Fine Payments By Organizational Co-Defendants.  The parties stipulate and agree that, to the extent the Court imposes a criminal fine against any of the other organizational co-defendants in this matter, the defendant will receive credit toward its criminal fine obligation (under 18 U.S.C. § 3612(i)) for any fine-related payments made by such organizational co-defendants.

d.  Length Of Probationary Term:  It is the parties' intention that the defendant will cease to exist or operate following its entry of a guilty plea in this matter. Nevertheless, pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend that, if it appears the defendant will remain in existence and operation following sentencing in this case, the defendant be sentenced to a 60-month term of probation.

e.  Restitution.  Pursuant to 18 U.S.C. § 3663 and/or 3663A, the defendant specifically agrees to pay full restitution, regardless of the resulting loss amount but in no event more than $500 million, to all victims directly or proximately harmed by the defendant's "relevant conduct," including conduct pertaining to any dismissed counts or uncharged conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A.  The defendant understands that such restitution will be included in the Court's Order of Judgment and that an unanticipated restitution amount will not serve as grounds to withdraw the defendant's guilty plea or to withdraw from this plea agreement.

f.  Assets and Financial Responsibility.  The defendant shall make a full accounting of all assets in which the defendant has any legal or equitable interest.  The

- 3 -

defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Attorney's Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

g. <u>Acceptance of Responsibility</u>. If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a). If the defendant has an offense level of 16 or more, the United States will move the Court for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

**4.** **AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

a. This office shall not prosecute the defendant for any offenses committed by the defendant, and known by the United States, in connection with the subject matter described in the factual basis of this agreement.

b. This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office.

**5.** **COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

- 4 -

1   a.  If the Court, after reviewing this plea agreement, concludes that any

2 provision contained herein is inappropriate, it may reject the plea agreement and give the

3 defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P.

4 11(c)(5).

5   b.  If the defendant's guilty plea or plea agreement is rejected, withdrawn,

6 vacated, or reversed at any time, this agreement shall be null and void, the United States

7 shall be free to prosecute the defendant for all crimes of which it then has knowledge and

8 any charges that have been dismissed because of this plea agreement shall automatically

9 be reinstated.  In such event, the defendant waives any and all objections, motions, and

10 defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional

11 restrictions in bringing later charges or proceedings.  The defendant understands that any

12 statements made at the time of the defendant's change of plea or sentencing may be used

13 against the defendant in any subsequent hearing, trial, or proceeding subject to the

14 limitations of Fed. R. Evid. 410.

15 **6.**  **WAIVER OF DEFENSES AND APPEAL RIGHTS**

16   The defendant waives (1) any and all motions, defenses, probable cause

17 determinations, and objections that the defendant could assert to the indictment or

18 information; and (2) any right to file an appeal, any collateral attack, and any other writ

19 or motion that challenges the conviction, an order of restitution or forfeiture, the entry of

20 judgment against the defendant, or any aspect of the defendant's sentence, including the

21 manner in which the sentence is determined, including but not limited to any appeals

22 under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and

23 2255 (habeas petitions), and any right to file a motion for modification of sentence,

24 including under 18 U.S.C. § 3582(c).  This waiver shall result in the dismissal of any

25 appeal, collateral attack, or other motion the defendant might file challenging the

26 conviction, order of restitution or forfeiture, or sentence in this case.  This waiver shall

27 not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel

28 or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics

Op. 15-01 (2015)).

**7.    DISCLOSURE OF INFORMATION**

a.    The United States retains the unrestricted right to provide information and make any and all statements it deems appropriate to the U.S. Probation Office and to the Court in connection with the case.

b.    Any information, statements, documents, and evidence that the defendant provides to the United States pursuant to this agreement may be used against the defendant at any time.

c.    The defendant shall cooperate fully with the U.S. Probation Office.  Such cooperation shall include providing complete and truthful responses to questions posed by the U.S. Probation Office including, but not limited to, questions relating to:

(1)    criminal convictions, history of drug abuse, and mental illness; and

(2)    financial information, including present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

**8.    FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

a.    Nothing in this agreement shall be construed to protect the defendant from administrative or civil forfeiture proceedings or prohibit the United States from proceeding with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule).  If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

b.    The defendant agrees to forfeit, and hereby forfeits, all interest in any asset that the defendant owns or over which the defendant exercises control, directly or

- 6 -

indirectly, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of the offense(s), or which was used to facilitate the commission of the offense(s).  Such property includes, but is not limited to, all right, title, and interest in funds held in the following bank accounts:

   (1)  Prosperity Bank account number x7188

   (2)  Compass Bank account number x3873

Such property further includes, but is not limited to, all right, title, and interest in the following domain names:

   (1)  atlantabackpage.com

   (2)  backpage.be

   (3)  backpage.com

   (4)  backpage.com.br

   (5)  backpage.cz

   (6)  backpage.dk

   (7)  backpage.ee

   (8)  backpage.es

   (9)  backpage.fi

   (10)  backpage.fr

   (11)  backpage.gr

   (12)  backpage.hu

   (13)  backpage.ie

   (14)  backpage.it

   (15)  backpage.lt

   (16)  backpage.mx

   (17)  backpage.net

   (18)  backpage.no

   (19)  backpage.pl

   (20)  backpage.pt

1     (21) backpage.ro

2     (22) backpage.si

3     (23) backpage.sk

4     (24) backpage.us

5     (25) backpage-insider.com

6     (26) bestofbackpage.com

7     (27) bestofbigcity.com

8     (28) bigcity.com

9     (29) chicagobackpage.com

10    (30) denverbackpage.com

11    (31) newyorkbackpage.com

12    (32) phoenixbackpage.com

13    (33) sandiegobackpage.com

14    (34) seattlebackpage.com

15    (35) tampabackpage.com

16 Such property further includes, but is not limited to, all right, title, and interest in any

17 funds remaining in the following IOLTA bank accounts at the conclusion of litigation

18 (with the understanding that the funds currently deposited in those IOLTA bank accounts

19 may only be withdrawn by counsel based on the provision of legal services):

20    (1) First Republic Bank IOLTA Account x6180

21    (2) First Republic Bank IOLTA Account x6255

22    (3) First Republic Bank IOLTA Account x5978

23    (4) All funds previously deposited in Wells Fargo IOLTA account

24      number x7091 to fund the criminal defense of Backpage.com, LLC,

25      Website Technologies, LLC, Posting Solutions LLC, Amstel River

26      Holdings LLC, Ad Tech BV, and/or UGC Tech Group BV

27 Such property further includes, but is not limited to, all right, title, and interest in any

28 funds previously advanced to a bail bond service (with the understanding that, should co-

defendant Carl Ferrer not be required to post a bond in this matter, the defendant will take immediate steps to recover any funds previously advanced to a bail bond service and surrender those funds to the United States for forfeiture).

c. The defendant further agrees to waive all interest in any such asset in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant further understands and agrees that forfeiture of the assets is appropriate and in accordance with the applicable forfeiture statutes, which may include Title 8 U.S.C. § 1324(b), Title 18 U.S.C. §§ 924(d), 981, 982 and 2253, Title 21 U.S.C. §§ 853 and 881, and Title 28 U.S.C. § 2461(c).

d. Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose upon the defendant in addition to forfeiture. This agreement does not preclude the United States from instituting any civil or administrative forfeiture proceedings as may be appropriate now or in the future.

e. The defendant agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, double jeopardy or any other means) to any forfeiture imposed as a result of this guilty plea or any pending or completed administrative or civil forfeiture actions, including that the forfeiture constitutes an excessive fine or punishment. The defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding. The defendant acknowledges that all property covered by this agreement is subject to forfeiture as proceeds of illegal conduct, property facilitating illegal conduct, and substitute assets for property otherwise subject to forfeiture, and that no other person or entity has a legitimate claim to these items listed.

1        f.     The defendant agrees not to file a claim to any of the listed property in any

2  civil proceeding, administrative or judicial, which may be initiated.  The defendant

3  further agrees that he/she will not contest civil, administrative or judicial forfeiture of the

4  listed      property.      The     defendant     agrees     to     waive     his/her

5  right to notice of any forfeiture proceeding involving this property, and agrees not to file

6  a claim or assist others in filing a claim in that forfeiture proceeding.

7        g.     The government reserves its right to proceed against any remaining assets

8  not identified either in this agreement or in any civil actions which are being resolved

9  along with this plea of guilty, including any property in which the defendant has any

10  interest or control, if said assets, real or personal, tangible or intangible were involved in

11  the offense(s).

12        h.     The defendant hereby waives, and agrees to hold the government and its

13  agents and employees harmless from any and all claims whatsoever in connection with

14  the seizure, forfeiture, and disposal of the property described above.  Without limitation,

15  the defendant understands and agrees that by virtue of this plea of guilty, the defendant

16  will waive any rights or cause of action that the defendant might otherwise have had to

17  claim that he/she is a "substantially prevailing party" for the purpose of recovery of

18  attorney fees and other litigation costs in any related civil forfeiture proceeding pursuant

19  to 28 U.S.C. § 2465(b)(1).

20  **9.**    **ELEMENTS**

21                          **Money Laundering Conspiracy**

22        Beginning no later than 2004, and continuing through in or around March 2018, in

23  the District of Arizona and elsewhere:

24        1.     There was an agreement between two or more persons to commit one or

25        more of the crimes of Concealment Money Laundering (18 U.S.C. §

26        1956(a)(1)(B)(i)), International Promotional Money Laundering (18 U.S.C.

27        § 1956(a)(2)(A)),Transactional Money Laundering (18 U.S.C. § 1957(a)), and/or

28        International Concealment Money Laundering (18 U.S.C. § 1956(a)(2)(B)(i)); and

2.      The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

**10.      FACTUAL BASIS**

a.      The defendant admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

The website www.Backpage.com ("Backpage") was created in 2004.  It eventually became the second-largest classified advertising website in the world and, during its 14 years of existence, has derived the great majority of its revenue from fees charged in return for publishing advertisements for "adult" and "escort" services.

The great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada).  Acting with this knowledge, certain employees and representatives of Website Technologies, LLC (who were authorized to bind the company with their actions) conspired to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers.  For example, the company utilized "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage.  These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.

- 11 -

In addition to conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers, certain employees and representatives of Website Technologies, LLC (who were authorized to bind the company with their actions) also conspired to engage in various money laundering offenses. Since 2004, Backpage has earned hundreds of millions of dollars in revenue from publishing "escort" and "adult" ads. Over time, many banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business. In response, the aforementioned employees and representatives found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies (including but not limited to CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

b.      The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any intentional material inconsistencies in the defendant's testimony may subject the defendant to additional penalties for perjury or false swearing, which may be enforced by the United States under this agreement.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT'S AUTHORIZED REPRESENTATIVE

I am authorized to enter into a written plea bargain agreement and enter a plea of guilty on behalf of the defendant.

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it on behalf of the defendant.

- 12 -

1   I understand that by entering my plea of guilty, the defendant shall waive its rights

2   to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance

3   of witnesses, to present evidence in its defense, to remain silent and refuse to be a witness

4   against itself by asserting its privilege against self-incrimination (if applicable), all with

5   the assistance of counsel, and to be presumed innocent until proven guilty beyond a

6   reasonable doubt.

7   I agree to enter this guilty plea as indicated above on the terms and conditions set

8   forth in this agreement.

9   I understand the nature of the charges to which the defendant is entering its guilty

10  plea. I further understand the nature and range of the possible sentence and that the

11  defendant's ultimate sentence shall be determined by the Court after consideration of the

12  advisory Sentencing Guidelines.

13  The defendant's guilty plea is not the result of force, threats, assurances, or

14  promises, other than the promises contained in this agreement. The defendant voluntarily

15  agrees to the provisions of this agreement and agrees to be bound according to its

16  provisions.

17  I understand that if the defendant is granted probation or placed on supervised

18  release by the Court, the terms and conditions of such probation/supervised release are

19  subject to modification at any time. I further understand that if the defendant violates any

20  of the conditions of its probation/supervised release, its probation/supervised release may

21  be revoked and upon such revocation, notwithstanding any other provision of this

22  agreement, its sentence otherwise may be altered.

23  This written plea agreement, and any written addenda filed as attachments to this

24  plea agreement, contain all the terms and conditions of the plea. Any additional

25  agreements, if any such agreements exist, shall be recorded in a separate document and

26  may be filed with the Court under seal; accordingly, additional agreements, if any, may

27  not be in the public record.

28

1   I further agree on behalf of the defendant that promises, including any predictions

2   as to the Sentencing Guideline range or to any Sentencing Guideline factors that will

3   apply, made by anyone (including the defendant's attorney) that are not contained within

4   this written plea agreement, are null and void and have no force and effect.

5   I fully understand the terms and conditions of this plea agreement. I am not now

6   using or under the influence of any drug, medication, liquor, or other intoxicant or

7   depressant that would impair my ability to fully understand the terms and conditions of

8   this plea agreement.

9

10   _____4-5-18_____          _____

     Date                                  CARL FERRER

11                                         Defendant's Authorized Representative

12              **APPROVAL OF DEFENSE COUNSEL**

13   I have discussed this case and the plea agreement with my client in detail and have

14   advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the

15   constitutional and other rights of an accused, the factual basis for and the nature of the

16   offense to which the guilty plea will be entered, possible defenses, and the consequences

17   of the guilty plea including the maximum statutory sentence possible. I have further

18   discussed the concept of the advisory Sentencing Guidelines with the defendant. No

19   assurances, promises, or representations have been given to me or to the defendant by the

20   United States or any of its representatives that are not contained in this written

21   agreement. I concur in the entry of the plea as indicated above and that the terms and

22   conditions set forth in this agreement are in the best interests of my client. I agree to

23   make a bona fide effort to ensure that the guilty plea is entered in accordance with all the

24   requirements of Fed. R. Crim. P. 11.

25

26   _____4/5/2018_____          _____

     Date                                    David Botsford

27                                           Attorney for Defendant

28

- 14 -

**APPROVAL OF THE UNITED STATES**

I have reviewed this matter and the plea agreement. I agree on behalf of the United States that the terms and conditions set forth herein are appropriate and are in the best interests of justice.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

4-5-18
Date

KEVIN RAPP
DOMINIC LANZA
MARGARET PERLMETER
JOHN J. KUCERA
Assistant U.S. Attorneys

REGINALD JONES
Senior Trial Attorney

**ACCEPTANCE BY THE COURT**

Date

United States District Judge

- 15 -

Exhibit D7

1  ELIZABETH A. STRANGE
   First Assistant United States Attorney
2  District of Arizona

3  KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
   DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
4  MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
   JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
5  Assistant U.S. Attorneys
   40 N. Central Avenue, Suite 1800
6  Phoenix, Arizona 85004-4408
   Telephone (602) 514-7500
7
8  JOHN P. CRONAN
   Acting Assistant Attorney General
9  Criminal Division, U.S. Department of Justice

10 REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
   Senior Trial Attorney, U.S. Department of Justice
11 Child Exploitation and Obscenity Section
   950 Pennsylvania Ave N.W., Room 2116
12 Washington, D.C. 20530
   Telephone (202) 616-2807
13 Attorneys for Plaintiff

14              IN THE UNITED STATES DISTRICT COURT

15              FOR THE DISTRICT OF ARIZONA

16 United States of America,

17                    Plaintiff,              CR-18-465-PHX-DJH

18        vs.                                 **PLEA AGREEMENT**

19
3  Posting Solutions LLC,
20
                      Defendant.
21

22        Plaintiff, United States of America, and the defendant, Posting Solutions LLC,

23 hereby agree to dispose of this matter on the following terms and conditions:

24 **1.    PLEA**

25        The defendant will plead guilty to an Information charging the defendant with a

26 violation of 18 United States Code (U.S.C.) § 1956(h), Money Laundering Conspiracy, a

27 Class C felony offense.

28

cc: AUSA, Defense Counsel, USPO

**2.**    <u>**MAXIMUM PENALTIES**</u>

     a.     A violation of 18 U.S.C. § 1956(h) is punishable by a maximum fine of $500,000 (or, if any person derived pecuniary gain from the offense, or if the offense resulted in pecuniary loss to a person other than the defendant, not more than the greater of twice the gross gain or twice the gross loss), a maximum term of imprisonment of 20 years, or both, and a term of supervised release of 3 years. A maximum term of probation is five years.

     b.     According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

        (1)     make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

        (2)     pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

        (3)     serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

        (4)     pay upon conviction a $400 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

     c.     The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

**3.**    <u>**AGREEMENTS REGARDING SENTENCING**</u>

     a.     <u>California And Texas Proceedings</u>: It is the parties' expectation that, around the time the defendant enters a guilty plea in this case, co-defendant Carl Ferrer

will enter guilty pleas to Backpage-related charges in California and Texas state court. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that the defendant's guilty plea in this case is contingent upon the acceptance of Ferrer's plea agreements in the California and Texas matters. If either of those plea agreements is rejected, the defendant will be afforded an opportunity to withdraw the guilty plea in this case.

b.     Timing Of Sentencing:  The defendant agrees that sentencing in this case may be delayed until the federal sentencing of co-defendant Carl Ferrer.

c.     Offset for Fine Payments By Organizational Co-Defendants.  The parties stipulate and agree that, to the extent the Court imposes a criminal fine against any of the other organizational co-defendants in this matter, the defendant will receive credit toward its criminal fine obligation (under 18 U.S.C. § 3612(i)) for any fine-related payments made by such organizational co-defendants.

d.     Length Of Probationary Term:  It is the parties' intention that the defendant will cease to exist or operate following its entry of a guilty plea in this matter. Nevertheless, pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend that, if it appears the defendant will remain in existence and operation following sentencing in this case, the defendant be sentenced to a 60-month term of probation.

e.     Restitution.  Pursuant to 18 U.S.C. § 3663 and/or 3663A, the defendant specifically agrees to pay full restitution, regardless of the resulting loss amount but in no event more than $500 million, to all victims directly or proximately harmed by the defendant's "relevant conduct," including conduct pertaining to any dismissed counts or uncharged conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A.  The defendant understands that such restitution will be included in the Court's Order of Judgment and that an unanticipated restitution amount will not serve as grounds to withdraw the defendant's guilty plea or to withdraw from this plea agreement.

f.     Assets and Financial Responsibility.  The defendant shall make a full

- 3 -

accounting of all assets in which the defendant has any legal or equitable interest. The defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Attorney's Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

g. <u>Acceptance of Responsibility</u>. If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a). If the defendant has an offense level of 16 or more, the United States will move the Court for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

**4. AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

a. This office shall not prosecute the defendant for any offenses committed by the defendant, and known by the United States, in connection with the subject matter described in the factual basis of this agreement.

b. This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office.

**5. COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

a. If the Court, after reviewing this plea agreement, concludes that any provision contained herein is inappropriate, it may reject the plea agreement and give the defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P. 11(c)(5).

b. If the defendant's guilty plea or plea agreement is rejected, withdrawn, vacated, or reversed at any time, this agreement shall be null and void, the United States shall be free to prosecute the defendant for all crimes of which it then has knowledge and any charges that have been dismissed because of this plea agreement shall automatically be reinstated. In such event, the defendant waives any and all objections, motions, and defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional restrictions in bringing later charges or proceedings. The defendant understands that any statements made at the time of the defendant's change of plea or sentencing may be used against the defendant in any subsequent hearing, trial, or proceeding subject to the limitations of Fed. R. Evid. 410.

**6.     WAIVER OF DEFENSES AND APPEAL RIGHTS**

The defendant waives (1) any and all motions, defenses, probable cause determinations, and objections that the defendant could assert to the indictment or information; and (2) any right to file an appeal, any collateral attack, and any other writ or motion that challenges the conviction, an order of restitution or forfeiture, the entry of judgment against the defendant, or any aspect of the defendant's sentence, including the manner in which the sentence is determined, including but not limited to any appeals under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255 (habeas petitions), and any right to file a motion for modification of sentence, including under 18 U.S.C. § 3582(c). This waiver shall result in the dismissal of any appeal, collateral attack, or other motion the defendant might file challenging the conviction, order of restitution or forfeiture, or sentence in this case. This waiver shall not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics

Op. 15-01 (2015)).

7. **DISCLOSURE OF INFORMATION**

a. The United States retains the unrestricted right to provide information and make any and all statements it deems appropriate to the U.S. Probation Office and to the Court in connection with the case.

b. Any information, statements, documents, and evidence that the defendant provides to the United States pursuant to this agreement may be used against the defendant at any time.

c. The defendant shall cooperate fully with the U.S. Probation Office. Such cooperation shall include providing complete and truthful responses to questions posed by the U.S. Probation Office including, but not limited to, questions relating to:

(1) criminal convictions, history of drug abuse, and mental illness; and

(2) financial information, including present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

8. **FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

a. Nothing in this agreement shall be construed to protect the defendant from administrative or civil forfeiture proceedings or prohibit the United States from proceeding with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule). If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

b. The defendant agrees to forfeit, and hereby forfeits, all interest in any asset that the defendant owns or over which the defendant exercises control, directly or

indirectly, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of the offense(s), or which was used to facilitate the commission of the offense(s). Such property includes, but is not limited to, all right, title, and interest in funds held in the following bank accounts:

        (1)     Prosperity Bank account number x7188

        (2)     Compass Bank account number x3873

Such property further includes, but is not limited to, all right, title, and interest in the following domain names:

        (1)     atlantabackpage.com

        (2)     backpage.be

        (3)     backpage.com

        (4)     backpage.com.br

        (5)     backpage.cz

        (6)     backpage.dk

        (7)     backpage.ee

        (8)     backpage.es

        (9)     backpage.fi

        (10)    backpage.fr

        (11)    backpage.gr

        (12)    backpage.hu

        (13)    backpage.ie

        (14)    backpage.it

        (15)    backpage.lt

        (16)    backpage.mx

        (17)    backpage.net

        (18)    backpage.no

        (19)    backpage.pl

        (20)    backpage.pt

| | (21) | backpage.ro |
|---|---|---|
| | (22) | backpage.si |
| | (23) | backpage.sk |
| | (24) | backpage.us |
| | (25) | backpage-insider.com |
| | (26) | bestofbackpage.com |
| | (27) | bestofbigcity.com |
| | (28) | bigcity.com |
| | (29) | chicagobackpage.com |
| | (30) | denverbackpage.com |
| | (31) | newyorkbackpage.com |
| | (32) | phoenixbackpage.com |
| | (33) | sandiegobackpage.com |
| | (34) | seattlebackpage.com |
| | (35) | tampabackpage.com |

Such property further includes, but is not limited to, all right, title, and interest in any funds remaining in the following IOLTA bank accounts at the conclusion of litigation (with the understanding that the funds currently deposited in those IOLTA bank accounts may only be withdrawn by counsel based on the provision of legal services):

    (1)   First Republic Bank IOLTA Account x6180

    (2)   First Republic Bank IOLTA Account x6255

    (3)   First Republic Bank IOLTA Account x5978

    (4)   All funds previously deposited in Wells Fargo IOLTA account number x7091 to fund the criminal defense of Backpage.com, LLC, Website Technologies, LLC, Posting Solutions LLC, Amstel River Holdings LLC, Ad Tech BV, and/or UGC Tech Group BV

Such property further includes, but is not limited to, all right, title, and interest in any funds previously advanced to a bail bond service (with the understanding that, should co-

1    defendant Carl Ferrer not be required to post a bond in this matter, the defendant will take

2    immediate steps to recover any funds previously advanced to a bail bond service and

3    surrender those funds to the United States for forfeiture).

4         c.    The defendant further agrees to waive all interest in any such asset in any

5    administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal.

6    The defendant agrees to consent to the entry of orders of forfeiture for such property and

7    waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding

8    notice of the forfeiture in the charging instrument, announcement of the forfeiture at

9    sentencing, and incorporation of the forfeiture in the judgment.  The defendant further

10   understands and agrees that forfeiture of the assets is appropriate and in accordance with

11   the applicable forfeiture statutes, which may include Title 8 U.S.C. § 1324(b), Title 18

12   U.S.C. §§ 924(d), 981, 982 and 2253, Title 21 U.S.C. §§ 853 and 881, and Title 28

13   U.S.C. § 2461(c).

14        d.    Forfeiture of the defendant's assets shall not be treated as satisfaction of

15   any fine, restitution, cost of imprisonment, or any other penalty this court may impose

16   upon the defendant in addition to forfeiture.  This agreement does not preclude the United

17   States from instituting any civil or administrative forfeiture proceedings as may be

18   appropriate now or in the future.

19        e.    The defendant agrees to waive all constitutional and statutory challenges in

20   any manner (including direct appeal, habeas corpus, double jeopardy or any other means)

21   to any forfeiture imposed as a result of this guilty plea or any pending or completed

22   administrative or civil forfeiture actions, including that the forfeiture constitutes an

23   excessive fine or punishment.  The defendant agrees to take all steps as requested by the

24   United States to pass clear title to forfeitable assets to the United States, and to testify

25   truthfully in any judicial forfeiture proceeding.  The defendant acknowledges that all

26   property covered by this agreement is subject to forfeiture as proceeds of illegal conduct,

27   property facilitating illegal conduct, and substitute assets for property otherwise subject

28   to forfeiture, and that no other person or entity has a legitimate claim to these items listed.

- 9 -

f. The defendant agrees not to file a claim to any of the listed property in any civil proceeding, administrative or judicial, which may be initiated. The defendant further agrees that he/she will not contest civil, administrative or judicial forfeiture of the listed property. The defendant agrees to waive his/her right to notice of any forfeiture proceeding involving this property, and agrees not to file a claim or assist others in filing a claim in that forfeiture proceeding.

g. The government reserves its right to proceed against any remaining assets not identified either in this agreement or in any civil actions which are being resolved along with this plea of guilty, including any property in which the defendant has any interest or control, if said assets, real or personal, tangible or intangible were involved in the offense(s).

h. The defendant hereby waives, and agrees to hold the government and its agents and employees harmless from any and all claims whatsoever in connection with the seizure, forfeiture, and disposal of the property described above. Without limitation, the defendant understands and agrees that by virtue of this plea of guilty, the defendant will waive any rights or cause of action that the defendant might otherwise have had to claim that he/she is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related civil forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

**9.** **ELEMENTS**

**Money Laundering Conspiracy**

Beginning no later than 2004, and continuing through in or around March 2018, in the District of Arizona and elsewhere:

1. There was an agreement between two or more persons to commit one or more of the crimes of Concealment Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i)), International Promotional Money Laundering (18 U.S.C. § 1956(a)(2)(A)),Transactional Money Laundering (18 U.S.C. § 1957(a)), and/or International Concealment Money Laundering (18 U.S.C. § 1956(a)(2)(B)(i)); and

2. The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

**10. FACTUAL BASIS**

a. The defendant admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

The website www.Backpage.com ("Backpage") was created in 2004. It eventually became the second-largest classified advertising website in the world and, during its 14 years of existence, has derived the great majority of its revenue from fees charged in return for publishing advertisements for "adult" and "escort" services.

The great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, certain employees and representatives of Posting Solutions LLC (who were authorized to bind the company with their actions) conspired to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers. For example, the company utilized "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage. These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.

In addition to conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers, certain employees and representatives of Posting Solutions LLC (who were authorized to bind the company with their actions) also conspired to engage in various money laundering offenses. Since 2004, Backpage has earned hundreds of millions of dollars in revenue from publishing "escort" and "adult" ads. Over time, many banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business. In response, the aforementioned employees and representatives found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies (including but not limited to CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

b.      The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any intentional material inconsistencies in the defendant's testimony may subject the defendant to additional penalties for perjury or false swearing, which may be enforced by the United States under this agreement.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT'S AUTHORIZED REPRESENTATIVE

I am authorized to enter into a written plea bargain agreement and enter a plea of guilty on behalf of the defendant.

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it on behalf of the defendant.

1    I understand that by entering my plea of guilty, the defendant shall waive its rights

2    to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance

3    of witnesses, to present evidence in its defense, to remain silent and refuse to be a witness

4    against itself by asserting its privilege against self-incrimination (if applicable), all with

5    the assistance of counsel, and to be presumed innocent until proven guilty beyond a

6    reasonable doubt.

7    I agree to enter this guilty plea as indicated above on the terms and conditions set

8    forth in this agreement.

9    I understand the nature of the charges to which the defendant is entering its guilty

10   plea. I further understand the nature and range of the possible sentence and that the

11   defendant's ultimate sentence shall be determined by the Court after consideration of the

12   advisory Sentencing Guidelines.

13   The defendant's guilty plea is not the result of force, threats, assurances, or

14   promises, other than the promises contained in this agreement. The defendant voluntarily

15   agrees to the provisions of this agreement and agrees to be bound according to its

16   provisions.

17   I understand that if the defendant is granted probation or placed on supervised

18   release by the Court, the terms and conditions of such probation/supervised release are

19   subject to modification at any time. I further understand that if the defendant violates any

20   of the conditions of its probation/supervised release, its probation/supervised release may

21   be revoked and upon such revocation, notwithstanding any other provision of this

22   agreement, its sentence otherwise may be altered.

23   This written plea agreement, and any written addenda filed as attachments to this

24   plea agreement, contain all the terms and conditions of the plea.  Any additional

25   agreements, if any such agreements exist, shall be recorded in a separate document and

26   may be filed with the Court under seal; accordingly, additional agreements, if any, may

27   not be in the public record.

28

I further agree on behalf of the defendant that promises, including any predictions as to the Sentencing Guideline range or to any Sentencing Guideline factors that will apply, made by anyone (including the defendant's attorney) that are not contained within this written plea agreement, are null and void and have no force and effect.

I fully understand the terms and conditions of this plea agreement. I am not now using or under the influence of any drug, medication, liquor, or other intoxicant or depressant that would impair my ability to fully understand the terms and conditions of this plea agreement.

_4-5-18_
Date

_CARL FERRER_
Defendant's Authorized Representative

## APPROVAL OF DEFENSE COUNSEL

I have discussed this case and the plea agreement with my client in detail and have advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the constitutional and other rights of an accused, the factual basis for and the nature of the offense to which the guilty plea will be entered, possible defenses, and the consequences of the guilty plea including the maximum statutory sentence possible. I have further discussed the concept of the advisory Sentencing Guidelines with the defendant. No assurances, promises, or representations have been given to me or to the defendant by the United States or any of its representatives that are not contained in this written agreement. I concur in the entry of the plea as indicated above and that the terms and conditions set forth in this agreement are in the best interests of my client. I agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all the requirements of Fed. R. Crim. P. 11.

_4/5/2018_
Date

_David Botsford_
Attorney for Defendant

- 14 -

**APPROVAL OF THE UNITED STATES**

I have reviewed this matter and the plea agreement. I agree on behalf of the United States that the terms and conditions set forth herein are appropriate and are in the best interests of justice.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

_____
Date   01-5-18

_____
KEVIN RAPP
DOMINIC LANZA
MARGARET PERLMETER
JOHN J. KUCERA
Assistant U.S. Attorneys

REGINALD JONES
Senior Trial Attorney

**ACCEPTANCE BY THE COURT**

_____
Date

_____
United States District Judge

**EFiled:  Sep 14 2018 06:28PM EDT**
**Transaction ID 62455883**
**Case No. 2018-0606-SG**

# Exhibit E

1
2
3
4
5
6          **IN THE UNITED STATES DISTRICT COURT**
7              **FOR THE DISTRICT OF ARIZONA**
8

| | |
|---|---|
| United States of America, | No. CR-18-00465-001-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Backpage.com LLC, | |
| Defendant. | |

15        Pending before the Court is the Government's "Motion to Unseal." (Doc. 11.)
16   Finding good cause appearing,
17        **IT IS ORDERED**:
18        1.      The Motion (Doc. 11) is **granted**.
19        2.      The Clerk of Court shall unseal this matter, effective immediately.
20   The Court finds excludable delay under 18 U.S.C. § 3161(h) from ___ to ____.
21   Dated this 12th day of April, 2018.
22
23
24                              _____
                               Honorable John Z. Boyle
                               United States Magistrate Judge
25
26
27
28

1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   United States of America,                    No. CR-18-00464-001-PHX-DJH

10                 Plaintiff,                        **ORDER**

11  v.

12  Carl Allen Ferrer,

13                 Defendant.

14  _____

15          Pending before the Court is the Government's "Motion to Unseal." (Doc. 14.)

16  Finding good cause appearing,

17          **IT IS ORDERED**:

18          1.      The Motion (Doc. 14) is **granted**.

19          2.      The Clerk of Court shall unseal this matter, effective immediately.

20  The Court finds excludable delay under 18 U.S.C. § 3161(h) from ___ to ____.

21  Dated this 12th day of April, 2018.

22

23

24                                          _____
                                            Honorable John Z. Boyle
25                                          United States Magistrate Judge

26

27

28

**EFiled:  Sep 14 2018 06:28PM EDT**
**Transaction ID 62455883**
**Case No. 2018-0606-SG**

# Exhibit F

Carl Ferrer
Chief Executive Officer
Backpage.com LLC
13601 Preston Road Suite E801
Dallas, TX 75240

**Sent via Email**

April 24, 2018

James Grant
Jeff Gray
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
jimgrant@dwt.com
jeffgray@dwt.com

Robert Corn-Revere
Ronald G. London
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006
bobcornrevere@dwt.com
ronnielondon@dwt.com

Scott Commerson
Nicole Phillis
Davis Wright Tremaine LLP
865 S. Figueroa St., Suite 2400
Los Angeles, CA 90017-2566
scottcommerson@dwt.com
nicolephillis@dwt.com

Dear Counsel:

I am in receipt of your letter dated April 20, 2018 in which you informed your clients, Carl Ferrer, Backpage.com, LLC and related entities owned or controlled by Mr. Ferrer (specifically, UGC Tech Group CV, Website Technologies, LLC, Altantische Bedrijven CV, Amstel Holdings, LLC, Lupine Holdings LLC, Kickapoo River Investments LLC, CF Holdings GP LLC, and CF Acquisitions LLC) (collectively, your "Backpage Clients") that Davis Wright Tremaine LLP ("DWT") would be withdrawing as counsel in the following matters:

- Rodgers v. Backpage LLC et al., No. 38-CV-2017-900041.00 (Houston Cty. Cir. Ct., Alabama)
- Doe v. Ferrer et al., No. MCC1700068 (Super. Ct. Riverside Co.)

- Ambrose v. Backpage LLC et al., No. 2017-L-004979 (Cook Cty. Cir. Ct., Ill.)
- Plaintiff XXXXXXX v. Backpage.com LLC et al., No. DC-17-00951 (44th Jud. Dist. Ct., Dallas Ct., Tex.)
- Doe 1 v. Backpage.com LLC et al., No. 2018-04501 (270th Dist. Ct., Harris Co., Texas)
- Doe 2 v. Backpage.com LLC et al., No. 2018-09781 (270th Dist. Ct., Harris Co., Texas)
- Doe 3 v. Backpage.com LLC et al., No. 2018-12781 (125th Dist. Ct., Harris Co., Texas)
- Doe 4 v. Backpage.com LLC et al., No. 2018-12747 (157th Dist. Ct., Harris Co., Texas)
- R.O. & K.M. v. Backpage.com LLC et al., No. 17-2-04897-1 (Super. Ct. Pierce Co., Wash.)
- O.L. v. Backpage.com LLC et al., No. 13-2-13382-8 (Super. Ct. Pierce Co., Wash.)
- Hawley v. Backpage.com, No. 1711-CC00589 (11th Jud. Dist. St. Charles Co., Mo.)
- Backpage.com LLC v. Hawley, No. 4:17-cv-01951 (E.D.Mo.)
- Backpage LLC et al. v. Hawley, No. 18-1096 (8th Cir.)
- Backpage LLC v. Dart, No. 1:15-cv-06340 (N.D.Ill)
- Florida Abolitionist v. Backpage.com LLC et al., No. 6:17-cv-218 (M.D. Fla.)
- Kocher v. Backpage.com LLC et al., No. 3:18-cv-00449 (D. Or.)
- Jane Doe Nos. 1, 2 & 3 v. Backpage.com LLC et al., No. 17-cv-11069 (D. Mass.)
- Backpage.com LLC et al. v. Healey, No. 17-2090 (1st Cir.)

This letter responds to your prior correspondence and requests that DWT immediately take steps to avoid a material adverse effect to the Backpage Clients in these matters.  Your sudden withdrawal from these proceedings — if allowed on such short notice — would result in irreparable harm to the Backpage Clients and their legal rights.

### Extensions of Time Are Necessary to Avoid Material Adverse Effects of DWT's Withdrawal.

Your letter acknowledges that the Backpage Clients are facing imminent deadlines for responsive pleadings and critical briefing on dispositive motions in these various matters nationwide.  A review of the public dockets of those proceedings indicates that responsive pleadings are due in several actions within the next week or two.  *See, e.g., O.L. v. Backpage.com LLC et al.*, No. 13-2-13382-8 (Super. Ct. Pierce Co., Wash.) (responsive pleading due May 2, 2018); *Doe 2 v. Backpage.com LLC et al.*, No. 2018-09781 (270th Dist. Ct., Harris Co., Texas) (response due April 26, 2018); *Doe 4 v.*

*Backpage.com LLC et al.*, No. 2018-12747 (157th Dist. Ct., Harris Co., Texas) (response due April 26, 2018); *Jane Doe Nos. 1, 2 & 3 v. Backpage.com LLC et al.,* No. 17-cv-11069 (D. Mass.) (response due May 3, 2018).

Under governing rules of professional conduct, an attorney may not withdraw from a client's representation if doing so would result in material harm to the client's position in litigation or would otherwise prejudice the client's interests. *See, e.g.,* Wash. R. Prof. Conduct 1.16(b)(1); Cal. R. Prof. Conduct 3-700(A)(2); Tex. Discip. R. Prof. Conduct 1.15; ABA Model Rule 1.6(a)(1) & (b)(1). An attorney also has an ethical duty to give his or her client sufficient notice and time to hire a new attorney before withdrawing from the representation. *See* Wash. R. Prof. Conduct 1.16(d); Cal. R. Prof. Conduct 3-700(A)(2); Tex. Discip. R. Prof. Conduct 1.15(d). Moreover, as to the cases in which you have entered an appearance, your sudden withdrawal is likely improper without court approval. *See, e.g.,* Tex. R. Civ. P. 10; *Rogers v. Clinton*, 794 S.W.2d 9, 10 n.1 (Tex. 1990).

Here, DWT's sudden withdrawal threatens to irreparably harm the Backpage Clients' interests, which could remain unprotected if a default were entered against them. There is little time for all of these clients to locate new counsel and prepare responsive pleadings on such short notice, myself included. I did not receive any advance notice of your intention to withdraw, and even if withdrawal were appropriate, I would expect a reputable firm like DWT to adhere to its professional duties when terminating the representation. Please be advised that neither I nor any other Backpage Client consent to the withdrawal of any motions that have already been filed in any pending matter. Those motions should remain on-file with the court, and any attempt by DWT and its affiliates to withdraw those motions will be considered an attempt to prejudice the rights of the Backpage Clients in that litigation.

To avoid prejudice and irreparable harm, I hereby request that you secure a 30-day extension of time for the Backpage Clients to locate new counsel in all pending matters. I further request that DWT immediately seek stipulations, via special appearance, to extend the time to respond in all cases in which it has not yet entered an appearance. There are two cases in Texas, for instance, in which letter agreements have been filed by your local counsel, Akin Gump, that extends the time to respond.

## DWT's Joint Representation Agreements Preclude The Sudden Withdrawal Proposed in the April 20 Letter.

Your letter is also striking in what it does not say — i.e., that DWT has decided to terminate one group of clients at the expense of another. Your letter does not indicate

that DWT intends to withdraw as counsel for all Backpage-affiliated clients, and it makes no mention of the other individual defendants who have been named in several of the matters listed above (e.g., Michael Lacey and James Larkin).  I have reason to believe that DWT cannot terminate its representation of Backpage.com LLC in favor of those two individuals.  Moreover, as a joint client of DWT, I do not consent to DWT's continued representation of any other person or entity other than Backpage if DWT terminates its representation.

DWT cannot terminate its representation of Backpage.com LLC, the entity, in favor of other co-defendants.  To my knowledge, Backpage.com LLC is the only joint client for whom DWT has secured advance consent in the event of a conflict of interest.  That is what was contractually agreed among the parties to the joint representations, and a contrary result would be improper.  An attorney simply cannot decide to drop one client in favor of another in the case of a concurrent conflict of interest.  *See State Comp. Ins. Fund v. Drobot*, 192 F. Supp. 3d 1080, 1114 (C.D. Cal. 2016); *see also*, *Truck Ins. Exchange v. Fireman's Fund Ins. Co.*, 6 Cal. App. 4th 1050, 1057 (1992) ("A law firm that knowingly undertakes adverse concurrent representation may not avoid disqualification by withdrawing from the representation of the less favored client before [the] hearing.").

### DWT's Must Account for and Return the Remainder of Backpage's $6.25 Million Retainer.

To the extent that you wish to terminate your representation of Backpage.com LLC, then you must immediately (i) account for the $6.25 million trust payment that was made by Backpage.com LLC to DWT at the commencement of the representation and (ii) return all unused trust funds, which remain the property of Backpage.  *See* Wash. R. Prof. Conduct 1.15(d) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned."). On behalf of all the clients, I also request that you immediately return all hard disks, files, and other property of the Backpage Clients provided to you during the representation.

Please confirm that (i) DWT will be requesting extensions of time in favor of the Backpage Clients in the various proceedings identified in your April 20 letter and (ii) DWT will continue to represent Backpage.com LLC in these further proceedings (pursuant to the terms of its representation agreements).

We reserve the right to file this letter with the Court in all pending proceedings, if necessary.  Please confirm by the close of business on April 25, 2018 that DWT and/or its affiliated counsel will immediately request extensions of time on behalf of the Backpage Clients, before the earlier of (a) three (3) days or (b) any applicable responsive pleading deadlines.

Very truly yours,

Carl Ferrer
Backpage CEO

Cc:  Local Counsel, as follows:
- Robert D. Segall, Copeland, Franco, Screws & Gill, P.A., Montgomery, AL (segall@copelandfranco.com)
- M. Scott Barnard, Akin Gump Strauss Hauer & Feld LLP, Dallas, TX (sbarnard@akingump.com)
- Andrew F. Newman, Akin Gump Strauss Hauer & Feld LLP, Dallas, TX (anewman@akingump.com)
- Molly E. Whitman, Akin Gump Strauss Hauer & Feld LLP, Dallas, TX (mwhitman@akingump.com)
- Wayne B. Giampetro, Poltrock & Giampietro, Chicago, IL (wgiampietro@wpglawyers.com)
- Mark S. Sableman, Thompson Coburn LLP, St. Louis, MO (msableman@thompsoncoburn.com)
- Lawrence G. Walters, Walters Law Group, Longwood, FL (larry@firstamendment.com)
- Robert A. Bertsche, Prince Lobel Tye LLP, Boston, MA (rbertsche@princelobel.com)
- Charles H.R. Peters, Schiff Hardin, LLP, Chicago, IL, (cpeters@schiffhardin.com)

EFiled:  Sep 14 2018 06:28PM EDT
Transaction ID 62455883
Case No. 2018-0606-SG

Exhibit G

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

United States of America,

        Plaintiff,

v.

Carl Allen Ferrer,

        Defendant.

No. CR-18-00464-001-PHX-DJH

**PRELIMINARY ORDER OF FORFEITURE**

16
17
18
19
20

      Upon consideration of the Stipulation for Entry of Preliminary Order of Forfeiture (Doc. 22) filed by the plaintiff, United States of America, and the defendant, Carl Ferrer ("defendant"), pursuant to the information, the defendant's guilty plea to said information, and Rule 32.2(b), Federal Rules of Criminal Procedure, and good cause appearing, the Court **ORDERS** as follows:

21
22
23
24
25

      Any and all of the defendant's rights, title, and interest in and to the property listed below (the "Forfeited Property") is hereby forfeited to the United States on the ground that it represents or is traceable to proceeds of the underlying violation of conviction. Consistent with the express agreement of the parties, this Order is final as to defendant upon entry.

26

      **IT IS FURTHER ORDERED** the Forfeited Property includes the following:

27
28

…
…
…

A.   <u>Bank Accounts</u>

    1.   Any and all bank funds, securities, or other assets on deposit or seized from account number x2912 held at Republic Bank of Arizona. (The estimated value is $170,743.)

    2.   Any and all bank funds, securities, or other assets on deposit or seized from account number x2500 held at Republic Bank of Arizona. (The estimated value is $597,886.)

    3.   Any and all bank funds, securities, or other assets on deposit or seized from account number x4832 held at Green Bank. (The estimated value is $98,946.)

    4.   Any and all bank funds, securities, or other assets on deposit or seized from account number x4155 at JP Morgan Chase that were previously transferred into that account by the bail bonds service of the defendant. (The estimated value is $500,000.)

    5.   Any and all bitcoin cash or other assets on deposit or seized from bitcoin cash wallet address –t8v7e that were previously or will be transferred into that account from bitcoin cash wallet address *CYPw8Ms. (The estimated amount of bitcoin cash is 55.)

B.   <u>Real Property</u>

    1.   The real property located at 7409 KingsBarns The Colony, Texas.

C.   <u>Domain Names</u>

    1.   admoderation.com (Versio)

    2.   admoderators.com (Versio)

    3.   adnet.ws (NetNames)

    4.   adplace24.com (Versio)

    5.   adplaces24.com (Versio)

    6.   adpost24.com (Versio)

    7.   adpost24.cz (GoDaddy)

1        8.     adquick365.com (Versio)

2        9.     adreputation.com (NetNames)

3      10.    ads-posted-mp.com (Versio)

4      11.    adsplace24.com (Versio)

5      12.    adspot24.com (Versio)

6      13.    adspots24.com (Versio)

7      14.    adsspot24.com (Versio)

8      15.    adtechbv.co.nl (NetNames)

9      16.    adtechbv.com (NetNames)

10     17.    adtechbv.nl (NetNames)

11     18.    advert-ep.com (Versio)

12     19.    adverts-mp.com (Versio)

13     20.    axme.com (GoDaddy)

14     21.    back0age.com (NetNames)

15     22.    backpa.ge (NetNames)

16     23.    backpaee.com (NetNames)

17     24.    backpage-insider.com (NetNames)

18     25.    backpage.adult (NetNames)

19     26.    backpage.ae (NetNames)

20     27.    backpage.at (NetNames)

21     28.    backpage.ax (NetNames)

22     29.    backpage.be (NetNames)

23     30.    backpage.bg (European domains)

24     31.    backpage.bg (NetNames)

25     32.    backpage.ca (NetNames)

26     33.    backpage.cl (NetNames)

27     34.    backpage.cn (European domains)

28     35.    backpage.cn (NetNames)

| | | |
|---|---|---|
| 1 | 36. | backpage.co.id (NetNames) |
| 2 | 37. | backpage.co.nl (European domains) |
| 3 | 38. | backpage.co.nl (NetNames) |
| 4 | 39. | backpage.co.nz (NetNames) |
| 5 | 40. | backpage.co.uk (NetNames) |
| 6 | 41. | backpage.co.ve (NetNames) |
| 7 | 42. | backpage.co.za (NetNames) |
| 8 | 43. | backpage.com (NetNames) |
| 9 | 44. | backpage.com.ar (NetNames) |
| 10 | 45. | backpage.com.au (NetNames) |
| 11 | 46. | backpage.com.ph (NetNames) |
| 12 | 47. | backpage.cz (NetNames) |
| 13 | 48. | backpage.dk (NetNames) |
| 14 | 49. | backpage.ec (NetNames) |
| 15 | 50. | backpage.ee (European domains) |
| 16 | 51. | backpage.ee (NetNames) |
| 17 | 52. | backpage.es (NetNames) |
| 18 | 53. | backpage.fi (European domains) |
| 19 | 54. | backpage.fi (NetNames) |
| 20 | 55. | backpage.fr (European domains) |
| 21 | 56. | backpage.fr (NetNames) |
| 22 | 57. | backpage.gr (European domains) |
| 23 | 58. | backpage.gr (NetNames) |
| 24 | 59. | backpage.hk (European domains) |
| 25 | 60. | backpage.hk (NetNames) |
| 26 | 61. | backpage.hu (European domains) |
| 27 | 62. | backpage.hu (NetNames) |
| 28 | 63. | backpage.ie (NetNames) |

64. backpage.in (NetNames)

65. backpage.it (NetNames)

66. backpage.jp (NetNames)

67. backpage.kr (NetNames)

68. backpage.lt (NetNames)

69. backpage.lv (European domains)

70. backpage.lv (NetNames)

71. backpage.me (NetNames)

72. backpage.mx (NetNames)

73. backpage.my (NetNames)

74. backpage.net (NetNames)

75. backpage.nl (NetNames)

76. backpage.no (European domains)

77. backpage.no (NetNames)

78. backpage.nz (NetNames)

79. backpage.pe (NetNames)

80. backpage.ph (NetNames)

81. backpage.pk (NetNames)

82. backpage.pl (NetNames)

83. backpage.porn (NetNames)

84. backpage.pt (NetNames)

85. backpage.ro (European domains)

86. backpage.ro (NetNames)

87. backpage.se (NetNames)

88. backpage.sex (NetNames)

89. backpage.sg (NetNames)

90. backpage.si (European domains)

91. backpage.si (NetNames)

| | | |
|---|---|---|
| 92. | backpage.sk (European domains) |
| 93. | backpage.sk (NetNames) |
| 94. | backpage.sucks (NetNames) |
| 95. | backpage.tw (NetNames) |
| 96. | backpage.uk (NetNames) |
| 97. | backpage.uk.com (NetNames) |
| 98. | backpage.us (NetNames) |
| 99. | backpage.vn (NetNames) |
| 100. | backpage.xxx (NetNames) |
| 101. | backpage.xyz (NetNames) |
| 102. | backpagecompimp.com (NetNames) |
| 103. | backpagecompimps.com (NetNames) |
| 104. | backpagepimp.com (NetNames) |
| 105. | backpagepimps.com (NetNames) |
| 106. | backpagg.com (NetNames) |
| 107. | backpagm.com (NetNames) |
| 108. | backpagu.com (NetNames) |
| 109. | backpaoe.com (NetNames) |
| 110. | backpawe.com (NetNames) |
| 111. | backqage.com (NetNames) |
| 112. | backrage.com (NetNames) |
| 113. | backxage.com (NetNames) |
| 114. | bakkpage.com (NetNames) |
| 115. | bcklistings.com (NetNames) |
| 116. | bestofbackpage.com (NetNames) |
| 117. | bestofbigcity.com (NetNames) |
| 118. | bickpage.com (NetNames) |
| 119. | bigcity.com (NetNames) |

| | |
|---|---|
| 120. | bpclassified.com (NetNames) |
| 121. | bpclassifieds.com (NetNames) |
| 122. | carlferrer.com (NetNames) |
| 123. | clasificadosymas.com (NetNames) |
| 124. | clasificadosymas.net (NetNames) |
| 125. | clasificadosymas.org (NetNames) |
| 126. | classifiedsolutions.co.uk (NetNames) |
| 127. | classifiedsolutions.net (NetNames) |
| 128. | classyadultads.com (Versio) |
| 129. | columbusbackpage.com (NetNames) |
| 130. | connecticutbackpage.com (NetNames) |
| 131. | cracker.co.id (NetNames) |
| 132. | cracker.com (NetNames) |
| 133. | cracker.com.au (NetNames) |
| 134. | cracker.id (NetNames) |
| 135. | cracker.net.au (NetNames) |
| 136. | crackers.com.au (NetNames) |
| 137. | crackers.net.au (NetNames) |
| 138. | ctbackpage.com (NetNames) |
| 139. | dallasbackpage.com (NetNames) |
| 140. | denverbackpage.com (NetNames) |
| 141. | easypost123.com (Versio) |
| 142. | easyposts123.com (Versio) |
| 143. | emais.com.pt (NetNames) |
| 144. | evilempire.com (NetNames) |
| 145. | ezpost123.com (Versio) |
| 146. | fackpage.com (NetNames) |
| 147. | fastadboard.com (Versio) |

148. guliettagroup.nl (Versio)

149. htpp.org (NetNames)

150. ichold.com (NetNames)

151. internetspeechfoundation.com (nameisp)

152. internetspeechfoundation.org (nameisp)

153. loads2drive.com (NetNames)

154. loadstodrive.com (NetNames)

155. loadtodrive.com (NetNames)

156. losangelesbackpage.com (NetNames)

157. mediafilecloud.com (NetNames)

158. miamibackpage.com (NetNames)

159. minneapolisbackpage.com (NetNames)

160. mobileposting.com (Versio)

161. mobilepostings.com (Versio)

162. mobilepostlist.com (Versio)

163. mobilposting.com (Versio)

164. naked.city (NetNames)

165. nakedcity.com (NetNames)

166. newyorkbackpage.com (NetNames)

167. paidbyhour.com (NetNames)

168. petseekr.com (NetNames)

169. petsfindr.com (NetNames)

170. phoenixbackpage.com (NetNames)

171. posteasy123.com (Versio)

172. postfaster.com (NetNames)

173. postfastly.com (NetNames)

174. postfastr.com (NetNames)

175. postonlinewith.com (Versio)

176. postonlinewith.me (Versio)

177. postseasy123.com (Versio)

178. postsol.com (GoDaddy)

179. postszone24.com (Versio)

180. postzone24.com (Versio)

181. postzones24.com (Versio)

182. rentseekr.com (NetNames)

183. results911.com (NetNames)

184. sandiegobackpage.com (NetNames)

185. sanfranciscobackpage.com (NetNames)

186. seattlebackpage.com (NetNames)

187. sellyostuffonline.com (Versio)

188. sfbackpage.com (NetNames)

189. simplepost24.com (Versio)

190. simpleposts24.com (Versio)

191. svc.ws (NetNames)

192. truckrjobs.com (NetNames)

193. ugctechgroup.com (NetNames)

194. universads.nl (Versio)

195. villagevoicepimps.com (GoDaddy)

196. websitetechnologies.co.uk (NetNames)

197. websitetechnologies.com (NetNames)

198. websitetechnologies.net (NetNames)

199. websitetechnologies.nl (NetNames)

200. websitetechnologies.org (NetNames)

201. weprocessmoney.com (GoDaddy)

202. wst.ws (NetNames)

203. xn--yms-fla.com (NetNames)

1   204.   ymas.ar.com (European domains)

2   205.   ymas.br.com (European domains)

3   206.   ymas.br.com (NetNames)

4   207.   ymas.bz (European domains)

5   208.   ymas.bz (NetNames)

6   209.   ymas.cl (European domains)

7   210.   ymas.cl (NetNames)

8   211.   ymas.co.bz (European domains)

9   212.   ymas.co.bz (NetNames)

10  213.   ymas.co.cr (European domains)

11  214.   ymas.co.cr (NetNames)

12  215.   ymas.co.ni (European domains)

13  216.   ymas.co.ni (NetNames)

14  217.   ymas.co.ve (European domains)

15  218.   ymas.co.ve (NetNames)

16  219.   ymas.com (NetNames)

17  220.   ymas.com.br (European domains)

18  221.   ymas.com.br (NetNames)

19  222.   ymas.com.bz (European domains)

20  223.   ymas.com.bz (NetNames)

21  224.   ymas.com.co (European domains)

22  225.   ymas.com.co (NetNames)

23  226.   ymas.com.do (European domains)

24  227.   ymas.com.do (NetNames)

25  228.   ymas.com.ec (European domains)

26  229.   ymas.com.ec (NetNames)

27  230.   ymas.com.es (European domains)

28  231.   ymas.com.es (NetNames)

232. ymas.com.gt (European domains)

233. ymas.com.gt (NetNames)

234. ymas.com.hn (European domains)

235. ymas.com.hn (NetNames)

236. ymas.com.mx  (NetNames)

237. ymas.com.ni (European domains)

238. ymas.com.ni (NetNames)

239. ymas.com.pe (European domains)

240. ymas.com.pe (NetNames)

241. ymas.com.pr (European domains)

242. ymas.com.pr (NetNames)

243. ymas.com.pt  (NetNames)

244. ymas.com.uy (European domains)

245. ymas.com.uy (NetNames)

246. ymas.com.ve (European domains)

247. ymas.com.ve (NetNames)

248. ymas.cr (European domains)

249. ymas.cr (NetNames)

250. ymas.do (European domains)

251. ymas.do (NetNames)

252. ymas.ec (European domains)

253. ymas.ec (NetNames)

254. ymas.es (European domains)

255. ymas.es (NetNames)

256. ymas.org (NetNames)

257. ymas.pe (European domains)

258. ymas.pe (NetNames)

259. ymas.pt (NetNames)

260. ymas.us (European domains)

261. ymas.us (NetNames)

262. ymas.uy (European domains)

263. ymas.uy (NetNames)

264. ymas.uy.com (European domains)

D. <u>Security Deposits And Retainers/Deposits For Future Services</u>

1. Any and all bank funds, securities, or other assets remaining in IOLTA account number x6180 at First Republic Bank at the conclusion of litigation in this case (with the understanding that the funds currently on deposit in that account may be withdrawn by counsel solely for the provision of legal services).

2. Any and all bank funds, securities, or other assets remaining in IOLTA account number x6255 at First Republic Bank at the conclusion of litigation in this case (with the understanding that the funds currently on deposit in that account may be withdrawn by counsel solely for the provision of legal services).

3. Any and all bank funds, securities, or other assets remaining in IOLTA account number x5978 at First Republic Bank at the conclusion of litigation in this case (with the understanding that the funds currently on deposit in that account may be withdrawn by counsel solely for the provision of legal services).

4. Any and all bank funds, securities, or other assets previously deposited into IOLTA account number x7091 at Wells Fargo to fund the criminal defense of Backpage.com, LLC, Website Technologies, LLC, Posting Solutions LLC, Amstel River Holdings LLC, Ad Tech BV, and/or UGC Tech Group BV that are remaining in the account at the conclusion of litigation in this case (with the understanding that the funds currently on deposit in that

account may be withdrawn by counsel solely for the provision of legal services).

**IT IS FURTHER ORDERED** as follows:

A.     Upon the entry of this Order, and pursuant to 21 U.S.C. § 853 and Fed. R. Crim. P. 32.2(b)(3), the United States Attorney General (or his designee, the United States Marshals Service ("USMS")) shall seize the Forfeited Property, subject to the following limitations:

(1)     With respect to the accounts listed in Section D, the accounts shall not be seized at this time.  Rather, the funds currently on deposit in the listed accounts shall remain under the control of counsel and may be withdrawn by counsel in such amounts as may be necessary to defray the cost of any legal services provided in connection with the instant case or any related civil or criminal proceeding.  At the conclusion of all litigation in connection with the instant case or any related civil or criminal proceeding, counsel shall submit an accounting of all withdrawals made from the accounts listed in Section D to the Attorney General (or his designee) and a schedule of the balances remaining in the respective accounts.  At that time, the United States or the Attorney General (or his designee) may move pursuant to Rule 32.2(e) to amend this Order to specify the amounts in each of the accounts that are subject to forfeiture.  At the end of litigation, instead of seizing the remaining balance in each of the respective accounts once the Order of Forfeiture is amended, the Attorney General (or his designee) shall direct counsel to transfer the remaining balance in each account to an account designated by the Attorney General (or his designee), which transfer will be made by certified check or wire transfer, at the sole election of the Attorney General (or his designee), at a time of the Attorney General's (or his designee's) choosing.

(2)     The property listed in Section B shall be seized at the conclusion of any ancillary proceeding needed to determine the rights of any third party in the forfeited property pursuant to Rule 32.2(c) and 21 U.S.C. § 853(n).  If the United States or the Attorney General (or his designee) determines that it is necessary to liquidate the

1    property pursuant to an interlocutory sale while such ancillary proceeding is pending, he

2    may so move pursuant to Rule 32.2(b)(7).

3            B.     Upon entry of this Order, the United States is authorized to conduct any

4    discovery for the purpose of identifying, locating, or disposing of the Forfeited Property

5    pursuant to this Order, 21 U.S.C. § 853(m), and Rule 32.2(b)(3) of the Federal Rules of

6    Criminal Procedure.  "Any discovery" shall include all methods of discovery permitted

7    under the Federal Rules of Civil Procedure.

8            C.     The United States Attorney General (or his designee) shall commence any

9    appropriate ancillary proceeding to comply with statutes governing third party rights,

10    including giving notice of this and any other order affecting the Forfeited Property.  The

11    following paragraphs shall apply to any ancillary proceeding conducted in this matter:

12            (1)    Pursuant to 21 U.S.C. § 853(n)(1) and Supplemental Rule

13    G(4)(a)(iv)(C) of the Supplemental Rules for Admiralty or Maritime Claims and Asset

14    Forfeiture Actions, the government shall publish, for at least thirty (30) consecutive days

15    on an official government website, notice of this Order and any other order affecting the

16    Forfeited Property, and notice that any person, other than defendant, having or claiming a

17    legal interest in the property must file a petition with the Court within thirty (30) days of

18    the publication of notice or receipt of actual notice, whichever is earlier.  The United

19    States shall also, to the extent practicable, provide written notice to any person known to

20    have an alleged interest in the Forfeitable Property that any such person is required to file

21    a petition within thirty (30) days of the giving of such direct notice.

22            (2)    Other than defendant, any person asserting a legal interest in the

23    Forfeited Property may, within thirty (30) days of the publication of notice or receipt of

24    notice, whichever is earlier, petition the Court for a hearing without a jury to adjudicate

25    the validity of his alleged interest in the property, and for an amendment of this order of

26    forfeiture, pursuant to 21 U.S.C. § 853(n)(2).

27            (3)    Any petition filed by a third party asserting an interest in the

28    Forfeited Property shall be signed by the petitioner under penalty of perjury and shall set

forth the nature and extent of the petitioner's purported right, title, or interest in such property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought. *See* 21 U.S.C. § 853(n)(3).

(4) The United States shall have clear title to the Forfeited Property following the Court's disposition of all third-party interests or, if no petitions are filed, following the expiration of the period provided in 21 U.S.C. § 853(n)(2) for the filing of third party petitions.

D. Pursuant to Fed. R. Crim. P. 32.2(b)(3) and the agreement of the government and defendant, this Preliminary Order of Forfeiture shall be final as to defendant upon entry and shall be made part of his sentence and included in his judgment. Further, if no timely third party ancillary claims are filed after the government's giving notice as ordered herein, all right, title, and interest in the Forfeited Property shall vest in the government, which shall dispose of the property in accordance with law.

E. The Court shall retain jurisdiction to enforce this Order, and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

Dated this 16th day of May, 2018.


_____
Honorable Diane J. Humetewa
United States District Judge

EFiled:  Sep 14 2018 06:28PM EDT
Transaction ID 62455883
Case No. 2018-0606-SG

# Exhibit H

1
2
3
4
5
6 **IN THE UNITED STATES DISTRICT COURT**
7 **FOR THE DISTRICT OF ARIZONA**
8

9 United States of America,                    No. CR-18-00465-PHX-DJH

10               Plaintiff,                     **PRELIMINARY ORDER OF**
                                                **FORFEITURE**
11 v.

12 Backpage.com LLC, et al.,

13               Defendants.

14

15

16        Upon consideration of the Stipulation for Entry of Preliminary Order of Forfeiture

17 (Doc. 21) filed by the plaintiff, United States of America, and the defendants,

18 Backpage.com, LLC, Website Technologies, LLC, Posting Solutions LLC, Amstel River

19 Holdings, LLC, Ad Tech BV, and UGC Tech Group CV ("defendants"), pursuant to the

20 information, each defendant's guilty plea to said information, and Rule 32.2(b), Federal

21 Rules of Criminal Procedure, and good cause appearing, the Court **ORDERS** as follows:

22        Any and all of each defendant's rights, title, and interest in and to the following

23 property (the "Forfeited Property") is hereby forfeited to the United States on the ground

24 that it represents or is traceable to proceeds of the underlying violation of conviction.

25 Consistent with the express agreement of the parties, this Order is final as to each

26 defendant upon entry.

27        **IT IS FURTHER ORDERED** the Forfeited Property includes the following:

28 …

A.    <u>U.S. Bank Accounts</u>

    1.    Any and all bank funds, securities, or other assets on deposit or seized from account number x7188 held at Prosperity Bank. (The account is held in the name of Posting Solutions LLC and the estimated value is $3,100,000.)

    2.    Any and all bank funds, securities, or other assets on deposit or seized from account number x4155 at JP Morgan Chase that were previously transferred into that account by the bail bonds service of Carl Ferrer. (The estimated value is $500,000.)

    3.    Any and all bitcoin or other assets on deposit or seized from bitcoin wallet address -6Lix5 that were previously transferred into that account from the bitcoin wallet address –CSRd8. (The estimated number of bitcoin is 405.)

    4.    Any and all bitcoin or other assets on deposit or seized from bitcoin wallet address -6Lix5 that were previously transferred into that account from the bitcoin wallet address -9aRkE. (The estimated number of bitcoin is 200.)

    5.    Any and all bitcoin or other assets on deposit or seized from bitcoin wallet address -6Lix5 that were previously transferred into that account from Coinapault. (The estimated number of bitcoin is 7.)

    6.    Any and all bitcoin or other assets on deposit or seized from bitcoin wallet -6Lix5 that were previously transferred into that account from GoCoin. (The estimated number of bitcoin is 412.)

    7.    Any and all bitcoin or other assets on deposit or seized from bitcoin wallet address -6Lix5 that were previously transferred into that account from Mobile Currency. (The estimated number of bitcoin is 173.)

    8.    Any and all litecoin or other assets on deposit or seized from litecoin wallet address -goaeV that were previously transferred into that wallet from the Nano Ledger S. (The estimated number of litecoin is 16,311.)

    9.    Any and all bitcoin cash or other assets on deposit or seized from bitcoin cash wallet address –t8v7e that were previously transferred into that

account from the Nano Ledger S. (The estimated amount of bitcoin cash is 2,673.)

10. Any and all bank funds, securities, or other assets on deposit or seized from account number x4155 at JP Morgan Chase that were previously transferred into that account from an Ad Tech BV account (x2071) held in the Netherlands. (The estimated value is $106,998.41.)

11. Any and all bank funds, securities, or other assets on deposit or seized from account number x4155 at JP Morgan Chase that were previously transferred into that account from a Payment Solutions BV account (x7684) held in the Netherlands. (The estimated value is $700,000.)

12. Any and all bank funds, securities, or other assets on deposit or seized from account number x6886 held at Crypto Capital. (The account is held in the name of Website Technologies and the estimated value is $52,722.87.)

13. Any and all bank funds, securities, or other assets on deposit or seized from account number x1124 held at Crypto Capital. (The account is held in the name of Ad Tech BV and the estimated value is $41,994.24.)

14. Any and all bank funds, securities, or other assets on deposit or seized from account number x1933 held at Crypto Capital. (The account is held in the name of Ad Tech BV and the estimated value is $129,000.)

15. Any and all bank funds, securities, cryptocurrency, or other assets on deposit or seized from an account held at Kraken in the name of Ad Tech BV. (The estimated value is $236,742.03.)

16. Any and all bank funds, securities, or other assets on deposit or seized from account number x4155 at JP Morgan Chase that were previously transferred into that account by Crypto Capital account of Ad Tech BV. (The estimated value is $50,000.)

17. Any and all bank funds, securities, or other assets on deposit or seized from account number x4155 at JP Morgan Chase that were previously transferred

- 3 -

into that account by Crypto Capital account of Website Technologies. (The estimated value is $42,500.)

18. Any and all bank funds, securities, or other assets on deposit or seized from account number x4155 at JP Morgan Chase that were previously or will be transferred into that account by Paul Hastings LLP on behalf of Website Technologies, LLC. (The estimated value is $248,970.)

B. Foreign Bank Accounts

1. Any and all bank funds, securities, or other assets on deposit or seized from account number x5803 held at Fio Banka (Czech Republic). (The account is held in the name of Ad Tech BV and the estimated value is $1,228.76.)

2. Any and all bank funds, securities, or other assets on deposit or seized from account number x5801 held at Fio Banka (Czech Republic). (The account is held in the name of Ad Tech BV and the estimated value is $18,610.10.)

3. Any and all bank funds, securities, or other assets on deposit or seized from account number x5805 held at Fio Banka (Czech Republic). (The account is held in the name of Ad Tech BV and the estimated value is $3,738.45.)

4. Any and all bank funds, securities, or other assets on deposit or seized from account number x4198 held at Fio Banka (Czech Republic). (The account is held in the name of Protecctio s.r.o. and the estimated value is $112,880.49.)

5. Any and all bank funds, securities, or other assets on deposit or seized from account number x4194 held at Fio Banka (Czech Republic). (The account is held in the name of Protecctio s.r.o. and the estimated value is $3,803,097.22.)

6. Any and all bank funds, securities, or other assets on deposit or seized from account number x4196 held at Fio Banka (Czech Republic). (The account is held in the name of Protecctio s.r.o. and the estimated value is $4,902.90.)

7.   Any and all bank funds, securities, or other assets on deposit or seized from account number x2226 held at Fio Banka (Czech Republic).  (The account is held in the name of Gold Leaf s.r.o. and the estimated value is $1,425,902.33.)

8.   Any and all bank funds, securities, or other assets on deposit or seized from account number x2231 held at Fio Banka (Czech Republic).  (The account is held in the name of Gold Leaf s.r.o. and the estimated value is $104,062.02.)

9.   Any and all bank funds, securities, or other assets on deposit or seized from account number x2230 held at Fio Banka (Czech Republic).  (The account is held in the name of Gold Leaf s.r.o. and the estimated value is $504,972.87.)

10.  Any and all bank funds, securities, or other assets on deposit or seized from account number x8083 held at Fio Banka (Czech Republic).  (The account is held in the name of Varicok Company s.r.o. and the estimated value is $440,467.75.)

11.  Any and all bank funds, securities, or other assets on deposit or seized from account number x8086 held at Fio Banka (Czech Republic).  (The account is held in the name of Varicok Company s.r.o. and the estimated value is $29,287.55.)

12.  Any and all bank funds, securities, or other assets on deposit or seized from account number x8080 held at Fio Banka (Czech Republic).  (The account is held in the name of Varicok Company s.r.o. and the estimated value is $280,692.50.)

13.  Any and all bank funds, securities, or other assets on deposit or seized from account number LI090x held at AS LHV Pank (Estonia).  (The account is held in the name of Olist O.U. and the estimated value is $1,725,000.)

14.     Any and all bank funds, securities, or other assets on deposit or seized from account number LI090x held at Bank Frick (Liechtenstein). (The account is held in the name of Ad Tech BV and the estimated value is $8,292.87.)

15.     Any and all bank funds, securities, or other assets on deposit or seized from account number LI300x held at Bank Frick (Liechtenstein). (The account is held in the name of Ad Tech BV and the estimated value is $2,601,164.44.)

16.     Any and all bank funds, securities, or other assets on deposit or seized from account number LI740x held at Bank Frick (Liechtenstein). (The account is held in the name of Ad Tech BV and the estimated value is $1,533,820.07.)

17.     Any and all bank funds, securities, or other assets on deposit or seized from account number LI900x held at Bank Frick (Liechtenstein). (The account is held in the name of Ad Tech BV and the estimated value is $1,598,027.)

18.     Any and all bank funds, securities, or other assets on deposit or seized from account number x7664 held at Knab Bank (Netherlands). (The account is held in the name of Procop Services BV and the estimated value is $2,700,000.)

19.     Any and all bank funds, securities, or other assets on deposit or seized from account number x2452 held at Rabo Bank (Netherlands). (The account is held in the name of Guilietta Group BV and the estimated value is $650,000.)

20.     Any and all bank funds, securities, or other assets on deposit or seized from account number x4721 held at Rabo Bank (Netherlands). (The account is held in the name of Guilietta Group BV and the estimated value is $650,000.)

21.    Any and all bank funds, securities, or other assets on deposit or seized from an account at Cashflows Europe Ltd (UK) held in the name of Gulietta Group BV.  (The estimated value is $613,343.07.)

22.    Any and all bank funds, securities, or other assets on deposit or seized from an account at Cashflows Europe Ltd (UK) held in the name of Universeads BV.  (The estimated value is $79,304.96.)

23.    Any and all bank funds, securities, or other assets on deposit or seized from account at Cashflows Europe Ltd (UK) held in the name of Procop Services BV.  (The estimated value is $146,245.91.)

C.    Domain Names

1.    admoderation.com (Versio)

2.    admoderators.com (Versio)

3.    adnet.ws (NetNames)

4.    adplace24.com (Versio)

5.    adplaces24.com (Versio)

6.    adpost24.com (Versio)

7.    adpost24.cz (GoDaddy)

8.    adquick365.com (Versio)

9.    adreputation.com (NetNames)

10.    ads-posted-mp.com (Versio)

11.    adsplace24.com (Versio)

12.    adspot24.com (Versio)

13.    adspots24.com (Versio)

14.    adsspot24.com (Versio)

15.    adtechbv.co.nl (NetNames)

16.    adtechbv.com (NetNames)

17.    adtechbv.nl (NetNames)

18.    advert-ep.com (Versio)

| | | |
|---|---|---|
| 19. | adverts-mp.com (Versio) | |
| 20. | axme.com (GoDaddy) | |
| 21. | back0age.com (NetNames) | |
| 22. | backpa.ge (NetNames) | |
| 23. | backpaee.com (NetNames) | |
| 24. | backpage-insider.com (NetNames) | |
| 25. | backpage.adult (NetNames) | |
| 26. | backpage.ae (NetNames) | |
| 27. | backpage.at (NetNames) | |
| 28. | backpage.ax (NetNames) | |
| 29. | backpage.be (NetNames) | |
| 30. | backpage.bg (European domains) | |
| 31. | backpage.bg (NetNames) | |
| 32. | backpage.ca (NetNames) | |
| 33. | backpage.cl (NetNames) | |
| 34. | backpage.cn (European domains) | |
| 35. | backpage.cn (NetNames) | |
| 36. | backpage.co.id (NetNames) | |
| 37. | backpage.co.nl (European domains) | |
| 38. | backpage.co.nl (NetNames) | |
| 39. | backpage.co.nz (NetNames) | |
| 40. | backpage.co.uk (NetNames) | |
| 41. | backpage.co.ve (NetNames) | |
| 42. | backpage.co.za (NetNames) | |
| 43. | backpage.com (NetNames) | |
| 44. | backpage.com.ar (NetNames) | |
| 45. | backpage.com.au (NetNames) | |
| 46. | backpage.com.ph (NetNames) | |

| | | |
|---|---|---|
| 1 | 47. | backpage.cz (NetNames) |
| 2 | 48. | backpage.dk (NetNames) |
| 3 | 49. | backpage.ec (NetNames) |
| 4 | 50. | backpage.ee (European domains) |
| 5 | 51. | backpage.ee (NetNames) |
| 6 | 52. | backpage.es (NetNames) |
| 7 | 53. | backpage.fi (European domains) |
| 8 | 54. | backpage.fi (NetNames) |
| 9 | 55. | backpage.fr (European domains) |
| 10 | 56. | backpage.fr (NetNames) |
| 11 | 57. | backpage.gr (European domains) |
| 12 | 58. | backpage.gr (NetNames) |
| 13 | 59. | backpage.hk (European domains) |
| 14 | 60. | backpage.hk (NetNames) |
| 15 | 61. | backpage.hu (European domains) |
| 16 | 62. | backpage.hu (NetNames) |
| 17 | 63. | backpage.ie (NetNames) |
| 18 | 64. | backpage.in (NetNames) |
| 19 | 65. | backpage.it (NetNames) |
| 20 | 66. | backpage.jp (NetNames) |
| 21 | 67. | backpage.kr (NetNames) |
| 22 | 68. | backpage.lt (NetNames) |
| 23 | 69. | backpage.lv (European domains) |
| 24 | 70. | backpage.lv (NetNames) |
| 25 | 71. | backpage.me (NetNames) |
| 26 | 72. | backpage.mx (NetNames) |
| 27 | 73. | backpage.my (NetNames) |
| 28 | 74. | backpage.net (NetNames) |

75. backpage.nl (NetNames)

76. backpage.no (European domains)

77. backpage.no (NetNames)

78. backpage.nz (NetNames)

79. backpage.pe (NetNames)

80. backpage.ph (NetNames)

81. backpage.pk (NetNames)

82. backpage.pl (NetNames)

83. backpage.porn (NetNames)

84. backpage.pt (NetNames)

85. backpage.ro (European domains)

86. backpage.ro (NetNames)

87. backpage.se (NetNames)

88. backpage.sex (NetNames)

89. backpage.sg (NetNames)

90. backpage.si (European domains)

91. backpage.si (NetNames)

92. backpage.sk (European domains)

93. backpage.sk (NetNames)

94. backpage.sucks (NetNames)

95. backpage.tw (NetNames)

96. backpage.uk (NetNames)

97. backpage.uk.com (NetNames)

98. backpage.us (NetNames)

99. backpage.vn (NetNames)

100. backpage.xxx (NetNames)

101. backpage.xyz (NetNames)

102. backpagecompimp.com (NetNames)

103. backpagecompimps.com (NetNames)

104. backpagepimp.com (NetNames)

105. backpagepimps.com (NetNames)

106. backpagg.com (NetNames)

107. backpagm.com (NetNames)

108. backpagu.com (NetNames)

109. backpaoe.com (NetNames)

110. backpawe.com (NetNames)

111. backqage.com (NetNames)

112. backrage.com (NetNames)

113. backxage.com (NetNames)

114. bakkpage.com (NetNames)

115. bcklistings.com (NetNames)

116. bestofbackpage.com (NetNames)

117. bestofbigcity.com (NetNames)

118. bickpage.com (NetNames)

119. bigcity.com (NetNames)

120. bpclassified.com (NetNames)

121. bpclassifieds.com (NetNames)

122. carlferrer.com (NetNames)

123. clasificadosymas.com (NetNames)

124. clasificadosymas.net (NetNames)

125. clasificadosymas.org (NetNames)

126. classifiedsolutions.co.uk (NetNames)

127. classifiedsolutions.net (NetNames)

128. classyadultads.com (Versio)

129. columbusbackpage.com (NetNames)

130. connecticutbackpage.com (NetNames)

131. cracker.co.id (NetNames)
132. cracker.com (NetNames)
133. cracker.com.au (NetNames)
134. cracker.id (NetNames)
135. cracker.net.au (NetNames)
136. crackers.com.au (NetNames)
137. crackers.net.au (NetNames)
138. ctbackpage.com (NetNames)
139. dallasbackpage.com (NetNames)
140. denverbackpage.com (NetNames)
141. easypost123.com (Versio)
142. easyposts123.com (Versio)
143. emais.com.pt (NetNames)
144. evilempire.com (NetNames)
145. ezpost123.com (Versio)
146. fackpage.com (NetNames)
147. fastadboard.com (Versio)
148. guliettagroup.nl (Versio)
149. htpp.org (NetNames)
150. ichold.com (NetNames)
151. internetspeechfoundation.com (nameisp)
152. internetspeechfoundation.org (nameisp)
153. loads2drive.com (NetNames)
154. loadstodrive.com (NetNames)
155. loadtodrive.com (NetNames)
156. losangelesbackpage.com (NetNames)
157. mediafilecloud.com (NetNames)
158. miamibackpage.com (NetNames)

159.   minneapolisbackpage.com (NetNames)

160.   mobileposting.com (Versio)

161.   mobilepostings.com (Versio)

162.   mobilepostlist.com (Versio)

163.   mobilposting.com (Versio)

164.   naked.city (NetNames)

165.   nakedcity.com (NetNames)

166.   newyorkbackpage.com (NetNames)

167.   paidbyhour.com (NetNames)

168.   petseekr.com (NetNames)

169.   petsfindr.com (NetNames)

170.   phoenixbackpage.com (NetNames)

171.   posteasy123.com (Versio)

172.   postfaster.com (NetNames)

173.   postfastly.com (NetNames)

174.   postfastr.com (NetNames)

175.   postonlinewith.com (Versio)

176.   postonlinewith.me (Versio)

177.   postseasy123.com (Versio)

178.   postsol.com (GoDaddy)

179.   postszone24.com (Versio)

180.   postzone24.com (Versio)

181.   postzones24.com (Versio)

182.   rentseekr.com (NetNames)

183.   results911.com (NetNames)

184.   sandiegobackpage.com (NetNames)

185.   sanfranciscobackpage.com (NetNames)

186.   seattlebackpage.com (NetNames)

187. sellyostuffonline.com (Versio)

188. sfbackpage.com (NetNames)

189. simplepost24.com (Versio)

190. simpleposts24.com (Versio)

191. svc.ws (NetNames)

192. truckrjobs.com (NetNames)

193. ugctechgroup.com (NetNames)

194. universads.nl (Versio)

195. villagevoicepimps.com (GoDaddy)

196. websitetechnologies.co.uk (NetNames)

197. websitetechnologies.com (NetNames)

198. websitetechnologies.net (NetNames)

199. websitetechnologies.nl (NetNames)

200. websitetechnologies.org (NetNames)

201. weprocessmoney.com (GoDaddy)

202. wst.ws (NetNames)

203. xn--yms-fla.com (NetNames)

204. ymas.ar.com (European domains)

205. ymas.br.com (European domains)

206. ymas.br.com (NetNames)

207. ymas.bz (European domains)

208. ymas.bz (NetNames)

209. ymas.cl (European domains)

210. ymas.cl (NetNames)

211. ymas.co.bz (European domains)

212. ymas.co.bz (NetNames)

213. ymas.co.cr (European domains)

214. ymas.co.cr (NetNames)

- 14 -

| | | |
|---|---|---|
| 1 | 215. | ymas.co.ni (European domains) |
| 2 | 216. | ymas.co.ni (NetNames) |
| 3 | 217. | ymas.co.ve (European domains) |
| 4 | 218. | ymas.co.ve (NetNames) |
| 5 | 219. | ymas.com (NetNames) |
| 6 | 220. | ymas.com.br (European domains) |
| 7 | 221. | ymas.com.br (NetNames) |
| 8 | 222. | ymas.com.bz (European domains) |
| 9 | 223. | ymas.com.bz (NetNames) |
| 10 | 224. | ymas.com.co (European domains) |
| 11 | 225. | ymas.com.co (NetNames) |
| 12 | 226. | ymas.com.do (European domains) |
| 13 | 227. | ymas.com.do (NetNames) |
| 14 | 228. | ymas.com.ec (European domains) |
| 15 | 229. | ymas.com.ec (NetNames) |
| 16 | 230. | ymas.com.es (European domains) |
| 17 | 231. | ymas.com.es (NetNames) |
| 18 | 232. | ymas.com.gt (European domains) |
| 19 | 233. | ymas.com.gt (NetNames) |
| 20 | 234. | ymas.com.hn (European domains) |
| 21 | 235. | ymas.com.hn (NetNames) |
| 22 | 236. | ymas.com.mx  (NetNames) |
| 23 | 237. | ymas.com.ni (European domains) |
| 24 | 238. | ymas.com.ni (NetNames) |
| 25 | 239. | ymas.com.pe (European domains) |
| 26 | 240. | ymas.com.pe (NetNames) |
| 27 | 241. | ymas.com.pr (European domains) |
| 28 | 242. | ymas.com.pr (NetNames) |

243. ymas.com.pt  (NetNames)

244. ymas.com.uy (European domains)

245. ymas.com.uy (NetNames)

246. ymas.com.ve (European domains)

247. ymas.com.ve (NetNames)

248. ymas.cr (European domains)

249. ymas.cr (NetNames)

250. ymas.do (European domains)

251. ymas.do (NetNames)

252. ymas.ec (European domains)

253. ymas.ec (NetNames)

254. ymas.es (European domains)

255. ymas.es (NetNames)

256. ymas.org (NetNames)

257. ymas.pe (European domains)

258. ymas.pe (NetNames)

259. ymas.pt (NetNames)

260. ymas.us (European domains)

261. ymas.us (NetNames)

262. ymas.uy (European domains)

263. ymas.uy (NetNames)

264. ymas.uy.com (European domains)

D. Security Deposits And Retainers/Deposits For Future Services

1. Deposit/retainer to DesertNet.  (The estimated value is $600,000.)

2. Deposit/retainer to SalesForce Data Storage & Services.  (The estimated value is $113,458.)

3. Deposit/retainer to Sophos EndPoint.  (The estimated value is $14,225.)

4. Deposit/retainer to SHI VMWare.  (The estimated value is $180,417.)

5.      Deposit/retainer to SalesForce Data Storage & Services. (The estimated value is $113,458.)

6.      Deposit/retainer to SHI. (The estimated value is $57,971.)

7.      Prepaid rent to Spaces. (The estimated value is $97,607.)

8.      Security deposit to Spaces. (The estimated value is $40,945.)

9.      Deposit/retainer to Switch Data Center. (The estimated value is $85,933.05.)

10.      Any and all bank funds, securities, or other assets remaining in IOLTA account number x6180 at First Republic Bank at the conclusion of litigation in this case (with the understanding that the funds currently on deposit in that account may be withdrawn by counsel solely for the provision of legal services).

11.      Any and all bank funds, securities, or other assets remaining in IOLTA account number x6255 at First Republic Bank at the conclusion of litigation in this case (with the understanding that the funds currently on deposit in that account may be withdrawn by counsel solely for the provision of legal services).

12.      Any and all bank funds, securities, or other assets remaining in IOLTA account number x5978 at First Republic Bank at the conclusion of litigation in this case (with the understanding that the funds currently on deposit in that account may be withdrawn by counsel solely for the provision of legal services).

13.      Any and all bank funds, securities, or other assets previously deposited into IOLTA account number x7091 at Wells Fargo to fund the criminal defense of Backpage.com, LLC, Website Technologies, LLC, Posting Solutions LLC, Amstel River Holdings LLC, Ad Tech BV, and/or UGC Tech Group BV that are remaining in the account at the conclusion of litigation in this case (with the understanding that the funds currently on deposit in that

1   account may be withdrawn by counsel solely for the provision of legal

2   services).

3  E.   <u>Reserves and Accounts Receivable—Foreign</u>

4      1.   Any and all bank funds, securities, or other assets on deposit at Bank Frick

5           & Co. Ag, Landstrasse 14, 9496 Balzers, Liechtenstein for the following

6           companies: (a) Ad Tech BV, dba Cracker.com (estimated to be at least

7           $1,439,203.51).

8      2.   Any and all bank funds, securities, or other assets on deposit at Borgun,

9           Armuli 30, 108 Reykjavik, Iceland for the following companies: (a)

10          Protecctio SRO, dba AdPost24.com (estimated to be at least $157,899.51);

11          and (b) Goldleaf SRO, dba Fastadboard.com (estimated to be at least

12          $341,768.81).

13     3.   Any and all bank funds, securities, or other assets on deposit at Cpc1

14          (Cashflows), Capital Park, Cambridge, CB21 5XE, United Kingdom for the

15          following companies: (a) Protecctio SRO, dba AdPost24.com (estimated to

16          be at least $94,656.37); (b) Gulietta Group BV, dba Mobileposting.com

17          (estimated to be at least $15,043.12); (c) Universads BV, dba

18          Easypost123.com (estimated to be at least $332,595.37); (d) Procop

19          Services BV, dba Postzone24.Com (estimated to be at least $205,508.33);

20          and (e) Procop Services BV, dba Postix.com (estimated to be at least

21          $225,454.43).

22     4.   Any and all bank funds, securities, or other assets on deposit at Cpc1

23          (Cashflows), Capital Park, Cambridge, CB21 5XE, United Kingdom for

24          Amex for the following companies: (a) Gulietta Group BV, dba

25          mobileposting.com (estimated to be at least $1,042,803.72); (b) Universads

26          BV, dba easypost123.com (estimated to be at least $221,211.47); (c)

27          Procop Services BV, dba Postzone24.com (estimated to be at least

28

$6,897.66); and (d) Procop Services BV, dba Postix.Com (estimated to be at least $28,738.20).

5.    Any and all bank funds, securities, or other assets on deposit at E-Comprocessing, 14 Tonbridge Chambers Pembury Road Tonbridge Kent TN9 2HZ United Kingdom for the following companies: (a) Gulietta Group BV, dba Mobileposting.com (estimated to be at least $661,276.95); (b) Universads BV, dba easypost123.com (estimated to be at least $952,506.56); (c) Protecctio SRO, dba adpost24.com (estimated to be at least $1,383,949.27); (d) Goldleaf SRO, dba fastadboard.com (estimated to be at least $757,816.01); (e) Varicok SRO, dba postfree.com (estimated to be at least $278,652.63); (f) Procop Services BV, dba postzone24.com (estimated to be at least $142,114.96); and (g) Olist OU, dba jeboom.com (estimated to be at least $1,238,115.92).

6.    Any and all bank funds, securities, or other assets on deposit at Emerchantpay LTD, 29 Howard Street, North Shields, Tyne And Wear, NE30 1AR, United Kingdom for the Neosurf card for the following companies: (a) Protecctio SRO, dba adpost24.com (estimated to be at least $136,792.29); (b) Goldleaf SRO, dba fastadboard.com (estimated to be at least $248.27); (c) Varicok SRO, dba postfree.com (estimated to be at least $86,076.89); and (d) Olist OU, dba jeboom.com (estimated to be at least $509.21).

7.    Any and all bank funds, securities, or other assets on deposit at Kalixa, The Corn Mill, 1 Roydon Road, Stanstead Abbotts, Ware, Hertfordshire; SG12 BXL, United Kingdom for the following companies: (a) Gulietta Group BV, dba Mobileposting.com (estimated to be at least $342,522.89); (b) Universads BV, dba Easypost123.com (estimated to be at least $546,714.23); (c) Procop Services BV, dba Postzone24.com (estimated to

be at least $94,134.65); and (d) Procop Services BV, dba Postix.com (estimated to be at least $141,617.92).

8. Any and all bank funds, securities, or other assets on deposit at Korta Bank Rafstöðvarvegi 7 | 110 Reykjavík, Iceland for the following companies: (a) Protecctio SRO, dba Adpost24.com (estimated to be at least $1,783,607.59); (b) Universads BV, dba Easypost123.com (estimated to be at least $178,011.10); (c) Goldleaf SRO, dba FAstADBoard.com (estimated to be at least $2,128,385.54); (d) Varicok SRO, dba Postfree.com (estimated to be at least $448,593.62); (e) Procop Services BV, dba Postix.com (estimated to be at least $133,611.63); (f) Olist OU, dba Jeboom.com (estimated to be at least $675,552.56).

9. Any and all bank funds, securities, or other assets on deposit at Kvika Bank, Borgartún 25, 6th Floor, 105 Reykjavík, Iceland for the following companies: (a) Gulietta Group BV, dba mobileposting.com (estimated to be at least $116,880.00).

10. Any and all bank funds, securities, or other assets on deposit at Masa Pay, 19f Hangke Building No.92 Yuan Shen Rd. Pudong, Shanghai 200120 China for the following companies: (a) Goldleaf SRO, dba fastadboard.com (estimated to be at least $87,799.92).

11. Any and all bank funds, securities, or other assets on deposit at Poli Payments Pty Limited, Level 8. 222 Exhibition Street, Melbourne, Victoria, 3000 for the following companies: (a) Ad Tech BV, dba Cracker.com (estimated to be at least $471,960.05).

12. Any and all bank funds, securities, or other assets on deposit at Transact Europe, 52-54 Dimitar Hadzhikotsev Str., 1421 Sofia, Bulgaria for the following companies: (a) Protecctio SRO, dba adpost24.com (estimated to be at least $720,254.57); (b) Goldleaf SRO, dba fastadboard.com

(estimated to be at least $1,375,661.62); and (c) Procop Services BV, dba postix.com (estimated to be at least $130,962.90).

13. Any and all bank funds, securities, or other assets on deposit at Worldline SA/NV, Haachtsesteenweg 1442, 1130 Brussels, Belgium for the following companies: (a) Protecctio SRO, dba adpost24.com (estimated to be at least $767,421.64); and (b) Procop Services BV, dba postix.com (estimated to be at least $121,701.67).

14. Any and all bank funds, securities, or other assets on deposit at DCR Strategies INC., 2680 Skymark Ave. Suite 420 Mississauga, ON, L4W 5L6 for the following companies: (a) Posting Solutions LLC, dba Postfastr.com (estimated to be at least $503,425.14).

15. Any and all bank funds, securities, or other assets on deposit at Ecorepay, aka BillPro Pty Ltd, Operations Level 5 / 12 Commercial Road, Newstead, Queensland 4006 Australia for the following companies: (a) Classified Strategies Cooperatief U.A., dba Backpage.com and cracker.com (estimated to be at least $846,414.00).

16. Any and all bank funds, securities, or other assets on deposit at Ipaydna International Limited, Level 12, 1 Peking Road, Tsim Sha Tsui, Kowloon, Hong Kong or Ipaydna (EU) Limited, Suite B, 29 Harley Street, London, W1G9QR, United Kingdom, for the following companies: (a) Classified Solutions Ltd., dba Backpage.com (estimated to be at least $809,492.29).

F. Reserves and Accounts Receivable—Domestic

1. Any and all bank funds, securities, or other assets on deposit at Paymitco, 4700 Millenia Blvd. Suite 175, Orlando, Florida 32839 for the following companies: (a) Posting Solutions LLC, dba backpage.com (estimated to be at least $647,410.05).

2. Any and all bank funds, securities, or other assets on deposit at Romit, 25 Taylor St., San Francisco, CA 94123 for the following companies: (a)

Website Technologies LLC, dba backpage.com (estimated to be at least $600,777.43).

3. Any and all bank funds, securities, or other assets on deposit at Cardquiry With Posting Solutions LLC, 2209 E. Lexington Ave, Fresno, CA 93720 for the following companies: (a) Posting Solutions LLC, dba backpage.com (estimated to be at least $275,381.95).

4. Any and all bank funds, securities, or other assets on deposit at Business & Corporate Development, LLC, A South Carolina Limited Liability ("Bcd") for the following companies: (a) Protecctio SRO, dba adpost24.com (estimated to be at least $396.59); (b) Gulietta Group BV, dba mobileposting.com (estimated to be at least $33,416.02); (c) Universads BV, dba easypost123.com (estimated to be at least $15,942.60); (d) Goldleaf SRO, dba fastadboard.com (estimated to be at least $11,793.50); (e) Varicok SRO, dba postfree.com (estimated to be at least $5,191.95); (f) Procop Services BV, dba postix.com (estimated to be at least $1,379.57); (g) Procop Services BV, dba postzone24.com (estimated to be at least $1,084.12); (h) Olist OU, dba jeboom.com (estimated to be at least $5,637.20); and (i) Posting Solutions LLC, dba backpage.com (estimated to be at least $328,667.76).

G. Trademarks And Other Intellectual Property

1. Backpage (United States, Australia, Canada, Europe).

2. Cracker (Australia).

3. All social media accounts affiliated with Backpage.com (e.g., Twitter account)

**IT IS FURTHER ORDERED** as follows:

A. Upon the entry of this Order, and pursuant to 21 U.S.C. § 853 and Fed. R. Crim. P. 32.2(b)(3), the United States Attorney General (or his designee, the United

States Marshals Service ("USMS")) shall seize the Forfeited Property, subject to the following limitations:

(1)     With respect to accounts 10-13 listed in Section D, the accounts shall not be seized at this time.  Rather, the funds currently on deposit in accounts 10-13 shall remain under the control of counsel and may be withdrawn by counsel in such amounts as may be necessary to defray the cost of any legal services provided in connection with the instant case or any related civil or criminal proceeding.  At the conclusion of all litigation in connection with the instant case or any related civil or criminal proceeding, counsel shall submit an accounting of all withdrawals made from accounts 10-13 to the Attorney General (or his designee) and a schedule of the balances remaining in the respective accounts.  At that time, the United States or the Attorney General (or his designee) may move pursuant to Rule 32.2(e) to amend this Order to specify the amounts in each of the accounts that are subject to forfeiture.  At the end of litigation, instead of seizing the remaining balance in each of the respective accounts once the Order of Forfeiture is amended, the Attorney General (or his designee) shall direct counsel to transfer the remaining balance in each account to an account designated by the Attorney General (or his designee), which transfer will be made by certified check or wire transfer, at the sole election of the Attorney General (or his designee), at a time of the Attorney General's (or his designee's) choosing.

B.     Upon entry of this Order, the United States is authorized to conduct any discovery for the purpose of identifying, locating, or disposing of the Forfeited Property pursuant to this Order, 21 U.S.C. § 853(m), and Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure.  "Any discovery" shall include all methods of discovery permitted under the Federal Rules of Civil Procedure.

C.     The United States Attorney General (or his designee) shall commence any appropriate ancillary proceeding to comply with statutes governing third party rights, including giving notice of this and any other order affecting the Forfeited Property.  The following paragraphs shall apply to any ancillary proceeding conducted in this matter:

- 23 -

(1)     Pursuant to 21 U.S.C. § 853(n)(1) and Supplemental Rule G(4)(a)(iv)(C) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the government shall publish, for at least thirty (30) consecutive days on an official government website, notice of this Order and any other order affecting the Forfeited Property, and notice that any person, other than each defendant, having or claiming a legal interest in the property must file a petition with the Court within thirty (30) days of the publication of notice or receipt of actual notice, whichever is earlier. The United States shall also, to the extent practicable, provide written notice to any person known to have an alleged interest in the Forfeitable Property that any such person is required to file a petition within thirty (30) days of the giving of such direct notice.

(2)     Other than each defendant, any person asserting a legal interest in the Forfeited Property may, within thirty (30) days of the publication of notice or receipt of notice, whichever is earlier, petition the Court for a hearing without a jury to adjudicate the validity of his alleged interest in the property, and for an amendment of this order of forfeiture, pursuant to 21 U.S.C. § 853(n)(2).

(3)     Any petition filed by a third party asserting an interest in the Forfeited Property shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's purported right, title, or interest in such property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought. *See* 21 U.S.C. § 853(n)(3).

(4)     The United States shall have clear title to the Forfeited Property following the Court's disposition of all third-party interests or, if no petitions are filed, following the expiration of the period provided in 21 U.S.C. § 853(n)(2) for the filing of third party petitions.

D.     Pursuant to Fed. R. Crim. P. 32.2(b)(3) and the agreement of the government and each defendant, this Preliminary Order of Forfeiture shall be final as to each defendant upon entry and shall be made part of its sentence and included in his

judgment. Further, if no timely third party ancillary claims are filed after the government's giving notice as ordered herein, all right, title, and interest in the Forfeited Property shall vest in the government, which shall dispose of the property in accordance with law.

     E.     The Court shall retain jurisdiction to enforce this Order, and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

     Dated this 16th day of May, 2018.

_____
Honorable Diane J. Humetewa
United States District Judge

**EFiled:  Sep 14 2018 06:28PM EDT**
**Transaction ID 62455883**
**Case No. 2018-0606-SG**

# Exhibit I

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
Jane Doe No. 1, Jane Doe No. 2, and     )
Jane Doe No. 3                          )
            Plaintiffs,                 )
                                        )
v.                                      )      Civil Action No. 17-11069-LTS
                                        )
Backpage.com, LLC, Carl Ferrer,         )
Michael Lacey and James Larkin          )
            Defendants,                 )
_____)


ORDER ON MOTION TO DISMISS

January 16, 2018

SOROKIN, J.


        The Communications Decency Act of 1996 ("CDA"), 47 U.S.C., commands, "No

provider or user of an interactive computer service shall be treated as the publisher or speaker of

any information provided by another information content provider." id. at § 230(c)(1).

Defendants, invoking this immunity and Doe v. Backpage.com, LLC, 817 F.3d 12 (1st Cir.

2016), cert. denied, 137 S. Ct. 622 (2017), have sought dismissal of this action (Doc. No. 31).

Plaintiffs oppose, inter alia, contending that their complaint plausibly alleges that Defendants are

an "information content provider" as defined by the CDA and thus no immunity applies.  See 47

U.S.C. § 230(c)(1) (defining "information content provider" as "any person or entity that is

responsible, in whole or in part, for the creation or development of information provided through

the Internet."); see also FTC v. Accusearch, Inc., 570 F.3d 1187, 1197 (10th Cir. 2009) ("[A]n

interactive computer service that is also an 'information content provider' of certain content is

not immune from liability arising from publication of that content.").

1

Plaintiff Jane Doe. No. 3 alleges "on information and belief, Backpage . . . redrafted the advertisement [submitted to Backpage regarding Jane Doe No. 3] to suggest Jane Doe No. 3 was an adult." Doc. No. 1 at ¶ 78. The Complaint augments this redrafting allegation by Backpage with other allegations that assert that, as submitted to Backpage.com, the proposed ad of Jane Doe No. 3 described her as a minor. See id. Given the seriousness of the issues at stake for all parties and the express allegation that Defendants or Backpage added content not provided by the proposed advertisement (that Jane Doe No. 3 was an adult), tempered by the general nature of the redrafting allegation made, as it is, on information and belief,[1] the Court concludes Plaintiffs may take some tailored discovery to clarify the redrafting allegation. See Menard v. CSX Transp., Inc., 698 F.3d 40, 44-46 (1st Cir. 2012) (finding that, where allegations are based on "information and belief" and "modest discovery may provide the missing link," "the district court has discretion to allow limited discovery and, if justified, a final amendment of the complaint.").

The parties may take discovery focused on the changes, if any, made by Defendants or their agents in the course of posting advertisements describing or referring to Jane Doe No. 3. The parties shall complete this discovery within sixty days. Seven days thereafter, the parties shall submit a joint status report.

---

[1] "Upon information and belief" means "based on secondhand information that [the asserting party] believes to be true." Menard v. CSX Transp., Inc., 698 F.3d 40, 44 n.5 (1st Cir. 2012) (quoting Black's Law Dictionary 783 (7th ed. 1999)).

2

The proceedings are STAYED in all other respects, which stay will lift automatically upon the Court's ruling on the pending motion to dismiss (Doc. No. 31) after this discovery process.

SO ORDERED.

  /s/ Leo T. Sorokin

Leo T. Sorokin
United States District Judge

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

R.O., by and through her mother S.H., and K.M., by and through her mother L.M.,

    Respondents,

v.

MEDALIST HOLDINGS., INC.;
LEEWARD HOLDINGS, LLC;
CAMARILLO HOLDINGS, LLC;
JAMES LARKIN; MICHAEL LACEY,

    Petitioners,

DARTMOOR HOLDINGS, LLC; IC
HOLDINGS, LLC; BACKPAGE.COM,
LLC, UGC TECH GROUP C.V.;
WEBSITE TECHNOLOGIES, LLC;
ATLANTISCHE BEDRIJVEN C.V.;
AMSTEL RIVER HOLDINGS, LLC;
LUPINE HOLDINGS LLC; KICKAPOO
RIVER INVESTMENTS LLC; CF
HOLDINGS GP, LLC; CF
ACQUISITIONS, LLC; CARL
FERRER,

    Other Parties/
    Defendants Below,

No. 52264-1-II

17-2-04897-1

RULING GRANTING STAY

Petitioners (collectively, Medalist) are moving for discretionary review of the superior court's decisions to: (1) fully disqualify Medalist's counsel instead of allowing

52264-1-II

counsel to withdraw from representing other defendants while continuing to represent

Medalist; (2) impose discovery sanctions of $200,000 (plus fees); and (3) order counsel

to produce 1.2 million documents or pay additional sanctions. Medalist here moves to

stay these portions of the trial court's June 28, 2018 order and stay trial court proceedings

(trial is set for October 16th) pending resolution of its motion for discretionary review, set

for argument on September 26, 2018.

Medalist contends that the issues it raises are debatable and a stay should issue.

With respect to the counsel issue, it contends that the superior court provided insufficient

notice that it intended to completely disqualify counsel and disregarded joint

representation agreements.    It adds that the superior court acknowledged that

disqualification was an "appealable issue." Mot. for Stay at 4.  Medalist further contends

that the disputed documents are not clearly responsive to earlier discovery requests and

have never been reviewed for responsiveness or privilege.  Finally, it adds that the

$200,000 discovery sanction award was unwarranted because the superior court should

not have imputed statements made by another defendant, Carl Ferrer, to Medalist.

Medalist believes it will be harmed if this court does not impose a stay because it cannot

pay sanctions or hire new counsel because of "extensive government seizures of funds."

Mot. for Stay at 7.

Respondents, R.O. and K.M., oppose the stay motion.  They assert that discovery

shows that Medalist "owned and operated backpage.com and helped facilitate illegal

prostitution on the website from 2004 onward." Resp. to Mot. for Stay at 4-5.  They argue

that the superior court acted correctly to disqualify counsel from representing all

defendants because there was a material change in circumstances and irreconcilable

52264-1-II

conflicts would likely arise.   They further contend that Medalist had notice that

disqualification was possible and had an opportunity to respond.   They detail what they

assert is a long history of discovery delay by the defendants.  Addressing the 1.2 million

documents, they note that the superior court, in January 2018, approved of the search

terms used to compile these documents as "reasonably calculated to lead to the discovery

of admissible evidence."   Resp. to Mot. for Stay at 18.   They add that otherwise-

disqualified counsel remains retained for this discovery matter, and that the production

requires a privilege log.

     With respect to harm to them if a stay issues, R.O. and K.M. note that this case

has been pending for nearly two years, and twelve months have passed since they issued

discovery requests.   They emphasize that they are survivors of sex trafficking and "have

a compelling interest in moving on with their lives."   Resp. to Mot. for Stay at 19.   They

add that nothing in the record supports Medalist's claim that it cannot afford to pay

sanctions or hire new counsel.

     Upon review of the motion to stay, the response, the reply, the motion for

discretionary review, and the documents cited by the parties contained in the appendix to

the motion for discretionary review, this court determines to grant Medalist's motion to

stay.

     RAP 8.3 authorizes the court to "issue orders, before or after acceptance of review

. . . to insure effective and equitable review, including authority to grant injunctive or other

relief to a party."   In evaluating whether to stay enforcement of a superior court decision,

this court considers whether the issue presented by the appeal is debatable, and whether

a stay is necessary to preserve for the movant the fruits of a successful appeal,

3

52264-1-II

considering the equities of the situation. *Purser v. Rahm,* 104 Wn.2d 159, 177, 702 P.2d 1196 (1985), *cert. dismissed,* 478 U.S. 1029 (1986); *see generally Confederated Tribes of Chehalis Reservation v. Johnson,* 135 Wn.2d 734, 759, 958 P.2d 260 (1998).

Although the party seeking discretionary review faces an uphill battle under RAP 2.3(b), the court concludes the disqualification issue raised by Medalist is debatable given the unique circumstances surrounding the entry of the disqualification order. In addition, the harm to Medalist from having to proceed to trial just months after trial counsel's disqualification, weighs in favor of a stay of trial even though R.O. and J.M. have a significant interest in seeing their claims litigated in a timely and efficient matter.

Looking to the discovery sanctions, this court accepts that Medalist's argument that the sanctions are impermissibly based on hearsay raises a debatable issue. With respect to the trial court's order on document production, the issues Medalist raises regarding privilege and production of documents to third parties, as well as disqualified counsel's responsibility to produce documents, satisfy the debatability standard. Because a trial stay is being entered and because R.O. and J.M.'s response to the stay motion does not set out discovery-specific harms to them other than those inherent in delaying trial court proceedings, this court also stays imposition of the $200,000 in sanctions, and the document production and additional sanctions set out in the superior court's June 28, 2018 order.[1]

---

[1] This court notes that the superior court expressed serious concerns about document retention in its order but recognizes that in Medalist's motion for discretionary review, disqualified counsel assures this court that it has committed to "preserve all documents." Mot. for Disc. Rev. at 18.

52264-1-II

Finally, the parties dispute whether Medalist should be required to post a bond if its stay request is granted. R.O. and K.M. request a bond of $267,000, plus interest. Medalist argues that RAP 8.1 does not require a bond to stay trial court proceedings and adds that it cannot afford to post bond. But RAP 8.1 and RAP 8.3 set out that a bond is "ordinarily" required. RAP 8.1(b)(3); RAP 8.3. Medalist's arguments are insufficient to set aside the bond presumption contained in the RAPs, even in light of the asset forfeitures. This court, therefore, grants R.O. and J.M.'s request that Medalist furnish a supersedeas bond of $267,843.12 plus interest likely to accrue during the pendency of its motion for discretionary review. RAP 8.1(c)(1); RAP 8.1(d)(1); RAP 8.3. Accordingly, it is hereby

ORDERED that Medalist's motion for a stay is granted upon the posting of a bond with the Pierce County Superior Court Clerk for $267,843.12 plus the interest likely to accrue during the pendency of Medalist's motion for discretionary review.

DATED this ____5____ day of ____September____, 2018.

_____
Aurora R. Bearse
Court Commissioner

cc:   Eric Stahl
      Michael T. Pfau
      Erik L. Bauer
      Jason P. Amala
      Vincent T. Nappo
      Darrell L. Cochran
      Ralph H. Palumbo

5

**EFiled:  Sep 14 2018 06:28PM EDT**
**Transaction ID 62455883**
**Case No. 2018-0606-SG**

Exhibit J



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main:   (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:  (602) 514-7693 |
| Phoenix, AZ  85004-4408 | Direct Fax:  (602) 514-7450 |

August 28, 2018

Carl Ferrer
c/o Nanci Clarence
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, CA 94109

c/o David Botsford
BOTSFORD & ROARK
1307 West Avenue
Austin, TX 78701

<u>VIA EMAIL</u>

  Re: *Backpage Forfeiture Matters*

Dear Mr. Ferrer:

  As you know, paragraph 3(b) of your plea agreement contains a provision requiring you to "take all steps within [your] power to forfeit to the United States all corporate assets and other property owned or controlled by Website Technologies, LLC ('Website Technologies'), which owns and operates the Backpage website, as well as all corporate assets and other property owned or controlled by Backpage.com, LLC, Posting Solutions LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC Tech Group CV.  Such steps shall include, but not be limited to, agreeing to the forfeiture of the domain names, servers, intellectual property, trademarks, trade secrets, bank accounts, cryptocurrency, and other financial instruments owned or controlled by such entities."

  Pursuant to this provision, on or around May 8, 2018, you consented (in your capacity as owner of the Backpage entities) to the entry of a preliminary order of forfeiture that identified an array of bank accounts and other assets owned or otherwise controlled by the Backpage entities.  Among other things, this order specified that any funds remaining in the IOLTA accounts of your attorneys or the Backpage entities' attorneys at the conclusion of the proceedings in which you are cooperating—proceedings that are currently ongoing—are subject to forfeiture.  On May 16, 2018, the district court entered the order.  As a result, the

August 28, 2018
Page 2 of 2

Backpage entities no longer possess any legal interest in the assets specified therein. *See* Fed. R. Crim. P. 32.2(4)(A) (upon entry, "the preliminary forfeiture order becomes final as to the defendant").

The United States is committed to utilizing the assets that are seized and forfeited in this case to provide restitution to victims. The Supreme Court has recognized that the government has a strong and legitimate interest in providing for victims in this fashion. *See, e.g., Kaley v. United States*, 571 U.S. 320, 323 (2014) ("Forfeitures help to ensure that crime does not pay . . . . The Government also uses forfeited property to recompense victims of crime, improve conditions in crime-damaged communities, and support law enforcement activities like police training. Accordingly, 'there is a strong governmental interest in obtaining full recovery of all forfeitable assets.'") (citation omitted). *See also Luis v. United States*, 136 S.Ct. 1083, 1104-05 (2016) ("In light of the importance of separating criminals from their ill-gotten gains and providing restitution to victims of crime, the Court [has] found 'a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense.'") (citation omitted).

For these reasons, we urge you to continue your efforts to ensure that all of the Backpage entities' assets remain available for forfeiture and victim-restitution purposes. As you know, our investigation into Backpage is ongoing and the terms of your plea agreement have yet to be accepted by the court. Please continue to abide by your obligation not to discuss the substance of your assistance to any third party. Such disclosure would compromise the investigation into additional targets and the seizure of tainted assets.

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

EFiled: Sep 18 2018 02:33PM EDT
Transaction ID 62464668
Case No. 2018-0606-SG

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CAMARILLO HOLDINGS, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0606-SG |
| | ) | |
| AMSTEL RIVER HOLDINGS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR <u>EXPEDITED PROCEEDINGS</u>

SMITH, KATZENSTEIN & JENKINS LLP
Kathleen M. Miller (No. 2898)
Robert K. Beste (No. 3931)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
kmiller@skjlaw.com
rkb@skjlaw.com

September 18, 2018

*Attorneys for Plaintiffs*

## Table of Contents

**Page No.**

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................3

I.   Defendants have made no showing to overcome the strong
      public policy for granting expedited treatment of advancement claims...........3

    A. Advancement proceedings are summary and entitled to expedited
       treatment........................................................................................................3

    B. There has been no delay and Defendants have not alleged,
       much less shown, any prejudice..................................................................5

    C. Defendants' claims that expedited proceedings are unnecessary
       are meritless on their face ...........................................................................9

II.  The remainder of Defendants' conclusory arguments do not support denial
      of the Motion to Expedite ..............................................................................10

CONCLUSION ..................................................................................................13

# Table of Authorities

**Cases**                                                                   **Page No.**

*Bergonzi v. Rite Aid Corp.*,
   2003 WL 22407303 (Del. Ch. Oct. 20, 2003) .......................................................3

*CNL-AB LLC v. Eastern Prop. Fund I SPE (MS REF) LLC*,
   2011 WL 353529 (Del. Ch. Jan. 28, 2011).............................................................5

*Fuisz v. Biolval Techs., Inc.*,
   2000 WL 1277369 (Del. Ch. Sept. 6, 2000) ..........................................................3

*In re Lipson v. Supercuts, Inc.*,
   1996 WL 560191 (Del. Ch. Sept. 10, 1996)...........................................................4

*Tafeen v. Homestore, Inc.*,
   2005 WL 1314782 (Del. Ch. May 26, 2005) *aff'd,* 886 A.2d 502 (Del. 2005)......4

*Trascent Mgt. Consulting, LLC v. Bouri*,
   152 A.3d 108 (Del. 2016) ............................................................................. 12, 13

## Other Authorities

David A. Drexler, Lewis A. Black, Jr. & A. Gilchrist Sparks, III,
   *Delaware Corporation Law and Practice*, (2018) .................................................3

Donald J. Wolfe, Jr. & Michael A. Pittinger,
   *Corporate and Commercial Practice in the Delaware Court of Chancery,*
   (2017) .....................................................................................................................3

# INTRODUCTION

Defendants Carl Ferrer and Backpage.com LLC[1] do not contest that actions for advancement are summary proceedings given expedited treatment or that the documents upon which Plaintiffs rely grant them advancement rights.  Despite these tacit admissions, Defendants hope to overcome the strong public policy in Delaware to expedite advancement claims by arguing that the underlying actions present "unique circumstances" arising from underlying criminal proceedings.  Defendants' Opposition to Plaintiffs' Motion for Expedited Proceedings ("AB") (ID_____) at 1. These alleged unique circumstances are anything but unique.[2]  Indeed, this Court is often presented with cases for advancement relating to underlying criminal matters. Other than Defendants' say-so, this case is no different than other advancement cases with underlying criminal proceedings.   Indeed, Defendants cite no authority otherwise.

Defendants' only attempt to directly address Plaintiffs' right to expedition in

_____

[1] The complaint names 21 defendants.  It appears that counsel is representing only these two defendants.  The remainder of the defendants have not appeared through counsel and have provided no opposition to the Motion to Expedite.

[2] What is unique is that Defendants base their opposition, not on their own statements or positions, but on summaries of third-parties' hearsay allegations. AB at fn. 1.  It is also unique that Defendants appear to take the position that they have no interest in the retainers at issue here. AB at 2 (the "Defendants' asset and retainers are forfeited *to the United States…*").  If Defendants have no interest in the retainers, then how do they have standing to object here?  Yet, they did object to the Motion to Expedite.

1

this summary proceeding is to rely on one Delaware case, not involving advancement, for the proposition that Plaintiffs' motion is barred by laches. As discussed more fully below, there has been no unreasonable delay and no showing of prejudice and, therefore, Defendants' arguments can be dispensed with quickly.

Defendants also make several conclusory statements to assert that this action is a collateral attack on prior judgments or is barred by a federal statute. AB 14-16. None of these assertions is accurate, nor do they weigh against granting the Motion to Expedite. Defendants can raise their arguments when the merits of the claims are presented to the Court. There is no reason or basis to delay the determination of Plaintiffs' rights.

Finally, Defendants argue that the Motion to Expedite should be denied so that they may file a motion to stay this proceeding. AB 17-18. As with their other arguments, Defendants provide no authority or basis to deny the Motion to Expedite on this ground.

Plaintiffs have important advancement rights which are critical to their being able to have counsel of their choosing defend them in the on-going pending civil and criminal matters. Defendants advanced defense costs for Plaintiffs for several years without dispute. Compl. ¶ 11. They now seek to block Plaintiffs' access to the retainers posted to assure advancement "as part of their agreement to cooperate in federal and state criminal cases" (AB at 11)—in other words, at the request of

Plaintiffs' adversaries in the pending criminal litigation.  Defendants have provided

no basis to delay the determination of Plaintiffs' rights and accordingly, the Motion

to Expedite should be granted.

## ARGUMENT

### I.    Defendants have made no showing to overcome the strong public policy for granting expedited treatment of advancement claims

#### A.    Advancement proceedings are summary and entitled to expedited treatment

This Court repeatedly has held that advancement plaintiffs should be afforded

prompt consideration of their advancement claims and granted motions to expedite.

*see, e.g.*, *Bergonzi v. Rite Aid Corp.*, 2003 WL 22407303 at *4 (Del. Ch. Oct. 20,

2003) ("The adoption of section 145(k) 'reflects a policy determination by the

General Assembly that the Court of Chancery should be receptive to and accord

expedited treatment to claims for advancement of expenses raised by putative

corporate indemnities'")[3] (quoting *Fuisz v. Biolval Techs., Inc.*, 2000 WL 1277369

(Del. Ch. Sept. 6, 2000); 1 David A. Drexler, Lewis A. Black, Jr. & A. Gilchrist

Sparks, III, *Delaware Corporation Law and Practice*, § 9.02[i], at 9-41 (2018)

_____

[3] Defendants do not dispute that the same policy applies in the limited liability company context. *See also* Donald J. Wolfe, Jr. & Michael A. Pittinger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 8.02[k] (2017) ("Delaware courts apply many corporate indemnification and advancement principles by analogy in the alternative entity setting…").

("[T]he strong public policy for affording advancement proceedings summary treatment precludes" consideration of other matters such as indemnification).

Indeed, for an advancement right to have meaning, it must be decided before the conclusion of the underlying litigation or investigation. *See Tafeen v. Homestore, Inc.*, 2005 WL 1314782, at *3 (Del. Ch. May 26, 2005) *aff'd,* 886 A.2d 502 (Del. 2005) (finding "to be of any value to the executive or director, advancement must be made promptly, otherwise its benefit is forever lost because the failure to advance fees affects the counsel the director may choose and litigation strategy that the executive or director will be able to afford."); *In re Lipson v. Supercuts, Inc.*, 1996 WL 560191, at *2 (Del. Ch. Sept. 10, 1996) ("By its very nature, a proceeding of this kind must be summary in character, because if advance indemnification is to have any utility or meaning, a claimant's entitlement to it must be decided relatively promptly.").  If a claim for advancement is delayed, it could eviscerate the very right; that is, the right to receive payment of the litigation expenses during the litigation. *See*, *Tafeen*, 2005 WL 1314782 at *2 (finding "it is clear to the Court that [plaintiff] would suffer severe and irreparable harm as a result of the stay [of the advancement proceeding] because it would prevent [plaintiff] from adequately defending himself in the numerous ongoing litigations in which Tafeen is a defendant.")

Defendants do not dispute this strong public policy or provide any basis upon which that policy would not apply here.

**B.      There has been no delay and Defendants have not alleged, much less shown, any prejudice**

The only Delaware case Defendants cite in their entire opposition does not help them.  Defendants rely on *CNL-AB LLC v. Eastern Prop. Fund I SPE (MS REF) LLC*, 2011 WL 353529 (Del. Ch. Jan. 28, 2011) for the proposition that laches bars an action in equity.[4] AB at 20.   *CNL-AB LLC*, an action seeking a temporary restraining order, provides that to prove laches, a party must show: "(1) knowledge of a claim by the claimant; (2) unreasonable delay in bringing the claim; and (3) resulting prejudice to the nonmovant." *Id.* at *5.  Defendants' half-hearted argument fails to even come close to satisfying their burden.

Defendants argue that Plaintiffs delayed in pursuing this action and seeking a hearing on their Motion to Expedite. AB at 20.  Defendants are wrong.  Plaintiffs filed their complaint under seal on August 16, 2018 (ID 62357551), seeking advancement pursuant to the Domestic Backpage Entities' LLC Agreements and the Purchase and Loan Documents.[5]  The Motion to Expedite was filed with the complaint.  *Id.*  Summonses for the Domestic Backpage Entities, all of which are

---

[4] Defendants claim that waiver, *res judicata,* and estoppel should preclude this action. AB at 20.  Defendants' conclusory statements, with no argument or legal authority, should be given the treatment they deserve, and be rejected out of hand.

[5] Capitalized terms not defined herein shall have the meaning ascribed to them in the Complaint.

Delaware entities, were issued on August 22 (ID 62371679).  These entities (except Backpage.com LLC) were served with the verified complaint, the summons, and the Motion to Expedite on August 23, 2018 (ID 62380056 - return of service).  Mr. Ferrer is the principal of these entities.[6]

On August 23, 2018, the Defendants were served with a copy of Plaintiffs' proposed public version of the complaint and the requisite notice by first class mail to 2501 Oak Lane Avenue, Suite 700, Dallas TX 75219 and c/o Website Technologies LLC/Posting Solutions LLC, 13601 Preston Road, Suite E801, Dallas TX 75240.  Also on August 23, the notice and proposed public complaint were served on Texas counsel, who now appear for Mr. Ferrer and Backpage.com LLC, by email. Ex. 2.  Texas counsel did not respond to the notice or contact Plaintiffs' counsel to advise that they would be representing any defendant.

Under the Purchase and Loan Documents, each of the non-Delaware entities and Mr. Ferrer consented to jurisdiction in Delaware.  The documents do not, however, expressly provide for an agreed manner of service of process.  Therefore, out of an abundance of caution, Plaintiffs filed a motion pursuant to Court of

---

[6] Mr. Ferrer has identified himself as CEO of "Backpage.com LLC and related entities, including Posting Solutions, Ad Tech BV, UGC Tech Group CV, Website Technologies, LLC Altantische Bedrijven CV, Amstel Holdings, LLC, Lupine Holdings LLC, and Kickapoo River Investments LLC…." Ex. 1.

Chancery Rule 4(d)(7)[7] on August 24, seeking permission to serve the non-Delaware entities and Mr. Ferrer via registered mail, return receipt requested (the "Service Motion") (ID 62381643), which was granted on August 28, 2018 (ID 62390627) (the "Service Order"). The next day, Plaintiffs filed a summons instruction letter requesting that, pursuant to the Service Order, summonses for the non-Delaware defendants be issued (ID 62393019). The summonses were issued on August 30, 2018 (ID 62398546).

Pursuant to the Service Order, on August 31, 2018, Plaintiffs served the non-Delaware defendants with the Complaint for Advancement of Legal Fees & Expenses, Verifications, the summons, SIS, the Motion to Expedite, and the Service Order via registered mail, return receipt requested at 2501 Oak Lane Avenue, Suite 700, Dallas TX 75219 and c/o Website Technologies LLC/Posting Solutions LLC 13601 Preston Road, Suite E801, Dallas TX 75240.[8] The packages sent to the Preston Road address were delivered on September 6, 2018 (Ex. 3). Also pursuant to the Service Order, Plaintiffs served the Complaint for Advancement of Legal Fees & Expenses, Verifications, the summons, SIS, the Motion to Expedite, and the

---

[7] Before the Service Motion could be filed, Plaintiffs had to file a motion requesting permission to file the Service Motion under seal due to concern that Defendants would claim that Plaintiffs violated confidentiality provisions in the Purchase and Loan Documents, which were cited in the Service Motion. The motion to file under seal was filed on August 23 and was granted on August 24, 2018 (ID 62381620).

[8] Packages sent to the Oak Lane Avenue address were returned as "undeliverable".

Service Order via email and FedEx on Texas Counsel on August 31. (Ex. 4). It was not until a week later that Texas Counsel contacted Plaintiffs' counsel to advise that they would be representing the "Backpage Defendants" in this action (Ex. 5). Once defense counsel was identified, a hearing on the motion was scheduled with the Court. Thus, there was no delay in seeking a hearing on the Motion to Expedite and to the extent that there was any delay, it was due to Defendants sitting back and waiting.

As Defendants admit, following their criminal pleas, Mr. Ferrer (or one or more of his entities) demanded return of the Retainers and the RLL Trust Funds. Due to the competing demands for the funds, the law firms are holding the funds pending resolution of the dispute. Thus, the funds have not been available for Plaintiffs' defense counsel—seriously impairing Plaintiffs' ability to defend all the Pending Actions and to engage new counsel as needed. Plaintiffs worked diligently on the complaint in this matter and filed it as promptly as possible under the circumstances. After Defendants blocked Plaintiffs from accessing the funds needed to fund their significant defense costs, and imposing significant financial burdens on Plaintiffs, they should not be heard to complain that Plaintiffs did not commence this action quickly enough.[9]

---

[9] Defendants claim Plaintiffs waited "for nearly half a year." AB at 5. Defendants are again wrong. Mr. Ferrer's letter (Ex. 1) is dated May 1, 2018. This action was filed just over 3 months later.

Importantly, Defendants make no attempt to show prejudice, because they cannot.

### C.   Defendants' claims that expedited proceedings are unnecessary are meritless on their face

Defendants claim that expedited proceedings are not necessary here because two out of the 21 pending proceedings have been stayed.  Defendants ignore the other 19 proceedings, except to say that requests to stay some other proceedings *may* be granted sometime in the future.  Thus, the fact remains that Plaintiffs are subjected to multiple Pending Actions that are not stayed.  Accordingly, Defendants' "stay" argument fails on its face.

Similarly, based on nothing more than a mere hearsay allegation in a pending proceeding, Defendants claim that expedited proceedings are not necessary because Plaintiffs have access to "millions of dollars" from which they can pay for their defense. AB at 19.  This conclusory allegation is insufficient to deny the summary nature of this advancement action—and it also ignores the fact that the government has seized most of Plaintiffs' assets.  Furthermore, Defendants' argument that because they have no funds from which to further advance Plaintiffs' legal expenses, there is no risk of dissipation of assets (AB at 19), misses the point.  The concern here is Plaintiffs' inability to have access to the Retainers and the RLL Trust Funds, not that Defendants will further dissipate their assets.

## II.     The remainder of Defendants' conclusory arguments do not support denial of the Motion to Expedite

The remainder of Defendants' arguments provide no grounds to deny the Motion to Expedite.

Defendants argue that Plaintiffs' claims in this action conflict with an order entered by an Arizona federal court and a Texas state court, and therefore, the Motion to Expedite should be denied (AB at 14).  First, a determination of whether there is a conflict with other court orders (which there is not) must await a determination on the merits.  It is not a ground to deny expedited proceedings. Second, contrary to Defendants' assertion, the orders are not in conflict.

The Texas order **does not** make any finding that the Retainers or the RLL Trust Funds are funds that are to be returned to Defendants, as they assert.   The Order was entered in connection with David Wright Termaine LLP's and Akin Gump Strasuss Hauer & Held LLP's motion to withdraw as counsel to the Backpage.com defendants, but not Medalist Holdings, LLC, Camarillo Holdings, LLC, James Larkin, and Michael Lacey (defendants there and Plaintiffs here).  In response to the motion to withdraw, Defendants (represented by Texas counsel here) argued to disqualify these firms (Ex. 6), despite the fact that they never filed a motion seeking to disqualify or to seek return of the retainers. *See* Ex. 7.  Accordingly, the order granting the motion to withdraw (AB, Ex. C) makes no determination of the right to the funds held by either firm.  It merely provides that counsel "shall meet

10

and confer on a division of the retainer funds held in trust so as not to prejudice Backpage Defendants in this Court." *Id.* The meet and confer took place, but no resolution was reached.

Similarly, the Preliminary Forfeiture Orders (AB, Exs. G and H) ***do not*** determine that the Retainers are property to be forfeited.  The orders define "Forfeited Property" as "[a]ny and all of the ***defendant's rights, title, and interest in and to the property listed***" therein. Ex. G, p. 1, Ex. H, p. 1 (emphasis added).  The retainers at issue here are ***not*** listed in the Orders and, thus, are not affected by the Orders.  Moreover, even if the retainers at issue here were listed in the Orders, the Orders would serve only to extinguish the interests of Mr. Ferrer and certain of the Backpage.com defendants in the retainers—the Orders would not determine the rights of any third-parties to the forfeited assets.

Moreover, even those IOLTA accounts that are identified in the Preliminary Forfeiture Orders are only forfeited to the extent there are assets remaining at the conclusion of the corresponding litigation.  The Orders make clear that the retainer funds "may be withdrawn by counsel solely for the provision of legal services" *See* Ex. G, ¶ D. 1-4, Ex. H, ¶ D. 10-13.  Thus, the Orders themselves belie Defendants' arguments that the funds in the affected firms' retainer accounts have been forfeited.

Defendants claim that the retainers at issue here are subject to "other pending litigation," but then refer to two Perkins Coie accounts and one Paul Hasting

account.  AB at 8-9.  The Perkins Coie accounts are a brokerage account and a Liquid Assets account with an entity other than the law firm, not IOLTA accounts. Plaintiffs' complaint makes no allegations regarding funds held by Paul Hasting, which are not subject to this action, so that account is irrelevant here.  And, with respect to Davis Wright Tremaine, Defendants cite no pending litigation (just an email about an email), and Davis Wright Tremaine continues to hold funds in its trust account.

Defendants also argue that the Motion to Expedite should be denied because the contracts under which Plaintiffs have advancement rights are the subject of one of the criminal proceedings (for which Plaintiffs seek advancement) alleging that they are a part of a criminal scheme.  AB at 3.  First, Defendants are not taking the position that the agreements are unenforceable.  Rather, they again rely on mere hearsay allegations in an underlying action.  Second, an attack on the underlying agreement is not a proper defense in an advancement action. *Trascent Mgt. Consulting, LLC v. Bouri*, 152 A.3d 108 (Del. 2016) (holding that Court of Chancery in an advancement action properly refused to consider defendant's claim that the agreement that provided for advancement was not enforceable because it was fraudulently induced to enter into it).  An agreement that provides for advancement will be enforced and any attack on its validity may be made in a plenary action. *Id.* at 110.  The *Trascent* court stated:

> Sanctioning that defense would undermine the General Assembly's purpose in making advancement proceedings summary in nature, by enabling an employer to engage a key manager on a promise of advancement, and then introduce into summary proceedings for the enforcement of that right, a complicated plenary claim the basis for which will, as in this case, often overlap with the merits of the very claims triggering the manager's advancement rights.

*Id.* Thus, the underlying allegation not properly asserted in this action, let alone a basis to deny expedition.

Finally, Defendants argue that the motion should be denied to protect their Fifth Amendment rights. AB at 5, 16-18. It is not clear what Fifth Amendment rights would be implicated here (as shown above, the validity of the agreements is not at issue). Furthermore, during the time Defendants want to drag out this case, they have access to their retainers to pay their counsel in the actions pending against them. *See* AB, Ex. G, ¶ D and H, ¶ D. Yet, they have denied Plaintiffs access to the retainers to defend themselves (by putting the retainers in dispute) and want to continue that denial. Certainly, such a result is not equitable and is not a basis to deny the Motion to Expedite.

## CONCLUSION

For the reasons stated above, Plaintiffs request that the Motion to Expedite be granted and that trial in this matter be set as soon as reasonably practicable in the Court's calendar.

September 18, 2018                      SMITH, KATZENSTEIN & JENKINS LLP

                                        */s/ Kathleen M. Miller*
                                        Kathleen M. Miller (No. 2898)
                                        Robert K. Beste (No. 3931)
                                        1000 West Street, Suite 1501
                                        Wilmington, DE 19801
                                        (302) 652-8400
                                        kmiller@skjlaw.com
                                        rkb@skjlaw.com

                                        *Attorneys for Plaintiffs*

                                        WORDS: 3,200

**EFiled:  Sep 18 2018 02:33PM EDT**
**Transaction ID 62464668**
**Case No. 2018-0606-SG**

# Exhibit 1

May 1, 2018

*Via Email*
dquigley@rllaz.com

Mr. Daniel J. Quigley
Rusing Lopez & Lizardi, PLLC
6363 N. Swan Road, Suite 151
Tucson, Arizona 85718

Dear Mr. Quigley,

As CEO of Backpage.com LLC and related entities, including Posting Solutions, Ad Tech BV, UGC Tech Group CV, Website Technologies, LLC, Altantische Bedrijven CV, Amstel Holdings, LLC, Lupine Holdings LLC, and Kickapoo River Investments LLC, I respectfully request that you and your firm immediately terminate your representation and immediately return all unused trust funds, which remain the property of Backpage and these entities.

My records indicate that Rusing Lopez & Lizardi PLLC has approximately $4.75 million held in trust for these entities. My request is predicated on my belief that the only reason your firm has this money is to represent Backpage.com and these related entities. If, in fact, this is the case, please return the funds immediately, together with a full accounting of how any funds have been used.

It is my understanding that your firm does not represent me individually or any of the entities I own in any active litigation. Please clarify if that is not the case.

Additionally, as part of the termination of your representation, I request that you immediately return to me all hard disks, files, and other property provided to you during the course of representation.

Sincerely,

Carl Ferrer

CC:   Nanci Clarence, Jonathan Baum

# Exhibit 2

## Patrick T. Carr

| | |
|---|---|
| **From:** | Patrick T. Carr |
| **Sent:** | Thursday, August 23, 2018 12:26 PM |
| **To:** | carl.ferrer@backpage.com; lshosid@bellnunnally.com; mcastillo@curtislaw.net |
| **Cc:** | Kathleen Miller |
| **Subject:** | Camarillo Holdings vs. Amstel River |
| **Attachments:** | 2018-08-23 Plaintiffs' proposed Public Version of Complaint (10456545-2).PDF; 2018 (8-23) Notice of Proposed Public Version of Complaint (10456803).PDF; 2018 (8-23) Court of Chancery Rule 5.1 (10456796).PDF |

Please see the attached communication.



**Patrick Carr  |  Legal Assistant to Robert J. Katzenstein, Kathleen M. Miller, Kelly A. Green and Jennifer M. Rutter**
Smith, Katzenstein & Jenkins LLP  |  The Brandywine Building
1000 West Street, Suite 1501
Wilmington, DE  19801
302.504.1645 Direct  |  302.652.8400 Main
PCarr@skjlaw.com  |  www.skjlaw.com

# Exhibit 3

ALERT: DUE TO HURRICANE FLORENCE, MANY POST OFFICES IN THE PROJECTED PATH HAVE OR WILL SUSPEND OPERATIONS. DELIVER...

# USPS Tracking®

FAQs  ›  (http://faq.usps.com/?articleId=220900)

## Track Another Package  +

**Tracking Number:** 70141200000219225352

Remove ✕

Your item was delivered to the front desk or reception area at 12:37 pm on September 6, 2018 in DALLAS, TX 75240.

## ✅ Delivered

September 6, 2018 at 12:37 pm
Delivered, Front Desk/Reception
DALLAS, TX 75240

Get Updates ∨

| | |
|---|---|
| Text & Email Updates | ∨ |
| Tracking History | ∨ |
| Product Information | ∨ |

See Less ∧

Feedback

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

ALERT: DUE TO HURRICANE FLORENCE, MANY POST OFFICES IN THE PROJECTED PATH HAVE OR WILL SUSPEND OPERATIONS. DELIVER...

# USPS Tracking®

FAQs > (http://faq.usps.com/?articleId=220900)

## Track Another Package +

**Tracking Number:** 70141200000219225246

Remove ✕

Your item was delivered to the front desk or reception area at 12:37 pm on September 6, 2018 in DALLAS, TX 75240.

## ⊘ Delivered

September 6, 2018 at 12:37 pm
Delivered, Front Desk/Reception
DALLAS, TX 75240

Get Updates ⌄

| | |
|---|---|
| Text & Email Updates | ⌄ |
| Tracking History | ⌄ |
| Product Information | ⌄ |

See Less ⌃

Feedback

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

ALERT: DUE TO HURRICANE FLORENCE, MANY POST OFFICES IN THE PROJECTED PATH HAVE OR WILL SUSPEND OPERATIONS. DELIVER...

# USPS Tracking®

FAQs > (http://faq.usps.com/?articleId=220900)

## Track Another Package +

Tracking Number: 70141200000219225413

Remove ✕

Your item was delivered to the front desk or reception area at 12:37 pm on September 6, 2018 in DALLAS, TX 75240.

## ⊘ Delivered

September 6, 2018 at 12:37 pm
Delivered, Front Desk/Reception
DALLAS, TX 75240

Get Updates ⌄

---

Text & Email Updates                                                    ⌄

---

Tracking History                                                        ⌄

---

Product Information                                                     ⌄

---

See Less ⌃

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

FAQs (http://faq.usps.com/?articleId=220900)

Feedback

ALERT: DUE TO HURRICANE FLORENCE, MANY POST OFFICES IN THE PROJECTED PATH HAVE OR WILL SUSPEND OPERATIONS. DELIVER...

# USPS Tracking®

FAQs  ❯  (http://faq.usps.com/?articleId=220900)

## Track Another Package  +

**Tracking Number:** 70141200000219225499

Remove ✕

Your item was delivered to the front desk or reception area at 12:37 pm on September 6, 2018 in DALLAS, TX 75240.

## ✅ Delivered

September 6, 2018 at 12:37 pm
Delivered, Front Desk/Reception
DALLAS, TX 75240

Get Updates ∨

| | |
|---|---|
| **Text & Email Updates** | ∨ |
| **Tracking History** | ∨ |
| **Product Information** | ∨ |

See Less ∧

Feedback

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

ALERT: DUE TO HURRICANE FLORENCE, MANY POST OFFICES IN THE PROJECTED PATH HAVE OR WILL SUSPEND OPERATIONS. DELIVER...

# USPS Tracking®

FAQs > (http://faq.usps.com/?articleId=220900)

### Track Another Package +

Tracking Number: 70141200000219243660

Remove ✕

Your item was delivered to the front desk or reception area at 12:37 pm on September 6, 2018 in DALLAS, TX 75240.

## ⓥ Delivered

September 6, 2018 at 12:37 pm
Delivered, Front Desk/Reception
DALLAS, TX 75240

Get Updates ⌄

| Text & Email Updates | ⌄ |
|---|---|
| Tracking History | ⌄ |
| Product Information | ⌄ |

See Less ⌃

Feedback

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

9/18/2018                                USPS.com® - USPS Tracking® Results

ALERT: DUE TO HURRICANE FLORENCE, MANY POST OFFICES IN THE PROJECTED PATH HAVE OR WILL SUSPEND OPERATIONS. DELIVER...

# USPS Tracking®

FAQs  >  (http://faq.usps.com/?articleId=220900)

### Track Another Package  +

**Tracking Number:** 70141200000219225208

Remove ✕

Your item was delivered to the front desk or reception area at 12:37 pm on September 6, 2018 in DALLAS, TX 75240.

## ⊘ Delivered

September 6, 2018 at 12:37 pm
Delivered, Front Desk/Reception
DALLAS, TX 75240

Get Updates ∨

| | |
|---|---|
| Text & Email Updates | ∨ |
| Tracking History | ∨ |
| Product Information | ∨ |

See Less ∧

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

Feedback

ALERT: DUE TO HURRICANE FLORENCE, MANY POST OFFICES IN THE PROJECTED PATH HAVE OR WILL SUSPEND OPERATIONS. DELIVER...

# USPS Tracking®

FAQs > (http://faq.usps.com/?articleId=220900)

## Track Another Package +

**Tracking Number:** 70141200000219243622

Remove ✕

Your item was delivered to the front desk or reception area at 12:37 pm on September 6, 2018 in DALLAS, TX 75240.

### ⊘ Delivered

September 6, 2018 at 12:37 pm
Delivered, Front Desk/Reception
DALLAS, TX 75240

Get Updates ∨

| Text & Email Updates | ∨ |
| --- | --- |
| Tracking History | ∨ |
| Product Information | ∨ |

See Less ∧

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

Feedback

9/18/2018                                   USPS.com® - USPS Tracking® Results

ALERT: DUE TO HURRICANE FLORENCE, MANY POST OFFICES IN THE PROJECTED PATH HAVE OR WILL SUSPEND OPERATIONS. DELIVER...

# USPS Tracking®

FAQs > (http://faq.usps.com/?articleId=220900)

Track Another Package +

**Tracking Number:** 70141200000219243646                          Remove ✕

Your item was delivered to the front desk or reception area at 12:37 pm on September 6, 2018 in DALLAS, TX 75240.

## ⊘ **Delivered**

September 6, 2018 at 12:37 pm
Delivered, Front Desk/Reception
DALLAS, TX 75240

Get Updates ∨

| Text & Email Updates | ∨ |
|---|---|
| Tracking History | ∨ |
| Product Information | ∨ |

See Less ∧

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

ALERT: DUE TO HURRICANE FLORENCE, MANY POST OFFICES IN THE PROJECTED PATH HAVE OR WILL SUSPEND OPERATIONS. DELIVER...

# USPS Tracking®

FAQs ❯ (http://faq.usps.com/?articleId=220900)

## Track Another Package ✚

**Tracking Number:** 70141200000219225185

Remove ✕

Your item was delivered to the front desk or reception area at 12:37 pm on September 6, 2018 in DALLAS, TX 75240.

## ⊘ **Delivered**

September 6, 2018 at 12:37 pm
Delivered, Front Desk/Reception
DALLAS, TX 75240

Get Updates ⌄

| | |
|---|---|
| **Text & Email Updates** | ⌄ |
| **Tracking History** | ⌄ |
| **Product Information** | ⌄ |

See Less ⌃

Feedback

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

9/18/2018                                USPS.com® - USPS Tracking® Results

ALERT: DUE TO HURRICANE FLORENCE, MANY POST OFFICES IN THE PROJECTED PATH HAVE OR WILL SUSPEND OPERATIONS. DELIVER...

# USPS Tracking®

FAQs ❯ (http://faq.usps.com/?articleId=220900)

## Track Another Package ✛

**Tracking Number:** 70141200000219225437

Remove ✕

Your item was delivered to the front desk or reception area at 12:37 pm on September 6, 2018 in DALLAS, TX 75240.

### ✓ Delivered

September 6, 2018 at 12:37 pm
Delivered, Front Desk/Reception
DALLAS, TX 75240

Get Updates ⌄

| Text & Email Updates | ⌄ |
|---|---|
| Tracking History | ⌄ |
| Product Information | ⌄ |

See Less ⌃

Feedback

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

# Exhibit 4

## Patrick T. Carr

| | |
|---|---|
| **From:** | Patrick T. Carr |
| **Sent:** | Friday, August 31, 2018 3:29 PM |
| **To:** | 'lshosid@bellnunnally.com'; 'mcastillo@curtislaw.net' |
| **Cc:** | Kathleen Miller |
| **Subject:** | Camarillo Holdings, LLC, et al. vs. Amstel River Holdings, LLC, et al. |
| **Attachments:** | 2018-08-31 Letter from Kathleen M. Miller serving Complaint on Foreign Defendants (10457679).PDF; Camarillo Holdings vs. Amstel River.zip |

Dear Counsel:

Please see the attached.



**Patrick Carr  |  Legal Assistant to Robert J. Katzenstein, Kathleen M. Miller, Kelly A. Green and Jennifer M. Rutter**
Smith, Katzenstein & Jenkins LLP |  The Brandywine Building
1000 West Street, Suite 1501
Wilmington, DE  19801
302.504.1645 Direct  |  302.652.8400 Main
PCarr@skjlaw.com  |  www.skjlaw.com

# Exhibit 5

**Patrick T. Carr**

---

**From:** Christopher Harbin <charbin@curtislaw.net>
**Sent:** Friday, September 7, 2018 3:58 PM
**To:** Kathleen Miller <KMM@skjlaw.com>; Robert K. Beste <RKB@skjlaw.com>
**Cc:** Mark Castillo <mcastillo@curtislaw.net>
**Subject:** Camarillo Holdings, et al. v. Amstel River - C.A. No. 2016-0606-SG

Ms. Miller and Mr. Beste:

As you may be aware, Curtis Castillo PC represents the Backpage Defendants in various civil litigations across the country.

We are currently in the process of retaining local counsel in Delaware to represent the Backpage Defendants.  We understand that answers may be due as early as Wednesday, September 12.  Can you confirm that is correct?  Also, in light of our necessity to retain local counsel, we would appreciate the courtesy of a two-week extension as to any answer deadlines.  Please let us know if you are amenable to such an extension.

Best,
Christopher

Christopher L. Harbin
Curtis | Castillo PC
Bank of America Plaza (Main)
901 Main Street, Suite 6515
Dallas, TX 75202

Telephone: 214.752.2222, x116
Facsimile:  214.752.0709
Email: charbin@curtislaw.net
Website: www.curtislaw.net

# Exhibit 6

Case 1:18-cv-01456-LPS   Document 1-4   Filed 09/19/18   Page 344 of 359 PageID #: 1682

FILED
DALLAS COUNTY
9/25/2018 7:08 PM
FELICIA PITRE
DISTRICT CLERK

## CAUSE NO. DC-17-00951

| | | |
|---|---|---|
| **PLAINTIFF XXXXXXXX,** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **Plaintiff** | § | |
| **v.** | § | |
| | § | |
| **MEDALIST HOLDINGS, LLC;** | § | |
| **LEEWARD HOLDINGS, LLC;** | § | **DALLAS COUNTY, TEXAS** |
| **CAMARILLO HOLDINGS, LLC;** | § | |
| **DARTMOOR HOLDINGS, LLC;** | § | |
| **IC HOLDINGS, LLC;** | § | |
| **BACKPAGE.COM, LLC;** | § | |
| **UGC TECH GROUP CV;** | § | |
| **WEBSITE TECHNOLOGIES, LLC;** | § | |
| **ATLANTISCHE BEDRIJVEN CV;** | § | |
| **AMSTEL RIVER HOLDINGS, LLC;** | § | |
| **LUPINE HOLDINGS LLC;** | § | |
| **KICKAPOO RIVER INVESTMENTS,** | § | |
| **LLC;** | § | |
| **CF HOLDINGS GP, LLC;** | § | |
| **CF ACQUISITIONS, LLC;** | § | |
| **CARL FERRER;** | § | |
| **JAMES LARKIN;** | § | |
| **MICHAEL LACEY;** | § | |
| **MICHAEL PHILLIP PATRAKIS;** | § | |
| **AND JOHN DOE 1-5,** | § | |
| | § | |
| **Defendants.** | § | **44th JUDICIAL DISTRICT** |

## BACKPAGE DEFENDANTS' OBJECTION TO MOTION TO WITHDRAW AS ATTORNEYS OF RECORD

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Defendants Dartmoor Holdings, LLC, IC Holdings, LLC, Backpage.com, LLC, UGC Tech Group C.V., Website Technologies, LLC, Atlantische Bedrijven C.V., Amstel River Holdings, LLC, Lupine Holdings LLC, Kickapoo River Investments, LLC, CF Holdings GP, LLC, CF Acquisitions, LLC, and Carl Ferrer (collectively, the "Backpage Defendants"), and

file this *Backpage Defendants' Objection to Motion to Withdraw as Attorneys of Record* (the "Objection"), and in support of said Objection would show the Court the following:

1.      On June 15, 2018, attorneys of record from the law firm Davis Wright Tremaine LLP and attorneys of record from the law firm Akin Gump Strauss Hauer & Feld LLP (collectively, "Movants") filed their Motion to Withdraw as Attorneys of Record for the Backpage Defendants.

2.      There are critical issues that need to be addressed prior to their withdrawal.

3.      The Movants currently hold important property that belongs to the Backpage Defendants. Movants are in possession of the Backpage Defendants' retainer funds, documents, information, and electronic hardware. The Backpage Defendants' property is necessary for their effective representation in this case. It is, therefore, critical that the Backpage Defendants' property be returned prior to the Movants' withdrawal.

4.      Since at least April 24, 2018, the Backpage Defendants (both directly and through counsel) have requested that withdrawing counsel Davis Wright Tremaine ("DWT") (a) immediately account for and return all retainer funds held, and (b) "immediately return all hard disks, files, and other property" to the Backpage Defendants.

5.      The Movants have not returned the Backpage Defendants' property.

6.      Additionally, a one-sided withdrawal by the Movants from representing the Backpage Defendants would be inconsistent with recent rulings made in similar cases.  As stated by Plaintiff's counsel in their own objection to DWT's withdrawal. on June 5, 2018, Judge G. Helen Whitener of the Superior Court in Pierce County, Washington, *sua sponte* disqualified DWT from continuing to represent the "Medalist" defendants after DWT's withdrawal from representing the Backpage Defendants in similar litigation.  Judge Whitener disqualified DWT because she

concluded irreconcilable conflicts of interest exist that would prevent DWT from withdrawing in its representation of some defendants but not others. *See* Plaintiff's Objection at p. 4-6. Similarly, the United States filed a Motion to Disqualify Counsel in pending litigation in the United States District Court for the District of Arizona[1] due to conflicts of interest arising from representing individuals associated with the Backpage and Medalist Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE PREMISES CONSIDERED**, the Backpage Defendants respectfully request that Movants be ordered to return all property, including retainer funds and files, belonging to the Backpage Defendants to the care of their undersigned counsel prior to the granting of the Motion to Withdraw, and that the Court enter an order granting the Backpage Defendants such other relief, whether at law or in equity, to which they have shown themselves entitled.

June 25, 2018

Respectfully submitted,

*/s/ Mark A. Castillo*
Stephanie D. Curtis
State Bar No. 05286800
Mark A. Castillo
State Bar No. 24027795
Christopher Harbin
State Bar No. 24083134
**CURTIS | CASTILLO PC**
901 Main Street, Suite 6515
Dallas, TX 75202
Telephone: 214.752.2222
Facsimile: 214.752.0709
scurtis@curtislaw.net
mcastillo@curtislaw.net
charbin@curtislaw.net

**COUNSEL FOR DEFENDANTS
DARTMOOR HOLDINGS, LLC,
IC HOLDINGS, LLC,
BACKPAGE.COM, LLC, UGC TECH
GROUP CV, WEBSITE**

---

[1] *United States v. Lacey and Larkin*, CR-18-00422-PHX-SPL.

**TECHNOLOGIES, LLC,
ATLANTISCHE BEDRIJVEN CV,
AMSTEL RIVER HOLDINGS, LLC,
LUPINE HOLDINGS LLC, KICKAPOO
RIVER INVESTMENTS, LLC, CF
HOLDINGS GP, LLC, ACQUISITIONS,
LLC, and CARL FERRER**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 25, 2018, a true and correct copy of the foregoing document was served on Movants as listed below by electronic case filing and/or facsimile, in accordance with Rule 21a of the Texas Rules of Civil Procedure.

M. Scott Barnard
sbarnard@akingump.com
Andrew F. Newman
anewman@akingump.com
Molly E. Whitman
mwhitman@akingump.com
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas, 75201-4675
Facsimile: 214.969.4343

**WITHDRAWING COUNSEL
FOR DEFENDANTS**

Robert Corn-Revere (*pro hac vice*)
bobcornrevere@dwt.com
Ronald G. London (*pro hac vice*)
ronnielondon@dwt.com
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Ste. 800
Washington, DC 20006
Facsimile: 202.973.4425

**WITHDRAWING COUNSEL
FOR DEFENDANTS**

Marc C. Lenahan
law@lenahan.com
Thomas B. Cowart
thomas@lenahan.com
Lenahan Law, P.L.L.C.
2655 Villa Creek, Suite 204
Dallas, Texas, 75234

**COUNSEL FOR PLAINTIFF**

Michael T. Pfau
michael@pcvalaw.com
Jason P. Amala
jason@pcvalaw.com
Vincent T. Nappo
vnappo@pcvalaw.com
Pfau Cochran Vertetis Amala P.L.L.C.
911 Pacific Avenue, Suite 200
Tacoma, WA, 98402

**COUNSEL FOR PLAINTIFF**

*/s/ Bryan C. Assink*
Bryan C. Assink

# Exhibit 7

NO. DC-17-00951

| | | |
|---|---|---|
| **PLAINTIFF XXXXXXXX,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| | § | |
| **MEDALIST HOLDINGS, LLC;** | § | |
| **LEEWARD HOLDINGS, LLC;** | § | |
| **CAMARILLO HOLDINGS, LLC;** | § | |
| **DARTMOOR HOLDINGS, LLC;** | § | **DALLAS COUNTY, TEXAS** |
| **IC HOLDINGS, LLC;** | § | |
| **BACKPAGE.COM, LLC;** | § | |
| **UGC TECH GROUP CV;** | § | |
| **WEBSITE TECHNOLOGIES, LLC;** | § | |
| **ATLANTISCHE BEDRIJVEN C.V.;** | § | |
| **AMSTEL RIVER HOLDINGS, LLC;** | § | |
| **LUPINE HOLDINGS LLC;** | § | |
| **KICKAPOO RIVER INVESTMENTS, LLC;** | § | |
| **CF HOLDINGS GP, LLC;** | § | |
| **CF ACQUISITIONS, LLC;** | § | |
| **CARL FERRER;** | § | |
| **JAMES LARKIN;** | § | |
| **MICHAEL LACEY;** | § | |
| **MICHAEL PHILLIP** | § | |
| **PATRAKIS; AND** | § | |
| **JOHN DOE 1-5,** | § | |
| | § | |
| **Defendants.** | § | **44TH JUDICIAL DISTRICT** |

**CONSOLIDATED REPLY TO BACKPAGE DEFENDANTS' OBJECTION,
AND TO PLAINTIFF'S RESPONSE AND OBJECTION, TO THE
<u>MOTION TO WITHDRAW AS ATTORNEYS OF RECORD</u>**

TO THE HONORABLE COURT:

Neither the Backpage Defendants' Objection ("Obj.") nor the Plaintiff's Response and

Objection ("Resp.") present any grounds for staying the Court's hand in granting the undersigned

counsel's Motion to Withdraw as Attorneys of Record for the Backpage Defendants in this case.[1]

---

[1] The "Backpage Defendants" are Backpage.com, LLC, Dartmoor Holdings, LLC, IC
Holdings, LLC, Website Technologies, LLC, Atlantische Bedrijven C.V., UGC Tech Group C.V.,

**REPLY TO OBJECTIONS TO
MOTION TO WITHDRAW**                       1

1.    As set out in the Motion, attorneys of record for the Backpage Defendants from the law firms Davis Wright Tremaine LLP ("DWT") and Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") determined that grounds arose under which they can no longer represent the Backpage Defendants.  This was based on communications from Carl Ferrer (individually and as CEO of Backpage.com, LLC), and Ferrer's and Backpage.com, LLC's actions in other matters, including the criminal action cited in ¶ 6 and note 2 of the Backpage Defendants' Objection.  *See* Mot. 2; *see also id.* (citing Tex. R. Prof'l Cond. 1.06(e)).[2]  DWT and Akin Gump would continue as counsel of record for the Medalist Defendants,[3] as permitted under joint representation agreements entered by Mr. Ferrer and the Backpage Defendants.  *See* Mot. ¶ 2; *see also infra* note 8.

2.    There are no "critical issues that need to be addressed prior to [this] withdrawal," contrary to the Backpage Defendants' claim.  Obj. ¶ 2.  The issues that the Backpage Defendants raise regarding retainer funds, documents, electronic hardware, and so forth, *id.* ¶¶ 3-5, are not properly before this Court and, even if they were, would not be grounds for forcing attorneys to continue as counsel for parties they have determined they can no longer represent consistent with

---

Amstel River Holdings, LLC, Lupine Holdings, LLC, Kickapoo River Investments, LLC, CF Holdings GP, LLC, CF Acquisitions, LLC, and Carl Ferrer.

[2]  Counsel cannot elaborate on the grounds for withdrawal, but could do so in an *in camera* submission if the Court finds that it would be necessary or helpful.  "Documents supporting motions to withdraw as counsel are routinely filed under seal where necessary to preserve the confidentiality of the attorney-client relationship between a party and its counsel."  *Sabre Int'l Security v. Torres Advanced Enter.*, 219 F. Supp. 3d 155, 158 (D.D.C. 2016); *Team Obsolete Ltd. v. AHRMA Ltd.*, 464 F. Supp. 2d 164, 165-66 (E.D.N.Y. 2006) (citing cases).  Other courts confronted with these issues regarding withdrawals from representation of the Backpage Defendants have taken such an approach.  *See*, *e.g.*, *Doe No. 1 v. Backpage.com, LLC et al.*, No. 1:17-cv-11069-LTS, Dkt. 75 (D. Mass. May 16, 2018).  *See also infra* note 8.

[3]  The "Medalist Defendants" are Medalist Holdings, Inc., Leeward Holdings, LLC, Camarillo Holdings, LLC, Michael Lacey, and James Larkin.

**REPLY TO OBJECTIONS TO**
**MOTION TO WITHDRAW**                    2

the Texas Disciplinary Rules of Professional Conduct.[4]  These issues are the subject of ongoing discussions with counsel for the Backpage Defendants; but these communications are privileged and confidential, and simply irrelevant to the issue of withdrawal).[5]  The Court should disregard the references in the Objection to portions of the communications, both because they are not a complete record of the issues, and as this simply is not the right forum to address these issues.[6]

3.      The Backpage Defendants' reference to "recent rulings [] in similar cases," Obj. ¶ 6, seems to be directed to the undersigned's continued representation of the Medalist Defendants, not to the matter currently before the Court, which is the Motion to Withdraw.  Accordingly, it presents no ground for delaying grant of the present Motion.  They refer to *R.O. and K.M. v Medalist Holdings LLC, et al.*, Case No. 17-2-04897-1, in the Superior Court of Pierce County, Washington, where the court "*sua sponte* disqualified DWT from continuing to represent the Medalist [D]efendants."  *Id.* (internal quotation marks omitted).  But the Backpage Defendants neglect to mention that the same court approved DWT's withdrawal as counsel for the Backpage Defendants in that case.  Additionally, the Medalist Defendants intend to appeal the trial court's ruling, as the court made its determination without any motion, briefing or argument.

4.      The Backpage Defendants next cite a motion for disqualification by federal prosecutors in the U.S. District Court in Arizona, in a criminal action involving Backpage.com, where Ferrer entered a plea and will serve as a government witness.  Obj. ¶ 5 (citing *United States v. Lacey, et al.*, No. CR-18-00422-PHY-SPL (D. Ariz. filed Apr. 6, 2018)).  As the Objection's reference

---

[4]   Counsel will, of course, comply with obligations applicable "upon termination of representation."  Tex. R. Prof'l Conduct 1.15(d).

[5]   Regarding the retainer that Backpage Defendants reference in their Objection, here, too, the undersigned are precluded by rules of client confidentiality from relating details, but note that applicable rules of professional conduct preclude release of any retainer at this time.

[6]   And, obviously, the Court has an extremely limited record with respect to them.

**REPLY TO OBJECTIONS TO**
**MOTION TO WITHDRAW**          3

makes clear, in that case, there has only been a motion to disqualify, and responsive briefing.   No

order has yet issued.

5.      Conversely, in multiple other cases in which orders *have* issued, requests by DWT and

other firms to withdraw from representation of the Backpage Defendants have routinely been

granted.[7]   Significantly, in one of those cases, the court ordered an *in camera* submission on the

very same disqualification issue that the Backpage Defendants raise here, *see supra* note 2, and

in the time since the Backpage Defendants filed the instant Objection, that court ruled that DWT

may continue on as counsel for the non-Backpage Defendants.   *See Doe No. 1 v. Backpage.com,*

*LLC et al.*, No. 1:17-cv-11069-LTS, Dkt. 81 (D. Mass. May 16, 2018).   Even more significantly,

the cases where withdrawal was routinely allowed now include a case in Harris County, where

the motion recently was granted over an objection by the Backpage Defendants that was ***iden-***

***tical*** to what they filed here.   *See Jane Doe #4 v. Backpage.com, LLC, et al.*, No. 2018-12747,

Order on Mot. to Withdraw (157th Dist. Ct. Harris Cty., Tex. July 3, 2018).   Simply put, the

undersigned are seeking to withdraw given the circumstances and their professional respon-

sibilities, and there is no motion for disqualification before the Court.[8]

---

[7]   *See*, *e.g.*, *Rodgers v. Backpage.com, LLC et al.*, No. CV-2017- 900041.00, Dkt. 362 (Cir. Ct. Houston Cty., Ala. May 18, 2018); *Doe v. Medalist Holdings, Inc.*, No. MCC170068 (Super. Ct. Riverside Cty., Cal. July 3, 2018); *Fla. Abolitionist et al. v. Backpage.com, LLC et al.*, No. 6:17-cv-00218-JA-TBS, Dkt. 103 (M.D. Fla. May 14, 2018); *Doe No. 1 v. Backpage.com*, No. 1:17-cv-11069-LTS, Dkt. 81 (D. Mass. June 29, 2018); *Kocher v. Hilton Worldwide Holdings, Inc.*, No. 3:18-cv-00449-SB (D. Ore. Arp. 26, 2018 & May 9, 2018); *O.L. v. Backpage.com, LLC et al.*, No. 13-2-13382-8 (Super. Ct. Pierce Cty., Wash. May 14, 2018) (notice of withdrawal effective date).   *Cf. Backpage.com, LLC v. Dart*, No. 15-cv-06340, Dkt. 228 (N.D. Ill. Apr. 26, 2018); *Backpage.com, LLC v. Hawley*, No. 18-1096, (8th Cir. May 15, 2018); *Backpage.com, LLC v. Hawley*, No. 4:17-cv-01951-PLC, Dkt. 69 (E.D. Mo. July 10, 2018).

[8]   Nor would the Backpage Defendants have grounds to bring such a motion, given their undertakings in joint representation agreements to which the Medalist Defendants are also parties (and which are privileged and cannot be further discussed except through *in camera* submission).

6.     That remains the case despite the fact that Plaintiff has lodged an objection addressed solely to disqualification.   Resp., *passim*.   This is improper in a response to a motion to withdraw.   A party must file a ***motion*** to disqualify in order to argue for disqualification of another party's representation.   *NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 399 (Tex. 1989) ("A motion to disqualify counsel is the proper procedural vehicle to challenge an attorney's representation" and "trial courts must strictly adhere to an exacting standard when considering such motions."); *see also Spearman v. Morris*, No. 15-13-00690-CV, 2014 WL 1018354, at *3 (Tex. App.—Dallas Feb. 27, 2014, pet. denied) (mem. op.) (appellant waived any potential grounds to disqualify opposing counsel by raising only in his answer and not filing a motion).   Clearly, Plaintiff's Response does not qualify as a motion to disqualify, and this issue is not before the Court at this time.[9]   Accordingly, this Court should disregard any request for disqualification contained in Plaintiff's Response, and grant the Motion to Withdraw.

WHEREFORE, the undersigned attorneys of record for the Backpage Defendants from Davis Wright Tremaine LLP and Akin Gump Strauss Hauer & Feld LLP request that the Court grant the Motion to Withdraw.

---

[9]   Even if Plaintiff had styled her Response to also move for disqualification—which she has not—the Response does not contain the Certificate of Conference that this Court and the Local Rules of Dallas County require, and indeed, Plaintiff has not conferred with counsel on this point.   Dallas Cty. Loc. R. 2.07.

**REPLY TO OBJECTIONS TO**
**MOTION TO WITHDRAW**                          5

Respectfully submitted,

*/s/ M. Scott Barnard*
M. Scott Barnard
Texas State Bar No. 24001690
sbarnard@akingump.com
Andrew F. Newman
Texas State Bar No. 24060331
anewman@akingump.com
Molly E. Whitman
Texas State Bar No. 24081990
mwhitman@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas  75201-4675
Telephone:      (214) 969-2800
Facsimile:      (214) 969-4343

-and-

Robert Corn-Revere (pro hac vice)
bobcornrevere@dwt.com
Ronald G. London (pro hac vice)
ronnielondon@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Ste. 800
Washington, DC  20006
Telephone :     (202) 973-4225
Facsimile :     (202) 973-4425

**ATTORNEYS FOR DEFENDANTS
MEDALIST HOLDINGS, INC., LEEWARD
HOLDINGS, INC., CAMARILLO HOLDINGS,
LLC, DARTMOOR HOLDINGS, LLC, IC
HOLDINGS, LLC, BACKPAGE.COM, LLC,
UGC TECH GROUP CV, WEBSITE TECH-
NOLOGIES, LLC, ATLANTISCHE
BEDRIJVEN C.V., AMSTEL RIVER
HOLDINGS, LLC, LUPINE HOLDINGS LLC,
KICKAPOO RIVER INVESTMENTS, LLC,
CF HOLDINGS GP, LLC, CF ACQUISITIONS,
LLC, CARL FERRER, MICHAEL LACEY
AND JAMES LARKIN**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing has been served upon the following counsel of record on this 19th day of July, 2018:

Annie McAdams
annie@mcadamspc.com
Scott McElmore
scott@mcadamspc.com
ANNIE MCADAMS PC
1150 Bissonnet
Houston Texas 77005

David E. Harris
dharris@shhblaw.com
Louie J. Cook
lcook@shhblaw.com
SICO HOELSCHER HARRIS & BRAUGH LLP
802 N. Carancahua, Suite 900
Corpus Christi, Texas  78401

Backpage Defendants
Carl Ferrer
Chief Executive Officer
Backpage.com LLC
2501 Oak Lawn Ave.
Dallas, TX 75240
(602) 206-9506

Mark Castillo
Curtis Castillo PC
Bank of America Plaza
901 Main St., Ste. 6515
Dallas, TX 75202
(214) 752-2222


*/s/ Molly E. Whitman*
Molly E. Whitman


**REPLY TO OBJECTIONS TO
MOTION TO WITHDRAW**          7

**EFiled:  Sep 18 2018 02:33PM EDT**
**Transaction ID 62464668**
**Case No. 2018-0606-SG**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2018, a true and correct copy of the

foregoing **Plaintiff's Reply in Support of their Motion for Expedited**

**Proceedings** was served on the following by File & ServeXpress:

> Chipman Brown Cicero & Cole, LLP
> Paul D. Brown, Esq.
> Joseph B. Cicero, Esq.
> 1313 N. Market Street, Suite 5400
> Wilmington, Delaware 19801


> */s/ Kathleen M. Miller*
> Kathleen M. Miller (ID No. 2898)



**EFiled: Sep 18 2018 02:33PM EDT**
**Transaction ID 62464668**
**Case No. 2018-0606-SG**

September 18, 2018

## VIA E-FILE & FEDERAL EXPRESS

The Honorable Sam Glasscock, III
Court of Chancery
34 The Circle
Georgetown, DE 19947

> **Re:** *Camarillo Holdings, LLC, et al. v. Amstel River Holdings, LLC, et al.*
> **C.A. No. 2018-0606-SG**

Dear Vice Chancellor Glasscock:

Enclosed are courtesy copies of the following documents, all of which were

filed today, September 18, 2018:

1. Plaintiff's Reply in Support of their Motion for Expedited Proceedings;

2. Exhibits 1-7; and

3. Certificate of Service.

A telephonic hearing on the Motion to Expedite has been set for September

20, 2018 at 10:00 a.m.

Respectfully,

Kathleen M. Miller (ID No. 2898)
kmiller@skjlaw.com

WORDS: 54

Enclosure

The Honorable Sam Glasscock, III
Page 2 of 2
September 18, 2018


CC:   Paul D. Brown, Esq. (by e-file w/o enclosure)
      Joseph B. Cicero, Esq. (by e-file w/o enclosure)

**EFiled:  Sep 19 2018 11:01AM EDT**
**Transaction ID 62468274**
**Case No. 2018-0606-SG**

**CHIPMAN BROWN
CICERO & COLE**

**DELAWARE | NEW YORK**

CHIPMAN BROWN CICERO & COLE, L
HERCULES PLA
1313 N. MARKET STREET, SUITE 5400
WILMINGTON, DELAWARE 19801
WWW.CHIPMANBROWN.COM

PAUL D. BROWN
(302) 295-0194
BROWN@CHIPMANBROWN.COM

September 19, 2018

**VIA E-FILING & HAND DELIVERY**

Vice Chancellor Sam Glasscock, III
Court of Chancery of Delaware
34 The Circle
Georgetown, DE 19947

   Re: ***Camarillo Holdings, LLC, et al.***
     ***v. Amstel River Holdings, LLC, et al.***
     **C.A. No. 2018-0606-SG**

Dear Vice Chancellor Glasscock:

  Enclosed please find two copies of *Defendants Carl Ferrer's and Backpage.com, LLC's Opposition to Plaintiffs' Motion To Expedite Proceedings*, which was filed electronically on September 14, 2018.

      Respectfully,

      */s/ Paul D. Brown*

      Paul D. Brown (#3903)
      WORDS:  27

Enclosures
cc: Kathleen M. Miller, Esq. (via e-filing)
  Robert K. Beste III, Esq. (via e-filing)